UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| SWEPI LP, a Delaware | ) | |
| Limited Partnership, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No.: 1:14:cv-00035 |
| | ) | JB/SCY |
| MORA COUNTY, NEW MEXICO; | ) | |
| MORA COUNTY BOARD OF COUNTY | ) | |
| COMMISSIONERS, PAULA A. GARCIA, | ) | |
| Mora County Commissioner; | ) | |
| JOHN P. OLIVAS, Mora County | ) | |
| Commissioner; and ALFONSO J. GRIEGO, | ) | |
| Mora County Commissioner, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LA MERCED DE SANTA GETRUDIS DE LO | ) | |
| DE MORA, a Land Grant; and | ) | |
| JACOBO PACHECO, an individual, | ) | |
| | ) | |
| Intervenor Defendants | ) | |

**INTERVENOR DDEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS**

**TABLE OF CONTENTS**

I.   Summary of the Argument……………………………………………………………...4

II.  Factual and Procedural History……………………………………………………5

III. Standard for Motion to Dismiss…………………………………………………...........6

*Argument*

IV.  Intervenors are entitled to dismissal of this action because the people of Mora County possess the inherent and constitutional right of local, community self-government, and the Plaintiff SWEPI's assertion of corporate constitutional "rights" violates that right………………………………………………………………………7

   A.  Community self-government is the well-settled foundation of the American system of constitutional law……………………………………………………7

      1.  Community self-government was the foundation of the early American colonies…………………………………………………9
      2.  Community self-government is the foundation of American constitutional law …………………………………………… 11
      3.  Denial of the right of community self-government was the cause of the American Revolution………………………………13
      4.  Community self-government is the foundation of the Declaration of Independence …..................................................17
      5.  Community self-government is the foundation for state constitutions…………………………………………………20
      6.  The Treaty of Guadalupe Hidalgo, New Mexico Enabling Act, and New Mexico Constitution guarantee the right of local, community self-government to the people of Mora County…  21
      7.  The U.S. Constitution guarantees the right of local, community self-government to the people of Mora County……………… 23
      8.  The Mora County Community Water Rights and Local Self-Government Ordinance too now secures the right of local, community self-government for the people of Mora County….27

   B.  Corporate constitutional "rights" unconstitutionally infringe the people's right of local, community self-government……………………………………27

      1.  Business corporations are chartered by state governments as subordinate entities………………………………………… 28
      2.  Over the past 150 years, the judiciary has "found" corporations within the U.S. Constitution and bestowed constitutional rights upon them…………………….....................................30

        3.   Corporations routinely use constitutional "rights" to deny communities their right of self-governance…………………33

V.  The Ordinance is a lawful exercise of the right of local, community self-government, and Plaintiff's claims must fail by operation of it………………………………………..35

    A.   The Ordinance codifies political and civil rights for the people of Mora County.35
    B.   The Ordinance bans corporate oil and gas extraction to protect the peoples' fundamental civil rights……………………………………………………………37
    C.   The Ordinance alters local government in Mora County by eliminating corporate constitutional "rights" which would otherwise render the County incapable of protecting the peoples' fundamental political and civil rights…………………..38

VI. Conclusion…………………………………………………………………………40

## I.       SUMMARY OF THE ARGUMENT

The right of local, community self-government is a fundamental, individual political right
– exercised collectively – of people to govern the local communities in which they reside.

The right includes three component rights – first, the right to a system of government
within the local community that is controlled by a majority of its citizens; second, the right to a
system of government within the local community that secures and protects the civil and political
rights of every person in the community; and third, the right to alter or abolish the system of
local government if it infringes those component rights.

The right of local, community self-government is inherent and inalienable. It derives
necessarily from the fundamental principle that *all* political power is inherent in the people, is
exercised by them for their benefit, and is subject to their control. The right is secured by the
New Mexico Constitution, the American Declaration of Independence, and the United States
Constitution. Because the right is inherent and inalienable, no government can define, diminish,
or otherwise control it.

State governments have created a variety of local governmental bodies, both incorporated
and unincorporated, for administration of state policy locally, and for conduct of municipal
affairs. While States typically delegate specific governmental powers to such local governments
- and limit their powers otherwise - state authorized powers of such local governments are
distinct and apart from the people's right of local, community self-government. The peoples'
right is not dependent upon state delegation, and so, cannot be diminished by limitations placed
on local governments by other governments.

This means that local communities, when exercising the people's right of local,
community self-government, are not subject to constraints on local lawmaking imposed by state

and federal governments. Such constraints include the conferral of constitutional rights onto corporations, when those "rights" compete with people's civil and political rights.

## II.    FACTUAL AND PROCEDURAL HISTORY

Plaintiff Swepi, filed their Complaint in this action on January 10, 2014, and the County of Mora was served on January 27, 2014. Doc.1 Defendant Mora County requested, and was granted, a three week extension to file an Answer, and that Answer had not been filed when Intervenors, the Mora Land Grant, and Mora citizen Jacobo Pacheco filed their Motion for Intervention on  and their Memorandum in support on March 6, 2014. Doc. 6. The Plaintiff opposed the Intervention, but the Defendants did not. On March 20, 2014, the Plaintiff filed his Response in Opposition to Intervention. Doc. 12. On April 4, 2014 the Intervenors Filed their Reply Brief. Doc.13 On November 3rd this Court heard oral argument on the Intervention Motion. Doc.54 and on November 18th Intervenors filed their Supplemental Argument in Support of Intervention. Doc. 56. On Dec. 5, 2014 this Court entered its Order allowing Intervention. Doc. 59.

On Dec. 15th, 2014 the former Intervenors and now Defendants Mora Land Grant and Mora citizen Jacobo Pacheco filed their Motion to Dismiss (Doc. 66). At oral argument on Dec. 19th the Court asked counsel if he was ready to argue the Motion to Dismiss and Counsel indicated he wanted additional time and counsel's best recollection is that he expressed an intent to file a Brief in support of the Motion to Dismiss prior it to being argued on Feb. 4, 2015, the date set by the Court. (Counsel does not have the transcript of that hearing.) Counsel has been working on this Brief since the Court set the hearing date for Feb. 4, 2015 and intended to file the Brief as soon as possible after the court date. On January 2, 2015 the Defendants' filed their

Response to the Intervenors Motion to Dismiss Doc .71 arguing essentially that the Motion

should be denied because no authority was attached.

Jacobo Pacheco and Mora Land Grant are asking this Court in the  Motion to Exceed

Page Limitations to file this Memorandum in Support of their Motion to Dismiss in excess of 24

pages and raising issues not directly included in the Plaintiff's Response. Doc. 72

### III. STANDARD FOR MOTION TO DISMISS

A Motion to Dismiss should be granted when there is no material issue of fact and the

party is entitled to judgment as a matter of law. *Park Univ. Enters. V. Am Cas. Co., 442 F.3d*

*1239, 1244 (10*[th] *Cir. 2006*)

In the present instance Plaintiff is basing his claim on his status as a corporation with

constitutional rights. Defendants assert and we must assume for purposes of this Motion that

Plaintiff's allegations are taken as true and that Plaintiff is a corporation with valid and valuable

leases in Mora County, and has an intent to develop those leases, and but for the challenged

Ordinance it would be utilizing those leases by drilling in Mora County. The people of Mora

County have the inherent and constitutional right of local, community, self government including

the right to pass reasonable laws to protect their air, land, water, environment, and health and

safety. They have passed the "Mora County Community Water Rights and Local Self-

Government Ordinance ("Ordinance") based on these rights.  The Complaint fails because the

actions sought to be carried out by Plaintiff and on which his Complaint is based violate this

legally valid and constitutional ordinance. There are no factual issues in dispute for purposes of

this Motion to Dismiss and the defendants have established as a matter of law that their Motion

should be granted.

**IV.      The Intervenors are entitled to dismissal of this action because the people of
Mora County possess the inherent and constitutional right of local, community self-**

**government, and the Plaintiff SWEPI's assertion of corporate constitutional "rights" violates that right.**

The people of Mora County's natural, inherent, and inalienable right of local, community self-government is embedded in, and secured by, our constitutional structure.[1] *See Indiana ex rel. Holt v. Denny*, 118 Ind. 449, 457-75, 21 N.E. 274 (1889) (recognizing an inherent right of local self-government embedded in the constitutional structure). It is secured by the history of the founding of the United States, the American Declaration of Independence, the U.S. Constitution, the New Mexico Constitution, and the Mora County Ordinance.

The constitutional right of the people of Mora County to govern themselves is infringed by the existence and enforcement of corporate constitutional "rights." Because SWEPI seeks to enforce that doctrine in ways that violate the constitutional right of the people of Mora County to local, community self-government, the Intervenors are entitled to dismissal of this action.

**A. Community self-government is the well-settled foundation of the American system of constitutional law.**

The Supreme Court has declared that "when considering whether a right is a fundamental right, the court [must] look to whether it is a right "deeply rooted in this nation's history and tradition." *Griswold v. Connecticut*, 381 U.S. 479, 493 (1965) (Brennan, J., concurring) (courts look to "traditions and (collective) conscience of our people to determine whether a principle is so rooted" there "as to be ranked as fundamental.") (citations omitted); *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1997) ("Appropriate limits on substantive due process come not from drawing arbitrary lines but rather from careful 'respect for the teachings of history (and), solid recognition of the basic values that underlie our society'") (*quoting Griswold*, 381 U.S. at 501 (Harlan, J., concurring)).

---

[1] This section of the brief contains a lengthy historical discussion atypical of most court filings.

The right of community self-governance is deeply rooted in our nation's history and tradition. Communities within the early American colonies were founded on the people's authority to govern themselves. From the Mayflower Compact to the conflagration of the American Revolutionary War and the ratification of the United States Constitution, no principle has been more seminal than that of the people's sovereignty, and no right more fundamental than the right of local, community self-government. *Cf. Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (declaring that "[o]ur Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decisionmaking" that direct the court's recognition and enforcement of constitutional guarantees) (citation omitted).

The colonists' struggle with British rule illustrates how community self-government took shape as the foundation of the American system of constitutional law. The colonists' efforts culminated in the Declaration of Independence, which codified the principles of local self-government that had been forged by American settlements since the 1600s. In adopting the Declaration of Independence, in 1776, the Second Continental Congress made clear that a government's power originates from the people, and that the people have the right to alter their system of government to protect their "Life, Liberty . . . Safety and Happiness":

> We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. — That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed, — *That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness.*

AMER. DECL.OF IND. at ¶ 2 (emphasis added).

The violation of this right, enumerated in the Declaration as the first grievance against the British Empire, justifying severance from its rule, read "HE has refused his Assent to Laws, the most

wholesome and necessary for the public Good." *Id*. at ¶ 3. Since there were neither states, nor a national government at the time, the grievance constitutes a complaint against the denial of the colonists' right to local, community self-government.

> **1. Community self-government was the foundation of the early American colonies.**

The concept of community self-government in America dates back to the Mayflower Compact, adopted in 1620, over a hundred and fifty years before Thomas Jefferson codified the principles of local self-government in the national Declaration of Independence.[2] The Mayflower Compact was the first constitution of its kind to be written by the American colonists, and it set the stage for an understanding of government that represented a dramatic departure from European rule. In one paragraph, the original colonists dismantled the old system of government—based on royal authority—and forged a new one based purely on the political sovereignty of the people themselves. They declared:

> [W]e covenant and combine ourselves together into a civil body politic, for our better ordering, and preservation, and furtherance of the ends aforesaid; and by virtue hereof to enact, constitute, and frame, such just and equal laws, ordinances, acts, constitutions, and offices, from time to time, as shall be thought most meet and convenient for the general good of the colony.[3]

Far from being unusual, such early American concepts of community self-government— that people possessed the authority to create, control, and change their own governing systems— were the norm. In the 1620s, early colonists founded settlements in New Hampshire that became the Towns of Portsmouth and Dover. Both were "wholly self-ruled," and Dover's inhabitants

---

[2] McQuillan, A TREATISE ON THE LAW OF MUNICIPAL CORPORATIONS, Vol. 1 at 152 (1911) ("in this country from the beginning, political power has been exercised by citizens of the various local communities as local communities, and this constitutes the most important feature in our system of government.").
[3] The Mayflower Compact at ¶ 2 (http://en.wikipedia.org/wiki/Mayflower_Compact) (accessed November 10, 2014).

self-organized themselves into a "body politic … with all such laws as shall be concluded by a major part of the Freemen of our Society." In 1639, the settlers of Exeter, New Hampshire, created their own government, declaring in the Exeter Compact that we "combine ourselves together to erect and set up among us such Government. . . according to the libertyes of our English colony of Massachusetts." Lutz, ed., COLONIAL ORIGINS OF THE AMERICAN CONSTITUTION: A DOCUMENTARY HISTORY 3 (1998).

People in towns, villages, and colonies also joined with people from other areas to create broader levels of government to further secure their right to community self-government. For example, on January 14, 1639, people from the Connecticut Towns of Windsor, Hartford, and Wethersfield joined together to adopt the Fundamental Orders of Connecticut, the first written state constitution in America, which created a compact securing the right of self-government within those Towns.[4] And in 1643, the people of various towns and colonies joined together to create the United Colonies of New England, approving Articles of Confederation for the United Colonies which declared that the people of each plantation, town, and colony shall have "exclusive jurisdiction and government within their limits," thereby securing their authority to self-govern locally.[5]

Judge Eugene McQuillan, author of a seminal treatise on the law of municipal corporations, explained that those communities constituted "miniature commonwealths. . . [with] the solid foundation of that well-compacted structure of self-government." McQuillan, A

---

[4] *See* the Avalon Project at Yale Law School, Fundamental Orders of 1639 (http://avalon.law.yale.edu/17th_century/order.asp) (accessed November 8, 2014).
[5] *See* the Avalon Project at Yale Law School, the Articles of Confederation of the United Colonies of New England, May 19, 1643 (http://avalon.law.yale.edu/17th_century/art1613.asp) (accessed November 8, 2014). Others proceeding to create self-governing jurisdictions included the Popham Colony in present-day Maine, the Saybrook Colony of present-day Connecticut, and the colonies of New Haven, New Netherland, East Jersey, West Jersey, and the Province of Carolina, among many others.

TREATISE ON THE LAW OF MUNICIPAL CORPORATIONS, Vol. 1 at 144 (1911). Thus, the early American colonies were replete with constitutions, compacts, and agreements reflecting that uniquely self-organizing American form of government, one in which the people of those communities possessed the unabridged (and sovereign) right to create, control, and change their systems of governance.[6] *Id. at* 384–85 ("[T]he people of the various organized communities exercise their rights of local self-government under the protection of these fundamental principles which were accepted, without doubt or question. . .").

### 2.  Community self-government is the foundation of American constitutional law.

While Great Britain tolerated the colonists' self-rule in the interests of efficiency, it believed that final authority over governing matters lie with the British king and parliament. Clashes between these two theories of government—of the right of the American people to create, manage, and alter their systems of government as they saw fit; and the "right" of the British government to manage the colonies—were commonplace in the period leading up to the

---

[6] An English writer in the middle of the nineteenth century explained how the freedom of a society correlates with the strength of local government: "There are two elements to which every form of Government may be reduced. These are LOCAL SELF-GOVERNMENT on the one hand, and CENTRALIZATION on the other. According as the former or the latter of these exists more or less predominant, will the state of any nation be the more or less free, happy, progressive, truly prosperous, and safe…. LOCAL SELF-GOVERNMENT is that system of Government under which the greatest number of minds, knowing the most, and having the fullest opportunities of knowing it, about the special matter in hand, and having the greatest interest in its well-working, have the management of it, or control over it. CENTRALIZATION is that system of Government under which the smallest number of minds, and those knowing the least, and having the fewest opportunities of knowing it, about the special matter in hand, and having the smallest interest in its well-working, have the management of it, or control over it." Smith, Joshua Toulmin, LOCAL SELF-GOVERNMENT AND CENTRALIZATION 11, 12 (1851).

Revolutionary War.[7] Such clashes led to the development of the doctrine of community self-government as constitutional law, and, inevitably, to revolutionary conflict.

In 1760, colonial lawyer James Otis, Jr. first used the right of community self-government as a constitutional doctrine when he represented colonial merchants in a direct challenge to Great Britain's authority to adopt "writs of assistance". Miller, ORIGINS OF THE AMERICAN REVOLUTION 46 (1962). The writs allowed British authorities to enter any colonist's residence without advance notice or probable cause. Otis argued that the writs were invalid because they had been adopted only by the British parliament, and not by the people of the colonies. Otis' thesis—that the people themselves were the only rightful lawmaking authority—was the first articulation of community self-government as a legal and constitutional doctrine within the colonial context. Beach, SAMUEL ADAMS: THE FATEFUL YEARS 1764-1776 55 (1965). Otis' work, entitled *The Rights of the British Colonies Asserted and Proved,* placed the right of local self-government (including the right to alter any system of governance that undermines that right) at the heart of the patriots' struggle. In his pamphlet he explained:

> There is no one act which a government can have a right to make that does not tend to the advancement of the security, tranquility, and prosperity of the people…. The form of government is by nature and by right so far left to the individuals of each society that they may alter it from a simple democracy or government of all over all to any other form they please….

*See* Kurland and Lerner, eds., THE FOUNDERS' CONSTITUTION, Vol. 1, Chap. 13, Doc. 4 (1987).

---

[7] Foreshadowing the American Revolutionary War, there were no fewer than a dozen armed peoples' revolts against British rule between 1676 and the 1760's. As with the Revolutionary War, almost all were triggered by British efforts to strip the colonists of self-governing authority. They included Bacon's Rebellion of 1676 (driven by the royal governor's refusal to implement measures adopted by the Virginia legislature); Culpeper's Rebellion of 1677 (evicting the proprietary government of Carolina due to the collection of a British-imposed tobacco duty); the Boston Revolt of 1689 (imprisoning the royal governor and re-establishing an earlier form of representative government); and the Mast Tree Riot of 1734 (against the royal government's prohibition on colonial use of mature pine trees used by the English navy for masts). Miller, ORIGINS OF THE AMERICAN REVOLUTION 38 (1962).

### 3. Denial of the right of community self-government was the cause of the American Revolution.

The British parliament's denial of the right of local, community self-government was the cause of the American Revolution.  In Boston, which would become the epicenter of the American Revolution, a concerted movement—to replace British rule with a system of governance premised on community self-government—began in 1764. That year, the British parliament passed the Currency Acts to remove colonial legislative control over issuing currency. In response, the people of the Town of Boston, through their Town Meeting[8], voted to establish the first, temporary Committee of Correspondence. The Committee was tasked with informing the public about the Currency Acts, along with building public support for repeal. Maier, FROM RESISTANCE TO REVOLUTION 216 (1972).  Other towns formed similar committees. *See* Miller, ORIGINS OF THE AMERICAN REVOLUTION 124-26 (1962).

"Stamp Act Riots" against British authority ensued. In 1765, the Stamp Act Congress issued a "Declaration of Rights and Grievances," which focused on the Currency and Stamp Acts' violation of the colonial right to local self-government. The Stamp Act Congress argued that the Currency Act's removal of monetary policy from the colonists, and the Stamp Act's removal of tax policy, violated the people's right of local self-government.  *See* JOURNAL OF THE FIRST CONGRESS OF THE AMERICAN COLONIES 29-31 (1845).

The British Parliament retaliated by adopting the "American Colonies Act," which rejected the colonists' authority to self-govern locally. It proclaimed that Parliament "had hath,

---

[8] The Boston Town Meeting was a regular event to which all of the people of Boston were invited to discuss, and vote upon, issues important to Bostonians. The Town Meeting form of government, unique to New England, continues today. All New England Towns hold an annual Town Meeting (and special Town Meetings in between) to vote on resolutions and laws proposed by residents. Current Massachusetts law recognizing the form and structure of those Town Meetings can be found at Chapter 43-A of the General Laws of the Commonwealth of Massachusetts.

and of right ought to have, full power and authority to make laws and statutes of sufficient force and validity to bind the colonies and people of America . . . in all cases whatsoever." Maier, FROM RESISTANCE TO REVOLUTION 145 (1972). In response, the colonists attacked the Act as "inconsistent with the natural, constitutional and charter rights and privileges of the inhabitants of this colony." Kruman, BETWEEN AUTHORITY AND LIBERTY: STATE CONSTITUTION MAKING IN REVOLUTIONARY AMERICA 12 (1997).

Over the next decade, Parliament continued to assert taxation authority over the colonists, and the American people continued to assert their right of community self-governance. In 1772, the people of Boston voted to establish the first permanent Committee of Correspondence in the colonies, tasking it with proclaiming "the rights of the colonists. . . [and] to communicate and publish the same to the several towns in this province and to the world as the sense of this town." Miller, ORIGINS OF THE AMERICAN REVOLUTION 329-30 (1962). People in hundreds of towns and villages formed committees to coordinate responses to Parliamentary actions. *Id.*

Also in 1772, frontier settlers living along the Watauga and Nolichucky Rivers, in the eastern part of what would become the state of Tennessee, joined together to become the Watauga Association—the first independent constitutional government in America. After negotiating a ten-year lease with the Cherokee, the settlers unanimously adopted the Articles of the Watauga Association, establishing a local government system, a five-member court, a courthouse, and a jail.  President Theodore Roosevelt declared that "the Watauga settlers outlined in advance the nation's work. They bid defiance to outside foes and they successfully solved the difficult problem of self-government." Dickinson, "Watauga Association," TENNESSEE ENCYCLOPEDIA OF HISTORY AND CULTURE (2002).

In May 1773, Parliament adopted the Tea Act, allowing the East India Company to sell, for the first time, surplus tea directly to people in the colonies. Purchase of the English tea, and the payment of parliamentary taxes along with it, was viewed as an effort to weaken colonial opposition to parliamentary taxation, and thus to weaken colonial claims to the right of local self-government. Maier, FROM RESISTANCE TO REVOLUTION 275-78 (1972). But the colonists rebelled, resulting in the Boston Tea Party, as well as similar Tea Parties hosted by the people of other towns and villages.

To punish the colonists for their opposition to the Tea Act, Parliament adopted a series of laws known as the "Intolerable Acts" or "Coercive Acts." These sought to nullify completely certain types of colonial self-government.[9] For instance, the British-imposed Massachusetts Government Act sent a clear signal that Great Britain would not tolerate local self-government in the colonies. Miller, ORIGINS OF THE AMERICAN REVOLUTION 369-70 (1962). Long seen as a model for local, community self-government, Massachusetts's law had given people wide latitude to make local governing decisions.[10]

The goal of the Massachusetts Government Act was to displace the various legislative mechanisms of local self-government by expanding the royal governor's powers. British officials believed that their inability to control the people of Massachusetts was directly attributable to the

---

[9] The Acts included the Quebec Act (stripping the people of Quebec of most governing authority, it was seen as a parliamentary model for future treatment of the colonists); the Administration of Justice Act (requiring trials of certain British officers to occur in British courts, removing the jurisdiction of colonial courts over them); the Massachusetts Government Act (banning Town Meetings without the consent of the royal Governor, and canceling part of the Colony's original Charter by eliminating the authority of the colonial assembly to elect the Executive Council); and the Quartering Act (requiring the colonies to provide housing for British soldiers over the refusal of the assemblies of several states to do so).

[10] The 1691 Charter for the Massachusetts Bay Colony provided that all residents of the Colony "shall have and enjoy all liberties and immunities of free and natural subjects. . . as if they and every one of them were born within this our realm of England." Beach, SAMUEL ADAMS: THE FATEFUL YEARS 1764-1776 48 (1965).

highly independent nature of its local governments and the operation of the Town Meeting at the community level. The Act required that each "agenda item at every town meeting in Massachusetts. . . be submitted in writing to the governor and meet with his approval. . . No meeting could be called without the prior consent of the governor." Raphael, THE FIRST AMERICAN REVOLUTION BEFORE LEXINGTON AND CONCORD 50 (2011). As Lord North explained to Parliament, the purpose of the Act was "to take the executive power from the hands of the democratic part of government." Christie and Labaree, EMPIRE OR INDEPENDENCE, 1760-1776 188 (1976). The royal governor eventually used the Act to dissolve the Massachusetts Assembly completely.

The people of Massachusetts rebelled against this threat to their right of local self-government by closing down the British judicial system, so that it could not be used to enforce the Act. People in the Towns of Worcester, Springfield, Southampton, Salem, Marblehead, Taunton, and Stoughton not only forcibly closed the courts, but forced hundreds of British officials to resign their positions. Without the courts, the people of those Towns drew up their own plans for keeping order, while urging the people of their own Town Meetings to "pay no regard to the late act of parliament, respecting the calling of town meetings, but, to proceed in their usual manner." Raphael, THE FIRST AMERICAN REVOLUTION BEFORE LEXINGTON AND CONCORD 107 (2011).

### 4.  Community self-government is the foundation of the Declaration of Independence.

Beginning in 1773, in response to those royal assertions of power and nullification of local self-governance, the people of ninety towns, villages, and counties across the thirteen colonies began to issue their own local declarations of independence. Declaring that only their own homegrown, democratically-elected governments could "constitutionally make any laws or

regulations," those communities proclaimed their own independence from British rule years before issuance of a national Declaration of Independence by Congress. Maier, AMERICAN SCRIPTURE: MAKING THE DECLARATION OF INDEPENDENCE 48-49 (1997). The Charlotte Town Resolves, as one example of many, declared in May 1775, over a year before the national declaration, that "all laws derived from the authority of the King or Parliament are annulled and vacated."[11]

It was amidst the issuance of these local declarations that the colonists formed the First Continental Congress, which met in September of 1774, with representatives attending from twelve of the thirteen colonies. During that Congress, the delegates declared: "[a]ssemblies have been frequently dissolved, contrary to the rights of the people … [and] that the inhabitants of the English Colonies in North America, by the immutable laws of nature … are entitled to life, liberty, and property, and they have never ceded to any sovereign power whatever a right to dispose of either without their consent." This articulation of the right of community self-government continued to lay the foundation for the final break between the American colonies and Great Britain.

In May 1776 – before the issuance of the national Declaration of Independence - the Second Continental Congress adopted a resolution that power be transferred from governments resting on the Crown's sovereignty to those based upon popular authority and self-government. The preamble demanded "that the exercise of every kind of authority under the. . . Crown should be totally suppressed." JOURNALS OF THE CONTINENTAL CONGRESS, 4:342, 357-58. Several months later, the people of Virginia adopted the first "Declaration of Rights," which set forth the constitutional doctrine of local self-government:

---

[11] The Avalon Project at Yale Law School, THE MECKLENBURGH RESOLUTIONS (May 20, 1775) (http://avalon.law.yale.edu/18th_century/nc06.asp) (accessed November 9, 2014).

Section 2. That all power is vested in, and consequently derived from, the people; that magistrates are their trustees and servants and at all times amenable to them.

Section 3. That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or *community*; of all the various modes and forms of government, that is best which is capable of producing the greatest degree of happiness and safety and is most effectually secured against the danger of maladministration. And that, when any government shall be found inadequate or contrary to these purposes, a majority of the *community* has an indubitable, inalienable, and indefeasible right to reform, alter, or abolish it, in such manner as shall be judged most conducive to the public weal.[12]

This fundamental principle of local self-government was recognized and reasserted by the Congress in June 1776, when it issued the national Declaration of Independence. Penned originally by Thomas Jefferson and edited by a congressional committee, the Declaration listed the infringement of local self-government as the primary basis for severance from Great Britain.[13] It codified the principles of local self-government that had been forged by the American colonists starting in the 1600s onward. Drawing on the declarations of towns, villages, colonies, compacts, early constitutions, and the writings of James Otis and others, the Declaration reaffirmed four major principles of law:

-First, that certain rights—those of life, liberty, safety, and the pursuit of happiness—are natural rights, held by virtue of being human[14];

-Second, that governments are created to secure those natural rights[15];

-Third, that each government owes its existence to, and derives its power exclusively from, the community that creates it[16]; and

---

[12] *Id*. at Virginia Declaration of Rights (http://avalon.law.yale.edu/18th_century/virginia.asp) (accessed November 10, 2014) (emphasis added).

[13] The great majority of the numerous facts "submitted to a candid world" by the Declaration to document the colonists' grievances with the crown concerned the power of self-government, beginning with the very first: "He has refused his Assent to Laws the most wholesome and necessary for the public good."

[14] DECL. OF INDEPENDENCE at ¶ 2 ("That all men. . . are endowed by their Creator with certain unalienable rights; that among these are life, liberty, and the pursuit of happiness.").

[15] *Id*. ("that, to secure these rights, governments are instituted among men.").

[16] *Id*. ("deriving their just powers from the consent of the governed.").

-Fourth, that when government becomes destructive of the people's natural rights, the people have a right (and duty) to alter or abolish that government and establish new forms.[17]

The Declaration of Independence has been congressionally recognized as an organic, enforceable law of the United States, and so is part of the United States Code. *See* 1 U.S.C. at i-iii. In the words of historian Joshua Miller, the great principles "evoked in the Declaration are autonomy of collectivities, natural rights, and the legitimacy of revolution." *See* Miller, THE RISE AND FALL OF DEMOCRACY IN EARLY AMERICA, 1630-1789 70 (1991).

### 5.  Community self-government is the foundation for state constitutions.

The Constitutions adopted by the people of the colonies—transforming the colonies from chartered corporations into sovereign states—reaffirmed and codified, as the basis for those state governments, the four principles of local self-government asserted by the Declaration of Independence.[18] For instance, in Pennsylvania's Declaration of Rights, incorporated into the Pennsylvania Constitution of 1776, the people declared:

---

[17] *Id.* ("whenever any form of government becomes destructive of these ends, it is the right of the people to alter or to abolish it, and to institute new government, laying its foundation on such principles, and organizing its powers in such form, as to them shall seem most likely to effect their safety and happiness. . . it is their right, it is their duty, to throw off such government.").

[18] The people of two states, New York and Connecticut, adopted the text of the Declaration directly into their state constitutions; the people of eight states adopted a Declaration of Rights that restated the four principles of the Declaration; and the people of four states—New Jersey, Georgia, South Carolina, and New Hampshire—included the principles of the Declaration in the text of the preamble to their state constitutions. *See* The Avalon Project at Yale Law School at Constitution of New York (April 20, 1777); Constitution of New Jersey (July 2, 1776); Constitution of Georgia (February 5, 1777); Constitution of South Carolina (March 26, 1776); Constitution of New Hampshire (January 5, 1776); Constitution of Delaware (September 21, 1776); Constitution of Maryland (November 11, 1776), Constitution of North Carolina (December 18, 1776); Constitution of Pennsylvania (September 28, 1776); Constitution of Virginia (June 29, 1776); Constitution of Vermont (July 8, 1777), http://avalon.law.yale.edu/subject_menus/18th.asp (accessed November 11, 2014).

That all men are born equally free, and independent; and have certain, natural, inherent, and inalienable rights; amongst which are; the enjoying and defending of life and liberty; acquiring, possessing, and protecting property; and pursuing and obtaining happiness and safety.

That all power being originally inherent in, and consequently derived from, the people; therefore all officers of government, whether legislative, or executive, are their trustees, and servants, and at all times accountable to them.

That government is, or ought to be, instituted for the common benefit, protection and security of the people, nation, or *community*; and not for the particular emolument or advantage of any single man, family, or set of men, who are a part only of that community; And that the *community* hath an indubitable, unalienable and indefeasible right to reform, alter, or abolish government in such manner as shall be by that *community* judged most conducive to the public weal.[19]

In addition to being expressly secured by state constitutions, the right of community self-government was embodied in the process by which the people of each state drafted and adopted their constitutions. All but one of the thirteen original colonies entrusted the responsibility of drafting new constitutions to the people themselves through constitutional conventions, rather than through permanent state legislatures. *See* Marc Kruman, BETWEEN AUTHORITY AND LIBERTY: STATE CONSTITUTION MAKING IN REVOLUTIONARY AMERICA 157-58 (1997).

> **6. The Treaty of Guadalupe Hidalgo, New Mexico Enabling Act, and New Mexico Constitution guarantee the right of local, community self-government to the people of Mora County.**

Like the people of the British colonies, New Mexicans—both indigenous and those of Spanish and Mexican descent—have fought for their right of local, community self-government.

_____

[19] *See* The Avalon Project at Yale Law School, Constitution of Pennsylvania at ¶¶ 2-5 (September 28, 1776) (http://avalon.law.yale.edu/18th_century/pa08.asp) (accessed November 9, 2014) (emphasis added); Gormley, THE PENNSYLVANIA CONSTITUTION at 43–44 (the Pennsylvania Constitution "explicitly incorporated the Declaration of Rights into the Constitution with the mandate that it 'ought never to be violated on any pretence whatever.'").

From preserving the Pueblos' right of self-government[20], to battling against Spanish, Mexican, and American colonial efforts to remove the right[21], New Mexicans have a long history of defending their self-governing authority, very often with their lives. This intense, ongoing insistence upon self-governing authority eventually forced Spain, and then a newly-independent Mexico, to accommodate the local self-government authority of the people of the Pueblos, and to institute land grants to appease indigenous and other New Mexican peoples.

In the 1848 Treaty of Guadalupe Hidalgo, which ended the Mexican-American War, the United States guaranteed certain rights and powers to communities in New Mexico. Articles VIII and IX guarantee the "free enjoyment of the liberty and property" of the inhabitants of what became Mora County. *See* Doc. 17-1, Ordinance §2. By those Articles, the Treaty guarantees community use rights, "including, but not limited to . . . hunting, pasture, wood gathering, and watering." *Id.* New Mexico's Bill of Rights reinforces these guarantees: "the rights, privileges, and immunities, civil, political and religious guaranteed to the people of New Mexico by the Treaty of Guadalupe Hidalgo shall be preserved inviolate." N.M. Const., art II, § 6.

In 1910, as a prerequisite to statehood, Congress adopted an Enabling Act for New Mexico. The Act required the drafting and popular ratification of a New Mexican Constitution, and required that:

> The constitution be republican in form and make no distinction in civil or political rights on account of race or color, and *shall not be repugnant to the constitution of the United States and the principles of the declaration of independence.*

---

[20] As recognized by the New Mexican Pueblos through the Constitution of the All Indian Pueblo Council, the governance goal of the confederation of Pueblos is to "preserve and protect . . . our inherent rights of self-government." AIPC Const. at Preamble.

[21] Between 1540 and 1600, Pueblo communities were "subjected to seven successive waves of soldiers, missionaries and settlers." Each wave met with resistance from indigenous peoples. Adrea Lawrence, Lessons from an Indian Day School: Negotiating Colonization in Northern New Mexico, 1902-1907 (2011).

Act of June 20, 1910, 36 Statutes at Large 557, Chapter 310, section 2 (emphasis added). The

"principles of the declaration of independence," which via the Enabling Act are enforceable law

in New Mexico, can mean nothing other than the Declaration's theory of the fundamental right

of self-government, as there are no other principles of law in the Declaration. The rest of the

document is merely a list of the particular grievances the American colonists had against Great

Britain.

The resulting New Mexico Bill of Rights reaffirmed the framework of law articulated by

the Declaration, as it was required to do, proclaiming:

> All political power is vested in and derived from the people: all government of right
> originates with the people, is founded upon their will and is instituted solely for their
> good.

N.M. Const., art II, § 2. "Political power" here necessarily refers to the Declaration's

articulation of *the* theory of legitimate government for the people of the United States.


### 7.   The U.S. Constitution guarantees the right of local, community self-government to the people of Mora County.

The U.S. Constitution also secures the right of local, community self-government in a

number of places. The Preamble says:

> We the People of the United States, in Order to form a more perfect Union, establish
> Justice, insure domestic Tranquility, provide for the common defence, promote the
> general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do
> ordain and establish this Constitution for the United States of America.

U.S. Const. at Preamble.

Three of the four principles of self-government from the Declaration appear here, though

more loosely. The words "justice, tranquility, defence, welfare, and blessings of liberty" express

the Declaration's principle that people have certain natural rights by virtue of being human. The

words "in Order to" and "do ordain and establish" express the Declaration's principle that people

form governments to secure their civil and political rights. The words "We the People of the

United States" express the Declaration's principle that governmental authority stems from the people of the community exercising the powers of government, and is to be exercised for their benefit only. Only the Declaration's fourth fundamental principle, on the people's authority to alter or abolish governments, fails to find literal expression in the Preamble.[22]

The founders debated whether more explicitly to insert all four principles of the Declaration of Independence directly into the Constitution's preamble, or whether the people's right of self-government was so fundamental that it need not be expressly stated in the text of the Constitution itself.[23] Advocating for express inclusion, James Madison argued: "[i]f it be a truth,

---

[22] As one writer said, "The people, who are sovereigns of the state, possess a power to alter when and in what way they please. To say [otherwise] ... is to make the thing created, greater than the power that created it." Fed. Gazette, 18 Mar. 1789 (reprinted in Matthew J. Herrington, *Popular Sovereignty in Pennsylvania 1776–1791*, 67 TEMP. L. REV. 575 (1994)).

[23] This debate was forced by the people of the states through their ratifying conventions. The conventions of many states chose to use the ratification process as another vehicle for securing their right to community self-government. They did so by offering amendments that incorporated the principles of the Declaration directly into the text of the Constitution. The people who voted to reject the Constitution outright (and the populations they represented), and the people who refused to ratify without the offering of those local self-government amendments (and the populations they represented) constituted a majority of the people living within the United States at the time of ratification. *See* The Avalon Project at Yale Law School at Ratification of the Constitution by the Various States (http://avalon.law.yale.edu/subject_menus/18th.asp) (accessed November 11, 2014).

Mirroring the Declaration of Rights already adopted by a majority of people within a majority of states in their own constitutions, the people of Virginia ratified the Constitution subject to the following amendments:

1st. That there are certain natural rights of which men when they form a social compact cannot deprive or divest their posterity, among which are the enjoyment of life, and liberty, with the means of acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety.

2d. That all power is naturally vested in, and consequently derived from, the people; that magistrates therefore are their trustees, and agents, and at all times amenable to them.

3d. That the Government ought to be instituted for the common benefit, protection and security of the people; and that the doctrine of non-resistance against arbitrary power and oppression, is absurd, slavish, and destructive to the good and happiness of mankind.

and so self-evident that it cannot be denied—if it be recognized, as is the fact in many of the

State Constitutions. . . this solemn truth should be inserted in the Constitution."[24]

The House rejected the addition, significantly because it deemed the language already

incorporated within the Constitution's preamble. Roger Sherman explained that since:

> this right is indefeasible, and the people have recognized it in practice, the truth is
> better asserted than it can be by any words whatever. The words "We the people,"
> in the original Constitution, are as copious and expressive as possible; any
> addition will only drag out the sentence without illuminating it. . . [25]

Fourteen years later, the U.S. Supreme Court, in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137

(1803), validated Sherman's reasoning. Interpreting the Constitution's preamble as recognizing

the people's inherent and fundamental right of self-government, the Court concluded:

> [t]hat the people have an original right to establish, for their future government,
> such principles as, in their own opinion, shall most conduce to their own
> happiness, is the basis on which the whole American fabric has been erected.
> *Marbury,* 5 U.S. (1 Cranch) at 176. [26]

---

The Avalon Project at Yale Law School, Ratification of the Constitution by the State of
Virginia (June 26, 1788) (http://avalon.law.yale.edu/18th_century/ratva.asp) (accessed
November 8, 2014).

[24]Madison proposed amending the Constitution's preamble to include the following language:

> "That all power is originally vested in, and consequently derived from the people.

> That government is instituted, and ought to be exercised for the benefit of the
> people, which consists in the enjoyment of life and liberty, with the right of
> acquiring and using property, and generally of pursuing and obtaining happiness
> and safety.

> That the people have an indubitable, unalienable, and indefeasible right to reform
> or change their government, whenever it be found adverse or inadequate to the
> purposes of its institution."

U.S. House of Representatives, June 8, 1789
(http://teachingamericanhistory.org/bor/madison_17890608/) (accessed November 8,
2014).

[25] U.S. House of Representatives, August 14, 1789
(www.teachingamericanhistory.org/bor/select-committee-report/) (accessed November 8, 2014).

[26] Speaking at the Pennsylvania convention that ratified the federal Constitution, James Wilson
said: "His [Mr. Findley's] position is, that the supreme power resides in the States, as

The right of local, community self-government, as a fundamental right, is also protected by the Ninth Amendment of the Bill of Rights. That Amendment says: "the enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage other rights retained by the people." As the concurrence in *Griswold*, 381 U.S. at 488, explained: "The language and history of the Ninth Amendment reveal that the Framers of the Constitution believed that there are additional fundamental rights, protected from governmental infringement, [in addition to] those fundamental rights specifically mentioned in the first eight constitutional amendments."

Historical evidence uncovered in the last twenty-five years reinforces that the public intent of this amendment was to elevate the natural rights of people - that pre-existed the Constitution - to the same status, whether or not the rights were explicitly enumerated in the Bill of Rights.  Randy E. Barnett, *The Ninth Amendment: It Means What It Says*, 85 TEX. L. REV. 1, 28-29 (2006). These pre-existing natural rights include individual rights as well as collective rights.  *Id.* at 21, 20, and 46.

Among the retained rights of the people is the fundamental right to alter or abolish their form of government whenever they see fit. *See* 2 Blackstone's COMMENTARIES: WITH NOTES OF REFERENCE TO THE CONSTITUTION AND LAWS OF THE FEDERAL GOVERNMENT OF THE UNITED STATES AND OF THE COMMONWEALTH OF VIRGINIA 162 (1803); *Deitz v City of Central*, 1 Colo. Rptr. 323 (Colo. Terr. 1871); *Henry Broderick, Inc. v. Riley*,157 P.2d 954, 966 (Wash. 1945) (the Ninth Amendment serves as a "sentinel against overcentralization of government, [and serves as

---

governments; and mine is, that it resides in the people, as the fountain of government; that the people have not—that the people mean not—and that the people ought not, to part with it to any government whatsoever. They can delegate it in such proportions, to such bodies, on such terms, and under such limitations, as they think proper." James Wilson, Pennsylvania Ratifying Convention, 4 Dec. 1787 (reprinted in Philip B. Kurland, THE FOUNDERS' CONSTITUTION VOLUME ONE at 62).

a] monument to the wisdom of the constitutional framers who realized that for the stable

preservation of our form of government, it is essential that local governmental functions be

locally performed."). As legal scholar Kurt Lash explains:

> The right to local self-government is a right retained by all people and can be exercised in whatever political direction the people please. What we have forgotten, what we have lost, is that the right to local self-government is more than an idea. It is a right enshrined in the Constitution itself.

Kurt Lash, THE LOST HISTORY OF THE NINTH AMENDMENT 360 (2009).[27]

Accordingly, the people of Grant Township possess an inherent, federal, and state

guaranteed right of local, community self-government, secured by the Declaration of

Independence, the Pennsylvania Constitution, and the United States Constitution.

### 8. The Mora County Community Water Rights and Local Self-Government Ordinance too now secures the right of local, community self-government for the people of Mora County.

With enactment of the Ordinance, the people of Mora County secured the Declaration's

theory of the right of local, community self-government by codifying it into local law:

> Section 4.5. Right to Self-Government: All residents of Mora County possess the fundamental and inalienable right to a form of governance where they live which recognizes that all power is inherent in the people, that all free governments are founded on the people's authority and consent, and that corporate entities and their directors and managers shall not enjoy special privileges or powers under the law which make community majorities subordinate to them.

> Section 4.6. People are Sovereign: The Mora County Commission shall be the governing authority responsible to, and governed by, the residents of the County. Use of the "Mora County" municipal corporation by the sovereign people of the County to make law shall not be construed to limit or surrender the sovereign authority or immunities of the people to a municipal corporation that is subordinate to them in all respects at all times. The people at all times enjoy and retain an inalienable and indefeasible right to self-governance in the community where they reside.

Doc 17-1, Ordinance §§ 4.5, 4.6.

---

[27] The U.S. Constitution also secures the right to local, community self-government at Article IV, §4: "The United States shall guarantee to every State in this Union a Republican Form of Government."

**B. Corporate constitutional "rights" unconstitutionally infringe the people's right of local, community self-government.**

Given the colonial history of local self-government in America, the foundation of our state and federal constitutions on local, community self-government, and the now mythic quality attached to the idea of "democracy" here, it is strange that the notion of local communities making decisions with the force of law is so foreign to American jurisprudence. Yet it is.

Community lawmaking as the legitimate exercise of self-government by people *where they live* has generated mostly critical, occasionally derisive treatment from legislators, jurists, and commentators since the time of the founding. Consistent with this attitude, American jurisprudence has developed legal doctrines to infringe the right of local, community self-government, both by denying it outright, and by severely restricting local governmental power allowed for communities by state law.

One of the doctrines that infringes the right of local, community self-government is that of corporate constitutional "rights." Business corporations are a species of property. The doctrine of corporate constitutional "rights" gives the constitutional rights of people to this property. Then, when local government enacts a law that a corporation dislikes, the corporation may assert its constitutionally-derived "rights" to challenge and defeat the law.[28] Thus, the existence and enforcement of that doctrine prevents the people of Mora County from exercising their right of local, community self-government.

**1. Business corporations are chartered by state governments as subordinate entities.**

---

[28] As will be seen in later sections of this Brief, because corporate "rights" are rooted in the federal constitution, corporations routinely exercise those "rights" to overturn not only local laws, but also state and federal ones.

The cause of the American Revolutionary War was the systemic usurpation of the rights of colonists by the British King and Parliament.[29] Those usurpations occurred largely through the King's empowerment of eighteenth century corporations of global trade, such as the East India Company. Oft-cited as the final spark of the War, the Boston Tea Party was the direct result of colonial opposition to the East India Company's securing of representation for its interests from the British government through the transfer of corporate tariff obligations to the colonists as taxes. This preferential governmental treatment of corporations over people enabled the Company to monopolize the tea market in the colonies while the people's right to representation and local self-government were actively violated.[30]

After the Revolution—and in recognition of their experiences with those British corporations—the colonists placed corporations under strict control. Early legislatures granted charters one at a time, for a limited number of years,[31] held business owners liable for harms and injuries, revoked corporate charters when necessary, forbade banking corporations from

---

[29] *See, e.g.,* the American Declaration of Independence, ¶1 *et seq.* (U.S. 1776) (listing the grievances of the colonists).

[30] James K. Hosmer, SAMUEL ADAMS 212 (1885) (stating that the British Parliament hoped that "the prosperity of the East India Company would be furthered, which for some time past, owing to the colonial non-importation agreements, had been obliged to see its tea accumulate in its warehouses, until the amount reached 17,000,000 pounds").

[31] *See Louis K. Liggett Co., v. Lee,* 288 U.S. 517 (1933) (Brandeis, J., dissenting) (stating that "at first the corporate privilege was granted sparingly; and only when the grant seemed necessary in order to procure for the community some specific benefit otherwise unattainable." Here, too, Brandeis answered the question of why incorporation for business was commonly denied long after it had been freely granted for religious, educational, and charitable purposes: "It was denied because of fear. Fear of encroachment upon the liberties and opportunities of the individual. Fear of the subjection of labor to capital. Fear of monopoly. Fear that absorption of capital by corporations, and their perpetual life, might bring evils similar to those which attended mortmain. There was a sense of some insidious menace inherent in large aggregations of capital, particularly when held by corporations.").

engaging in trade, prohibited corporations from owning each other, and established that

corporations could only be chartered for "public purposes."[32]

It is well-settled law that business corporations are creations of the state.[33] The United

States Supreme Court has repeatedly reaffirmed that business corporations are "creatures" of the

state.[34] As such, they are chartered by the state in the name of the people. It also is well-settled

---

[32] Robert Hamilton, THE LAW OF CORPORATIONS 6 (1991). As the Supreme Court of Virginia reasoned in 1809, if the applicant's "object is merely private or selfish; if it is detrimental to, or not promotive of, the public good, they have no adequate claim upon the legislature for the privileges." Morton J. Horwitz, THE TRANSFORMATION OF AMERICAN LAW, 1780-1860 112 (1977).

[33] *See St. Louis, I.M. & S Ry. Co. v. Paul*, 173 U.S. 404 (1899) (declaring that corporations are "creations of state"); *Bank of Augusta v. Earle*, 38 U.S. 519, 520 (1839) (stating that "corporations are municipal creations of states"); *United States v. Morton Salt Co*., 338 U.S. 632, 650 (1950) (explaining that corporations "are endowed with public attributes. They have a collective impact upon society, from which they derive the privilege as artificial entities"); *Hale v. Henkel*, 201 U.S. 43, 75 (1906) (declaring that "the corporation is a creature of the state. It is presumed to be incorporated for the benefit of the public. . . . Its rights to act as a corporation are only preserved to it so long as it obeys the laws of its creation"); *Chincleclamouche Lumber & Broom Co. v. Commonwealth*, 100 Pa. 438, 444 (Pa. 1881) (stating that "the objects for which a corporation is created are universally such as the government wishes to promote. They are deemed beneficial to the country"); *See also, People v. North River Sugar Refining Company*, 24 N.E. 834, 835 (NY 1890) (declaring that "[t]he life of a corporation is, indeed, less than that of the humblest citizen."); *F.E. Nugent Funeral Home v. Beamish*, 173 A. 177, 179 (Pa. 1934) (declaring that "[c]orporations organized under a state's laws. . . depend on it alone for power and authority"); *People v. Curtice*, 117 P. 357, 360 (Colo. 1911) (declaring that "[i]t is in no sense a sovereign corporation, because it rests on the will of the people of the entire state and continues only so long as the people of the entire state desire it to continue").

[34] *See, e.g., Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1093 (1991); *Kamen v. Kember Fin. Servs*., 500 U.S. 90, 99 (1991); *Braswell v. United States*, 487 U.S. 99, 105 (1988); *Burks v. Lasker*, 441 U.S. 471, 478 (1979) (declaring that "corporations are creatures of state law [] and it is state law which is the font of corporate directors' powers"); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978); *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479 (1977); *Cort v. Ash*, 422 U.S. 66, 84 (1975); *United Steelworkers of America v. R.H. Bouligny, Inc*., 382 U.S. 145, 147 (1965); *Shapiro v. United States*, 335 U.S. 1, 66 (1948); *Ferry v. Ramsey*, 277 U.S. 88, 96-97 (1928); *Essgee Co. of China v. United States*, 262 U.S. 151, 155 (1923); *Yazoo & M.V.R.Co. v. Clarksdale*, 257 U.S. 10, 26 (1921); *United States v. American Tobacco Co.*, 221 U.S. 106, 142-143 (1911); *Wilson v. United States*, 221 U.S. 361, 383 (1911); *Hale v. Henkel*, 201 U.S. 43 (1906); *Terre Haute & I.R.Co. v. Indiana*, 194 U.S. 579, 584 (1904); *Fidelity Mut. Life Asso. v. Mettler*, 185 U.S. 308 327 (1902); *Hancock Mut. Life Ins. Co. v. Warren*, 181 U.S. 73, 76 (1901); *Jellenik v. Huron Copper Mining Co*., 177 U.S. 1, 11-13 (1900); *Woodruff v.*

law that the Constitution not only protects people against the "State itself," but also against "all

of its creatures." *See West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 637

(1943).

> **2. Over the past 150 years, the judiciary has "found" corporations within the U.S. Constitution and bestowed constitutional rights upon them.**

Contrary to the fact that corporations are creatures of the state and thus inferior to the

people, over the past 150 years, the judiciary has conferred constitutional rights—once intended

to protect only natural persons—upon corporations.[35] It has done so by "finding" corporations in

the Fourteenth Amendment,[36] the Bill of Rights,[37] and the Contracts and Commerce Clauses[38] of

---

*Mississippi*, 162 U.S. 291, 299, 309 (1896); *Philadelphia & Southern Mail S.S. Co. v. Pennsylvania*, 122 U.S. 326 (1887); *Sinking-Fund Cases*, 99 U.S. 700, 718 (1878); *Railroad Co. v. Maryland*, 88 U.S. 456, 469, 471 (1874); *Dodge v. Woolsey*, 59 U.S. 331 (1855); *Bank of Augusta v. Earle*, 38 U.S. 519, 520 (1839); *Briscoe v. President & Directors of Bank of Kentucky*, 36 U.S. 257, 328 (1837).

[35] As a general principal of justice, rights have long been understood to accrue to the living, and not to the dead, nor to inanimate matter. Thomas Paine's *Common Sense* (1776)*,* credited with inspiring the popular call for American independence, argued that hereditary government and the rule of the dead over the living—expressed as oppressive legal precedent—defined the "old form" of government, while deference to the rights of the living characterized the new. *See also* Thomas Jefferson, who asked:

> Can one generation bind another, and all others, in succession forever? I think not. The Creator made the earth for the living, not the dead. Rights and powers can belong only to persons, not to things, not to mere matter unendowed with will. The dead are not even things…To what then are attached the rights and powers they held while in the form of men? A generation may bind itself as long as its majority continues in life; when that has disappeared, another majority is in its place, holding all the rights and powers their predecessors once held, and may change their laws and institutions to suit themselves. Nothing then is unchangeable but the inherent and inalienable rights of man!

Thomas Jefferson, *Letter to Major John Cartwright*, (June 5, 1824).

[36] Corporations were declared to be "persons" entitled to Fourteenth Amendment protections in *Santa Clara County v. Southern Pacific Railroad Company*, 118 U.S. 394 (1886) and *Minneapolis & St. Louis Railroad Company v. Beckwith*, 129 U.S. 26 (1889).

[37] Corporations were declared to be entitled to First Amendment protections in *First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978); to Fourth Amendment protections in *Hale v. Henkel*, 201 U.S. 43 (1906); and to Fifth Amendment protections in *Noble v. Union River Logging R. Co.*, 147 U.S. 165 (1893); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922);

the United States Constitution. As the judiciary conferred constitutional rights on corporations,

the legal community justified the result with literature on how corporations are legal persons.[39]

Nonetheless, the judiciary's finding of corporations within these constitutional guarantees—and

especially within the Fourteenth Amendment's guarantees of due process and equal protection—

has been challenged by sage Supreme Court jurists.[40]

---

and *Fong Foo v. United States*, 369 U.S. 141 (1962). Corporations have been discovered in other Amendments, including the Seventh Amendment, but this Brief focuses solely on those Amendments relevant to the instant suit.

[38] Courts conferred Contracts Clause protections on corporate charters in *Dartmouth College v. Woodward*, 4 Wheat. 518 (1816). For a contemporary use of the Contracts Clause to override local decisionmaking, *see City of New Orleans v. Bellsouth Telecommunications, Inc.* 690 F.3d 312 (5th Cir. 2012) (striking a law that imposed new consideration on a telecommunications corporation for the use of rights-of-way within the City). For an example of Commerce Clause protections for corporations, see, for example, *South Dakota Farm Bureau, Inc. et al. v. Hazeltine*, 340 F.3d 583 (8th Cir. 2003) (striking down the State's anti-corporate farming law as violating agribusiness corporations' rights under the Commerce Clause).

[39] Morton J. Horwitz, THE TRANSFORMATION OF AMERICAN LAW 1870-1960 101 (1992) (explaining that "[t]he efforts by legal thinkers to legitimate the business corporation during the 1890's were buttressed by a stunning reversal in American economic thought – a movement to defend and justify as inevitable the emergence of large-scale corporate concentration"). *Id*. at 80, 145.

[40] *See Connecticut General Life Insurance Co. v. Johnson*, 303 U.S. 77, 85-90 (1938) (Black, J., dissenting) (declaring that "[n]either the history nor the language of the Fourteenth Amendment justifies the belief that corporations are included within its protection"); *Wheeling Steel Corp. v. Glander*, 337 U.S. 562, 576-581 (1949) (Douglas, J., and Black, J., dissenting) (declaring that "I can only conclude that the *Santa Clara* case was wrong and should be overruled"); *See also, Hale v. Henkel*, 201 U.S. 43, 78 (1906) (Harlan, J., concurring) (declaring that "in my opinion, a corporation—an artificial being, invisible, intangible, and existing only in contemplation of law—cannot claim the immunity given by the 4th Amendment; for it is not a part of the 'people' within the meaning of that Amendment. Nor is it embraced by the word "persons" in the Amendment"); *Bell v. Maryland*, 378 U.S. 226, 263 (1964) (Douglas, J., dissenting) (declaring that "[t]he revolutionary change effected by affirmance in these sit-in cases would be much more damaging to an open and free society than what the Court did when it gave the corporation the sword and shield of the Due Process and Equal Protection Clauses of the Fourteenth Amendment"); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 822 (1978) (Rehnquist, J., dissenting) (declaring that "[t]his Court decided at an early date, with neither argument nor discussion, that a business corporation is a 'person' entitled to the protection of the Equal Protection Clause of the Fourteenth Amendment"); *Citizens United v. Federal Election Commission*, 558 U.S. 310, 466 (2010) (Stevens, J., concurring in part, dissenting in part) ("corporations have no consciences, no beliefs, no feelings, no thoughts, no desires. . . they are

Recently, Montana Supreme Court Justice James C. Nelson explained well how corporate

personhood is a perverted mutation of liberty's roots in natural rights:

> Lastly, I am compelled to say something about corporate "personhood." While I
> recognize that this doctrine is firmly entrenched in the law, *see Bellotti*, 435 U.S. at 780
> n. 15, 98 S. Ct. at 1418 n. 15; *but see* 435 U.S. at 822, 98 S. Ct. at 1439-40 (Rehnquist, J.,
> dissenting), I find the entire concept offensive. Corporations are artificial creatures of
> law. As such, they should enjoy only those powers—not constitutional rights, but
> legislatively-conferred powers—that are concomitant with their legitimate function, that
> being limited-liability investment vehicles for business. Corporations are not persons.
> Human beings are persons, and it is an affront to the inviolable dignity of our species that
> courts have created a legal fiction which forces people—human beings—to share
> fundamental, natural rights with soulless creations of government. Worse still, while
> corporations and human beings share many of the same rights under the law, they clearly
> are not bound equally to the same codes of good conduct, decency, and morality, and
> they are not held equally accountable for their sins. Indeed, it is truly ironic that the death
> penalty and hell are reserved only to natural persons.

*Western Tradition P'ship, Inc. v. Attorney Gen. of State*, 271 P.3d 1, 36 (Mont. 2011) (Nelson, J.,
dissenting), *cert. granted, judgment rev'd sub nom. Am. Tradition P'ship, Inc. v. Bullock*, 132 S.
Ct. 2490, 183 L. Ed. 2d 448 (2012).

### 3. Corporations routinely use constitutional "rights" to deny communities their right of local self-governance.

Endowed by state and federal governments with constitutional rights, business

corporations wield those "rights" routinely to override the people's right of local, community

self-government. Contemporarily, corporations have used their First[41], Fifth[42], and Fourteenth

---

not themselves members of "We the People" by whom and for whom our Constitution was
established. . . [today's decision] is thus a rejection of the common sense of the American
people, who have recognized a need to prevent corporations from undermining self-government
since the founding. . ."); *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751, 2802 (2014)
(Ginsburg, J., dissenting) (the "exercise of religion is characteristic of natural persons, not
artificial legal entities.").

[41] In 2010, the Supreme Court invalidated federal campaign finance laws as violative of the
corporate "right" to free speech as a "person." *Citizens United v. Federal Election Commission*,
558 U.S. 50 (2010); *See International Dairy Foods v. Amestoy*, 92 F.3d 67 (2nd Cir. 1996)
(nullifying a dairy labeling law in Vermont that violated the corporate "right" not to be
compelled to speak under the First Amendment); *CTIA-The Wireless Association v. City and
County of San Francisco*, No. 11-17707, No. 11-17773 (9th Cir., unreported memorandum
opinion, Sep. 10, 2012) (striking a City law requiring retail point-of-purchase warnings for health
risks from cellular telephone radio emissions as a violation of speech rights); *First National Bank*

Amendment "rights" to nullify laws, which sought to protect the people's health, safety, and welfare. Corporations have also asserted rights under the Contracts[43] and Commerce[44] Clauses of the U.S. Constitution to strike similar laws.

Efforts to continue to apply corporate constitutional "rights" have been met with increasing resistance in state courts. In 2013, in the Washington County, Pennsylvania Court of Common Pleas in a case dealing with an oil and gas corporation's attempt to shield a settlement agreement from disclosure pursuant to the corporation's Fourth Amendment "rights," President Judge O'Dell-Seneca declared that

> [t]here are no men or women defendants in the instant case; they are various business entities. . . These are all legal fictions, existing not by natural birth but by operations of state statutes. . . Such business entities cannot have been 'born equally free and

*of Boston v. Bellotti*, 435 U.S. 765 (1978) (nullifying a state law banning corporate spending on political referenda); *Pacific Gas & Elec. Co. v. Public Utilities Comm'n*, 475 U.S. 1 (1986) (preventing utility ratepayers from using space within a utility's monthly billing envelopes for consumer communications); *Central Hudson Gas & Electric Corp. v. Public Utilities Comm'n*, 447 U.S. 557 (1980) (overturning regulations aimed at conserving electricity during the 1970's energy crisis); *Jacobus v. State of Alaska*, 338 F.3d 1095 (9th Cir. 2003) (banning states from curtailing corporate participation in electoral activities as a violation of free speech rights).

[42] *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922) (overturning a Pennsylvania law - the Kohler Act – which required coal operators to leave pillars of coal in place to prevent subsidence, as violating the Fifth Amendment rights of coal corporations).

[43] *See Dartmouth College v. Woodward*, 4 Wheat. 518 (1816) (declaring that corporate charters were contracts protected by the Constitution's Contracts Clause, and therefore, that state legislatures were prohibited from unilaterally altering those charters. Interestingly, the Court also explained that municipal charters were not subject to the same prohibitions, thus enabling States to alter laws governing municipal corporations at will).

[44] *South Dakota Farm Bureau, Inc. et al., v. Hazeltine*, 340 F.3d 583 (8th Cir. 2003) (using the Commerce Clause to overturn South Dakota's anti-corporate farming law, which banned corporations from owning farmland or engaging in farming within the State); *See Smithfield Foods, Inc. v. Miller*, 367 F.3d 1061 (8th Cir. 2003) (striking down laws regulating corporate involvement in hog production); *Synagro-WWT, Inc. v. Rush Township*, 204 F. Supp. 2d 827 (M.D. Pa. 2002), 299 F. Supp. 2d 410 (M.D. Pa. 2003) (striking down laws intended to protect residents from corporate-hauled land applied sewage sludge); *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525 (1949) (striking down laws dealing with milk licenses intended to protect competition and milk supply); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935) (striking down laws mandating milk dealer prices which were adopted to ensure economically viable dairy farming).

independent,' because they were not born at all. Indeed, the framers of our constitution could not have intended them to be "free and independent," because, as the creations of the law, they are always subservient to it. . . In the absence of state law, business entities are nothing. Once created, they become property of the men and women who own them, and, therefore, the constitutional rights that business entities may assert are not coterminous or homogenous with the rights of human beings. . .Were they so, the chattel would become the co-equal to its owners, the servant on par with its masters, the agent the peer of its principals, and the legal fabrication superior to the law that created and sustains it. . . They cannot be 'let alone' by government, because businesses are but grapes, ripe upon the vine of the law, that the people of this Commonwealth raise, tend, and prune at their pleasure and need.

*Hallowich v. Range Resources Corporation, et al.*, No. 2010-3954 (Wash. Co. 2013).[45]

In addition to direct infringement of the right of local, community self-government—through the nullification of local and state laws aimed at protecting health, safety, and welfare and other civil and political rights—these assertions of corporate constitutional rights indirectly deny the right of self-government by "chilling" the actions of state and local legislators. For example, when Chemical Waste Management, Inc. successfully sued the State of Alabama on the claim that the State's differential taxation of out-of-state-generated hazardous waste violated the corporation's rights under the Commerce Clause[46], the decision served to eliminate legislative options in all states that sought to protect residents from the influx of out-of-state-generated hazardous waste.

**V**. **The Ordinance is a lawful exercise of the right of local, community self-government, and Plaintiffs' claims must fail by operation of it.**

The Intervenors have shown the natural and historical basis for the fundamental right of local, community self-government for the people of Mora. It remains only to show that Plaintiffs' claims are unavailable through a lawful exercise of the right via the Ordinance.

---

[45] In her opinion, Judge O'Dell Seneca held that corporations' privacy interests were not protected by the Pennsylvania Constitution's Declaration of Rights.
[46] *See Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334 (1992).

Intervenors do so here in three subsections. The first shows how the Ordinance codifies the people's political and civil rights. The second shows how the Ordinance bans corporate activity that would violate those rights. And the third shows how the Ordinance alters the system of local government in Mora County by eliminating doctrines of law that render the people unable to secure and protect their rights.

### A. The Ordinance codifies political and civil rights for the people of Mora County.

The Declaration of Independence established that all governments *of right* inherently derive their authority, that it, their actual powers, from the people of the community that the government serves. And that it is the job of government to protect that people's inherent, inalienable political and civil rights to life, liberty, safety, and happiness. Federal and state constitutions reaffirmed the legitimate role of government by protecting the fundamental rights of the people in state and federal bills of rights. Those bills of rights enhanced the Declaration's framework of political and civil rights by articulating rights to freedom of speech and religion, freedom from unreasonable searches and seizures, rights to due process and fair trials, freedom from cruel and unusual punishment, rights to equal protection, and others.

Now, pursuant to the Ordinance, Mora Countians have secured their right of local, community self-government at the local level (Ordinance §§ 4.5, 4.6). And they have used the right to articulate and codify certain additional fundamental rights:

Section 4.1. *Right to Water*: All residents, natural communities and ecosystems in Mora County possess a fundamental and inalienable right to sustainably access, use, consume, and preserve water drawn from natural water cycles that provide water necessary to sustain life within the County.

Section 4.2. *Right of Water for Agriculture*: All Mora County residents possess the fundamental and inalienable right to unpolluted natural water to produce healthy food, to

nourish our bodies, livestock and land and to continue "La Querencia de la Tierra," Love of the Land.

Section 4.3. *Rights of Natural Communities*: Natural communities and ecosystems, including, but not limited to, wetlands, streams, rivers, aquifers, and other water systems, possess inalienable and fundamental rights to exist and flourish within Mora County against oil and gas extraction….

Section 4.4. *Right to a Sustainable Energy Future*: All residents, natural communities, and ecosystems in Mora County possess a right to a sustainable energy future, which includes, but is not limited to, the development, production, and use of energy from renewable fuel sources, and the right to have an energy system based on fuel sources other than fossil fuel sources. This right shall also include the right to energy practices that do not cause harm, and which do not threaten to cause harm, to people, communities, or the natural environment….

Section 4.7. *Rights of La Querencia de la Tierra*: The farm-based indigenous/mestizo (mixed blood) people who created the original Mora County culture considered the Earth to be living and holy; thus they referred to their homeland as "La Querencia de la Tierra." Love of the Land. This sacredness connotes an intrinsic right of the land to exist without defilement.

Ordinance, §§ 4.1, 4.3, 4.2, 4.4, 4.7.

      **B.  The Ordinance bans corporate oil and gas extraction to protect the peoples' fundamental civil rights.**

To protect the rights secured by the Ordinance—both the core political right of local, community self-government, and the various civil rights pertaining to water, natural communities, energy, and land—the Ordinance next outlaws within the County the following activity by corporations and their agents: extraction of oil, natural gas, or other hydrocarbons (§ 5.1); extraction or importation of water and other substances for use in oil and gas extraction (§ 5.2); depositing, storing, transporting, or processing within Mora County waste water and other materials used in oil and gas extraction (§ 5.3); and construction or maintenance of infrastructure for oil and gas extraction (§5.4).

The Ordinance makes clear in two places that the purpose of these bans on corporate activity is to protect the political and civil rights of people secured by the Ordinance. The first place is the express purpose of the Ordinance, which says:

> The People of Mora County recognize that water is essential for the life, prosperity, sustainability, and health of their community and that damage to natural groundwater and surface water sources imposes great tangible loss, to the People, natural communities and ecosystems of Mora County, not just for today but for future generations. The People of Mora County recognize that they may be forced, without their consent, to endure or attempt to repair harm inflicted on their environment and their vital water supply, which they have no equivalent governing authority to prevent under current state and federal law. The governing body of Mora County adopts this … Ordinance to overcome that liability, to provide for community health and safety, to promote a sustainable lifestyle, and to secure the comfort and convenience of the people. (§ 1.2)

The second place is in the Board's legislative findings:

> WHEREAS, We recognize the Earth, water, and air as a source of life for all living in Mora County; and
>
> WHEREAS, We are convinced that the quality of life for residents of Mora County, for both the present and the future, will be destroyed if we allow at-risk exploitation and pollution of the Earth, water, and air; and
>
> WHEREAS, We the People of the County of Mora declare that we have the duty to safeguard the water both on and beneath the Earth's surface, and in the process, *safeguard the rights of people within the county of Mora and the rights of the ecosystems of which Mora County is a part;* and
>
> WHEREAS, We the People of Mora County declare that all of our water is held in the public trust as a common resource to be used for the benefit of Mora residents and of the natural ecosystems of which they are a part. We believe that industrial use of water supplies in this county placing the control of water in the hands of a corporate few, rather than the county would constitute abuse and usurpation; and that we are therefore duty bound to oppose such abuse and usurpation. That same duty requires us to recognize that two centuries' worth of governmental conferral of constitutional powers upon corporations has deprived people of the authority to govern their own communities, and requires us to take affirmative steps to remedy that usurpation of governing power; and
>
> WHERAS, we are conscious of the urgency of taking decisive action to protect our collective rights and the rights of future generations, and of ensuring a balanced environment for the survival of all residents of Mora County; THERFORE
>
> Be it Ordained by the Governing Body of Mora County, New Mexico…An Ordinance Protecting the Right of Human Communities, Nature, and Natural Water, By Establishing a Local Bill of Rights for Mora County that Protects the Natural Sources of Water from Damage Related to the Extraction of Oil, Natural Gas, or Other Hydrocarbons, By Affirming the Right to Local Autonomy and Self-Governance, and by Eliminating Legal Privileges and Powers from Corporations Violating the Ordinance. [Ordinance at whereas clauses; emphasis added]

Case law makes clear that this Court is bound to accept the Board's purpose and legislative findings as stated in the Ordinance when evaluating the lawfulness of the Ordinance. *Crider v. County of Boulder,* 246 F.3d 1285 (10th Cir. 2001) (subjective intent of individual local legislators irrelevant to Fourteenth Amendment substantive due process claim against ordinance); *Foley v. City of Las Vegas*, 747 F.2d 1294 (9th Cir. 1984) (subjective intent of individual local legislators irrelevant to First Amendment claim against ordinance).

### C.   The Ordinance alters local government in Mora County by eliminating doctrines of law that render the County incapable of protecting the peoples' fundamental political and civil rights.

To prevent the political and civil rights secured by the Ordinance from being infringed by nullification of the bans on corporate oil and gas extraction and related activity, the Ordinance strips corporations of legal powers that enable them to nullify lawmaking, in five ways. First, corporations violating or seeking to engage in activity banned by sections 5.1 through 5.4 shall not be afforded the constitutional rights or protections of persons under the U.S. and New Mexico Constitutions (§5.5). Second, corporations and their agents violating or seeking to engage in activity banned by sections 5.1 through 5.4 shall not have power to wield the doctrine of preemption or otherwise to challenge the Ordinance when such a challenge would interfere with the rights protected by the Ordinance or the authority of the County to protect the health, safety, and welfare of residents (§5.6). Third, corporations and their agents may not use federal or state permits, licenses, privileges, or charters to violate bans in or rights protected by the Ordinance (§5.7). Fourth, federal and state bills of rights are preemptive law in Mora County only to the extent that they are not inconsistent with the Ordinance's provisions on corporate powers and rights, and only to the extent that they do not elevate property interests over rights

secured by the Ordinance (§5.8). Fifth and finally, federal and state law shall be preemptive within Mora County only when they are both expressly preemptive and provide greater protection of the people's health, safety, and welfare than the County law to be preempted (§5.9).

Prior to enactment of the Ordinance, the only political and civil rights county government could secure for the people of Mora were those that could be enforced *without interfering with corporate constitutional "rights."* If plaintiffs are allowed to use constitutional "rights" and preemption to override bans meant to protect the people's fundamental political and civil rights, Mora County's community bill of rights becomes worthless, because rights-infringing activities then would be allowed to proceed. Thus the paper rights of a species of *property* would render the government of Mora County unable to secure and enforce the fundamental rights of the *people*. Vindicating corporate "rights" automatically usurps the ability of county government to protect the peoples' rights. Our system of law may enforce one set of rights or the other; but the system cannot enforce both. It is this conflict that inevitably, and unconstitutionally, restricts and constrains the ability of the county government to secure the people's civil rights.

It is evident from the text of the Ordinance in its legislative findings, purpose, and statements of law, that the County Board of Commissioners fully understood this legal reality when enacting the Ordinance. It understood that the doctrine of corporate constitutional "rights" would enable corporations to nullify corporate bans deemed necessary for protection of the people's political and civil rights. And it understood that under the right of local, community self-government, the people have the right and duty to alter a system of local government that is unable to protect their rights. So through the Ordinance, the people altered county government in Mora by stripping corporations of the ability to use constitutional rights to challenge and nullify the *bans imposed by the Ordinance. The sections of law in the Ordinance that accomplish this*

*are narrowly applied, only to corporations* and their agents engaged in or seeking to engage in oil and gas extraction or related activity, and only to prohibit a certain category of corporate constitutional "rights." Without these sections, the people of Mora County—under the prior system of county government constricted by corporate "rights" would be stranded with a local bill of rights they could neither assert nor enforce. Rejecting that unacceptable scenario, the people of Mora County have altered their old, illegitimate system of county government, and replaced it with a new, legitimate one.

**VI.  Conclusion.  The Plaintiff's Complaint asserts constitutional causes of action against the Defendants to nullify the Ordinance [Doc 1]. Because those claims are unavailable by operation of the Ordinance and the Constitutional Law on which the Ordinance is based, the Intervenor Defendants are entitled to dismissal of those claims as a matter of law.**

For the reasons asserted herein, the Intervenor Defendants are entitled to dismissal of the instant action.

Respectfully submitted this 3rd Day of January, 2016.

/s/ Jeffrey H. Haas
Jeffrey H. Haas, Esq.
Attorney for Intervenor Defendants
1433 Seville Road
Santa Fe, New Mexico 87505
(505) 469-0714
Jeffhhaas@aol.com

## CERTIFICATE OF SERVICE

I, Jeffrey H. Haas, Attorney at Law hereby certify that on the 3rd day of January 2015, the foregoing was filed electronically through the CM/ECF system, which caused the following counsel to be served by electronic means.

/s/ Jeffrey H. Haas


Bradford C. Berge
Michael Feldewert
Larry J. Montaño
John C. Anderson
110 N. Guadalupe, Suite 1
Post Office Box 2208
Santa Fe, New Mexico 87504-2208
TEL:   (505) 988-4421 FAX: (505) 983-6043
*bberge@hollandhart.com*
*mfeldewert@hollandhart.com*
*lmontano@hollandhart.com*
*jcanderson@hollandhart.com*

Nancy R. Long
Justin W. Miller
2200 Brothers Road P. O. Box 5098 Santa Fe, NM 87502-5098
505-982-8405
505-982-8513 (FAX)
*nancy@longpoundkomer .com*
*justin@longpoundkomer .com*
*email@longpoundkomer.com*