## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SWEPI, LP, a Delaware
Limited Partnership,

       Plaintiff,

vs.                                                                                   No. CIV 14-0035 JB/SCY

MORA COUNTY, NEW MEXICO;
MORA COUNTY BOARD OF COUNTY
COMMISSIONERS; PAULA A. GARCIA,
Mora County Commissioner; JOHN P. OLIVAS,
Mora County Commissioner; and ALFONSO J.
GRIEGO, Mora County Commissioner,

       Defendants,

and

LA MERCED DE SANTA GETRUDIS DE LO
DE MORA, a Land Grant; and JACOBO E.
PACHECO, an Individual,

       Defendant-Intervenors.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on SWEPI's Motion for Partial Judgment on the Pleadings, filed May 31, 2014 (Doc. 21)("Motion").   The Court held a hearing on November 3, 2014.   The primary issues are: (i) whether the Court may consider evidence outside the pleadings to determine issues of justiciability; (ii) whether Plaintiff SWEPI, LP has standing to bring its claims; (iii) whether SWEPI, LP's claims are ripe; (iv) whether SWEPI, LP can bring a claim for a violation of the Supremacy Clause of article 6 of the Constitution of the United States of America; (v) whether the Mora County, N.M., Ordinance 2013-10 (2013), filed January 10, 2014 (Doc. 1-1)("Ordinance"), violates the Supremacy Clause; (vi) whether the Ordinance violates

SWEPI, LP's substantive due-process rights; (vii) whether the Ordinance violates the Equal Protection Clause of Fourteenth Amendment to the Constitution of the United States; (vii) whether the Ordinance violates the First Amendment to the Constitution of the United States; (viii) whether the Defendants have the authority to enforce zoning regulations on New Mexico state land; (ix) whether New Mexico state law preempts the entire field of oil-and-gas production; (x) whether the Ordinance conflicts with state law; and (xi) whether the valid provisions of the Ordinance can be severed from the invalid provisions.   Because the Court may consider evidence outside the pleadings for issues of justiciability, the Court will consider outside evidence solely to determine standing and ripeness.   SWEPI, LP has suffered an injury in fact and thus has standing to bring each of its claims.   Additionally, because the Ordinance has already been enacted, and because SWEPI, LP would suffer harm if the Court delayed considering its claims, each of SWEPI, LP's claims are ripe, except for its claim under the Takings Clause of the Fifth Amendment to the Constitution of the United States.   SWEPI, LP has not sought just compensation for its takings claim through a state inverse condemnation action, and, as such, it is not ripe.   SWEPI, LP may bring its claim under the Supremacy Clause, because it can bring independent claims through a 42 U.S.C. § 1983 action and under the constitutional provisions that it asserts trumps the Ordinance. Also, the Ordinance violates the Supremacy Clause by conflicting with federal law, and certain provisions must be invalidated.   The Ordinance does not, however, violate SWEPI, LP's substantive due-process rights, because the Defendants had a legitimate state interest for enacting the Ordinance.   For the same reason, the Ordinance does not violate the Equal Protection Clause. The Ordinance violates the First Amendment by chilling protected First Amendment activities. The Defendants lack the authority to enforce zoning laws on New Mexico state lands, and thus, may not enforce the Ordinance on state lands.   Because there is room for concurrent jurisdiction

between state and local laws, New Mexico state law does not preempt the entire field of oil-and-gas production.   The Ordinance, however, conflicts with New Mexico state law by banning hydrocarbon extraction activities, and certain provisions must be invalidated.   Finally, the invalid provisions are not severable from the remaining valid provisions, and the Ordinance, in its entirety, must be invalidated.   The Court will, thus, grant the Motion in part and deny it in part, and will invalidate the Ordinance.

## FACTUAL BACKGROUND

In deciding a motion for judgment on the pleadings that a plaintiff filed, the Court may consider only "'allegations of fact [that] are admitted or not controverted in the pleadings'" so that "'only questions of law remain to be decided by the district court.'"   Kellar v. U.S. Dep't of Veteran's Affairs, No. CIV 08-0761 WYD/KLM, 2009 WL 1706719, at *1 (D. Colo. June 17, 2009)(Daniel, C.J.)(quoting 5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1367 (3d ed. 2004)).   The Court will, thus, in connection with this motion for judgment on the pleadings, state and consider only those facts alleged in the Complaint for Declaratory and Injunctive Relief and Damages, filed January 10, 2014 (Doc. 1)("Complaint"), which the Defendants did not deny in the Answer to Complaint, filed March, 13, 2014 (Doc. 9)("Answer").   The Court's previous Memorandum Opinion and Order provides a fuller statement of the allegations in the Complaint, including allegations which the Defendants deny. See SWEPI, LP v. Mora Cnty., No. CIV 14-0035 JB/SCY, 2014 WL 6983288, at *1-11 (D.N.M. Dec. 5, 2014)(Browning, J.).

1.      **The Parties.**

SWEPI, LP filed the Complaint, seeking an injunction to prohibit the Defendants from enforcing the Ordinance and seeking monetary damages.   See Complaint ¶ 2, at 2; Answer ¶ 2,

at 2.   SWEPI, LP entered into an oil-and-gas lease with the State of New Mexico through a lease dated August 1, 2010.   See Complaint ¶ 5, at 2; Answer ¶ 5, at 2 ("Defendants admit that a copy of a lease dated August 1, 2010 between the State of New Mexico and SWEPI is attached to the Complaint as exhibit 3.").   See also Oil and Gas Lease between SWEPI LP and the State of New Mexico, dated August 1, 2010, filed January 1, 2014 (Doc. 1-3)("Aug. 1, 2010, Lease").[1]

Mora County, New Mexico, is a political subdivision of the State of New Mexico.   See Complaint ¶ 8, at 3.   The Mora County Board of Commissioners is the governing body responsible for exercising the powers that the State of New Mexico has vested in Mora County. See Complaint ¶ 9, at 4.   Paula A. Garcia, John P. Olivas, and Alfonso J. Griego (collectively the "Individual Commissioners") are the three members of the Mora County Board of Commissioners. Complaint ¶¶ 10-12, at 4.

2.   **The Ordinance.**

On April 29, 2013, the Mora County Board of County Commissioners voted two to one to adopt the "Mora County Community Water Rights and Local Self-Government Ordinance." Ordinance 2013-01 (the "Ordinance").   Complaint for Declaratory and Injunctive Relief and

---

[1]SWEPI, LP also attached a portion of an oil-and-gas lease to the Complaint while alleging that it attached a copy of a lease dated April 1, 2010.   See Complaint ¶ 4, at 2; Exhibit 2, filed January 10, 2014 (Doc. 1-2).   The Defendants, in the Answer, denied that a copy of a lease is attached to the Complaint, but noted that an "incomplete copy of a Memorandum of Oil and Gas Lease purportedly executed on April 1, 2010 but acknowledged on April 6, 2010 is attached to the Complaint as Exhibit 2."   Answer ¶ 4, at 2.   On May 13, 2014, SWEPI, LP filed a notice of errata stating that its Exhibit 2 to the Complaint failed to properly display the original filing and that it attached to the notice an accurate copy of the exhibit.   See Notice of Errata, filed May 13, 2014 (Doc. 20)("Notice of Errata").   SWEPI, LP attached to the Notice of Errata a copy of a lease that is dated April 1, 2010.   See Memorandum of Oil and Gas Lease, filed May 13, 2014 (Doc. 20-1).

Damages ¶ 1, at 1, filed January 10, 2014 (Doc. 1)("Complaint"); id. ¶ 31, at 8.   See Answer ¶ 1, at 1; id. ¶ 31, at 5.[2]   The Ordinance, in full, provides:

> WHEREAS, We, the residents in Mora County, are a multi-cultural community with indigenous roots of Many; and
>
> WHEREAS, We recognize the Earth, water, and air as a source of life for all living in Mora County; and
>
> WHEREAS, We are convinced that the quality of life for residents in Mora County, for both the present and the future, will be destroyed if we allow at-risk exploitation and pollution of the Earth, water, and air; and
>
> **WHEREAS, We the People of the County of Mora declare that we have the duty to safeguard the water both on and beneath the Earth's surface, and in the process, safeguard the rights of people within the county of Mora and the rights of the ecosystems of which Mora County is a part; and**
>
> **WHEREAS, We the People of Mora County declare that all of our water is held in the public trust as a common resource to be used for the benefit of Mora residents and of the natural ecosystems of which they are a part.  We believe that industrial use of water supplies in this county placing the control of water in the hands of a corporate few, rather than the county would constitute abuse and usurpation; and that we are therefore duty bound to oppose such abuse and usurpation.  That same duty requires us to recognize that two centuries' worth of governmental conferral of constitutional powers**

---

[2]In the Complaint, SWEPI, LP states that the Ordinance is titled the "Mora County Water Rights and Local Self-Governance Ordinance."  Complaint ¶ 1, at 1.  The Defendants admit that that the Mora County Board of County Commissioners passed the Ordinance, "but state that the correct name of the Ordinance is the 'Mora County Community Water Rights and Local Self-Governance Ordinance.'"  Answer ¶ 1, at 1.  The Ordinance, which SWEPI, LP attached to the Complaint, is titled the "Mora County Community Water Rights and Local Self-Governance Ordinance."  Mora County, N.M., Ordinance 2013-10 §1.1 (2013), filed January 10, 2014 (Doc. 1-1)("This Ordinance shall be known and may be cited as the 'Mora County Community Water Rights and Local Self-Government Ordinance.'").  In deciding a rule 12(c) motion, the Court may consider the pleadings and documents attached to the pleadings.  See O'Donnell v. Sullivan, No. CIV 10-0133, 2010 WL 2585286, at *1 (D. Colo. June 23, 2010)(Babcock, J.)("A Rule 12(c) motion is confined to the pleadings and to any documents attached as exhibits to the pleadings, including the defendant's answer."  (internal citation omitted)(internal quotation marks omitted)).  Additionally, "[w]hen a document attached to the pleadings contradicts the allegations of the complaint, the document controls."  Morehead v. Keller, 845 F. Supp. 2d 689, 694 n.1 (W.D.N.C. 2012)(Conrad, C.J.)(citing Nishimatsu Constr. Co. v. Houston Nat'l Bank, 515 F.2d 1200, 1206 (5th Cir. 1975)).  Accordingly, the Court will refer to the Ordinance's title as "Mora County Community Water Rights and Local Self-Government Ordinance," in conformance with the Ordinance that is attached to the Complaint.

**upon corporations has deprived people of the authority to govern their own communities, and requires us to take affirmative steps to remedy that usurpation of governing power; and**

WHEREAS, we are conscious of the urgency of taking decisive action to protect our collective rights and the rights of future generations, and of ensuring a balanced environment for the survival of all residents of Mora County; THEREFORE,

BE IT ORDAINED BY THE GOVERNING BODY OF MORA COUNTY, NEW MEXICO . . . AN ORDINANCE PROTECTING THE RIGHT OF HUMAN COMMUNITIES, NATURE, AND NATURAL WATER, BY ESTABLISHING A LOCAL BILL OF RIGHTS FOR MORA COUNTY THAT PROTECTS THE NATURAL SOURCES OF WATER FROM DAMAGE RELATED TO THE EXTRACTION OF OIL, NATURAL GAS, OR OTHER HYDROCARBONS, BY AFFIRMING THE RIGHT TO LOCAL AUTONOMY AND SELF-GOVERNANCE, AND BY ELIMINATING LEGAL PRIVILEGES AND POWERS FROM CORPORATIONS VIOLATING THE ORDINANCE.

## Section 1.   Name and Purpose

Section 1.1 *Name*:   This Ordinance shall be known and may be cited as the "Mora County Community Water Rights and Local Self-Government Ordinance."

Section 1.2 *Purpose*:   The People of the County of Mora are a cohesive community of diverse elements, united by common culture, social bonds and a common destiny, and are represented politically in various aspects by the Mora County Government, numerous Acequias, Land Grants and Mutual Domestic Water Consumers Associations.   The People of Mora County recognize that water is essential for the life, prosperity, sustainability, and health of their community and that damage to natural groundwater and surface water sources imposes great tangible loss, to the People, natural communities and ecosystems of Mora County, not just for today but for future generations.   The People of Mora County recognize that they may be forced, without their consent, to endure or attempt to repair harm inflicted on their environment and their vital water supply, which they have no equivalent governing authority to prevent under current state and federal law.   The governing body of Mora County adopts this Mora County Community Water Rights and Local Self-Government Ordinance to overcome that liability, to provide for community health and safety, to promote a sustainable lifestyle, and to secure the comfort and convenience of the people.

## Section 2.   Authority

This Ordinance is enacted pursuant to the inherent right of the residents of Mora County to govern their own community.   That authority precedes government and is secured, without limitation, by:

The Treaty of Guadalupe Hidalgo, Article VIII & Article IX, which guarantees the "free enjoyment of their liberty and property" of the inhabitants of what became Mora County, and which states that property of every kind "shall be inviolably respected."   According to a 2001 Government Accounting Office report (http://www.gao.gov/new.iemts/d01951.pdt), this guarantees traditional communal use rights under the Treaty, including, but not limited to, the following rights-hunting "caza," pasture "pastas," wood gathering "leña," and watering "abrevederos;"

The Declaration of Independence, which states that governments are instituted to secure the rights of people, "deriving their just powers from the consent of the governed;"

The New Mexico Constitution, Article 2, which declares that "all political power is vested in and derived from the people: all government of right originates with the people, is founded upon their will and is instituted solely for their good."   That section also declares that the people "have the sole and exclusive right to govern themselves as a free, sovereign, and independent state" and that "all persons are born equally free, and have certain natural, inherent and inalienable rights" and that "[t]he enumeration in this constitution of certain rights shall not be construed to deny, impair, or disparage others retained by the people;"

The Mora County Comprehensive Land Use Plan, which states that "[t]he connection between our land, our water and our people has sustained our culture since the first settlements in Mora County, and our future depends on keeping these connections strong.   Water is a vital link, which, if severed from the land, will also fragment our people from their land.   The allocation of our limited water resources must recognize traditional subsistence agricultural and grazing activities as a priority over other types of more profitable land uses.   Water is not just a commodity to be bought and sold, or exploited for short-term gains.   Water is the lifeblood of Mora County's traditions, culture and land use.   A sustainable future for Mora County requires protection of the most valuable resource for our communities -- the Water!"

### Section 3.   Definitions

Section 3.1:   "Corporation" shall mean any corporation, limited partnership, limited liability partnership, business trust, or limited liability company organized under the laws of any state of the United States or under the laws of any country, and any other business entity that possesses State-conferred limited liability attributes for its owners, directors, officers, and/or managers.

Section 3.2:   "Extraction" shall mean the digging or drilling of a well for the purposes of exploring for, developing or producing oil, natural gas, or other hydrocarbons.

Section 3.3:   "Horizontal drilling" shall mean intentional deviation of a wellbore from the vertical for the purpose of reaching subsurface areas laterally remote from the point where a well drilling bit or similar equipment enters the earth at the surface.

Section 3.4:   "Hydraulic fracturing" shall mean an activity in which water, propane, diesel, chemicals and a solid proppant or any other agent are pumped into a wellbore at a rate sufficient to increase the pressure downhole to a value in excess of the fracture gradient of the formation rock, causing the formation to crack, thus allowing the fracturing fluid to enter and extend the crack farther into the formation, forming passages through which natural gas, oil, or other hydrocarbons can flow.

Section 3.5:   "Hydrocarbons" shall mean any of numerous organic compounds, such as benzene and methane, that contain only carbon and hydrogen.

Section 3.6:   "La Querencia de la Tierra" shall mean the loving respect which Mora County residents have towards the land and Earth, which is rooted in our indigenous worldview -- the Earth is living and holy, is the habitat that sustains us, and is composed of all natural & living systems, flora and fauna -- interrelated, interdependent and complementary -- which share our common destiny: The right to live free from contamination.

Section 3.7:   "Natural Gas" shall mean any gaseous substance, either combustible or noncombustible, which is produced in a natural state from the earth and which maintains a gaseous or rarified state at standard temperature or pressure conditions, and/or gaseous components or vapors occurring in, or derived from, petroleum or natural gas.

Section 3.8:   "Oil" shall mean any thick, flammable, yellow-to-black mixture of gaseous, liquid, and solid hydrocarbons that occur naturally beneath the earth's surface.

## Section 4.   Statements of Law -- Rights of Mora County Residents and the Natural Environment

Section 4.1. *Right to Water*:   All residents, natural communities and ecosystems in Mora County possess a fundamental and inalienable right to sustainably access, use, consume, and preserve water drawn from natural water cycles that provide water necessary to sustain life within the County.

Section 4.2. *Right of Water for Agriculture*:   All Mora County residents possess the fundamental and inalienable right to unpolluted natural water to produce healthy food, to nourish our bodies, livestock and land and to continue "La Querencia de la Tierra," Love of the Land.

Section 4.3. *Rights of Natural Communities*:   Natural communities and ecosystems, including, but not limited to, wetlands, streams, rivers, aquifers, and other water systems, possess inalienable and fundamental rights to exist and flourish within Mora County against oil and gas extraction.  Residents of the County, along with the Mora County Commission, shall possess legal standing to enforce those rights on behalf of those natural communities and ecosystems. Natural communities and ecosystems protected by this ordinance shall be protected on all lands within Mora County, including those owned by the state and federal government

Section 4.4. *Right to a Sustainable Energy Future*:   All residents, natural communities, and ecosystems in Mora County possess a right to a sustainable energy future, which includes, but is not limited to, the development, production, and use of energy from renewable fuel sources, and the right to have an energy system based on fuel sources other than fossil fuel sources.  This right shall also include the right to energy practices that do not cause harm, and which do not threaten to cause harm, to people, communities, or the natural environment.

Section 4.5. *Right to Self-Government*:   All residents of Mora County possess the fundamental and inalienable right to a form of governance where they live which recognizes that all power is inherent in the people, that all free governments are founded on the people's authority and consent, and that corporate entities and their directors and managers shall not enjoy special privileges or powers under the law which make community majorities subordinate to them.

Section 4.6. *People are Sovereign*:   The Mora County Commission shall be the governing authority responsible to, and governed by, the residents of the County. Use of the "Mora County" municipal corporation by the sovereign people of the County to make law shall not be construed to limit or surrender the sovereign authority or immunities of the people to a municipal corporation that is subordinate to them in all respects at all times.  The people at all times enjoy and retain an inalienable and indefeasible right to self-governance in the community where they reside.

Section 4.7. *Rights of La Querencia de la Tierra*:   The farm-based indigenous/mestizo (mixed blood) people who created the original Mora County culture considered the Earth to be living and holy; thus they referred to their homeland as "La Querencia de la Tierra," Love of the Land.  This sacredness connotes an intrinsic right of the land to exist without defilement.

Section 4.8. *Rights are Self-Executing*:   All rights delineated and secured by this ordinance shall be self-executing and these rights shall be enforceable against both public and private actors, and shall not require implementing legislation for their enforceability.

Section 4.9. *Exemption.*   Nothing in this ordinance shall be construed in such a manner as to impact the water rights of acequias, Mutual Domestic Water Consumers Associations or land grant, or to affect or color any negotiations regarding water rights, distribution or usage between these political subdivisions and the County of Mora.

## Section 5.   Statements of Law Prohibitions Necessary to Secure Bill of Rights' Protections

Section 5.1:   It shall be unlawful for any corporation to engage in the extraction of oil, natural gas, or other hydrocarbons within Mora County.

Section 5.2:   It shall be unlawful for any corporation to engage in the extraction of water from any surface or subsurface source within Mora County for use in the extraction of subsurface oil, natural gas, or other hydrocarbons, or for any director, officer, owner, or manager of a corporation to use a corporation to extract water from any surface or subsurface source, within Mora County, for use in the extraction of subsurface oil or natural gas or other hydrocarbons.   It shall be unlawful for a corporation to import water or any other substance, including but not limited to, propane, sand, and other substances used in the extraction of oil, natural gas, or other hydrocarbons, into Mora County for use in the extraction of subsurface oil, natural gas, or other hydrocarbons; or for any director, officer, owner, or manager of a corporation to do so.

Section 5.3:   It shall be unlawful for any corporation, or any director, officer, owner, or manager of a corporation to use a corporation to deposit, store, transport or process waste water, "produced" water, "frack" water, brine or other materials, chemicals or by-products used in the extraction of oil, natural gas, or other hydrocarbons, into the land, air or waters within Mora County.

Section 5.4:   It shall be unlawful for any corporation, or any director, officer, owner, or manager of a corporation to use a corporation to construct or maintain infrastructure related to the extraction of oil, natural gas, or other hydrocarbons within Mora County.   "Infrastructure" shall include, but not be limited to, pipelines or other vehicles of conveyance of oil, natural gas, or other hydrocarbons, and any ponds or other containments used for wastewater, "frack" water, or other materials used during the process of oil, gas, or other hydrocarbon extraction.

Section 5.5:   Corporations in violation of the prohibitions enacted by this ordinance, or seeking to engage in activities prohibited by this ordinance, shall not have the rights of "persons" afforded by the United States and New Mexico

Constitutions, nor shall those corporations be afforded rights under the 1st or 5th amendments to the United States Constitution or corresponding sections of the New Mexico Constitution, nor shall those corporations be afforded the protections of the commerce or contracts clauses within the United States Constitution or corresponding sections of the New Mexico Constitution.

Section 5.6:   Individuals or corporations in violation of the prohibitions enacted by this ordinance, or seeking to engage in activities prohibited by this ordinance, shall not possess the authority or power to enforce State or federal preemptive law against the people of Mora County, or to challenge or overturn County ordinances adopted by the Mora County Commission, when that enforcement or challenge interferes with the rights asserted by this ordinance or interferes with the authority of the county to protect the health, safety, and welfare of its residents.

Section 5.7:   No permit, license, privilege or charter issued by any state or federal agency, Commission or Board to any person or any corporation operating under a State charter, or any director, officer, owner, or manager of a corporation operating under a State charter, which would violate the prohibitions of this Ordinance or deprive any County resident(s), natural community, or ecosystem of any rights, privileges, or immunities secured by this Ordinance, the Treaty of Guadalupe Hildalgo, the New Mexico Constitution, the United States Constitution, or other laws, shall be deemed valid within Mora County.

Section 5.8:   The New Mexico Constitution's Bill of Rights, and the United States Constitution's Bill of Rights and amendments thereto, shall be recognized as preemptive law within the County of Mora only to the extent that their interpretation and application are not inconsistent with the provisions of this Ordinance regarding the powers and "rights" of corporations, and to the extent that they do not otherwise elevate property interests over rights secured by this Ordinance.

Section 5.9:   Laws adopted by the legislature of New Mexico and rules adopted by any State agency, and laws adopted by the United States Congress and rules adopted by any federal agency, shall be recognized as preemptive law within the County of Mora only if those laws and rules both expressly preempt County ordinances and charters, and provide greater protections for the health, safety, and welfare of the people of Mora County than County ordinances and charters.

## Section 6.   Strict Liability

Section 6.1:   Persons using corporations to engage in the extraction of oil, natural gas or other hydrocarbons in a neighboring municipality shall be strictly liable for all harms caused to the health, safety, and welfare of the residents of Mora County from those activities, and for all harms caused to ecosystems and natural communities within Mora County.

**Section 7.   Future Lost Profits**

Section 7.1:   Within the County of Mora, corporate claims to "future lost profits" shall not be considered property interests under the law, and thus, shall not be recoverable by corporations seeking those damages.

**Section 8.   Enforcement**

Section 8.1.   Any violation of any provision of this Ordinance shall be considered a criminal offense, punishable by maximum penalties and imprisonment as authorized by applicable New Mexico law.  Each instance of a violation of the provisions of this Ordinance shall be treated as a separate offense subject to penalties authorized by applicable New Mexico law.

Section 8.2:   Mora County may enforce this Ordinance through an action brought in any court of competent jurisdiction.   In such an action, Mora County shall be entitled to recover all costs of litigation, including, without limitation, expert and attorney's fees, in addition to damages caused by the violation of this ordinance.

Section 8.3:   Any County resident shall have the authority to enforce this Ordinance through an action brought in a court of competent jurisdiction.   In such an action, the resident shall be entitled to recover all costs of litigation, including, without limitation, expert and attorney's fees.

Section 8.4:   Any person or municipality who brings an action to secure or protect the rights of natural communities or ecosystems against oil and gas extraction within Mora County shall bring that action in the name of the natural community or ecosystem in a court of competent jurisdiction.   Damages shall be measured by the cost of restoring the natural community or ecosystem to its pre-damaged state, and shall be paid to the County of Mora or other applicable governmental entity, to be used exclusively for the full and complete restoration of the natural community or ecosystem.

Section 8.5. Reinstatement of Moratorium on Oil and Gas Extraction.   In the event that this ordinance is overturned or nullified, for any reason, a moratorium on the extraction of oil and gas within the County of Mora shall become effective on the date that this ordinance becomes inactive.   That temporary moratorium shall have a duration of no more than six months, during which the Board of County Commissioners shall adopt another ordinance which permanently bans hydrocarbon extraction within the County of Mora.

**Section 9   Effective Date and Existing State Permit Holders**

This Ordinance shall be effective five (5) days after the date of its enactment, at which point the Ordinance shall apply to any and all extractions of oil, natural gas,

or other hydrocarbons in Mora County regardless of the date of any applicable governmental permits.

## Section 10. County Commission Action and Voter Referenda to Repeal Ordinance

The foundation for the making and adoption of this law is the people's fundamental and inalienable right to govern themselves, and thereby secure their rights to life, liberty, and the pursuit of happiness.   Accordingly, this Ordinance automatically suspends the operating rules of the Mora County Commission when the question of repealing this Ordinance is introduced.   Repeal of this ordinance shall require both a unanimous vote of the Mora County Commissioners voting in favor of the repeal of the ordinance, and a voter referenda following that vote which shall make the repeal effective only if two thirds of the Mora County electorate vote to repeal the ordinance.

## Section 11.   People's Right to Self-Government - Preemption

Any attempts to use other units and levels of government to preempt, amend, alter, or overturn this Ordinance, or parts of this Ordinance, shall require the County Commission to hold public meetings that explore the adoption of other measures that expand local control and the ability of residents to protect their fundamental and inalienable right to self-government.   Such consideration may include actions to separate the County from the other levels of government used to preempt, amend, alter, or overturn the provisions of this Ordinance or other levels of government used to intimidate the people of Mora County or their elected officials.

## Section 12.   New Mexico Constitutional Changes

Through the adoption of this local law, the people of Mora County call for amendment of the New Mexico Constitution to explicitly secure a community right to local self-government that cannot be preempted by the State if the community's laws enforce rights or standards more protective of the health, safety, and welfare of the people of Mora County and the natural environment, communities, and ecosystems.   The people of Mora County also call for a state constitutional amendment that explicitly elevates community rights above corporate property rights, and that recognize the rights of nature enforceable by the residents of a community.

## Section 13.     Severability

The provisions of this Ordinance are severable.   If any court of competent jurisdiction decides that any section, clause, sentence, part, or provision of this Ordinance is illegal, invalid, or unconstitutional, such decision shall not affect, impair, or invalidate any of the remaining sections, clauses, sentences, parts, or provisions of the Ordinance.   The Mora County Commission hereby declares that

in the event of such a decision, and the determination that the court's ruling is legitimate, it would have enacted this Ordinance even without the section, clause, sentence, part, or provision that the court decides is illegal, invalid, or unconstitutional.

**Section 14.   Repealer**

All inconsistent provisions of prior Ordinances adopted by the Mora County Commission are hereby repealed, but only to the extent necessary to remedy the inconsistency.

Ordinance at 1-6 (alterations in original)(bold in original).   See Answer ¶ 1, at 1 (admitted that the Ordinance is attached to the Complaint).

## PROCEDURAL BACKGROUND

On January 10, 2014, SWEPI, LP filed suit against Mora County, the Mora County Commissioners, and the Individual Commissioners, bringing a number of federal and state claims. See Complaint at 1.   SWEPI, LP seeks both injunctive and compensatory relief.   See Complaint ¶¶ 142-52, at 27-28.   Specifically, SWEPI, LP seeks a declaration that the Ordinance is unconstitutional and that it violates state law, and seeks an entry of judgment that permanently enjoins Mora County from enforcing the Ordinance.   See Complaint ¶ 2, at 2.   SWEPI, LP alleges nine claims of relief in the Complaint: (i) violation of the Supremacy Clause, U.S. Const. art. 6 cl. 2; (ii) violation of the Equal Protection Clause, U.S. Const. amend XIV, § 1; (iii) violation of the Dormant Commerce Clause, U.S. Const. art. 1, § 8, cl. 3; (iv) substantive due-process violation for taking arbitrary action; (v) substantive due-process violation for lacking a compelling or legitimate interest; (vi) ultra vires legislation; (vii) conflict preemption; (viii) violations First and Fourth Amendments to the Constitution of the United States of America; and (ix) violations of the Fifth and Fourteenth Amendments for an inverse condemnation.   See Complaint ¶¶ 52-141, at 13-26.   SWEPI, LP also attached to the Complaint the Ordinance, an oil-and-gas lease, and part of an oil-and-gas memorandum.   See Complaint ¶ 1, at 1; id. ¶¶ 4-5, at 2-3.

1.      **The Motion.**

On May 13, 2014, SWEPI, LP filed the Motion, asking to Court to grant it judgment on its first, second, fourth, fifth, sixth, seventh, eighth, and ninth claims for relief.   See Motion at 1. SWEPI, LP argues that the Court should declare the Ordinance unconstitutional, because it "legalizes invidious discrimination against corporations," and because it "purports to strip corporations of their rights" that the First, Fifth, and Fourteenth Amendments guarantee.   Motion at 1.   It asserts that the Ordinance, "[b]y its express terms, . . . contravenes over two hundred years of Supreme Court precedent squarely establishing that corporations have protected constitutional rights," which "may not simply be cast aside out of animosity or disdain toward the corporate form."   Motion at 1.

SWEPI, LP argues that the Ordinance violates the Supremacy Clause by stating that its provisions take precedence over conflicting or contrary federal law.   See Motion at 2.   SWEPI, LP contends that the Ordinance violates the Due Process Clause and the Equal Protection Clause by depriving SWEPI, LP of its property rights for an arbitrary reason: SWEPI, LP's status as an incorporated entity.   See Motion at 2.   SWEPI, LP argues that the Ordinance takes SWEPI, LP's property without just compensation by completely eliminating all economic value from its property in Mora County.   See Motion at 2.   SWEPI, LP also argues that the Ordinance eviscerates SWEPI, LP's constitutional rights under the First and Fifth Amendments.   See Motion at 2.   It maintains that the Ordinance is ultra vires and violates New Mexico state law by imposing local zoning regulations on New Mexico state lands.   See Motion at 2.   SWEPI, LP asserts that the Ordinance also violates state law by "dictating the use and effective abandonment of State oil and gas minerals that have been leased by the State to SWEPI."   Motion at 2.   Finally, SWEPI, LP argues that the Ordinance violates SWEPI, LP's property and contract rights that the New

Mexico Constitution protects by depriving SWEPI, LP of its "right to explore for and extract hydrocarbons pursuant to its fee and State leases."   Motion at 2.

SWEPI, LP first argues that the Ordinance violates the federal Constitution by invalidating protections that federal law affords in "a thinly veiled threat of secession from the United States." Motion at 3.   SWEPI, LP asserts that a local law is invalid under the Supremacy Clause if the law "'conflicts with federal law or stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.'"   Motion at 3 (quoting Lawrence Cnty. v. Lead-Deadwood Sch. Dist., 469 U.S. 256, 260 (1985).   It argues that states lack the authority to nullify federal rights that they think are inconsistent with their local policies.   See Motion at 3-4 (citing Haywood v. Drown, 556 U.S. 729, 736 (2009)).   SWEPI, LP contends that a party can bring a claim under the Supremacy Clause even if 42 U.S.C. § 1983 does not provide a right of action for Supremacy Clause violations.   See Motion at 4 n.4.   SWEPI, LP further contends that the Ordinance unlawfully attempts to establish that its provisions take priority over federal law.   See Motion at 4.   SWEPI, LP asserts that, according to the Ordinance, if there is a conflict between the Ordinance and the Constitution, the Ordinance trumps the Constitution, which, according to SWEPI, LP, "violates the very essence of the Supremacy Clause."   Motion at 4.   It contends that the Ordinance explicitly divests corporations of their constitutional rights and that the "unconstitutionality of such an enactment is beyond debate."   Motion at 4 (citing Julian v. Hanna, 732 F.3d 842, 847-48 (7th Cir. 2013)).   SWEPI, LP asserts that the Ordinance also attempts to close the courthouse doors to corporations that the Ordinance aggrieves, which, SWEPI, LP argues, is unconstitutional. See Motion at 4-5 (citing Ordinance § 5.6, at 4-5).

SWEPI, LP also argues that the Ordinance violates the Equal Protection Clause.   See Motion at 5.   It contends that the Supreme Court of the United States of America has held that

corporations are persons "within the meaning of the Equal Protection Clause and are entitled to its protections." Motion at 5 (citing Metropolitan Life Ins. Co. v. Ward, 470 U.S. 869, 881 n.9 (1985); Covington & Lexington Turnpike Rd. Co. v. Sanford, 164 U.S. 578, 592 (1896)). SWEPI, LP maintains that the Equal Protection Clause's purpose is to protect "'every person within the State's jurisdiction against intentional and arbitrary discrimination,'" Motion at 6 (quoting Willowbrook v. Olech, 528 U.S. 562, 564 (2000))(citing Rowland v. Mad River Local Sch. Dist., 470 U.S. 1009, 1014 (1985)), and that the applicable test in this case is "whether 'there is a rational relationship between the disparity of treatment and some legitimate governmental purpose,'" Motion at 6 (quoting Heller v. Doe, 509 U.S. 312, 320 (1993)).

SWEPI, LP asserts that a state "'may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.'" Motion at 6 (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446 (1985))(citing Romer v. Evans, 517 U.S. 620, 633 (1996). SWEPI, LP argues that "a state law motivated by animus and directed at a politically unpopular group cannot survive even a rational relationship test." Motion at 6 (citing United States Dep't of Agric. v. Moreno, 413 U.S. 528, 534 (1973)). It asserts that the Ordinance violates the Equal Protection Clause by "prohibiting corporations, but not individuals, from engaging in virtually any activity related to oil and gas exploration or production." Motion at 7. SWEPI, LP argues that that this distinction is invidious, bears no rational relationship to any legitimate state interest, and is motivated "by nothing more than a disdain for the corporate form." Motion at 7.

SWEPI, LP contends that the Supreme Court has held that disparate treatment between corporations and individuals bears no rational relationship to a legitimate state interest and, thus, violates the Equal Protection Clause. See Motion at 7. SWEPI, LP asserts that the Supreme

Court, in <u>Frost v. Corporation Commission of Oklahoma</u>, 278 U.S. 515 (1929), held that a law cannot arbitrarily favor a corporation over an individual or an individual over a corporation.   <u>See</u> Motion at 7-8.   SWEPI, LP contends that the only context in which the Supreme Court has upheld disparate treatment between corporations and individuals is in the taxation context, which SWEPI, LP contends is a distinct area of law and that the disparate treatment cannot be expanded outside the taxation context.   <u>See</u> Motion at 8 n.4.   It argues that the Ordinance forbids corporations from engaging in conduct in which individuals or unincorporated associations may engage.   <u>See</u> Motion at 8.   This disparate treatment, SWEPI, LP asserts, bears no rational relationship to a legitimate state interest.   <u>See</u> Motion at 8.

SWEPI, LP maintains that, if a state law is based on an invidious classification or is motivated by a desire to harm a politically unpopular group, the law violates the Equal Protection Clause.   <u>See</u> Motion at 8.   It contends that the Ordinance's disparate treatment between corporations and individuals is motivated "by a gross antipathy toward the corporate form," and that it is based on a discriminatory purpose against corporations.   Motion at 8-9.   SWEPI, LP argues that the Ordinance also discriminates against people associated with corporations by applying to directors, officers, owners, and managers of corporations.   <u>See</u> Motion at 9.   It argues that the Ordinance does not have a legitimate purpose, but that it is "a vindictive effort to disempower and punish corporations and anyone who is in any way affiliated with an incorporated entity."   Motion at 9.   SWEPI, LP maintains that the Ordinance's animus against the corporate form makes clear that it does not have, in violation of the Equal Protection Clause, a rational relationship to a legitimate governmental interest.   <u>See</u> Motion at 10.

SWEPI, LP argues that, because it seeks to engage in activities which the Ordinance prohibits, the Ordinance purports to strip it of its First and Fourteenth Amendment rights.   <u>See</u>

Motion at 10-11 (citing Ordinance § 5.5, at 4 ("Corporations . . . seeking to engage in activities prohibited by this ordinance, shall not . . . be afforded rights under the 1st or 5th amendments to the United States Constitution . . . .")).   SWEPI, LP contends that, by purporting to strip it of its fundamental rights, "the Ordinance is plainly unconstitutional."   Motion at 11.   It asserts that the Supreme Court has held that First Amendment protections extend to corporations.   See Motion at 11 (citing Citizens United v. Fed. Election Comm'n, 558 U.S. at 342; Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1135 (10th Cir. 2013), aff'd sub nom., Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751 (2014)).   SWEPI, LP argues that the Ordinance is analogous to the Los Angeles International Airport ("LAX") resolution that the Supreme Court invalidated in Board of Airport Commissioners v. Jews for Jesus, 482 U.S. 569 (1987).   See Motion at 11.   It contends that the Board of Airport Commissioners for the City of Los Angeles, California, adopted a resolution banning all First Amendment activity in LAX's central terminal.   See Motion at 11. SWEPI, LP argues that the Supreme Court found the resolution unconstitutional, because no conceivable governmental interest could justify an absolute ban on speech.   See Motion at 11.   It contends that the Ordinance is more egregious than the LAX resolution, which the Supreme Court invalidated, because the resolution applied only to the central LAX terminal, which could be a viewed as a non-public forum, while the Ordinance applies to all of Mora County, including places that are public forums, or that have traditionally been devoted to assembly and debate.   See Motion at 11-12 (citing Perry Educ. Ass'n v. Perry Local Educators Ass'n, 460 U.S. 37, 45 (1983)).   SWEPI, LP further contends that the Ordinance is unconstitutional because it represents a selective ban on First and Fourteenth Amendment rights by applying only to those in violation of the Ordinance, or to those who seek to engage in activities that the Ordinance prohibits.   See Motion at 12.   It argues that this selective ban constitutes a viewpoint-based restriction to silence

those who oppose the Ordinance.   See Motion at 12.   SWEPI, LP argues that the Ordinance also violates the First Amendment by prohibiting corporations from challenging the Ordinance.   See Motion at 12 n.5.

SWEPI, LP argues that the Ordinance effects a regulatory taking of property without just compensation.   See Motion at 12.   It contends that a regulatory taking can occur if "'government regulation of private property'" is "'so onerous that its effect is tantamount to a direct appropriation or ouster.'"   Motion at 13 (quoting Lingle v. Chevron U.S.A. Inc., 544 U.S 528, 537 (2005).   SWEPI, LP argues that a plaintiff can prove a regulatory taking by showing that "a regulation 'deprives land of all economically beneficial use.'"   Motion at 13 (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1027 (1992)).   It asserts that the Supreme Court's decision in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922), conclusively demonstrates that the Ordinance constitutes a regulatory taking.   See Motion at 13.   There, SWEPI, LP contends, a mining company owned the mineral rights to a tract of land but not the surface rights.   See Motion at 13 (citing Pennsylvania Coal Co. v. Mahon, 260 U.S. at 412).   SWEPI, LP notes that the state passed a law prohibiting the mining of coal in a way that would cause the subsidence of structures used for human habitation.   See Motion at 13-14 (citing Pennsylvania Coal Co. v. Mahon, 260 U.S. at 412-13).   SWEPI, LP asserts that the Supreme Court held that the state law constituted a compensable taking, because it abolished a valuable estate in land, and because it made it commercially impracticable to mine coal, which had the same effect as appropriating or destroying the company's interest in the coal.   See Motion at 14.   Similarly, SWEPI, LP asserts that New Mexico law recognizes a mineral estate as an interest in real property that is separate and distinct from the surface estate.   See Motion at 14 (citing Johnson v. Gray, 1966-NMSC-020, ¶ 5, 410 P.2d 948, 950).   SWEPI, LP argues that the Ordinance is more egregious than the law in

Pennsylvania Coal Co. v. Mahon, because the Ordinance bans all extraction of hydrocarbons in Mora County, when undertaken by a corporation, while the Pennsylvania law merely limited the scope of coal mining to protect surface structures.  See Motion at 15.  It contends that this blanket prohibition makes it commercially impracticable for it to obtain any economic benefit from its mineral rights.  See Motion at 15 (citing Pennsylvania Coal Co. v. Mahon, 260 U.S. at 414 ("'For practical purposes, the right to coal consists of the right to mine it.'"  (quoting Commonwealth ex rel. Keator v. Clearview Coal Co., 100 A. 820, 820 (Pa. 1917)))).

SWEPI, LP contends that the Ordinance also violates its substantive due-process rights. See Motion at 15.   It argues that substantive due process prohibits a state from depriving property for an arbitrary reason.   See Motion at 15 (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998); Hyde Park Co. v. Santa Fe City Council, 226 F.3d 1207, 1210 (10th Cir. 2000)).   SWEPI, LP asserts that its oil-and-gas leases are property interests that the Due Process Clause protects. See Motion at 16 (citing McLaurin v. Shell W.E. & P., Inc., 778 F.2d 235 (5th Cir. 1985)).   It contends that, in violation of its substantive due-process rights, the Ordinance arbitrarily deprives it of its property interest, because of its status as a corporation.[3]   See Motion at 16.   SWEPI, LP argues that, by prohibiting hydrocarbon extraction and exploration on state lands, the Ordinance impedes the State of New Mexico's interest for natural resource developers to develop natural resources without creating waste and impedes the authority of the Commissioner of Public Lands ("Land Commissioner") over state lands.   See Motion at 16-17. (citing Burguete v. Del Curto, 1945-NMSC-025, ¶ 11, 163 P.2d 257, 259; Jensen v. State Highways Comm'n, 1982-NM-031

---

[3]SWEPI, LP is not a corporation; it is a limited partnership.  See Complaint ¶ 3, at 2. Because the Ordinance's definition of corporations includes limited partnerships, see Ordinance § 3.1, at 2 ("'Corporation' shall mean any corporation, limited partnership, . . . ."), SWEPI, LP refers to itself as a corporation in the Motion.  The Court will also, in addressing SWEPI, LP's claims, refer to SWEPI, LP as a corporation for clarity, because the Ordinance considers SWEPI, LP to be a corporation, even though it is not.

¶ 10, 642 P.2d 1089, 1090).   SWEPI, LP asserts that the Court must declare the Ordinance invalid, because it contradicts state law, and because of the arbitrary fashion in which it deprives SWEPI, LP of property.   See Motion at 18.

SWEPI, LP argues that the Ordinance violates state law by enacting zoning regulations over state land.   See Motion at 18.   It contends that state statutes created Mora County and that Mora County possesses only those "powers expressly granted to it by the Legislature together with those necessarily implied to implement express powers."   Motion at 18 (citing Board of Cnty. Comm'rs v. Greacen, 2000-NMSC-016, ¶¶ 7-8, 3 P.3d 672, 675-76).   SWEPI, LP argues that, while the New Mexico Legislature has granted counties the authority to pass some zoning ordinances, the New Mexico courts have held that a county cannot enforce its ordinances on lands that the State of New Mexico owns.   See Motion at 18-19 (citing Cnty. of Santa Fe v. Milagro Wireless, LLC, 2001-NMCA-070, ¶ 7, 32 P.3d 214, 216).   It asserts that, because the Ordinance prohibits all drilling in Mora County -- without making an exception for state land -- the Ordinance is ultra vires and invalid.   See Motion at 19.   SWEPI, LP further argues that, even if the Ordinance did not apply to state lands, because the Ordinance prohibits any activity related to the production of hydrocarbons, the Ordinance would still have the effect of prohibiting the extraction of hydrocarbons on state lands, because SWEPI, LP would need to establish and maintain the necessary infrastructure within Mora County to extract hydrocarbons on state land.   See Motion at 19-20.

SWEPI, LP argues that, because the Ordinance undermines state law and the State's interests, it is unenforceable.   See Motion at 20 (citing Chapman v. Luna, 1984-NMSC-029, 678 P.2d 687).   It contends that, because of the New Mexico Oil and Gas Act, N.M. Stat. Ann. § 70-2-1 to -38, the Attorney General of New Mexico has opined that counties cannot regulate

oil-and-gas activities.  See Motion at 20 (citing N.M. Att'y Gen. Op. 86-2, 1986 WL 220334 (1986)).   There, SWEPI, LP argues, the New Mexico Attorney General, Paul Bardacke, concluded that the New Mexico Oil Conservation Division occupies the entire field of oil-and-gas regulation, preempting any county ordinances that regulates or affects oil-and-gas production. See Motion at 20-21.   It further argues that, even if the Oil and Gas Act did not completely occupy the oil-and-gas regulation field, the Ordinance would be invalid, because it prohibits conduct that state law permits.   See Motion at 21 (citing Rancho Lobo, LTD v. DeVargas, 303 F.3d 1195, 1206 (10th Cir. 2002); Inc. Cnty. of Los Alamos v. Montoya, 1989-NMCA-004, 772 P.2d 891, 895).

Finally, SWEPI, LP argues that the Court must declare the Ordinance, in its entirety, invalid and that no part of the Ordinance is severable from the rest.  See Motion at 21.   It contends that a law, in which some portions are invalidated, can have its valid portions severed from the invalid ones, when the legislative purpose of the valid portions can be given effect through the remaining portions and where it cannot be shown that the legislature would not have passed the valid portions if it had known that the other portions would be invalidated.   See Motion at 22 (citing Bradbury & Stamm Constr. Co. v. Bureau of Revenue, 1962-NMSC-078, ¶ 7, 372 P.2d 808, 811).   SWEPI, LP asserts that the Ordinance's purpose is to divest corporations of their rights and privileges by prohibiting corporations from engaging in activities that the Ordinance prohibits.  See Motion at 22.   It argues that, once the Court invalidates this prohibition, the Ordinance's purpose cannot be given effect.   See Motion at 22.   SWEPI, LP maintains that the Ordinance's severability clause does not automatically make the Ordinance severable, because the clause merely provides a rule of construction, which can be considered, but is not binding.   See Motion at 22 (citing Bradbury & Stamm Const. Co. v. Bureau of Revenue, 1962-NMSC-078, ¶ 9). It further argues that the fact that the Ordinance suggests that Mora County would refuse to

recognize the legitimacy of a court order invalidating the Ordinance undercuts the severability clause's effect.   See Motion at 23.

      **2.**      **The Response.**

The Defendants responded to the Motion on June 12, 2014.   See Defendants' Answer to Plaintiff's Motion for Partial Judgment on the Pleadings, filed June 12, 2014 (Doc. 33)("Response").   They argue that SWEPI, LP's legal theories are flawed, that it has not shown that Mora County lacked a rational basis for passing the Ordinance, and that they have established factual issues that require discovery.   See Response at 1-2.   The Defendants provide a summary of how the Ordinance came into being.   See Response at 2-3.   They assert that, in 2011, Mora County residents began to discuss ways to protect the environment and water from oil-and-gas extraction activities, including hydraulic fracturing[4] ("fracking").   See Motion at 2. The Defendants contend that Mora County residents decided to take significant measures to safeguard their water, environment, and economy, and that the interested residents met weekly to draft and debate about the Ordinance until it was adopted on April 29, 2013.   See Response at 2.

The Defendants argue that they have raised a number of affirmative defenses in the Answer, which, if proven, would defeat SWEPI, LP's claims.   See Response at 3.   Specifically,

---

[4]Fracking is a hydrocarbon extraction technique.

Hydraulic fracturing (also hydrofracturing, hydrofracking, fracking or fraccing), is a well-stimulation technique in which rock is fractured by a hydraulically pressurized liquid made of water, sand, and chemicals. Some hydraulic fractures form naturally -- certain veins or dikes are examples.   A high-pressure fluid (usually chemicals and sand suspended in water) is briefly injected into a wellbore to create cracks in the deep-rock formations through which natural gas, petroleum, and brine will flow more freely.   When the hydraulic pressure is removed from the well, small grains of hydraulic fracturing proppants (either sand or aluminium oxide) hold the fractures open once the deep rock achieves geologic equilibrium.

Hydraulic Fracturing, Wikipedia.org, http://en.wikipedia.org/wiki/Hydraulic_fracturing#Method (last visited Jan. 17, 2015).

they contend that SWEPI, LP lacks standing and that the case is not ripe for adjudication.   See Response at 3.   The Defendants also contend that they have asserted a number of factual disputes in the Answer, including that SWEPI, LP does not possess valid leases that authorize it to extract hydrocarbons from Mora County, that SWEPI, LP does not intend to engage in activities related to the extraction of hydrocarbons in Mora County, that Mora County had a rational basis to enact the Ordinance, and that the Ordinance is necessary to protect Mora County residents' air, water, land, health, welfare, and safety.   See Response at 3.   They argue that, because they have asserted affirmative defenses and because they have asserted factual disputes in the Answer, the Court should deny the Motion.   See Response at 3-4.

The Defendants argue that, because the Court must accept all facts that the non-moving party pled and grant all inferences in the Defendants' favor, the Court must presume that SWEPI, LP does not have standing, that the case is not ripe, and that the affirmative defenses asserted in the Answer are viable.   See Response at 5 (citing Park Univ. Enter., Inc. v. Am. Cas. Co. of Reading, Pa., 442 F.3d 1239 (10th Cir. 2006), abrogation recognized in Magnus, Inc. v. Diamond State Ins. Co., 545 F. App'x 750 (10th Cir. 2013)(unpublished); Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church, 887 F.2d 228, 230 (9th Cir. 1989)). They contend that the Court must determine issues of standing before considering the case's merits.   See Response at 6 (citing Morgan v. McCotter, 365 F.3d 882, 887 (10th Cir. 2004)).   To establish standing, the Defendants assert, a plaintiff must suffer a present or imminent injury, rather than a possible or probable future injury.   See Response at 7.   They argue that SWEPI, LP cannot rely on general allegations of an injury at a dispositive stage of a case, but must instead provide evidence to demonstrate standing.   See Response at 7 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

The Defendants argue that SWEPI, LP must allege that it has valuable property to prove a loss, but that SWEPI, LP has not alleged that its leases have value.   See Response at 7.   They also contend that they have denied SWEPI, LP's allegations that it is the holder of a valid oil-and-gas lease, and that it is seeking to or is prepared to engage in activities that the Ordinance prohibits. See Response at 7 (citing Answer ¶¶ 4-7, at 2).   The Defendants assert that there is a genuine issue of fact whether SWEPI, LP has suffered an injury, and thus has standing, because the Defendants have disputed many of SWEPI, LP's factual allegations that are necessary to establish standing. See Response at 8.   They argue that SWEPI, LP's sole allegation concerning its property interests in Mora County is that it owns oil-and-gas leases.   See Response at 8 (citing Complaint ¶¶ 4-7, at 2-3).   They assert that they do not admit:

> (1) the existence or legitimacy of the leases or that the leases have value; (2) that Plaintiff obtained the leased mineral rights to explore for and extract hydrocarbons; (3) that Plaintiff's alleged property rights are valueless without the right to explore for and extract hydrocarbons; (4) that Plaintiff presently seeks to or is prepared to exercise its rights pursuant to the leases; (5) that there is a credible threat of prosecution were Plaintiff to exercise its rights; or (6) that but for the Ordinance, Plaintiff would engage in oil and gas development activities on the property covered by the leases.

Response at 8 (citing Answer ¶¶ 4-7, at 2).   The Defendants contend that the Court cannot assume that the leases provide SWEPI, LP with any rights, because that assumption would resolve an issue in the moving party's favor, which is contrary to the judgment on the pleadings standard.   See Response at 8-9.   They argue that, while an allegation that a plaintiff has a property interest may satisfy the pleading standard, it is insufficient to meet the standard for judgment on the pleadings, and that the Defendants' denial of SWEPI, LP's "factual allegations is sufficient to establish numerous issues of material fact as to whether Plaintiff has standing and to justify denial of Plaintiff's Motion."   Response at 9.

The Defendants argue that SWEPI, LP's corporate status is insufficient to establish standing.  See Response at 9.   They contend that SWEPI, LP must have more than "a generalized grievance" and that it cannot rely solely on allegations that the Ordinance discriminates against corporations to establish standing.  Response at 9 (citing Harris v. McRae, 448 U.S. 297, 320 (1980)).   The Defendants maintain that SWEPI, LP must assert a concrete and particularized harm that the Ordinance causes.  See Response at 9.   The Defendants argue that SWEPI, LP's allegations that it possesses oil-and-gas leases, and that it would seek to extract hydrocarbons if it were not for the Ordinance, are SWEPI, LP's attempt to create this concrete and particularized harm, but that the Defendants have denied those allegations.  See Response at 9-10 (citing Answer ¶¶ 4-7, at 2).   They contend that, because they denied those allegations, the Court cannot consider the allegations as true and the pleadings do not conclusively establish standing.  See Response at 10.

The Defendants assert that SWEPI, LP's standing is speculative, because it initiated the lawsuit before any enforcement had occurred under the Ordinance.  See Response at 10.   They argue that SWEPI, LP alleges only that it desires to engage in activities that the Ordinance prohibits.  See Response at 10.   They contend that SWEPI, LP's position in this case is comparable to that of the plaintiff in Kegler v. United States Department of Justice, 436 F. Supp. 2d 1204 (D. Wyo. 2006)(Johnson, J.).   See Response at 10.   The Defendants argue that, there, the plaintiff challenged the Gun Control Act of 1968, 18 U.S.C. §§ 921 to 930 ("GCA"), because the GCA prohibited persons convicted of a domestic violence misdemeanor from possessing a firearm.  Response at 10.   They contend that the Honorable Alan B. Johnson, United States District Judge for the District of Wyoming, found that, without any threat of investigation, arrest, or prosecution, the GCA, by itself, was insufficient for the plaintiff to establish standing.  See

Response at 10.   The Defendants assert that SWEPI, LP had not made definite plans to engage in hydrocarbon extraction or exploration, and there is no threat or history of investigation or prosecution.   See Response at 10.   They argue that SWEPI, LP's fears are based on the content of the Ordinance rather than an injury in fact.   See Response at 10-11.

The Defendants contend that there are genuine issues of material fact as whether SWEPI, LP's claims are ripe.   See Response at 11.   They assert that ripeness concerns whether a harm has sufficiently matured to warrant judicial intervention, and that a case may not be ripe if it involves uncertain or contingent events that may not occur.   See Response at 11 (citing Warth v. Seldin, 422 U.S. 490, 499 n.10 (1975); New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995)).   The Defendants argue that, even if SWEPI, LP's leases are valid, the Court cannot accept its allegation that it is prepared to explore for and extract hydrocarbons, because the Defendants denied those allegations.   See Response at 11-12 (citing Answer ¶¶ 6-9, at 2-3).   They contend that SWEPI, LP's leases that are attached to the Complaint are dated April 1, 2010, and August 1, 2010, and that SWEPI, LP has not alleged that it tried to act on the leases between the time that it entered the leases and the time that it filed the Complaint.   See Response at 12.   The Defendants maintain that SWEPI, LP's failure to act on the leases undermines its allegation that it is ready and willing to extract hydrocarbons in Mora County if not for the Ordinance.   See Response at 12.   They contend that, because the leases are for an initial five-year term, and because SWEPI, LP has not acted on the leases before filing the Complaint, it allowed more than half of the leases' initial terms to expire.   See Response at 12.   The Defendants argue that, because they contend that SWEPI, LP is not ready or willing to extract hydrocarbons from Mora County, there are disputed facts concerning whether SWEPI, LP's claims are ripe.   See Response at 12.

The Defendants argue that SWEPI, LP's leases, without other permits or authority from the State, do not provide SWEPI, LP with a legal basis to explore and produce hydrocarbons in Mora County.   See Response at 13.   They contend that SWEPI, LP has not alleged that it applied for a drilling permit, or sought permission for the disposition of toxic wastewater that could result from oil-and-gas extraction activities.   See Response at 13.   The Defendants argue that SWEPI, LP's position is similar to the position of the plaintiffs in Lujan v. Defenders of Wildlife, where the Supreme Court held that there was no case or controversy based on the plaintiffs' intent to travel to a certain area at some point in the future without any definitive plans to do so.   See Response at 13 (citing Lujan v. Defenders of Wildlife, 504 U.S. at 583-84 (Stevens, J., concurring)). They further argue that SWEPI, LP has not demonstrated that it has legal access to water, which is necessary for fracking, because neither of its leases provides it with water rights.   See Response at 13.   The Defendants contend that SWEPI, LP has failed to show that it has legally accessible water or that it can purchase water from existing users to be used for fracking.   See Response at 13-14 (citing N.M. Stat. Ann. § 72-12-7).   They argue that, because SWEPI, LP does not allege that it has available water, the Court must assume that SWEPI, LP has no water and that SWEPI, LP lacks the necessary resources to extract hydrocarbons through fracking.   See Response at 14.   The Defendants assert that SWEPI, LP's plans to act on its leases are based solely on contingent events that may not occur, and, as such, the case is currently not ripe.   See Response at 14.

The Defendants maintain that there are factual disputes concerning Mora County's legitimate interests in the Ordinance's enactment.   See Response at 14.   They contend that the Court has insufficient information to assess the dangers to public health, safety, and welfare against which the Ordinance protects.   See Response at 14.   The Defendants argue that SWEPI, LP conceded, in the Motion, that Mora County has an interest in the safe, responsible, and

economic extraction and production of natural resources.   See Response at 14-15 (citing Motion at 16).   The Defendants contend that the Ordinance's stated purpose is to recognize "'that water is essential for the life, prosperity, sustainability, and health of [the] community and that damage to natural groundwater and surface water resources imposes great tangible loss, to the People, natural communities and ecosystems of Mora County.'"   Response at 15 (quoting Ordinance § 1.2, at 2)(alterations in the Response but not in the Ordinance).   They maintain that regulating the oil-and-gas industry is a legitimate and rational means of accomplishing the legitimate government interest of protecting natural resources.   See Response at 15.

The Defendants contend that, while the Land Commissioner has dominion over state lands, that dominion is not without limitations and is subject to certain restrictions.   See Response at 15-16 (citing Burguete v. Del Curto, 1945-NMSC-025, ¶ 11).   Specifically, the Defendants assert that the Supreme Court of New Mexico recently held that the Land Commissioner's dominion is subject to three conditions:

> first, disposals of land are limited to the disposals described in the Enabling Act [of 1910, 36 Stat. 557]; second, land can only be sold or leased at a public auction to the highest and best bidder; and third, all sales and leases must yield at least the appraised value of the land.

Response at 15-16 (quoting King v. Lyons, 2011-NMSC-004, ¶ 7, 248 P.3d 878, 883).   They also contend that the Oil and Gas Commission and the Oil Conservation Division do not have exclusive authority to regulate oil-and-gas drilling in New Mexico.   See Response at 16-17 (citing Marbob Energy Corp. v. N.M. Oil Conservation Comm'n, 2009-NMSC-013, ¶ 1, 206 P.3d 135, 137).   The Defendants maintain that the Oil and Gas Act and the Oil and Gas Commission are unable to effectively regulate oil-and-gas production, and that the Ordinance fills the gaps left by ineffective enforcements and regulations.   See Response at 17.   They assert that they will present evidence of the inadequacy of the State's current oil-and-gas regulatory scheme.   See Response at 17-18.

- 30 -

Specifically, they contend that the Oil and Gas Commission lacks the authority to impose civil penalties, and that the New Mexico Attorney General has not brought suits or imposed meaningful penalties against violators of the Oil and Gas Act.   See Response at 18.   The Defendants maintain that Mora County has an interest in protecting the water, air, land, and environment on its land that is adjacent to state land within Mora County, because oil spills, gas leaks, and aquifer contamination do not stop at property boundaries.   See Response at 18.   They argue that, without discovery, the Court does not have sufficient information to balance Mora County's governmental interest against SWEPI, LP's infringement claims.   See Response at 19.

The Defendants argue that the Supremacy Clause does not create a private right of action. See Response at 18-19.   They contend that some federal statute must exist before the Court can engage in a Supremacy Clause analysis.   See Response at 19 (citing City of N.Y. v. F.C.C., 486 U.S. 57, 63 (1988)).   The Defendants argue that there is a factual dispute concerning whether Mora County acted in an unreasonable, arbitrary, or invidious manner, because they denied this allegation in the Answer.   See Response at 19 (citing Answer ¶ 63, at 8).   They assert that Mora County is a poor, low populous county; that it lacks the necessary resources and expertise to monitor and regulate oil-and-gas drilling;   and that, thus, making a total ban on corporate hydrocarbon extraction activities was the only available remedy to protect its land, air, water, and the health of its residents.   See Response at 19.   The Defendants contend that corporations are the only entities with the necessary resources and immunities to engage in hydrocarbon extraction, and that they can avoid damages for spills and leaks by declaring bankruptcy.   See Response at 19.   They argue that the ban affects only corporations, because corporations are the only entities that use fracking and other dangerous oil-and-gas extraction techniques, and not because of an invidious discrimination or bias.   See Response at 19.

The Defendants argue that the Court should deny the Motion, "because the people of Mora County possess the inherent and constitutional right of local community self-government, the right to governmental protection of their fundamental civil rights, and the right to change their local system of government if it denies these rights."   Response at 20.   They contend that[5]:

> On April 29, 2013, the people of Mora County exercised their right to change their system of local government to one that both recognizes their right of self-government and protects their fundamental civil rights.   To protect that new system, they restricted the operation of several legal doctrines, including the doctrine of corporate constitutional "rights."   In July of 1776, the Second Continental Congress adopted the Declaration of Independence, which established

>> that all men are created equal, that they are endowed by their Creator with certain *unalienable Rights*, that among these are Life, Liberty and the pursuit of Happiness. -- *That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed, -- That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government,* laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness.

> AMER. DEC. OF INDEP., ¶ 2 (emphasis added).   These words embody *the* theory of legitimate government for the people of the United States of America.   All governmental power comes from the people (*i.e.*, the principle of self-government); the proper role of government is the protection of the *people's* fundamental civil rights, including their life, liberty, and happiness; and the people inherently possess the right to change their system of government if it becomes destructive of those ends.

> Like the people of the thirteen original colonies, New Mexicans -- both indigenous and those of Spanish and Mexican descent -- have fought for their right of local community self-government.   From preservation of the Pueblos' right of self-government, to battles against Spanish, Mexican, and U.S. colonizers' efforts to remove that right, New Mexicans have a long history of defending their self-governing authority.   It was that ongoing insistence upon self-governing authority that eventually forced Spain -- and then a newly independent Mexico -- to accommodate the local self-government authority of the people of the Pueblos, and to institute land grants to appease indigenous and other New Mexican peoples.

---

[5]Rather than attempting to summarize the Defendants' arguments for this section, the Court will reproduce them in full.

In 1910, as a prerequisite to statehood, Congress adopted an Enabling Act for New Mexico.   The Act required the drafting and popular ratification of a New Mexican Constitution, and required that the new Constitution be consistent "with the principles of the declaration of independence."   Act of June 20, 1910, 36 Statutes at Large 557, Chapter 310, section 2.   The resulting New Mexico Bill of Rights thus reaffirmed the framework of law articulated by the Declaration, as it was required to do, proclaiming that all "political power is vested in and derived from the people" and that any government is illegitimate unless it "originates with the people, is founded upon their will and is instituted solely for their good."   N.M. CONST., art II, §2.

Now, through their Ordinance, the people of Mora have reaffirmed that theory of government in local law:

> Right to Self-Government: All residents of Mora County possess the fundamental and inalienable right to a form of governance where they live which recognizes that all power is inherent in the people, that all free governments are founded on the people's authority and consent, and that corporate entities and their directors and managers shall not enjoy special privileges or powers under the law which make community majorities subordinate to them.

Mora Ordinance at §4.5.

Thus, both inherently under the Declaration's theory of legitimate American government, and as expressly provided by federal law, their State Constitution, and the Mora Ordinance, Mora Countians possess the local, state, and federally guaranteed constitutional authority to govern their own community. That authority includes the right to change their local system of government if it fails to recognize their authority to govern, or if the system has been rendered incapable of securing the peoples' fundamental civil rights.

Response at 20-22 (footnotes omitted)(emphasis in original).   They further contend that the United States Congress has codified the Declaration of Independence as an "organic law" and that principles from the Declaration of Independence are embedded into the preamble to the Constitution.   Response at 21 n.4 (citing 1 U.S.C. § i-iii).

The Defendants argue that corporate constitutional rights nullify Mora County residents' self-governing authority.   See Response at 22.   They contend that, for the past 150 years, the judiciary has conferred on corporations rights that were once intended to protect only natural

persons.  <u>See</u> Response at 23.  They assert that corporations "are, of course, property, and property itself is incapable of possessing civil or political rights."  Response at 23 n.8.  The Defendants list a number of constitutional rights that the Supreme Court has recognized that corporations hold.  <u>See</u> Response at 23 & n.9, n.10, n.11 (citing <u>First Nat'l Bank of Boston v. Bellotti</u>, 435 U.S. 765 (1978); <u>Fong Foo v. United States</u>, 369 U.S. 141 (1962); <u>Pa. Coal Co. v. Mahon</u>, 260 U.S. at 393; <u>Hale v. Henkel</u>, 201 U.S. 43 (1906), <u>overruled in part by</u> <u>Murphy v. Waterfront Comm'n of N.Y. Harbor</u>, 378 U.S. 52 (1964); <u>Noble v. Union River Logging R. Co.</u>, 147 U.S. 165 (1893); <u>Minneapolis & St. Louis R.R. Co. v. Beckwith</u>, 129 U.S. 26 (1889); <u>Santa Clara Cnty. v. S. Pac. R.R. Co.</u>, 118 U.S. 394 (1886); <u>Trustees of Dartmouth Coll. v. Woodward</u>, 17 U.S. 518 (1819)).  They argue that several Supreme Court justices have declared that the doctrine of corporate constitutional rights lacks any basis in law.  <u>See</u> Response at 23 & n.12 (citing <u>Conn. Gen. Life Ins. Co. v. Johnson</u>, 303 U.S. 77, 85-90 (1938)(Black, J., dissenting); <u>Wheeling Steel Corp. v. Glander</u>, 337 U.S. 562, 576-581 (1949)(Douglas, J., dissenting); <u>Hale v. Henkel</u>, 201 U.S. at 78 (Harlan, J., concurring); <u>Bell v. Maryland</u>, 378 U.S. 226, 263 (1964)(Douglas, J., dissenting); <u>First Nat'l Bank of Boston v. Bellotti</u>, 435 U.S. at 822 (Rehnquist, J., dissenting); <u>Citizens United v. Fed. Election Comm'n</u>, 558 U.S. at 393 (2010)(Stevens, J., dissenting)).

The Defendants contend that corporations are creations of the state.  <u>See</u> Response at 24 (citing <u>Hale v. Henkel</u>, 201 U.S. at 75; <u>People of N. River Sugar Ref. Corp.</u>, 24 N.E. 834 (N.Y. 1890)).  They assert that the Constitution protects people from the state and all of its creations.  <u>See</u> Response at 24 (citing <u>W. Va. State Bd. of Educ. v. Barnette</u>, 319 U.S. 624, 637 (1943)).  The Defendants argue that corporations have continued to use their constitutional rights to restrict lawmaking.  <u>See</u> Response at 24-26 (citing <u>McCutcheon v. Fed. Election Comm'n</u>, 134

S. Ct. 1434 (2014); <u>Citizens United v. Fed. Election Comm'n</u>, 558 U.S. at 310; <u>Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n</u>, 475 U.S. 1 (1986); <u>Dow Chem. Corp. v. United States</u>, 476 U.S. 227 (1986); <u>Cent. Hudson Gas & Elec. Corp. v. Pub. Utils. Comm'n</u>, 447 U.S. 557 (1980); <u>United States v. Union Pac. R.R. Co.</u>, 98 U.S. 569 (1978); <u>Marshall v. Barlow's, Inc.</u>, 436 U.S. 307 (1978); <u>United States v. Martin Linen Supply Co.</u>, 430 U.S. 564 (1977); <u>Fong Foo v. United States</u>, 369 U.S. at 141; <u>Fed. Trade Comm'n v. Am. Tobacco Co.</u>, 264 U.S. 298 (1924); <u>Pa. Coal Co. v. Mahon</u>, 260 U.S. at 393; <u>Noble v. Union River Logging R. Co.</u>, 147 U.S. at 165; <u>Int'l Dairy Foods Ass'n v. Amestoy</u>, 92 F.3d 67 (2d Cir. 1996); <u>S.D. Farm Bureau, Inc. v. Hazeltine</u>, 340 F.3d 583 (8th Cir. 2003); <u>Synagro-WWT, Inc. v. Rush Twp.</u>, 204 F. Supp. 2d 827 (M.D. Pa. 2002)(McClure, J.); <u>United States v. Armco Steel Corp.</u>, 252 F. Supp. 364 (S.D. Cal. 1966)(Hall, J.); <u>City of Cincinnati v. Morris Inv. Co.</u>, 451 N.E. 2d 259 (Ohio Mun. Ct. 1982)). The Defendants contend that, by allowing corporate constitutional rights to override the authority of a community to make its own rules and law, the rights of property routinely and unconstitutionally supersede the collective rights of people. <u>See</u> Response at 26. They argue that this failure in Mora County's system of government triggered the Mora County residents to replace their county government with a government that recognizes the people's self-governing authority and that protects their rights. <u>See</u> Response at 26.

The Defendants argue that Mora County residents have certain fundamental rights, including the right to water, the right to a healthy environment, and the right to a sustainable energy future, and that Mora County residents decided that hydrocarbon extraction activities would violate those fundamental rights. <u>See</u>  Response at 26-27. They assert that Mora County residents banned corporate activities that violated their rights. <u>See</u> Response at 27. They argue:

> By their very nature, then, corporate constitutional "rights" often override the authority of community majorities to make their own rules for economic

> development, agriculture, energy, resource extraction, and other matters of public
> policy that affect the business of corporations.   Thusly have the rights *of property*
> routinely (and unconstitutionally) superseded the collective rights *of people*
> exercised through local and state governments, rendering -- in this case -- a local
> system of government incapable of carrying out the governing authority of the
> community majority.   It is that failure of their local system of government -- prior
> to the adoption of the Mora Ordinance -- that triggered the inherent and
> constitutional right of the people of Mora County to replace their system of county
> government with one which recognizes the people's self-governing authority and
> which protects their rights.

Response at 27 (emphasis in original).

The Defendants contend that, if the Court invalidates any portions of the Ordinance, those portions are severable from the remaining Ordinance.   See Response at 27.   They contend that an invalid portion of a law can be severed from the remaining portions if: (i) the invalid portion would not impair the force and effect of the valid portions; (ii) the legislative purpose of the valid portion can be given force and effect without the invalid portions; and (iii) it cannot be said that the legislature would not have passed the remaining portions without the invalid parts.   See Response at 27 (citing Bd. of Cnty. Comm'rs v. Quest Corp., 169 F. Supp. 2d 1243, 1250 (D.N.M. 2001)(Conway, S.J.)).   The Defendants argue that, if the Court invalidates the portions of the Ordinance concerning corporations, the remainder of the Ordinance can still be given force and effect, because it would still regulate hydrocarbon extraction.   See Response at 28.   They also argue that the legislative purpose of protecting the community health and safety, and providing a sustainable lifestyle, can still be given effect if the Court invalidates the provisions concerning corporations.   See Response at 28.   The Defendants contend that eliminating corporations' legal privileges is just one means by which the Ordinance achieves its purpose of protecting the rights of human communities, protecting nature, and preserving water.   See Response at 29. Additionally, they assert that the Ordinance's severability clause demonstrates that Mora County would have passed any remaining parts even if other parts were invalidated.   See Response at 29.

4.      **Intervenor's Opposition to Motion**.

The Defendant-Intervenors, La Merced de Santa Getrudis de lo Mora and Jacobo Pacheco,
filed the Defendant Intervenor-Applicants' Opposition to Plaintiffs' [sic] Motion for Judgement
[sic] on the Pleadings, filed June 12, 2014 (Doc. 34)("Intervenor Motion").    When the
Defendant-Intervenors filed the Intervenor Motion, the Court had not yet ruled on the Defendant
Intervenor-Applicants' Motion to Intervene, filed March 6, 2014 (Doc. 6)("Motion to Intervene").
They argue that the Court should deny the Motion for the reasons set forth in the Defendants'
Answer.   See Intervenor Motion at 3.   They also request that the Court postpone ruling on the
Motion until the Court rules on the Motion to Intervene and provides them with an opportunity to
respond to the Motion.   See Intervenor Motion at 3.

5.      **The Reply**.

SWEPI, LP replied on July 14, 2014.   See SWEPI's Reply Brief in Support of Motion for
Judgment on the Pleadings, filed July 14, 2014 (Doc. 39)("Reply").   It argues that it has standing
in the case, because it submitted to the Court recorded oil-and-gas leases, of which the Court may
take judicial notice.   Reply at 1.   SWEPI, LP contends that, because the Ordinance strips its
leases of economic value, it has suffered a concrete injury that affords it standing and which makes
the case ripe.   See Reply at 1.   It asserts that the Defendants strategy of generally denying basic
factual and legal allegations in the hope of avoiding an adverse judgment is dilatory and evasive.
See Reply at 1-2.

SWEPI, LP contends that the Defendants' denial of SWEPI, LP's allegation that it owns
valid oil-and-gas leases in Mora County is contrary to the Defendants' judicial admissions in the
Answer.   See Reply at 2 (citing Answer ¶ 5, at 2 (stating that the Defendants "admit that a copy of
a lease dated August 1, 2010 between the State of New Mexico and SWEPI is attached to the

Complaint as Exhibit 3")).   SWEPI, LP argues that the Defendants do not state a basis for retracting their judicial admission and that they cannot avoid the admission merely because it suits their current purposes.   See Reply at 2 (citing Guidry v. Sheet Metal Workers Int'l Ass'n, 10 F.3d 700, 716 (10th Cir. 1993), abrogated in part on reh'g, 39 F.3d 1078 (10th Cir. 2994)(en banc)).   It also contends that the Defendants cannot faithfully deny that the lease provides SWEPI, LP with the right to explore for, develop, and produce oil and gas.   See Reply at 2 (citing Aug. 1, 2010, Lease at 1).   It contends that the Memorandum of Oil and Gas Lease, filed May 13, 2014 (Doc. 20-1), was issued for the purpose of providing it with the right to explore for and produce oil and gas, and that it was filed with the Mora County Clerk's Office on June 24, 2010.   See Reply at 3.   SWEPI, LP argues that, because these leases are publicly filed, and because they describe matters of public record, the Court should take judicial notice of their contents.   See Reply at 3 (citing Van Woudenberg ex rel. Foor v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated by McGregor v. Gibson, 248 F.3d 946 (10th Cir. 2001); Campos v. Las Cruces Nursing Ctr., 828 F. Supp. 2d 1256, 1262 n.3d (D.N.M. 2011)(Browning, J.); Hooper v. Biloxi Reg'l Med. Ctr., Inc., No. CIV 13-0102 LG/JMR, 2013 WL 3729697, at *2 (S.D. Miss. July 15, 2013)(Guirola, C.J.)). SWEPI, LP argues that the Court may take judicial notice of the leases without converting the Motion into a motion for summary judgment.   See Reply at 3-4.   It argues that, because it attached the leases to the Complaint, the Court can consider them in ruling on the Motion.   See Reply at 4 n.2.

SWEPI, LP maintains that its interests in the leases confer it with standing.   See Reply at 4.   It argues that, because the Ordinance destroys its constitutionally protected property interests -- its oil-and-gas leases -- it has suffered an injury in fact.   See Reply at 5 (citing Deniz v. Mun. of Guaynabo, 285 F.3d 142, 149 (1st Cir. 2002)).   It argues that the Court's opinion in Alto

Eldorado Partners v. City of Santa Fe, No. CIV 08-0175 JB/ACT, 2009 WL 1312856 (D.N.M. Mar. 11, 2009), aff'd 634 F.3d 1170 (10th Cir. 2011), is instructive, where, according to SWEPI, LP, the Court found that the plaintiffs lacked standing to challenge a city ordinance that required thirty percent of proposed subdivided lots to have residences that were sold to low-income buyers. See Reply at 5.   SWEPI, LP contends that the Court concluded that the plaintiffs did not have a definite stake in any particular project that the Ordinance affected.   See Reply at 5.   SWEPI, LP asserts that, here, it has established a definite interest that is affected by the Ordinance: its oil-and-gas leases.   See Reply at 6.   SWEPI, LP addresses the Defendants' denial that SWEPI, LP obtained the leases to explore for and extract hydrocarbons by arguing that the leases state that their sole purpose is for the exploration, development, and production of oil and gas.   See Reply at 5 (citing Aug. 1, 2010, Lease at 1).   It further notes that the Supreme Court has recognized that a mineral estate's only viable use is the exploration and extraction of minerals.   See Reply at 6 (citing Penn. Coal Co. v. Mahon, 260 U.S. at 414).   SWEPI, LP asserts that the Court may take judicial notice that it is a subsidiary of Shell Oil Company and Royal Dutch Shell ("Shell Oil"), and that it is in the business of exploring for and extracting hydrocarbons.   See Reply at 7 n.5 (citing United States v. Cooper, 375 F.3d 1041, 1047 (10th Cir. 2004); Corporate Disclosure Statement, filed March 17, 2014 (Doc. 10)).

SWEPI, LP further argues that, even if it obtained the leases for purposes other than to explore for and extract hydrocarbons, it would have standing, because the Ordinance destroys an interest in real property.   See Reply at 7.   SWEPI, LP contends that, if it purchased the leases with the hope that they would appreciate in value, the destruction of the leases' value constitutes an injury in fact.   See Reply at 7.   It asserts that the United States Court of Appeals for the Fifth Circuit supports this argument in Energy Management Corp. v. City of Shreveport, 397 F.3d 297

(5th Cir. 2005), where it held that mineral estate holders of land near Cross Lake had standing to challenge an ordinance that banned all oil-and-gas drilling within 1,000 feet of the lake.  See Reply at 7-8.  There, SWEPI, LP argues, the plaintiffs did not have state-issued permits, which were required to drill for oil and gas, but that the Fifth Circuit held that the plaintiffs had standing, because the right to drill is a legally protected right, which the ordinance impeded.  See Reply at 8.  SWEPI, LP further argues that, in Dunn McCampbell Royalty Interest, Inc. v. National Park Service, 964 F. Supp. 1125 (S.D. Tex. 1995), the Honorable Janis G. Jack, United States District Judge for the Southern District of Texas, concluded that the plaintiffs could challenge a National Park Service Regulation, which required the Park Service to approve any plan of operations before someone could begin oil-and-gas exploration and extraction.  See Reply at 8.  There, SWEPI, LP contends, Judge Jack concluded that, even though the plaintiffs had never been denied a drilling permit, had never attempted to have the Park Service approve a plan of operations, and had never been denied a plan of operations, the plaintiffs had standing, because the challenged government actions were regulatory or proscriptive, and because the plaintiffs were subject to the regulations or prospectively subject to the regulations.  See Reply at 8-9.  SWEPI, LP addresses the Defendants' argument that it does not face a credible threat of prosecution by arguing that it has already shown that it has suffered a concrete injury.  See Reply at 9.  It further argues that it faces a credible threat, because it has engaged in conduct which the Ordinance prohibits and the First Amendment protects: filing this lawsuit.  See Reply at 9 n.6 (citing N.C. Right to Life v. Bartlett, 168 F.3d 705, 710 (4th Cir. 1999)).  SWEPI, LP additionally argues that its injuries can be traced to the Defendants and their actions.  See Reply at 9-10.

SWEPI, LP argues that its claims are ripe for adjudication.  See Reply at 10.  It contends that the Defendants misunderstand the ripeness doctrine.  See Reply at 10.  SWEPI, LP asserts

that ripeness considers whether an issue is purely legal and whether a challenged agency action is final.   See Reply at 10 (citing Sierra Club v. Yeutter, 911 F.2d 1405, 1415 (10th Cir. 1990)).   It contends that its claims are fit for judicial review, because they present pure legal questions that require no further factual development.   See Reply at 11.   SWEPI, LP also contends that, because Mora County has enacted the Ordinance into law, it is in full force and is not contingent upon any further legislative or administrative action.   See Reply at 11.   SWEPI, LP argues that, if resolution of the case is delayed, it would cause it, and every other mineral interest holder in Mora County, substantial hardship.   See Reply at 11-12 (citing Utah v. United States Dep't of Interior, 535 F.3d 1184, 1197 (10th Cir. 2008)).   It asserts that, if the Court determines that the case is not ripe, then it would either have to invest a significant amount of money to prepare for hydrocarbon exploration and extractions without knowing whether its plans would be permitted to proceed, or it would continue to hold onto its oil-and-gas leases while they lack any marketable value.   See Reply at 12 (citing Skull Valley Band of Goshute Indians v. Nielson, 376 F.3d 1223, 1238-39 (10th Cir. 2004)).   SWEPI, LP maintains that, in light of the lack of clarity surrounding the Ordinance's validity, it should not have to submit an application for a drilling permit or submit a plan detailing the disposal of toxic wastewater to establish ripeness.   See Reply at 12 (citing Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201-02 (1983)).   It argues that it has suffered a substantial hardship, because the Ordinance impairs its property interests.   See Reply at 12.

SWEPI, LP contends that the Motion presents pure questions of law.   See Reply at 13-14. It argues that it can bring a challenge under the Supremacy Clause, even if the federal law that preempts state law does not create a private right of action.   See Reply at 14 (citing Qwest Corp. v. City of Santa Fe, 380 F.3d 1258, 1266 (10th Cir. 2004)).   SWEPI, LP addresses the

Defendants' argument that corporations are the only entities with the resources and immunities to engage in fracking by arguing that the Ordinance prohibits more than just fracking and that there is no reason to believe that individuals would also not engage in the activities that the Ordinance prohibits.  See Reply at 14-15.  It contends that the Defendants have not provided any legal authority to support their assertion that corporations receive greater protections in bankruptcy. See Reply at 15.  SWEPI, LP also addresses the Defendants' assertion that the Ordinance was not passed because of a corporate bias by arguing that the Ordinance's language undermines that assertion, and by stating that the "Defendants spend the last ten pages of their brief railing against what they perceive to be the evils perpetuated by affording legal rights and recognition to corporate entities."   Reply at 15.

### 6.  The November 11, 2014, Hearing.

The Court held a hearing on November 3, 2014.  See Transcript of Hearing (taken November 3, 2014), filed November 14, 2014 (Doc. 54)("Tr.").  The Court first heard arguments on the Motion to Intervene.  See Tr. at 3:13-26:18 (Anderson, Haas, Long, Court).  Because the same attorney represented both the Intervenor-Defendants and the Defendants, the Court told the parties that, for the purposes of the hearing, it would "allow the intervenors to make whatever arguments they have" on the Motion, so that, if the Court later granted the Motion to Intervene, it would know their arguments regarding the Motion.  Tr. at 25:17-23 (Court).[6]

In discussing the Ordinance's origin, SWEPI, LP asserted that it believed that an environmental group on the East Coast did the original draft, and that Mora County later tailored and adopted it.  See Tr. at 28:10-29:4 (Anderson, Court).  The Defendants asserted that the

---

[6]The same attorney represents the Defendants and the Defendant-Intervenors: Jeffrey H. Haas.  See SWEPI, LP v. Mora County, 2014 WL 6983288, at *40 (noting that Mr. Haas represents the Defendants and the Defendant-Intervenors).  At the hearing, Mr. Hass did the majority of the arguing for the Defendants.

Ordinance was prepared after many hearings were held in Mora County over a one-to-two-year period.   See Tr. at 34:2-11 (Haas, Court).   They stated that local committees studied the Ordinance while drafting it and that an organization called the Community Environmental Legal Defense provided legal advice.   See Tr. at 34:12-25 (Haas, Court).   SWEPI, LP conceded that it did not know of any oil-and-gas exploration or development in Mora County.   See Tr. at 39:25-40:6 (Anderson).

SWEPI, LP and the Defendants agreed that the Court would have to deal with the jurisdictional issues of standing and ripeness before addressing the Motion's substance.   See Tr. at 29:19-30:5 (Anderson, Court); id. at 32:19-24 (Haas).   SWEPI, LP stated that the issues of ripeness and standing are issues for rule 12(b)(1) of the Federal Rules of Civil Procedure and that the Court can supplement the record in determining issues under rule 12(b)(1).   See Tr. at 30:20-31:4 (Anderson, Court).   SWEPI, LP argued, however, that the pleadings on their face establish standing.   See Tr. at 31:16-20 (Anderson).

In addressing standing, SWEPI, LP repeated a number of its arguments from the Reply, arguing that the leases confer standing and that the Court can rely on them, because it attached them to the Complaint, and because they are public documents.   See Tr. at 36:6-10 (Anderson). It argued that the leases were obtained before the Defendants enacted the Ordinance and that the leases are only for the development of hydrocarbons.   See Tr. at 37:11-23 (Anderson, Court). The Court asked SWEPI, LP if it purchased the leases to manufacture a lawsuit to challenge the Ordinance, and SWEPI, LP responded by stating that it invested millions of dollars to purchase dozens of leases in Mora County and that it purchased the leases in 2010, three years before the Defendants enacted the Ordinance.   See Tr. at 38:12-39:10 (Anderson, Court); id. at 61:1-8 (Montaño, Court); id. at 64:5-21 (Anderson).   SWEPI, LP argued that Alto Eldorado Partners v.

City of Santa Fe is distinguishable, because, here, SWEPI, LP is a subsidiary of Shell Oil, which is "a major oil and gas producer and developer," and because SWEPI, LP has a concrete, identifiable stake in the case: the millions of dollars it spent on leases in Mora County.   Tr. at 41:3-23 (Anderson, Court).   SWEPI, LP conceded that the record does not contain evidence of a concrete plan to begin hydrocarbon exploration and development in Mora County, but it argued that holding the leases is sufficient to establish standing, especially for its takings claim.   See Tr. at 42:2-43:22 (Anderson, Court).   SWEPI, LP contended that its status as a corporation does not, by itself, provide it with standing, but that, because the Ordinance violates its constitutional rights, it has standing.   See Tr. at 66:8-67:12 (Anderson, Court).

The Defendants addressed SWEPI, LP's contention that it spent millions of dollars in leases by arguing that, in the one lease that SWEPI, LP attached to the Complaint, SWEPI, LP paid $8,800.00 to lease 64,000[7] acres, which comes out to around $0.25 per acre.   See Tr. at 44:5-10 (Haas).   They repeated arguments from the Response that SWEPI, LP did not act on its leases before the Defendants passed the Ordinance, and that it does not allege that the leases have value or that the leases belong to it.   See Tr. at 44:24-45:11 (Haas).   The Court asked the Defendants why it could not assume that the leases have value when SWEPI, LP paid money for them, and the Defendants responded by arguing that, by SWEPI, LP attaching the leases to the Complaint, the Court can acknowledge the existence of the documents but that the Court cannot assume the truth of their substance.   See Tr. at 47:1-17 (Haas, Court).   They argued that they cannot determine the validity or value of the leases without discovery.   See Tr. at 47:18-11 (Haas, Court).   The Defendants argued that, even assuming the leases are valid, SWEPI, LP has standing to bring the lawsuit, but that judgment on the pleadings is still inappropriate.   See Tr. at 49:19-50:4 (Haas,

_____

[7]The Aug. 1, 2010, Lease is for 659.08 acres, not 64,000 acres.   See Aug. 1, 2010, Lease at 1.

Court).   The Defendants assert that, because there has not been any oil-and-gas exploration in Mora County in over twenty years, the leases do not have value, or at least there is no evidence of value, and thus SWEPI, LP fails to establish standing even though its Complaint is sufficient to file the lawsuit.   See Tr. at 58:20-59:11 (Haas).   They contend that the Court should deny the Motion, and permit them to conduct discovery to show the harm that hydrocarbon exploration and extraction has on the water in Mora County and to show that the leases are invalid.   See Tr. at 51:20-53:20 (Haas, Court).   The Defendants again argued that the threat of prosecution is insufficient to establish standing, because SWEPI, LP has not done anything that would suggest that it will engage in hydrocarbon exploration or extraction.   See Tr. at 55:4-56:3 (Long, Court). The Defendants stated that they did not investigate the leases' validity or value by asking the Land Commissioner, because they did not believe that the Land Commissioner would have that information. See Tr. at 56:21-58:10 (Long, Court).

In addressing ripeness, SWEPI, LP largely repeated its arguments from the Reply that the Ordinance constitutes a final legislative action and that, if the Court does not determine the case, it will suffer a hardship.   See Tr. at 72:7-74:12 (Anderson, Court).   It argued that it does not need to expend the money and resources to explore and drill for hydrocarbons in Mora County, risking prosecution, to show that it faces a hardship for ripeness purposes.   See Tr. at 75:8-20 (Anderson).

When asked about the fact that SWEPI, LP violated the Ordinance by filing the Complaint, yet Mora County has not prosecuted it, SWEPI, LP contended that it does not need to show an imminent threat of prosecution, because, for its First Amendment and equal protection claim, the Ordinance prohibits SWEPI, LP from engaging in certain activities.   See Tr. at 69:18-70:14 (Anderson, Court).

The Defendants again argued that there is no evidence in the record that SWEPI, LP is prepared to explore for and extract hydrocarbons in Mora County, because it denied those allegations in their Answer, making the case premature.  See Tr. at 75:24-21 (Haas).  They contended that, for ripeness, SWEPI, LP must show either that it is going to be prosecuted or that, if it acts in a certain manner, it will be prosecuted.  See Tr. at 77:25-78:4 (Haas).  The Defendants noted that, if SWEPI, LP will likely not attempt to extract hydrocarbons from Mora County, the Defendants will likely not attempt to enforce the Ordinance against it.  See Tr. at 79:5-20 (Haas, Court).

SWEPI, LP noted that Mora County has a legitimate state interest in its citizens' health, safety, and welfare, including an interest in clean water.  See Tr. at 83:14-84:7 (Anderson, Court). SWEPI, LP argued that a municipality cannot regulate zoning on state land, even state land that is within the municipality's borders.  See 84:25-87:10 (Anderson, Court).  It also argued that municipalities cannot pass ordinances that are inconsistent with rules that the State of New Mexico or its agencies promulgate.  See Tr. at 87:11-24 (Anderson, Court).

The Defendants represented that, in addressing SWEPI, LP's argument that state law preempts municipal law in the oil-and-gas arena, they will show that the Oil and Gas Commission cannot regulate oil-and-gas drilling, which creates a factual issue.  See Tr. at 91:2-25 (Haas, Court).  They contend that, because there is insufficient state enforcement against oil-and-gas leaks and spills, they had to pass the Ordinance to protect their water.  See Tr. at 92:1-25 (Haas). When the Court stated that State enforcement and the State's preemption of municipal law were legal issues, the Defendants argued that they are based on factual premises.  See Tr. at 93:10-94:12 (Haas, Court).  The Defendants argued that the more the Court supplements the

record, the more the Motion turns into a motion for summary judgment.  <u>See</u> Tr. at 96:19-21 (Haas).

In support of its Supremacy Clause claim, SWEPI, LP argued that the Ordinance explicitly states that it preempts federal, constitutional law.  <u>See</u> Tr. at 98:1-99:5 (Anderson).   The Defendants responded by arguing that corporate rights and community rights are included in the Constitution, the Declaration of Independence, and the nation's history, and that the Ordinance is based on "a history of law that predates the Constitution" and that is part of the Declaration of Independence, which is part of the United States Code.  Tr. at 99:10-100:6 (Haas).   They contended that the Ordinance does not declare that corporations are not constitutional persons, but that, if corporations violate the Ordinance, they lose their legal protections.  <u>See</u> Tr. at 100:7-12 (Haas).   The Defendants stated that it is ironic that SWEPI, LP -- a corporation and property -- is suing under 42 U.S.C. § 1983, which Congress passed after the Civil War to protect the rights of former slaves and to establish that people are not property, because, in this case, property is using § 1983 to sue people.  <u>See</u> Tr. at 100:13-101:4 (Haas).   They argued that the Treaty of Guadalupe Hidalgo[8] grants Mora County community rights and that, while it does not deprive corporations of

---

[8]The Treaty of Guadalupe Hidalgo ended the Mexican-American War.

The Treaty of Guadalupe Hidalgo (*Tratado de Guadalupe Hidalgo* in Spanish), officially entitled the Treaty of Peace, Friendship, Limits and Settlement between the United States of America and the Mexican Republic, is the peace treaty signed on February 2, 1848, in the Villa de Guadalupe Hidalgo (now a neighborhood of Mexico City) between the United States (US) and Mexico that ended the Mexican-American War (1846-48).

With the defeat of its army and the fall of its capital, Mexico entered into negotiations to end the war.   The treaty called for the US to pay $15 million to Mexico and to pay off the claims of American citizens against Mexico up to $3.25 million.   It gave the United States the Rio Grande as a boundary for Texas, and gave the US ownership of California and a large area comprising New Mexico, Arizona, Nevada, Utah, and parts of Wyoming and Colorado.   Mexicans in those annexed areas had the choice of relocating to within Mexico's new boundaries or

their constitutional rights, it gives Mora County the authority to pass the Ordinance.  See Tr. at 102:22-103:9 (Haas, Court).

Concerning its equal protection claims, SWEPI, LP repeated its arguments that the Ordinance's purpose is to disempower corporations and that it was enacted based on an animus against corporations, which is not a legitimate state interest.  See Tr. at 105:16-109:13 (Anderson, Court)(citing Bishop v. Smith, 760 F.3d 1070 (10th Cir. 2014)).  It further argued that the Ordinance prohibits only corporations from engaging in hydrocarbon exploration and extraction. See Tr. at 116:3-118:13 (Anderson, Court).  SWEPI, LP addressed the Defendants' arguments that corporations can create subsidiaries to protect themselves from liability by arguing that courts can pierce the corporate veil if it is appropriate.  See Tr. 119:15-23 (Anderson).  It argued that a corporation is far more likely than an individual to be able to pay damages for any leaks or spills, because of its assets, and because courts can use their equitable powers to reach through the corporation to satisfy a judgment with the shareholders' assets.  See Tr. at 119:24-120:9 (Anderson).

The Defendants argued that the Ordinance prohibits individuals, as well as corporations, from engaging in hydrocarbon exploration and extraction.  See Tr. at 109:21-111:13 (Haas, Court).  They contended that there is a factual issue whether they passed the Ordinance because of an anti-corporation animus.  See Tr. at 111:21-112:6 (Haas).  The Defendants further argued that the Ordinance applies only to corporations seeking to extract hydrocarbons in Mora County and not to corporations in general, which evidences that its purpose is to protect the environment and

---

receiving American citizenship with full civil rights.  Over 90% chose to become US citizens.

Treaty of Guadalupe Hidalgo, Wikipedia.org, http://en.wikipedia.org/wiki/Treaty_of_Guadalupe_ Hidalgo (last visited Jan. 17, 2015).

not to penalize corporations.   See Tr. at 112:7-19 (Haas); id. at 113:18-24 (Haas).   They maintained that corporations are singled out in the Ordinance, because only corporations have the resources and immunities to engage in oil-and-gas extraction, and to avoid liability for spill and leaks by declaring bankruptcy.   See Tr. at 112:16-113:6 (Haas).   The Defendants argued that there is a factual issue whether individuals engage in oil-and-gas extraction.   See Tr. at 113:6-10 (Haas).   They contended that corporations create subsidiaries to protect themselves from liability, which happened in this case, because SWEPI, LP is Shell Oil's subsidiary.   See Tr. at 114:23-115:10 (Haas, Court).

For its First Amendment claim, SWEPI, LP repeated some of the arguments from its briefs. See Tr. at 122:20-123:17 (Anderson).   The Defendants again argued that corporate constitutional rights conflict with community rights, which provides Mora County with the power to nullify SWEPI, LP's First Amendment rights.   See Tr. at 123:22-124:7 (Haas).

For its takings claim, SWEPI, LP argued that it has standing, because it needed to show only that it owns land that the Ordinance destroyed, which it has shown.   See Tr. at 125:2-126:25 (Anderson, Court).   It argued that its claim is based on an appropriation of property, which is a rubric of a regulatory takings claim.   See Tr. at 126:7-11 (Anderson).   SWEPI, LP argued that the Ordinance destroys all of the leases' beneficial use.   See Tr. at 131:7-22 (Anderson).   It also argued that its leases are only for oil-and-gas, and not for other minerals or for water.   See Tr. at 131:23-132:23 (Anderson, Court).   When asked if Mora County banned only fracking, but not all oil-and-gas-extraction, would the ban constitute a taking, SWEPI, LP asserted that the ban would likely not be a taking, but that it would depend on the case's facts and the wording of the ban.   See Tr. at 133:8-22 (Anderson, Court).   In addressing the Defendants' argument that the Ordinance

protects the public's good, SWEPI, LP argued that all takings must be for the public good and that a taking occurs even if it is for the public good.   See Tr. at 165:8-166:3 (Anderson).

The Defendants contended that, if the Ordinance banned releasing cyanide into water streams and if SWEPI, LP's lease was for gold mining that would involve the use of cyanide, the Ordinance would not be a taking.   See Tr. at 127:8-16 (Haas).   They argued that, in the same way, the Ordinance protects the health and safety of Mora County residents.   See Tr. at 127:17-128:16 (Haas, Court).   When the Court asked the Defendants if SWEPI, LP's leases have any benefit in light of the Ordinance, they argued that it could still gather water or other minerals that are not hydrocarbons.   See Tr. at 128:25-130:12 (Haas, Court).

SWEPI, LP and the Defendants repeated their arguments from their briefs for the substantive due-process claims.   See Tr. at 134:9-135:15 (Anderson, Haas, Court).   For its state-law preemption claim, SWEPI, LP argued that the Court would have diversity jurisdiction to decide the state-law claims if the Court ruled in its favor for its federal claims.   See Tr. at 136:20-137:23 (Montaño, Court).   It argued that local government cannot ban activities that the state government has said are permissible.   See Tr. at 138:1-17 (Montaño); id. at 143:13-144:1 (Montaño).   SWEPI, LP argued that a county cannot impose zoning regulations on state lands, even if the state lands are leased to a private party, because, once the state land is leased, the Land Commissioner still retains interest in the property.   See Tr. at 139:15-140:18 (Montaño, Court). SWEPI, LP contended that this restriction applies even when the state is acting in a commercial fashion and when the state lands are within a municipality's borders.   See Tr. at 141:11-142:17 (Montaño, Court).   It further argued that regulating oil-and-gas production on state lands economically affects the State of New Mexico, because the State receives royalties from the state lands.   See Tr. at 147:7-18 (Montaño).   SWEPI, LP asserted that counties often regulate

activities above ground, while the State often regulates activities that occur below ground.   See Tr. at 148:12-17 (Montaño).

The Defendants argued that the Oil and Gas Act does not explicitly preempt local governments from regulating oil and gas, and that the Ordinance does not regulate oil-and-gas extraction, but bans it.   See Tr. at 145:9-19 (Haas, Court).   They argued that, if conduct on state lands affects the water on the adjoining Mora County lands, Mora County has a right to regulate the conduct that is occurring on the state lands.   See Tr. at 146:10-22 (Haas).   Additionally, the Defendants argued that, if the Court decides the federal issues, it would not have diversity jurisdiction over the case, because arms of the state, including counties, are not citizens of the state for diversity purposes.   See Tr. at 174:24-176:2 (Long, Court)(citing Moor v. Alameda Cnty., 411 U.S. 693 (1973)).

SWEPI, LP argued that the Ordinance's severability would depend on how the Court rules on its other claims.   See Tr. at 152:25-153:8 (Anderson).   It argued that, if the Court invalidated the Ordinance's distinction between corporations and individuals, the Court should invalidate the entire Ordinance, because its purpose of divesting corporations of their rights could no longer be accomplished.   See Tr. at 153:24-154:24 (Anderson, Court).   SWEPI, LP further argued that the Ordinance contains "legislative booby traps" that will go into effect if any portion of the Ordinance is invalidated.   Tr. at 156:6-19 (Anderson).   It also contended that, if the Court found that the Ordinance constitutes a taking, the Court should invalidate the entire Ordinance.   See Tr. at 164:5-18 (Anderson).

The Defendants again argued that the Ordinance's purpose is to protect Mora County's environment and to prohibit oil-and-gas extraction, not to discriminate against corporations.   See Tr. at 157:11-158:12 (Haas).   They asserted that, if the Court invalidates the Ordinance's

distinction between corporations and individuals, the Court should sever those portions from the remaining provisions.   See Tr. at 158:13-21 (Haas).   The Defendants also argued that the Ordinance contains a severability clause, which states that any invalid portions should be severed from the rest of the Ordinance.   See Tr. at 160:7-161:9 (Haas).

The Court stated that it was inclined to find that SWEPI, LP has standing, based solely on the leases, and especially if SWEPI, LP supplements the record with additional documents supporting standing.   See Tr. at 71:3-12 (Court).   The Court also informed the parties that it was inclined to find that the case is ripe.   See Tr. at 82:18-5 (Court).   For SWEPI, LP's equal protection claim, the Court noted that it was inclined to find that the distinction between corporations and individuals was not based on a legitimate rational basis.   See Tr. at 121:9-122:15 (Court).   The Court stated that it was inclined to invalidate the portion of the Ordinance that says that corporations do not have First or Fifth Amendment rights in Mora County.   See Tr. at 124:11-125:1 (Court).   The Court noted that it would likely invalidate some of the Ordinance's provisions as a violation of SWEPI, LP's substantive due-process rights.   See Tr. at 135:16-23 (Court).

### 7.    SWEPI, LP's Supplemental Evidence.

On November 19, 2014, SWEPI, LP filed the Notice of Supplemental Evidence Relating to Justiciability, filed November 19, 2014 (Doc. 57)("SWEPI Supplement").   SWEPI, LP attached to its supplement copies of thirty-six oil-and-gas leases from Mora County.   SWEPI Supplement at 1-5.   Each of the oil-and-gas leases were executed in 2008 or 2010.   See SWEPI Supplement at 1-5.   According to the leases, SWEPI, LP paid a total of $216,200.00 for all of the leases.   See SWEPI Supplement at 1.   SWEPI, LP states that it submitted the supplemental evidence for the purpose of the establishing the Court's subject matter jurisdiction over the case.   See SWEPI

Supplement at 1 (citing <u>Newton v. Dep't of Veterans Affairs</u>, No. CIV 12-0163 JB/LAM, 2014 WL 1285494 (D.N.M. Mar. 26, 2014)(Browning, J.)).

    **8.**      **<u>The Defendants' Supplemental Evidence.</u>**

On December 15, 2014, the Defendants filed the Defendants' Notice of Supplemental Evidence Relating to Justiciability, filed December 15, 2014 (Doc. 65)("Defendants 1st Supplement"). The Defendants attached to their supplement an affidavit by Dr. Kate Zeigler, who is a geologist and is the owner of Zeigler Geologic Consulting, LLC. <u>See</u> Affidavit of Dr. Kate Zeigler, filed December 15, 2014 (Doc. 65-1)("Zeigler Aff."). Dr. Zeigler states that oil-and-gas prices are currently low and that they were much higher when SWEPI, LP entered into its leases. <u>See</u> Zeigler Aff. ¶ 12, at 2. She asserts that, in her expert opinion, SWEPI, LP cannot economically extract oil and gas in Mora County unless the oil-and-gas prices rise substantially. <u>See</u> Zeigler Aff. ¶ 13, at 2. She bases this opinion on the facts that there is currently no producing oil-and-gas wells in the immediate area around SWEPI, LP's leases; that SWEPI, LP has not attempted to drill for oil and gas, or attempted to obtain a drilling permit, in the last six years; and that there is no infrastructure of roads, pipelines, or storage tanks in the area of SWEPI, LP's leases. <u>See</u> Zeigler Aff. ¶ 13, at 2. Dr. Zeigler asserts that, if SWEPI, LP were to extract oil and gas in Mora County, it would have to use fracking. <u>See</u> Zeigler Aff. ¶ 14, at 2. She states that fracking could pollute or contaminate the water in Mora County, and that fracking can cause tremors if done along natural fault lines or if it changes the concentration of underground fluids. <u>See</u> Zeigler Aff. ¶¶ 16-17, at 3.

The Defendants also attached to its supplement a spreadsheet of all oil-and-gas wells in Mora County and an electronic mail transmission from William Jones, District IV Supervisor of the New Mexico Oil Conservation Division. <u>See</u> Well Spreadsheet, filed December 15, 2014

(Doc. 65-4); Electronic Mail Transmission from William Jones, District IV Supervisor of the New Mexico Oil Conservation Division, to Dianne Lindsay (Dec. 9, 2014), filed December 15, 2014 (Doc. 65-5)("Jones 1st Email").   In the electronic mail transmission, Jones states that all wells in Mora County have been plugged[9] and that the last well was plugged in 2001.   Jones Email at 1. Finally, the Defendants attached to their supplement a news article stating that oil prices have dropped, resulting in a drop in oil-and-gas drilling permits.   See Eddie Garcia, Dropping Oil Prices Felt in NM Oil Country, KOB Eyewitness News 4 (Dec. 10, 2014), filed December 15, 2014 (Doc. 65-6).

The Defendants argue that this evidence shows that SWEPI, LP is not currently seeking to engage in oil-and-gas exploration and extraction in Mora County.   See Defendants 1st Supplement at 2.   They contend that this evidence shows that SWEPI, LP's claims are not ripe and that it lacks standing.   See Defendants 1st Supplement at 2-4.

On December 16, 2014, the Defendants filed the Defendants' Second Notice of Supplemental Evidence Relating to Justiciability, filed December 16, 2014 (Doc. 67)("Defendants 2d Supplement").   The Defendants attached to their second supplement an electronic mail transmission from Jones stating that there have been no applications for oil-and-gas drilling permits in Mora County.   See Electronic Mail Transmission from William Jones, District IV Supervisor of the New Mexico Oil Conservation Division, to Dianne Lindsay (Dec. 15, 2014), filed December 16, 2014 (Doc. 67-1)("Jones 2d Email").   The Defendants again argue that the

_____

[9]Plugging an oil-and-gas well means:

To fill up the borehole of an abandoned well with mud and cement to prevent the flow of water or oil from one strata to another or to the surface.   In the industry's early years, wells were often improperly plugged or left open.   Modern practice requires that an abandoned well be properly and securely plugged.

Glossary, Prodigy Oil and Gas, http://www.prodigyoilandgas.com/oil-and-gas-glossary.html (last visited Jan. 17, 2015).

- 54 -

lack of permit applications shows that SWEPI, LP lacks standing and that the case is not ripe.   See

Defendants 2d Supplement at 2.

    **9.**  **Additional Briefing.**

   On January 9, 2015, the Court requested that the parties provide additional briefing on the

ripeness of SWEPI, LP's takings claim.   See Request for Additional Briefing, filed January 9,

2014 (Doc. 77)("Request for Briefing").   The Court noted that the United States Court of Appeals

for the Tenth Circuit requires a plaintiff to first seek just compensation from the state, if adequate

procedures exist, before bringing an action under the Takings Clause.   See Request for Briefing

at 2.   The Court asked the parties to provide additional briefing whether an inverse condemnation

action under N.M. Stat. Ann. § 42A-1-29 provides an adequate procedure for seeking

compensation, such that federal takings law requires SWEPI, LP to file an inverse condemnation

action before its takings claim is ripe.   See Request for Briefing at 2-3.

   The Defendants responded to the request by arguing that § 42A-1-29 provides SWEPI, LP

with an adequate procedure for seeking just compensation.   See Electronic Mail Transmission

from Nancy R. Long to the Honorable James O. Browning, United States District Judge for the

District of New Mexico at 1-2, filed January 19, 2015 (Doc. 82)("Defendants Takings Email").

They argue that SWEPI, LP has not sought compensation through an inverse condemnation action.

See Defendants Takings Email at 3.   The Defendants assert that, because SWEPI, LP has not

sought just compensation, its takings claim is not ripe.   See Defendants Takings Email at 4.

SWEPI, LP did not provide any additional briefing.

      **LAW REGARDING RULE 12(b)(1)**

   "Federal courts are courts of limited jurisdiction; they are empowered to hear only those

cases authorized and defined in the Constitution which have been entrusted to them under a

jurisdictional grant by Congress." Henry v. Office of Thrift Supervision, 43 F.3d 507, 511

(10th Cir. 1994)(citations omitted). A plaintiff generally bears the burden of demonstrating the

court's jurisdiction to hear his or her claims. See Steel Co. v. Citizens for a Better Env't, 523

U.S. 83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing

its existence."). Rule 12(b)(1) allows a party to raise the defense of the court's "lack of

jurisdiction over the subject matter" by motion. Fed. R. Civ. P. 12(b)(1). The Tenth Circuit

has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two

forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter

jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is

based." Ruiz v. McDonnell, 299 F .3d 1173, 1180 (10th Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those
> provided in opposing a rule 12(b)(6) motion: the court must consider the
> complaint's allegations to be true. See Ruiz v. McDonnell, 299 F.3d at 1180;
> Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981). But when the attack is
> aimed at the jurisdictional facts themselves, a district court may not presume the
> truthfulness of those allegations. A court has wide discretion to allow affidavits,
> other documents, and a limited evidentiary hearing to resolve disputed
> jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to
> evidence outside the pleadings does not convert the motion to a Rule 56 motion.

Hill v. Vanderbilt Capital Advisors, LLC, No. CIV 10-0133 JB/KBM, 2011 WL 6013025, at *8

(D.N.M. Sept. 30, 2011)(Browning, J.)(quoting Alto Eldorado Partners v. City of Santa Fe, 2009

WL 1312856, at *8-9). The Fifth Circuit has stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P.
> 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction
> -- its very power to hear the case -- there is substantial authority that the trial court
> is free to weigh the evidence and satisfy itself as to the existence of its power to
> hear the case. In short, no presumptive truthfulness attaches to plaintiff's
> allegations, and the existence of disputed material facts will not preclude the trial
> court from evaluating for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the allegations in the complaint to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or other evidence properly before the court.   See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995).   In those instances, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a rule 56 motion for summary judgment.   See Holt v. United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)).   Where, however, the court determines that jurisdictional issues raised in a rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion under either rule 12(b)(6) of the Federal Rules of Civil Procedure or rule 56 of the Federal Rules of Civil Procedure.   See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999); Tippett v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997).   "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.'"   Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."   Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).   The

sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.   See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff."   (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.   Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555).   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   Ashcroft v. Iqbal, 556 U.S. at 678.   "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."   Bell Atl. Corp. v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.   See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).   "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   Ashcroft v. Iqbal, 556 U.S.

at 678 (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 556).   "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."   <u>Ridge at Red Hawk, LLC v. Schneider</u>, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).   The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."   The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

<u>Robbins v. Oklahoma</u>, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 570).

Although affirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss, <u>see</u> Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, <u>see</u> <u>Glover v. Gartman</u>, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009); <u>Robbins v. Oklahoma</u>, 519 F.3d at 1242); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, <u>see</u> <u>Miller v. Shell Oil Co.</u>, 345 F.2d 891, 893 (10th Cir. 1965)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim.   If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").   The defense of limitations is the affirmative defense that is most likely to be established by the uncontroverted facts in the complaint.   <u>See</u> 5 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, <u>Federal</u>

Practice & Procedure: Civil § 1277, at 643 (3d ed. 2004).   If the complaint sets forth dates that appear, in the first instance, to fall outside of the statutory limitations period, then the defendant may move for dismissal under rule 12(b)(6).   See Rohner v. Union Pac. R.R. Co., 225 F.2d 272, 273-75 (10th Cir. 1955); Gossard v. Gossard, 149 F.2d 111, 113 (10th Cir. 1945); Andrew v. Schlumberger Tech. Co., 808 F. Supp. 2d 1288, 1292 (D.N.M. 2011)(Browning, J.).   The plaintiff may counter this motion with an assertion that a different statute of limitations or an equitable tolling doctrine applies to bring the suit within the statute; the Tenth Circuit has not clarified whether this assertion must be pled with supporting facts in the complaint or may be merely argued in response to the motion.   Cf. Kincheloe v. Farmer, 214 F.2d 604 (7th Cir. 1954)(holding that, once a plaintiff has pled facts in the complaint indicating that the statute of limitations is a complete or partial bar to an action, it is incumbent upon the plaintiff to plead, either in the complaint or in amendments to it, facts establishing an exception to the affirmative defense).   It appears, from case law in several circuits, that the plaintiff may avoid this problem altogether -- at least at the motion-to-dismiss stage -- by simply refraining from pleading specific or identifiable dates, see Goodman v. Praxair, Inc., 494 F.3d 458, 465-66 (4th Cir. 2007); Hollander v. Brown, 457 F.3d 688, 691 n.1 (7th Cir. 2006); Harris v. New York, 186 F.3d 243, 251 (2d Cir. 1999); Honeycutt v. Mitchell, No. CIV 08-0140 W, 2008 WL 3833472 (W.D. Okla. Aug. 15, 2008)(West, J.), and, although the Tenth Circuit has not squarely addressed this practice, the Court has permitted it, see Anderson Living Trust v. WPX Energy Prod., LLC, No. CIV 12-0040 JB/KBM, 2014 WL 2750652, at *17, *37-39 (D.N.M. May 16, 2014)(Browning, J.).

## LAW REGARDING RULE 12(c)

Any party may move for judgment on the pleadings if no material facts are in dispute, and the dispute can be resolved on both the pleadings and any facts of which the Court can take judicial notice.   See Fed. R. Civ. P. 12(c).   A motion pursuant to rule 12(c) of the Federal Rules of Civil Procedure is generally treated in the same manner as a rule 12(b)(6) motion to dismiss.   See Mock v. T.G. & Y. Stores Co., 971 F.2d 522, 528 (10th Cir. 1992).   The court accepts all well-pleaded allegations of the non-moving party as true and views all facts in a light most favorable to the non-moving party.   See Seamons v. Snow, 84 F.3d 1226, 1231-32 (10th Cir. 1996).   In ruling on a motion to dismiss for failure to state a claim, "courts should look to the specific allegations in the complaint to determine whether they plausibly support a legal claim for relief."   Alvarado v. KOB-TV, L.L.C., 493 F.3d 1210, 1215 n.2 (10th Cir. 2007)(citation omitted)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); Erickson v. Pardus, 551 U.S. 89 (2007).

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.   For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.   "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law."   West v. Atkins, 487 U.S. 42, 48 (1988).   Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.   See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).   The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.   See Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)("Because vicarious liability is inapplicable to Bivens[10] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).   "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor." Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)). Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.   See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

**1.      Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).   The

---

[10]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."   403 U.S. at 389.

under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . .
furthers the fundamental goals of preserving an area of individual freedom by limiting the reach
of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for
conduct for which they cannot fairly be blamed."   Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir.
1995).   "The traditional definition of acting under color of state law requires that the defendant
in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only
because the wrongdoer is clothed with the authority of state law.'"   West v. Atkins, 487 U.S.
at 49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).   "The authority with which
the defendant is allegedly 'clothed' may be either actual or apparent."   Jojola v. Chavez, 55 F.3d
at 493.   Accordingly, at a base level, to find that an action was taken under color of state law,
the court must find that "'the conduct allegedly causing the deprivation of a federal right' must
be 'fairly attributable to the State.'"   Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447
(quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state
employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time,
it is 'well settled that an otherwise private tort is not committed under color of law simply
because the tortfeasor is an employee of the state.'"   Jojola v. Chavez, 55 F.3d at 493 (quoting
Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d
1137, 1150 (3d Cir. 1995)).   Thus, "before conduct may be fairly attributed to the state because
it constitutes action 'under color of state law,' there must be 'a real nexus' between the
employee's use or misuse of their authority as a public employee, and the violation allegedly
committed by the defendant."   Jojola v. Chavez, 55 F.3d at 493.   What constitutes the required

real nexus, however, is not completely clear.    As the Tenth Circuit has stated, whether there is a

real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily
> identifiable fact, such as the officer's attire, the location of the act, or whether or
> not the officer acts in accordance with his or her duty.    Instead one must examine
> "the nature and circumstances of the officer's conduct and the relationship of that
> conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations

omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

### 2.    Individual Liability.

Government actors may be liable for the constitutional violations that another committed,

if the actors "set in motion a series of events that the defendant knew or reasonably should have

known would cause others to deprive the plaintiff of her constitutional rights," thus establishing

the "requisite causal connection" between the government actor's conduct and a plaintiff's

constitutional deprivations.    Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).    The Tenth

Circuit has explained that § 1983 liability should be "'read against the background of tort liability

that makes a man responsible for the natural consequences of his actions.'"    Martinez v. Carson,

697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell

v. Dep't of Soc. Servs., 436 U.S. at 663).    "Thus, Defendants are liable for the harm proximately

caused by their conduct."    Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446

F.3d at 1046).    As the Court has previously concluded, "a plaintiff who establishes liability for

deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover

compensatory damages for all injuries suffered as a consequence of those deprivations.    The

recovery should be guided by common-law tort principles -- including principles of

causation . . . ."   Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.   Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."   Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."   Id.   In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.   See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.   Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."   Martinez v. Carson, 697 F.3d at 1255.   The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit, now-Associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.   Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest.   The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him.   Is the third officer necessarily liable for the harm

> caused to the suspect on the theory that the illegal entry without knocking and
> announcing rendered any subsequent use of force unlawful?   The obvious
> answer is "no."   The suspect's conduct would constitute a "superseding" cause,
> see Restatement (Second) of Torts § 442 (1965), that would limit the officer's
> liability.   See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).   Additionally,

"[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

supersede the defendant's responsibility."   Trask v. Franco, 446 F.3d at 1047 (quoting William

Lloyd Prosser et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)).   If

> the reasonable foreseeability of an intervening act's occurrence is a factor in
> determining whether the intervening act relieves the actor from liability for his
> antecedent wrongful act, and under the undisputed facts there is room for
> reasonable difference of opinion as to whether such act was wrongful or
> foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

### 3.   **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless

there is "'an affirmative link . . . between the constitutional deprivation and either the

supervisor's personal participation, . . . exercise of control or direction, or . . . failure to

supervise.'"   Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v.

Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(alterations omitted).   Because supervisors can

be held liable only for their own constitutional or illegal policies, and not for the torts that their

employees commit, supervisory liability requires a showing that such policies were a "deliberate

or conscious choice."   Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal

quotation marks omitted).   Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not

enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.

The plaintiff must also demonstrate that, through its <u>deliberate</u> conduct, the municipality was the 'moving force' behind the injury alleged."   (emphasis in original)).

The Tenth Circuit has recognized that <u>Ashcroft v. Iqbal</u> limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.   See <u>Garcia v. Casuas</u>, 2011 WL 7444745, at *25-26 (citing <u>Dodds v. Richardson</u>, 614 F.3d 1185 (10th Cir. 2010)).   The language that may have altered the landscape for supervisory liability in <u>Ashcroft v. Iqbal</u> is as follows: "Because vicarious liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 676.   The Tenth Circuit in <u>Dodds v. Richardson</u> held:

> Whatever else can be said about <u>Iqbal</u>, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . . ."

614 F.3d at 1199.   The Tenth Circuit noted that <u>Ashcroft v. Iqbal</u> "does not purport to overrule existing Supreme Court precedent," but stated that "<u>Iqbal</u> may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."   <u>Dodds v. Richardson</u>, 614 F.3d at 1200.   It concluded that <u>Ashcroft v. Iqbal</u> did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."   <u>Dodds v. Richardson</u>, 614 F.3d at 1200.   The Tenth Circuit, based on this conclusion, set forth a test for supervisory liability under § 1983 after <u>Ashcroft v. Iqbal</u>:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).   The Tenth Circuit noted, however: "We do not mean to imply that these are distinct analytical prongs, never to be intertwined."   Dodds v. Richardson, 614 F.3d at 1200 n.8.   Relying on the Supreme Court's opinion in Board of County Commissioners v. Brown, the Tenth Circuit reasoned that two of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.   Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation.   Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.   Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404-05)(internal quotation marks omitted).   The Tenth Circuit noted that "[w]e think the same logic applies when the plaintiff sues a defendant-supervisor who promulgated, created, implemented or possessed responsibility for the continued operation of a policy that itself violates federal law."   Dodds v. Richardson, 614 F.3d at 1200 n.8.   Thus, the Tenth Circuit reduced the test to what can be seen as a two-part test for supervisor liability, requiring the plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing

their authorization or approval of such misconduct.'"   Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

    **4.**    **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.   See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).   Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom, and the injury alleged.   See Graves v. Thomas, 450 F.3d at 1218.   When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.   See Graves v. Thomas, 450 F.3d at 1218.

## LAW REGARDING STANDING

A federal court may hear cases only where the plaintiff has standing to sue.   Standing has two components.   First, standing has a constitutional component arising from Article III's requirement that federal courts hear only genuine cases or controversies.   Second, standing has a prudential component.   See Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1224 n.7 (10th Cir. 2008)(noting that, in addition to constitutional standing requirements, "the Supreme Court recognizes a set of 'prudential' standing concerns that may prevent judicial resolution of a case even where constitutional standing exists").   The burden of establishing standing rests on the plaintiff.   See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998).   The plaintiff must "allege . . . facts essential to show jurisdiction.   If they fail to make the necessary allegations, they have no standing."   FW/PBS v. City of Dallas, 493 U.S. 215, 231 (1990)(internal citations and quotations omitted).   Moreover, where the defendant challenges standing, a court

must presume lack of jurisdiction "unless the contrary appears affirmatively from the record." Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986))(internal quotation marks omitted).   "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record."   Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231)(citations omitted)(internal quotation marks omitted).

      **1.**      **Article III Standing.**

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."   San Juan County v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc).   See U.S. Const. art. III, § 2.   "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'"   Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008)(quoting Massachusetts v. EPA, 549 U.S. 497 (2007))(alterations in Wyoming ex rel. Crank v. United States but not in source)(internal quotation marks omitted).   "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing."   San Juan County v. United States, 503 F.3d at 1171.   To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision."   Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(internal quotation marks omitted).

"Standing is determined as of the time the action is brought."   Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)).   In Smith v. U.S. Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejected a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted allowed courts to affirm incorrect decisions without interfering with official, "published" law. The Tenth Circuit noted that the plaintiff had recently taken his state appeal and, therefore,

> was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in Nova Health Sys. v. Gandy, the Tenth Circuit found that abortion providers had standing to challenge an Oklahoma parental-notification law on the grounds that they were in imminent danger of losing patients because of the new law.   Although finding standing, the Tenth Circuit was careful to frame the issue as whether, "as of June 2001 [the time the lawsuit was filed]," Nova faced any imminent likelihood that it would lose some minor patients seeking abortions.   416 F.3d at 1155.   Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent threat as of the time of filing.   See 416 F.3d at 1155.

### 2.   **Prudential Standing.**

"Prudential standing is not jurisdictional in the same sense as Article III standing." Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007).   Prudential standing consists of "a judicially-created set of principles that, like constitutional standing, places limits on the class of

persons who may invoke the courts' decisional and remedial powers." Bd. of County Comm'rs v. Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002)(internal quotation marks omitted).   Generally, there are three prudential-standing requirements: (i) "a plaintiff must assert his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens"; and (iii) "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bd. of Cnty. Comm'rs v. Geringer, 297 F.3d at 1112 (internal quotation marks and citations omitted).

A "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Aid for Women v. Foulston, 441 F.3d 1101, 1111 (10th Cir. 2006)(quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)).   There is an exception to this general rule, however, known as third-party standing or jus tertii.   Third-party standing is allowed when: (i) "the party asserting the right has a close relationship with the person who possesses the right"; and (ii) "there is a hindrance to the possessor's ability to protect his own interests." Aid for Women v. Foulston, 441 F.3d at 1111-12.

## LAW REGARDING RIPENESS

"In order for a claim to be justiciable under Article III, it must be shown to be a ripe controversy." New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499.   Ripeness pertains to the timing of a case and is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499 (citation omitted)(internal quotation marks omitted).   Ripeness is a component of the Article III requirement that limits judicial review to "cases or controversies."   U.S. Const. art. III, § 2.   See U.S. West, Inc. v. Tristani, 182 F.3d 1202,

1208 (10th Cir. 1999).   A controversy must be "definite and concrete, touching the legal relations of parties having adverse legal interests," and "a real and substantial controversy admitting of specific relief through a decree of a conclusive character."   <u>Aetna Life Ins. Co. v. Haworth</u>, 300 U.S. 227, 240-41 (1937).   "[T]he question in each case is whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." <u>MedImmune, Inc. v. Genentech, Inc.</u>, 549 U.S. 118, 127 (2007)(citation omitted).

In <u>MedImmune, Inc. v. Genentech, Inc.</u>, a patent licensee, who continued to pay royalties for use of the patent, brought a declaratory-judgment action against the patent holder to determine whether the patent was invalid or unenforceable.   <u>See</u> 549 U.S. at 121-25.   What appeared to be missing in the case was the requisite immediacy -- there was little likelihood that the patent holder would ever bring suit against the licensee, because the licensee was continuing to pay royalties. Nevertheless, the Supreme Court held that there was an actual case or controversy, because the looming threat of the licensee having to pay treble damages, if it halted payments and the patent was ultimately upheld, "coerced" the licensee's payment of royalties.   <u>MedImmune, Inc. v. Genentech, Inc.</u>, 549 U.S. at 129.   Avoidance of such dilemmas "was the very purpose of the Declaratory Judgment Act."   <u>MedImmune, Inc. v. Genentech, Inc.</u>, 549 U.S. at 129.   Two cases concerning foreign policy illustrate the need for the facts to mature before declaratory-judgment jurisdiction arises.   In <u>Rabinowitz v. Kennedy</u>, 376 U.S. 605 (1964), the Supreme Court held that the petitioner attorneys were not exempt from registration under the Foreign Agents Registration Act, but it refused to consider whether the questions asked on the registration forms were proper. <u>See</u> 376 U.S. at 610.   Noting that the forms advised registrants that government regulations allowed them to apply for waivers of inappropriate or unduly burdensome requirements, it said:

"Since petitioners have made no attempt to determine which questions must be answered and how much information disclosed, this issue is not ripe for adjudication."   Rabinowitz v. Kennedy, 376 U.S. at 610.   In Zemel v. Rusk, 381 U.S. 1 (1965), the Supreme Court refused to consider Zemel's claim that he was constitutionally entitled to travel to Cuba.   See 381 U.S. at 3.   The Supreme Court explained that it would need to know the specifics of the travel:

> The complaint filed in this case does not specify the sort of travel to Cuba appellant has in mind -- e.g., whether he plans to proceed to Cuba directly or travel there via one or more other countries. Nor can we tell from the papers filed whether the Government will, in the event appellant journeys to Cuba, charge him under § 215(b) with leaving the United States on a carrier bound for Cuba with a passport not validated for Cuba; leaving the United States with such a passport with the intent of traveling to Cuba before he returns home; leaving the United States with such a passport on a journey which in fact takes him to Cuba; re-entering the United States with such a passport after having visited Cuba; some other act -- or whether it will charge him at all.   Whether each or any of these gradations of fact or charge would make a difference as to criminal liability is an issue on which the District Court wisely took no position.   Nor do we.   For if we are to avoid rendering a series of advisory opinions, adjudication of the reach and constitutionality of § 215(b) must await a concrete fact situation.

Zemel v. Rusk, 381 U.S. at 19-20.

In Eccles v. Peoples Bank, 333 U.S. 426 (1948), the Supreme Court held that a declaratory-judgment action was not ripe.   See 333 U.S. at 427.   The bank sought to challenge a condition imposed on its membership in the Federal Reserve System that restricted Transamerica Corporation's ownership of its stock.   See Eccles v. Peoples Bank, 333 U.S. at 428-29. Transamerica Corporation had acquired a few shares of stock, but only for investment, and not to obtain any control over the bank, which was what the membership condition was meant to prevent. See Eccles v. Peoples Bank, 333 U.S. at 430-31.   The bank filed suit, because it feared that, if it lost its membership, its deposits would not be insured.   See Eccles v. Peoples Bank, 33 U.S. at 427.   When suit was brought, however, the bank had failed to show "[t]he actuality of the plaintiff's need for a declaration of his rights."   Eccles v. Peoples Bank, 33 U.S. at 432.   The

Federal Reserve Board had "disavow[ed] any action to terminate the Bank's membership" under the existing circumstances.  Eccles v. Peoples Bank, 33 U.S. at 432.   The Supreme Court described the suit:

> [T]he Bank seeks a declaration of its rights if it should lose its independence [from Transamerica], or if the Board of Governors should reverse its policy and seek to invoke the condition even though the Bank remains independent and if then the Directors of the Federal Deposit Insurance Corporation should not change their policy not to grant deposit insurance to the Bank as a non-member of the Federal Reserve System.

Eccles v. Peoples Bank, 33 U.S. at 432.   In the Supreme Court's view, "[t]he concurrence of these contingent events, necessary for injury to be realized, is too speculative to warrant anticipatory judicial determinations."  Eccles v. Peoples Bank, 33 U.S. at 432.   It concluded: "[The] Bank's grievance here is too remote and insubstantial, too speculative in nature, to justify an injunction against the Board of Governors, and therefore equally inappropriate for a declaration of rights." Eccles v. Peoples Bank, 33 U.S. at 434.   Addressing these Supreme Court cases, the Tenth Circuit has held: "The Court made clear that generally one cannot bring a declaratory judgment action just to resolve one isolated issue in a possible future controversy."  Columbian Fin. Corp. v. BancInsure, Inc., 650 F.3d 1372, 1380 (10th Cir. 2011).

In Plant Oil Powered Diesel Fuel Systems, Inc. v. ExxonMobil Corp., 801 F. Supp. 2d 1163 (D.N.M. 2011)(Browning, J.), the Court held that certain claims that a proposed fit-for-purpose guideline violated antitrust principles was not ripe, because the plaintiff had not shown a hardship, and because the claims were based on "uncertain or contingent future events." 801 F. Supp. 2d at 1184.   The Court found that, "[b]ecause the Fit-for-Purpose Guidelines are both in their early stages and because their development is on-going, creating uncertainty what form they will ultimately take if and when they are submitted for approval, the Court concludes that POP Diesel's claims based on the Fit-for-Purpose Guidelines are premature."  Plant Oil

Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp, 801 F. Supp. 2d at 1185.   In Carroll v. Los

Alamos National Security, LLC, 704 F. Supp. 2d 1200 (D.N.M. 2010)(Browning, J.), the Court

found that negligent misrepresentation claims were ripe for adjudication.   See 704 F. Supp. 2d

at 1219.   There, the defendant conceded that an employee gave the plaintiff incorrect information

when the plaintiff was deciding on a pension plan.   See Carroll v. Los Alamos Nat'l Sec., LLC,

704 F. Supp. 2d at 1219.   The Court found that the plaintiff had a legally protected interest in

being given correct information regarding his pension-plan options and in making a fully informed

selection.   See   Carroll v. Los Alamos Nat'l Sec., LLC, 704 F. Supp. 2d at 1220.   The Court held

that, because the plaintiff had a legally protected interest in receiving accurate information and

there was no dispute that he did not, he was injured, and the matter was ripe for adjudication.

See   Carroll v. Los Alamos Nat'l Sec., LLC, 704 F. Supp. 2d at 1220.   With respect to the accrual

of the cause of action, the Court found that the claim had accrued, because the plaintiff had

suffered an injury, which gave rise to a claim, even though he had not yet suffered damages.

See Carroll v. Los Alamos Nat'l Sec., LLC, 704 F. Supp. 2d at 1221.   Ultimately, however, the

Court granted the defendants' motion for summary judgment on the negligent misrepresentation

claims, because the plaintiff had not established that the defendants caused him harm or that the

defendants' conduct would harm him in the future.   See Carroll v. Los Alamos Nat'l Sec., LLC,

704 F. Supp. 2d at 1226.

## LAW REGARDING TAKINGS CLAIMS UNDER THE FIFTH AMENDMENT

The Takings Clause of the Fifth Amendment to the Constitution of the United States states

that "private property" shall not "be taken for public use, without just compensation."   U.S.

Const. amend. V.   The Supreme Court has stated: "The Takings Clause of the Fifth Amendment,

applicable to the States through the Fourteenth Amendment, . . . prohibits the government from

taking private property for public use without just compensation."   Palazzolo v. Rhode Island,
533 U.S. 606, 617 (2001).   A government actor can "take" property for the purposes of the Fifth
Amendment either by physically depriving the owner of the property or by placing upon the
property such restrictive regulations that the owner is effectively deprived of the ability to use the
property.   See Palazzolo v. Rhode Island, 533 U.S. at 617 (noting that "even a minimal
'permanent physical occupation of real property' requires compensation under the Clause," and
that "a regulation which 'denies all economically beneficial or productive use of land' will require
compensation under the Takings Clause").

### LAW REGARDING FIRST AMENDMENT OVERBREADTH CHALLENGES

An overbreadth challenge is a facial challenge to a speech-restricting statute on First
Amendment grounds, and, if successful, it results in the invalidation of the entire statute.   To
succeed, the challenged statute must regulate substantially more expression than the First
Amendment allows governments to regulate.   See Schad v. Borough of Mt. Ephraim, 452 U.S.
61 (1981).   The party challenging the statute need not have been engaged in constitutionally
protected expression to have standing to challenge the law; even if the law is constitutional as
applied to the challenging party, if the law is found to be overbroad, it is invalid in its entirety.
See Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 634 (1980)("Given a
case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a
statute by showing that it substantially abridges the First Amendment rights of other parties not
before the court."   (citations omitted)).     There are, thus, two aspects of an overbreadth
challenge that set it apart from other facial challenges: the substantive aspect and the standing
aspect.

1.    <u>The Substantive Aspect: Inverting the Usual Rule for Facial Challenges</u>.

Outside of the First-Amendment context, for a party to succeed in facially challenging a statute, "the challenger must establish that no set of circumstances exists under which the Act would be valid."[11]    <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987).   Overbreadth is not

---

[11]The Tenth Circuit and leading commentators contend that the formulation in <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987), is neither normatively desirable nor -- more importantly for the Court's purposes -- descriptively accurate.

> [I]n <u>City of Chicago v. Morales</u>, [527 U.S. 41, 55 n.22 (1999),] a plurality of the Court asserted that "[t]o the extent that we have consistently articulated a clear standard for facial challenges, it is not the <u>Salerno</u> formulation, which has never been the decisive factor in any decision of this Court, including <u>Salerno</u> itself."

> . . . .

> <u>Salerno</u>'s language thus is accurately understood not as setting forth a test for facial challenges, but rather as describing the <u>result</u> of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard.   In other words, where a statute fails the relevant constitutional test (such as strict scrutiny, the <u>Ward</u> test, or reasonableness review), it can no longer be constitutionally applied to anyone -- and thus there is "no set of circumstances" in which the statute would be valid.   The relevant constitutional test, however, remains the proper inquiry.

<u>Doe v. City of Albuquerque</u>, 667 F.3d 1111, 1125-26, 1127 (10th Cir. 2012)(emphasis in original)(referring to <u>Ward v. Rock Against Racism</u>, 491 U.S. 781 (1989), which held that, even in a public forum, the government may impose reasonable restrictions on the time, place, or manner of protected speech, as long as the restrictions are narrowly tailored to serve a significant governmental interest, the restrictions leave open ample alternative channels for communicating the information, and the restrictions are justified without reference to the content of the regulated speech).   <u>See</u> Richard H. Fallon, Jr., <u>Fact and Fiction About Facial Challenges</u>, 99 Cal. L. Rev. 915, 936-49 (2011)(examining empirical evidence and concluding that the Supreme Court regularly facially invalidates laws, and ignores the purported standard when it does); Richard H. Fallon, Jr., <u>As-Applied and Facial Challenges and Third-Party Standing</u>, 113 Harv. L. Rev. 1321, 1322-23, 1342-43 (2000); Michael C. Dorf, <u>Facial Challenges to State and Federal Statutes</u>, 46 Stan. L. Rev 235, 239-42 (1994)("[T]he <u>Salerno</u> opinion cites no direct authority to support its truly draconian standard.").   If the standard in <u>United States v. Salerno</u> were taken seriously, virtually no statute would ever be invalidated.   A statute criminalizing male-male sexual relations would be constitutional, because it could validly be applied to nonconsensual male-male sexual relations.   <u>See</u> <u>Lawrence v. Texas</u>, 539 U.S. 558 (2003)(striking down a male-male sodomy law without ever using the term "facial challenge" or reciting any recognizable standard of the same). It is not clear how this standard even could be applied to Equal Protection challenges, invidious purpose challenges, procedural rights challenges, or challenges that a law falls outside of the

quite the 180-degree reverse of this standard -- which would be that a law is unconstitutional if it proscribes any constitutionally protected speech -- but instead invalidates only those laws whose "overbreadth is substantial."   Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc., 482 U.S. at 574.   The usual burden of proof in attacking the constitutionality of a statute is switched in the First Amendment context, so that the government "bears the burden of establishing its constitutionality," ACORN v. Municipality of Golden, 744 F.2d 739, 746 (10th Cir. 1984), and the usual presumption that a statute is constitutional is negated, see Doe v. City of Albuquerque, 667 F.3d 1111, 1120 (10th Cir. 2012)("[A]s a general matter, we give all statutes a presumption of constitutionality and we must apply the same presumption to . . . ordinances.   However, this presumption does not apply when the challenged statute infringes upon First Amendment rights." (omission in original)(citations omitted)(internal quotation marks omitted)).

An example of a successful overbreadth challenge occurred in Schad v. Borough of Mt. Ephraim.   In that case, a club that featured nude dancing challenged a city ordinance that purported to ban all live entertainment in commercial zones.[12]   See 452 U.S. at 63-64. Although the Supreme Court has since determined that the First Amendment does not protect nude dancing, see Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991), the ordinance banned a substantial swath of activities -- such as "plays, concerts, musicals, dance," and athletic

_____

federal government's enumerated powers; how it can be squared with void-for-vagueness doctrine; or whether and how it affects severability analysis.   See Citizens United v. Fed. Election Comm'n, 558 U.S. at 331("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.").

[12]The Borough of Mt. Ephraim argued that the zoning ordinance constituted a "reasonable time, place, and manner restriction."   452 U.S. at 74.   The Supreme Court replied that, "[t]o be reasonable, time, place, and manner restrictions not only must serve significant state interests but also must leave open adequate alternative channels of communication.   Here, the Borough totally excludes all live entertainment . . . ."   452 U.S. at 75-76 (citations omitted)(citing Grayned v. City of Rockford, 408 U.S. 104, 116 (1972)).

events -- that the First Amendment protected, Schad v. Borough of Mt. Ephraim, 452 U.S. at 66.

The Supreme Court did not do as they might have done in non-First Amendment settings and

narrowly interpret the ordinance to ban only constitutionally unprotected speech, but rather stuck

the ordinance down entirely as overbroad.   See 452 U.S. at 66.

"[T]he overbreadth of a statute must not only be real, but substantial as well, judged in

relation to the statute's plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601,

615-16 (1973).   In Broadrick v. Oklahoma, the Supreme Court upheld a state law, patterned on

the federal Hatch Act of 1939, 5 U.S.C. §§ 7321-7326, that barred government employees from

engaging in partisan political activities.   See 413 U.S. at 615-16.   On its face, the statute could

be construed to ban forms of expression, like wearing partisan buttons and displaying partisan

bumper stickers on vehicles, that both parties agreed the First Amendment protected.[13]   See 413

U.S. at 615-16.   The State Personnel Board, the body charged with enforcing the statute and

disciplining noncompliant employees, had, however, internally interpreted the statute to ban only

unprotected speech, and the disciplined plaintiff-employees had not been engaged in protected

speech, but merely sought to invalidate the law on the basis of the theoretical unconstitutional

applications.   See 413 U.S. at 615-16.   The Supreme Court held that the statute was "not

substantially overbroad and that whatever overbreadth may exist should be cured through

---

[13]Government employees do not receive the same level of First Amendment protection from adverse employment actions, e.g., firings that citizens do from adverse government action, e.g., penal or civil sanctions, discrimination on the basis of speech (content-based speech regulation), compelled speech, or the conditioning of a benefit.   See Erwin Chemerinsky, Constitutional Law: Principles and Policies § 11.2.4.1, at 969; id. § 11.3.8.1, at 1112. Government employees are protected from adverse employment actions only on the basis of speech if: (i) the speech is "on a matter of public concern," Connick v. Myers, 461 U.S. 138, 146 (1983); and (ii) the government's needs, "as an employer, in promoting the efficiency of the public services it performs through its employees," Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968), do not -- when balanced against the speech rights of the employee -- justify the speech restriction.

case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied."   413 U.S. at 615-16.

As to where the line is between insubstantial overbreadth and substantial overbreadth, the Supreme Court has stated:

> The concept of substantial overbreadth is not readily reduced to an exact definition.   It is clear, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.   On the contrary, the requirement of substantial overbreadth stems from the underlying justification for the overbreadth exception itself -- the interest in preventing an invalid statute from inhibiting the speech of third parties who are not before the Court.
>
> "The requirement of substantial overbreadth is directly derived from the purpose and nature of the doctrine.   While a sweeping statute, or one incapable of limitation, has the potential to repeatedly chill the exercise of expressive activity by many individuals, the extent of deterrence of protected speech can be expected to decrease with the declining reach of the regulation."   New York v. Ferber, 458 U.S. 747, 772 (1982).   In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.

Members of the City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800-01 (1984)(footnote omitted)(citations omitted).

When assessing whether an overbroad statute is likely to chill third parties from engaging in protected expression, courts should assess not only whether the number of unconstitutional potential applications of the statute is significant relative to the overall number of applications, but the level of interpretive discretion given to those in charge of its enforcement, and the likelihood of capricious enforcement.   In City of Houston v. Hill, 482 U.S. 451 (1987), the Supreme Court struck down as overbroad a city ordinance making it a crime "for any person to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty."   482 U.S. at 455 (quoting Code of Ordinances, City of Houston, Tex.

§ 34-11(a) (1984)).   The Supreme Court held that the ordinance was "not narrowly tailored to prohibit only disorderly conduct or fighting words," 482 U.S. at 465, and "criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement," 482 U.S. at 466.   The Supreme Court explained:

> As the Court observed over a century ago, "[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."   United States v. Reese, 92 U.S. (2 Otto) 214, 221 (1876).
>
> . . . .
>
> The ordinance's plain language is admittedly violated scores of times daily, yet only some individuals -- those chosen by the police in their unguided discretion -- are arrested.   Far from providing the "breathing space" that "First Amendment freedoms need . . . to survive," NAACP v. Button, 371 U.S. 415, 433 (1963), the ordinance is susceptible of regular application to protected expression.

City of Houston v. Hill, 482 U.S. at 465-67 (citations to the record omitted).   The Court presumes that, assuming the same level of overbreadth, the threat of criminal sanctions produces a stronger chilling effect than that of civil monetary sanctions, directions to cease and desist, or exposure to civil liability.

Some commentators have suggested that, when considering whether a statute's overbreadth is substantial, courts should take into account the importance of the protected speech being restricted or chilled.   See Richard Fallon, Jr., Making Sense of Overbreadth, 100 Yale L.J. 853, 894 (1991).   Under this view, a statute that chills a swath of political speech should be more readily facially invalidated than one that chills sexual, frivolous, or even artistic speech -- the latter statute being more amenable to as-applied challenges.   Although the Supreme Court has not endorsed this view explicitly, it has held that "the overbreadth doctrine

does not apply to commercial speech."   Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497 (1982).

In Griffin v. Bryant, No. CIV 13-0799 JB/GBW, 2014 WL 3377705 (D.N.M. June 18, 2014)(Browning, J.), the Court found that a plaintiff had standing to challenge a municipality's rule prohibiting statements criticizing the municipality's employees or governing body.   Even though the plaintiff had not been penalized for violating the municipality's rule, because the rule likely affected his speech, he had suffered a sufficient injury in fact to establish standing.   See Griffin v. Bryant, 2014 WL 3377705, at *28.

## 2.   The Standing Aspect: The Near Abolition of Prudential Standing Factors.

A non-First Amendment, non-overbreadth facial challenge is always more difficult to mount than an as-applied challenge to the same statute.   See United States v. Salerno, 481 U.S. at 745.   An as-applied challenge requires only that the law is unconstitutional as applied to the challenger's case; a facial challenge requires this showing as well[14] and also requires that there exists "no [other, theoretical] set of circumstances" in which the law could be constitutionally applied.   United States v. Salerno, 481 U.S. at 745.   A successful as-applied challenge is, thus, a necessary, but not sufficient, ingredient to a successful facial challenge.   The Supreme Court has attributed the relative difficulty of facial and as-applied challenges to the Case or Controversy Clause, U.S. Const. art. III, § 2, cl. 1, specifically its standing requirement[15]:

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will

---

[14]A logical consequence of there being "no set of circumstances" wherein the law would be constitutional is that the manner in which the government applied the law in the challenger's case must also be unconstitutional.

[15]Standing is not the only reason that facial challenges are disfavored.   Other cases say that "[f]acial adjudication carries too much promise of 'premature interpretation of statutes' on the basis of barebones records."   Sabri v. United States, 541 U.S. 600, 609 (2004)(alterations omitted)(quoting United States v. Raines, 362 U.S. 17, 22 (1960)).

not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.   A closely related principle is that constitutional rights are personal and may not be asserted vicariously.   These principles rest on more than the fussiness of judges. They reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws.   Constitutional judgments, as Mr. Chief Justice Marshall recognized, are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court.

Broadrick v. Oklahoma, 413 U.S. at 610 (citations omitted).

The relative difficulty of mounting facial and as-applied challenges is almost, but not entirely, reversed in the context of a First Amendment overbreadth challenge.   Although a successful as-applied challenge does not guarantee a victorious facial challenge -- the court could find the statute's overbreadth insubstantial -- it is not necessary to have a viable as-applied challenge to succeed on a facial challenge.   "[W]here the claim is that a statute is overly broad in violation of the First Amendment, . . . [there is] no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity."   Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 957 (1984).   Even if the challenger engaged in constitutionally unprotected, validly penalized speech, if he can establish that the statute penalizes a substantial swath of protected speech, then he will prevail in getting the statute invalidated not only as it relates to the constitutionally protected speech of others, but to his own unprotected speech as well.   For example, if a statute criminalized "demeaning, threatening, or inflammatory words," a challenger arrested for using "fighting words" in a bar -- unprotected speech which may be validly criminalized under Chaplinsky v. New Hampshire, 315 U.S. 568 (1942) -- could challenge the law on behalf of third parties who might risk arrest for constitutionally protected demeaning or inflammatory words, see Goading v. Wilson, 405 U.S. 518 (1972)(invalidating a Georgia law making it a crime for

"[a]ny person [to], without provocation, use . . . opprobrious words or abusive language, tending to cause a breach of the peace").

The relaxation of the usual standing rules in the overbreadth context goes further than simply allowing an individual to whom the law is constitutionally applied to sue on the basis of unconstitutional applications.  The challenged law need not have been applied against the challenger at all; as long as the barebones requirements of Article III standing are met,[16] the elements of prudential standing are presumed satisfied in an overbreadth challenge.[17]  In Secretary of State of Maryland v. Joseph H. Munson Co., the Supreme Court allowed a professional fundraising company to bring suit challenging a state statute that prohibited charities from soliciting funds unless at least seventy-five percent of their revenue was used for charitable purposes.  See 467 U.S. at 949.  The Supreme Court held that the plaintiff had standing, even though the law had not been and -- as the company was not a charity -- could not be applied against it:

> [T]he Secretary's most serious argument against allowing Munson to challenge the statute is that there is no showing that a charity cannot bring its own lawsuit.

---

[16]Establishing Article III standing requires three components: (i) an injury in fact, which is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical,"; (ii) causation between the injury in fact and the conduct complained of, such that the injury is fairly traceable to the challenged action; and (iii) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Lujan v. Defenders of Wildlife, 504 U.S. at 560-61 (Scalia, J.)(internal quotation marks omitted)(citations omitted).

[17]A leading commentator offers a possible justification for the virtual abandonment of standing doctrine in the context of overbreadth challenges that also explains the concept of "taxpayer standing" for suits brought under the Establishment Clause: the grammar of the Constitution's text.  Nicholas Q. Rosenkranz, The Subjects of the Constitution, 62 Stan. L. Rev. 1209, 1250-57, 1257-63 (2010).  The thrust of the argument is that, while all the other provisions of the Bill of Rights are written in passive voice, the First Amendment provides that "Congress shall make no law . . . ."  U.S. Const. amend. I.  See Rosenkranz, supra, at 1250.  Professor Rosenkranz suggests that, while the Constitution contemplates that, for example, Fourth Amendment harm occurs at the point when an unreasonable search occurs, First Amendment injury occurs when Congress passes the infringing law.  See Rosenkranz, supra, at 1255.

Although such an argument might defeat a party's standing outside the First Amendment context, this Court has not found the argument dispositive in determining whether standing exists to challenge a statute that allegedly chills free speech.   To the contrary, where the claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another without regard to the ability of the other to assert his own claims and "'with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.'"   Broadrick v. Oklahoma, 413 U.S. at 612 (quoting Dombrowski v. Pfister, 380 U.S. 479, 486 (1965)).

The fact that, because Munson is not a charity, there might not be a possibility that the challenged statute could restrict Munson's own First Amendment rights does not alter the analysis.   Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society -- to prevent the statute from chilling the First Amendment rights of other parties not before the court.   Munson's ability to serve that function has nothing to do with whether or not its own First Amendment rights are at stake. The crucial issues are whether Munson satisfies the requirement of "injury-in-fact," and whether it can be expected satisfactorily to frame the issues in the case. If so, there is no reason that Munson need also be a charity.   If not, Munson could not bring this challenge even if it were a charity.

The Secretary concedes that the Art. III case-or-controversy requirement has been met and the Secretary has come forward with no reason why Munson is an inadequate advocate to assert the charities' rights.   The activity sought to be protected is at the heart of the business relationship between Munson and its clients, and Munson's interests in challenging the statute are completely consistent with the First Amendment interests of the charities it represents.   We see no prudential reason not to allow it to challenge the statute

Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. at 957-58 (citations omitted).

## LAW REGARDING SUBSTANTIVE DUE-PROCESS CLAIMS

The Fourteenth Amendment's Due Process Clause provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law."   U.S. Const. amend. XIV, § 1. In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due process rights and not for third parties' acts.   See Robbins v. Oklahoma, 519 F.3d at 1251 (citing DeShaney v. Winnebago Cnty. of Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)).   "[N]othing in the language of the Due Process Clause itself requires the State to protect

the life, liberty and property of its citizens against invasion by private actors." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. at 195.  The Due Process Clause is not a guarantee of a minimal level of safety and security.  See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. at 195.

A government actor's official conduct intended to injure in a way that cannot reasonably be justified by any government interest most likely shocks the conscience.  See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)("[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.").  "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d 1214, 1222 (10th Cir. 2006)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)).  "The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222-23 (quoting Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995))(internal quotation marks omitted).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Peña v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.), aff'd, 511 F. App'x 742 (10th Cir.

2013)(finding that the use of deadly force did not shock the conscience even if the suspect did not have intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively")).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates.   See 265 F.3d at 1132.   The district court found that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience[.]"   265 F.3d at 1134.   The Tenth Circuit agreed with the district courts' conclusion, stating: "[U]nder the circumstances of this case, inaction in the face of known dangers or risks [was] not enough to satisfy the danger-creation theory's conscience shocking standard."   265 F.3d at 1135.

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. Apr. 30, 2010)(Browning, J.), the plaintiffs alleged that the defendants -- the school district, superintendent, principal, and vice principal of a middle school -- violated the plaintiffs' substantive due-process rights when they did not take sufficient action to prevent a student at the school from "racking"[18] the plaintiffs' son.   716 F. Supp. 2d at 1072-73.   The Court concluded that the defendants' conduct did not shock the conscience.   See 716 F. Supp. 2d at 1074-75.   The Court explained:

---

[18]The parties in Schaefer v. Las Cruces Public School District defined being "racked" as being "kicked and/or punched in the testicles."   716 F. Supp. 2d at 1059 n.2 (citations omitted)(internal quotation marks omitted).

Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent [the plaintiffs' son] from falling victim to the same fate.   Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.

While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked . . . .

Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy.   Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## LAW REGARDING INJUNCTIONS

To obtain a permanent injunction, the party requesting such relief bears the burden of showing: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest."   Fisher v. Oklahoma Health Care Auth., 335 F.3d 1175, 1180 (10th Cir. 2003)(citations omitted).   To obtain a preliminary injunction, a plaintiff must show: "(1) a substantial likelihood of success on the merits, (2) that the plaintiff will suffer irreparable injury if the preliminary injunction is denied, (3) that the threatened injury to the plaintiff outweighs the injury to the defendant(s) caused by the preliminary injunction, and (4) that an injunction is not adverse to the public interest."   Aid for Women v. Foulston, 441 F.3d at 1115 (citation omitted).   The right to relief under a preliminary injunction "must be clear and unequivocal."   Aid for Women v. Foulston, 441 F.3d at 1115 (citation and

internal quotations omitted).   "[A] district court cannot enter a judgment purporting to bind nonparties over whom it does not have jurisdiction, seek to join those nonparties to the underlying litigation, and then issue an injunction against those parties based on a need to protect its earlier judgment."   Steans v. Combined Ins. Co. of Am., 148 F.3d 1266, 1271 (11th Cir. 1998).

## LAW REGARDING SUPPLEMENTAL JURISDICTION

It is a fundamental precept of American law that the federal courts are "courts of limited jurisdiction."   Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005).   Federal courts "possess only that power authorized by Constitution and statute."   Kokkonen v. Guar. Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).   Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.   See 28 U.S.C. §§ 1331-32.

### 1.      Congressional Authority.

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims that are part of the same case or controversy."   Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. at 552.   The term "supplemental jurisdiction" is now used to refer collectively to the common-law doctrines of ancillary jurisdiction, pendent jurisdiction, and pendant-party jurisdiction.   28 U.S.C. § 1367, statutorily codifying Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365 (1978)(outlining the doctrine of ancillary jurisdiction), and United Mine Workers of Am. v. Gibbs, 383 U.S. 715 (1966)(outlining the doctrine of pendent jurisdiction), and invalidating Finley v. United States, 490 U.S. 545 (1989)(rejecting the doctrine of pendent-party

jurisdiction).   Federal courts may exercise pendent jurisdiction over state-law claims when "state and federal claims . . . derive from a common nucleus of operative fact."   United Mine Workers v. Gibbs, 383 U.S. at 725.   Supplemental jurisdiction gives federal courts the flexibility to hear a cause of action after the introduction of third parties whose insertion into the litigation lacks support of any independent grounds for federal jurisdiction, when those parties share a common interest in the outcome of the litigation and are logical participants in it.  See Owen Equip. & Erection Co. v. Kroger, 437 U.S. at 375 n.18.

In 1988, the Honorable William H. Rehnquist, Chief Justice of the United States, created the Federal Courts Study Committee to analyze the federal court system and to recommend reforms.  See James v. Chavez, No. CIV 09-0540 JB/CG, 2011 WL 6013547, at *5 (D.N.M. Nov. 21, 2011)(Browning, J.)(citing 16 James W. Moore et al., Moore's Federal Practice § 106.04[5] (Matthew Bender 3d ed.)).   In response to the Committee's findings regarding pendent, ancillary, and pendent-party jurisdiction, Congress codified the doctrines when it passed the Judicial Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a).   In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts "supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on claim and party joinder to deal economically -- in single rather than multiple litigation -- with matters arising from the same transaction or occurrence."   Report of the Federal Courts Study Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

2.       **District Court Discretion.**

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental jurisdiction, not as a litigant's right, but as a matter of judicial discretion.   See Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi. v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).   In circumstances where the supplemental jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to decline to exercise that jurisdiction.   The traditional analysis, based on the Supreme Court's opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy, convenience and fairness to litigants" when deciding whether to exercise supplemental jurisdiction.   383 U.S. at 726.   Similarly, Congress' supplemental jurisdiction statute enumerates four factors that the court should consider:

   **(1)**    the claim raises a novel or complex issue of State law,

   **(2)**    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

   **(3)**    the district court has dismissed all claims over which it has original jurisdiction, or

   **(4)**     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).   In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity."  Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.

Numerous courts have acknowledged that 28 U.S.C. § 1367(c) necessarily changed the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of 28 U.S.C. § 1367(c) exists, courts are not free to decline jurisdiction.   See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("[S]ection 1367 has

indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Exec. Software N. Am. v. U.S. Dist. Court, 24 F.3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of Gibbs in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."), overruled on other grounds by 533 F.3d 1087 (9th Cir. 2008); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c)."); Bonadeo v. Lujan, No. CIV 08-0812 JB/ACT, 2009 WL 1324119, at *8 (D.N.M. Apr. 30, 2009)(Browning, J.) ("28 U.S.C. § 1367(c) changed the district courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists.").   At least one other district court in the Tenth Circuit besides this Court has reached the same conclusion.   See Gudenkauf v. Stauffer Commc'ns, Inc., 896 F. Supp. 1082, 1084 (D. Kan. 1995)(Crow, J.)("[A]ny exercise of discretion declining jurisdiction over pendent claims or parties cannot occur until 'triggered' by the existence of one of the four conditions enumerated.").

The Tenth Circuit has held that district courts should generally decline jurisdiction over state claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."   Koch v. Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)).   The Supreme Court has also recognized:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.   Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Am. v. Gibbs, 383 U.S. at 726.   The Court has previously stated that a district court should usually decline to exercise supplemental jurisdiction when one of the 28 U.S.C. § 1367(c) factors applies.   See Armijo v. New Mexico, No. CIV 08-0336, 2009 WL 3672828, at *4 (D.N.M. Sept. 30, 2009)(Browning, J.).   The Tenth Circuit has recognized that a district court does not "abuse [its] discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction.'"   Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished)(quoting 28 U.S.C. § 1367(c)(3)).[19]   The Court has previously allowed a plaintiff to amend her complaint to add an additional federal claim, after the Court dismissed all other federal claims bud did not resolve the state claims.   See Young v. City of Albuquerque, No. CIV 13-1046 JB/RHS, 2014 WL 7473806, at *28-29 (Dec. 24, 2014)(Browning, J.)

---

[19] Muller v. Culbertson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.   See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").   The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).   The Court finds that Muller v. Culbertson and Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

## ANALYSIS

The Court will grant the Motion in part and deny it in part, and will invalidate the Ordinance.   The Court will consider evidence outside the pleadings solely for the purpose of determining issues of standing and ripeness, because the Court may consider evidence in determining justiciability issues.   SWEPI, LP has standing to bring each of its claims, because it has suffered an injury in fact.   Because the Defendants have already enacted the Ordinance, and because SWEPI, LP would suffer harm if the Court delayed considering its claims, each of SWEPI, LP's claims are ripe, except for its claim under the Takings Clause.   Because SWEPI, LP has not sought just compensation through a state inverse condemnation action, its takings claim is not ripe.   SWEPI, LP may bring its claim under the Supremacy Clause, because it could bring independent claims, through 42 U.S.C. § 1983, under the constitutional provisions that it asserts trumps the Ordinance.   Additionally, the Ordinance violates the Supremacy Clause, because it conflicts with federal law.   The Ordinance does not, however, violate SWEPI, LP's substantive due-process rights or the Equal Protection Clause, because the Defendants had a legitimate state interest for enacting the Ordinance.   The Ordinance violates the First Amendment by chilling protected First Amendment conduct.   Because the Defendants lack the authority to enforce zoning laws on New Mexico state lands, they may not enforce the Ordinance on state lands.   Also, because there is room for concurrent jurisdiction between state and local law, New Mexico state law does not preempt the entire oil-and-gas production field.   The Ordinance conflicts, however, with state law by prohibiting activities that state law permits: the production and extraction of oil and gas.   Finally, the invalid provisions are not severable from the valid provisions, making the Ordinance, in its entirety, invalid.

## I.   THE COURT CAN CONSIDER THE SUPPLEMENTED RECORD TO DETERMINE JUSTICIABILITY ISSUES.

The Court can consider the supplemented record to determine justiciability issues. Depending on the substance and issues involved in a 12(c) motion for judgment on the pleadings, the Court will either treat it as a rule 12(b)(6) motion or a rule 12(b)(1) motion.   Normally, rule 12(c) motions are determined under the same standard as rule 12(b)(6) motions.   See Mock v. T.G. & Y. Stores Co., 971 F.2d at 528.   If, however, a motion challenges the Court's subject-matter jurisdiction, it is resolved under rule 12(b)(1)'s standard.   See, e.g., Ponca Tribe of Indians of Okla. v. Cont'l Carbon Co., 439 F. Supp. 2d 1171, 1173 (W.D. Okla. 2006)(noting that, because the defendants' rule 12(c) motion "challenges the Court's subject matter jurisdiction, it will be considered under the standards applicable to Rule 12(b)(1) motions" (citing 5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1267 (3d ed. 2004)("For example, if a party raises an issue as to the court's subject matter jurisdiction on a motion for a judgment on the pleadings, the district judge will treat the motion as if it had been brought under Rule 12(b)(1)."))); Hellmann-Blumberg v. Univ. of Pac., No. CIV 12-0286, 2013 WL 1326469 (E.D. Cal. Mar. 29, 2013)(Burrell, S.J.)(considering 12(c) motion under 12(b)(1) standard).

This case is in a unique procedural posture.   SWEPI, LP -- the plaintiff -- filed the Motion pursuant to rule 12(c), and, in response, the Defendants argue that SWEPI, LP lacks standing and that the case is not ripe, thus depriving the Court of subject-matter jurisdiction.   If SWEPI, LP filed the Motion and the Defendants responded only to the merits of the Motion, the Court would apply a rule 12(b)(6) standard.   On the other hand, if the Defendants filed the Motion pursuant to rule 12(c) challenging the Court's subject matter jurisdiction, the Court would apply a rule 12(b)(1) standard.   The primary difference between a 12(b)(6) and 12(b)(1) standard is that, under a 12(b)(1) standard, the Court may consider evidence outside the pleadings, while under a

12(b)(6) standard, the Court is limited to the pleadings.   See Douglas v. Norton, 167 F. App'x 698, 705 n.10 (10th Cir. 2006)(unpublished)("A motion to dismiss pursuant to Rule 12(b)(1), as opposed to Rule 12(b)(6), allows the district court to rely on evidence outside the pleadings without converting the motion to a motion for summary judgment."   (citing Davis ex rel. Davis, 343 F.3d 1282, 1296 (10th Cir. 2003))).   If the Court applies a 12(b)(1) standard, it may consider the SWEPI Supplement, the Defendants 1st Supplement, and the Defendants 2d Supplement.   If a 12(b)(6) standard is applied, the Court may consider only the Complaint and the Answer.

The Defendants' arguments that SWEPI, LP lacks standing and that its claims are not ripe are issues that are normally resolved under rule 12(b)(1).   See United States v. Rodriguez-Aguirre, 264 F.3d 1195, 1202 n.5 (10th Cir. 2001)("Although the motion to dismiss did not specify the Rule of Civil Procedure under which dismissal was sought, we assume it was Rule 12(b)(1) regarding the standing argument . . . ."); New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499 ("The question of ripeness, like other challenges to a court's subject matter jurisdiction, is treated as a motion under Rule 12(b)(1).").   The rest of the Motion and the Response, however, goes to the merits of SWEPI, LP's claims, and the Court should consider the merits under rule 12(b)(6)'s standard.   The Court will thus consider the Defendants' standing and ripeness arguments under a rule 12(b)(1) standard, and will consider the remaining arguments and issues under a rule 12(b)(6) standard.

At least two courts have applied a 12(b)(1) standard to certain issues in a motion for judgment on the pleadings while applying a 12(b)(6) standard to other issues.   In Muir v. Winston-Salem State University, No. CIV 11-0282, 2012 WL 683359 (M.D.N.C. Mar. 2, 2012)(Tilley, S.J.), the Honorable Norwood Carlton Tilley, Jr., United States Senior Judge for the Middle District of North Carolina, in deciding a motion pursuant to rule 12(c), concluded that

some of the plaintiff's claims should be decided under a 12(b)(6) standard while others should be decided under a 12(b)(1) standard. See 2012 WL 683359, at *3 & n.5 ("Mr. Muir's failure to exhaust his administrative remedies as to his hostile work environment claim would, however, be the proper subject of a 12(b)(1) motion. Accordingly, Mr. Muir's hostile work environment claim is considered independently of his claims of discrete acts of discrimination." (citation omitted)). Similarly, in Mittleider v. Canadian Pacific Railway Company, No. CIV 11-4054 KES, 2012 WL 1231939 (D.S.D. Apr. 12, 2012)(Schreier, C.J.), the Honorable Karen E. Schreier, Chief United States District Judge for the District of South Dakota, applied both a 12(b)(1) standard and 12(b)(6) standard to the defendants' motion for judgment on the pleadings. See 2012 WL 1231939, at *2. Specifically, Judge Schreier applied a 12(b)(1) standard to the defendants' argument that the court lacked subject-matter jurisdiction, and she applied a 12(b)(6) standard to the defendants' argument that they were the wrong defendants for the case, because the court could not pierce the corporate veil. See 2012 WL 1231939, at *2.

Accordingly, the Court will treat the Defendants' subject-matter jurisdiction arguments -- lack of standing and ripeness -- under a rule 12(b)(1) standard and will consider the rest of the Motion under a rule 12(b)(6) standard. The Court will thus consider the parties' supplemental evidence for purpose of resolving the jurisdictional issues -- whether SWEPI, LP has standing and whether its claims are ripe -- but will not consider anything outside the pleadings and the documents attached the pleadings in resolving the rest of the Motion.

## II.   SWEPI, LP HAS STANDING IN THIS CASE.

SWEPI, LP has standing. SWEPI, LP must demonstrate standing on each of its claims and for each form of relief that it seeks. See Davis v. Fed. Election Comm'n, 554 U.S. 724, 234 (2008)("Standing is not dispensed in gross. Rather, a plaintiff must demonstrate standing for

each claim he seeks to press and for each form of relief that is sought." (alterations omitted)(citations omitted)(internal quotation marks omitted)). SWEPI, LP has met its burden. The Defendants' standing arguments appear to be based on the constitutional standing requirements and not on prudential standing grounds.[20] To establish standing, SWEPI, LP must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision." Protocols, LLC v. Leavitt, 549 F.3d at 1298 (internal quotation marks omitted). The Defendants address only the first condition -- an injury in fact. See Response at 7-9. The Court concludes that SWEPI, LP has proven that it has suffered an injury in fact. Additionally, while the Defendants do not challenge the other two conditions for constitutional standing, the Court concludes that they are satisfied.

### A. SWEPI, LP HAS SUFFERED AN INJURY IN FACT THAT PROVIDES IT WITH STANDING FOR EACH OF ITS CLAIMS.

SWEPI, LP has suffered an injury in fact that provides it with standing for each of its claims. An injury in fact means the "invasion of a legally protected interest that is '(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" N.E. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 663 (1993)(quoting Lujan v. Defenders of Wildlife, 504 U.S. at 560). SWEPI, LP's injury for almost all of its claims centers around the devaluation, or complete destruction of value, in its leases.

---

[20]Prudential standing concerns whether a plaintiff is asserting his or her own rights; whether a plaintiff's claim is a generalized grievance that all, or a large class of citizens, share; and whether a plaintiff's grievance falls within the zone of interests that the statute or constitutional guarantee, which is invoked in the suit, protects or regulates. See Bd. of Cnty. Comm'rs v. Geringer, 297 F.3d at 1112. The Defendants' main argument against standing is that SWEPI, LP has not shown that its leases have value or are valid. See Response at 7-8. Specifically, the Defendants argue that SWEPI, LP has not suffered an injury in fact, which is a component of constitutional standing and not of prudential standing. See Protocols, LLC v. Leavitt, 549 F.3d at 1298 (noting that a plaintiff must show a concrete, particularized, and actual or imminent injury for constitutional standing).

1.      **SWEPI, LP's Takings Claim.**

SWEPI, LP suffered an injury in fact to support its takings claim.   "'The owner of an interest in property at the time of an alleged taking has standing to assert that a taking has occurred.'"   Deniz v. Mun. of Guaynabo, 285 F.3d 142, 149 (1st Cir. 2002)(alterations omitted)(emphasis omitted)(quoting U.S. Olympic Comm. v. Intelicense Corp., 737 F.2d 263, 268 (2d Cir. 1984)).   As the United States Court of Appeals for the Eighth Circuit has recognized: "There is a substantial body of law recognizing that the owner of an interest in the affected property has standing to challenge the restriction."   Kerssenbrock-Praschma v. Saunders, 48 F.3d 323, 326 (8th Cir. 1995)(citing Huntington Branch NAACP v. Town of Huntington, 689 F.2d 391, 395 (2d Cir. 1982); Constr. Indus. Ass'n of Sonoma Cnty. v. City of Petaluma, 522 F.2d 897, 903 (1975); Horizon House v. Twp. Of Upper Southampton, 804 F. Supp. 683, 692 (E.D. Pa. 1992)(Reed, J.), aff'd, 995 F.2d 217 (3d Cir. 1993); In re Malone, 592 F. Supp. 1135, 1153-55 (E.D. Mo. 1984)(Nangle, C.J.), aff'd, 794 F.2d 680 (8th Cir. 1986)).   See Epice Corp. v. Land Reutilization Auth., No. CIV 07-0206 HEA, 2009 WL 4730337, at *4 (E.D. Mo. Dec. 4, 2009)(Autrey, J.)("Plaintiff's property interest, however, gives rise to Plaintiff's standing to bring this lawsuit.").   SWEPI, LP has presented evidence that it owns thirty-six oil-and-gas leases in Mora County.   See SWEPI Supplement at 1-5.   "It is well settled in [New Mexico] that a grant or reservation of the underlying oil and gas, or royalty rights therein, is a grant or reservation of real property that may be severed from the surface."   Johnson v. Gray, 1966-NMSC-020, ¶ 5 (citations omitted).   For a Takings Clause claim, state law determines what property rights exist.   See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. 702, 707 (2010)("Generally speaking, state law defines property interests . . . ."); Vandervere v. Lloyd, 644 F.3d 957, 963 (9th Cir. 2011)("[W]e look to state law to determine what property rights exist and therefore are subject

to 'taking' under the Fifth Amendment.").   SWEPI, LP's oil-and-gas leases are thus real property under New Mexico law.   The question then is whether the Defendants have infringed this property -- i.e. whether the Defendants have taken SWEPI, LP's property.   Because the Ordinance prohibits SWEPI, LP from acting on its leases, the Ordinance infringes -- i.e. affects -- SWEPI, LP's real property interests.   The Ordinance's effect on SWEPI, LP's property interests, and not the decrease in its leases' value, confers SWEPI, LP with standing.   The Defendants' argument concerning the value of SWEPI, LP's leases is misplaced.   Accordingly, because the Ordinance affects SWEPI, LP's leases, SWEPI, LP has standing to bring its takings claim.

In any case, even if SWEPI, LP were required to show that its leases have value that has been negatively affected by the Ordinance, it has done so.   While the Court should normally decline to resolve the merits of a case before determining standing, because without standing the Court has no authority to decide the merits of the case, see Hollingsworth v. Perry, 133 S. Ct. 2652, 1659 (2013), it is necessary in this case to consider the merits of SWEPI, LP's takings claim to determine whether its leases have decreased in value.   SWEPI, LP paid $216,200.00 for thirty-six oil-and-gas leases in Mora County.   See SWEPI Supplement at 1.   The Ordinance deprives SWEPI, LP of all economic value in its leases.   As the Supreme Court noted in Pennsylvania Coal Co. v. Mahon, the "right to coal consists in the right to mine it."   260 U.S. at 414 (internal quotation marks omitted)(citation omitted).   In the same way, the right to oil and gas consists in the right to extract it.   The Ordinance deprives SWEPI, LP of that right.   See Ordinance § 5.1, at 4 ("It shall be unlawful for any corporation to engage in the extraction of oil, natural gas, or other hydrocarbons within Mora County.").   The leases each state that they only provide the right to oil and gas.   See SWEPI Supplement at 1; Aug. 1, 2010, Lease at 1.   The only use and the only value of the leases lie in the ability and right to extract oil and gas, which the Ordinance prohibits.

The Ordinance effectively destroys all economic value that SWEPI, LP has in its leases.   See Lucas v. S.C. Coastal Council, 505 U.S. at 1027 (noting that taking occurs when a regulation "prohibits all economically beneficial use of land").[21]

In Energy Management Corp. v. City of Shrevenport, the Fifth Circuit held that mineral interest owners had standing to challenge a city ordinance that prohibited drilling for oil and gas within one thousand feet of Cross Lake.   See 397 F.3d at 299, 301-02.   The Fifth Circuit, in an opinion that the Honorable W. Eugene Davis, United States Circuit Judge for the Fifth Circuit, wrote, and Judges Garza and Prado joined, held that the plaintiff had suffered an injury in fact, because its "right to exploit its mineral interests by seeking a drilling permit . . . is a legally protected right."   397 F.3d at 302.   The Fifth Circuit states:

> [The plaintiff] further alleges that because of Ordinance 221, its mineral interests in and around Cross Lake have been adversely affected.   Ordinance 221 imposes limitations on oil and gas drilling activity around Cross Lake in addition to the [Louisiana Office of Conservation] regulations by limiting drilling locations and imposing other requirements which interfere with the exploitation of oil and gas interests by preventing or delaying the activity and making it more costly.   These allegations are sufficient to state an injury in fact.

397 F.3d 297, 302.   Similarly, the Ordinance affects SWEPI, LP's mineral interests in Mora County.   SWEPI, LP's ability to exploit its mineral interests has been infringed.   This infringement is sufficient to establish an injury in fact.   See 397 F.3d at 302.

The Defendants argue that SWEPI, LP has not shown that its leases have value.   See Response at 7.   While the Court has already concluded that SWEPI, LP has to only show an affected property interest and not a decrease in value, the Defendants' decrease-in-value argument is contrary to the evidence and would require the Court to adopt unreasonable inferences.   In

---

[21]The Court includes this discussion in this portion of the Memorandum Opinion and Order merely to determine whether SWEPI, LP has standing.   The Court is not, however, concluding whether the Ordinance constitutes a taking that requires just compensation.   Because SWEPI, LP's takings claim is not ripe, the Court will not resolve that issue.

deciding a motion for judgment on the pleadings, the Court must "grant all reasonable inferences" in the non-moving party's favor.   Park Univ. Enter., Inc. v. Am. Cas. Co. of Reading, Pa., 442 F.3d at 1239.   Inferring the SWEPI, LP's leases lack value, however, is not a reasonable inference.   SWEPI, LP paid $216,200.00 for the leases in the SWEPI Supplement.   See SWEPI Supplement at 1.   It paid $8,800.00 for the Aug. 1, 2010, Lease.   See Aug. 1, 2010, Lease at 1. The Defendants do not explain why these leases, which were worth $216,800.00 four to six years ago, are suddenly worthless today.   The Defendants are essentially arguing that, while the leases may have had value when SWEPI, LP first entered into them, they are now, for some unexplained reason, worthless.   The leases may be worth less today than they were four to six years ago, because they are closer to expiring, see Aug. 1, 2010, Lease at 1, 3 (stating that lease is for a five-year primary term with another five-year secondary term, if additional rental payments are made), but less value does not equal valueless.

The Defendants argue that SWEPI, LP is not currently prepared to engage in hydrocarbon extraction activities.   See Response at 11-14.   The issue whether SWEPI, LP is prepared to engage in hydrocarbon extraction activities, or whether SWEPI, LP will ever engage in hydrocarbon extraction activities, misses the mark.   SWEPI, LP may never intend to act on its leases and drill for oil and gas, yet it still suffered an injury in fact, specifically, the decrease in its leases' value.   See Kaing v. Pultegroup, Inc., 464 F. App'x 630, 631 (9th Cir. 2011)(unpublished)(noting that decreased property value is a concrete injury in fact).   SWEPI, LP may be holding onto its leases as an investment.   As an investment instrument, they have value, even if SWEPI, LP does not intend to act on them, because someone else may wish to purchase them, either as an investment, or to drill for oil and gas.[22]   If there is no possibility to act on the

_____

[22]Many people buy and sell leases with no intention of drilling.   A person, who has no intention of drilling for oil or gas, may purchase inexpensive oil-and-gas leases upon which there

leases, however -- because the Ordinance prohibits all hydrocarbon extraction activities -- the leases lack value, even as investment instruments.   As the Supreme Court has noted, the right to a mineral interest is the right to extract it.   See Pennsylvania Coal Co. v. Mahon, 260 U.S. at 414 (noting that the "right to coal consists in the right to mine it").   The Supreme Court explained: "What makes the right to mine coal valuable is that it can be exercised with profit.   To make it commercially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it."   Pennsylvania Coal Co. v. Mahon, 260 U.S. at 414. In the same way, what makes the right to drill for oil valuable -- i.e. an oil-and-gas lease valuable -- is the ability to act on it by drilling for oil.   Without that right, an oil-and-gas lease is worthless. Even if SWEPI, LP intended to hold its leases solely as an investment, because the Ordinance prohibits anyone from acting on them, they are worthless.   Without the possibility that oil and gas can be extracted under the leases, they have no value.   Thus, SWEPI, LP has suffered an injury in fact, regardless whether it intends to act on the leases.

This reasoning holds true even if it is currently economically infeasible to drill for oil and gas in Mora County.   If the Defendants were able to present evidence that, not only is SWEPI, LP not currently prepared to drill for oil and gas, but that no one would drill for oil and gas in Mora County, the Court would still find that SWEPI, LP has standing, because its leases would still have value but for the Ordinance.   Oil prices are constantly fluctuating.   See Crude Oil, Nasdaq.com, http://www.nasdaq.com/markets/crude-oil.aspx?timeframe=7y   (last   visited   Jan.   16, 2014)(showing that, over the last seven years, crude oil prices have fluctuated from around $40.00

is little prospect of oil or gas being discovered, with the hope that someone else may discover oil or gas on surrounding properties.   The discovery of nearby oil and gas would increase the value of the person's leases, and he or she would be able to sell them for a profit.   That the person paid little money for the leases and had no intention to drill does not make the leases valueless.   They still have value -- albeit not much until some later development increases the likelihood that oil will be found.   If land is leased at five cents an acre, the lease still has value -- five cents per acre -- and it has the potential of increasing in value if oil and gas is discovered nearby.

per barrel to around $140.00 per barrel).   While it may currently be economically infeasible to drill an oil-and-gas well in Mora County, because of the fluctuating oil prices, there is the possibility that, in the future, it will be economically feasible to drill.   This possibility gives the leases value.   Assuming that it is economically infeasible to drill, because there is the possibility of increased oil prices, an investment in Mora County oil-and-gas leases would be risky.   All investments, however, have an element of risk.   The greater the risk, the less value the leases have.   As long, however, as the possibility remains -- albeit it a risky one -- the leases retain some value.   Because the leases have value, which the Ordinance has destroyed, even if it is currently economically infeasible to drill for oil and gas, SWEPI, LP has suffered an injury in fact.

Finally, the Defendants may attempt to argue that there are no oil-and-gas reserves in Mora County, and, therefore, it will never be economically feasible to drill for oil and gas.[23]   Even if it were the case, however, the leases still have value until that information becomes public knowledge.   In a different motion, SWEPI, LP asserts that Shell Oil has spent approximately $1,000,000.00 in conducting tests and accumulating data regarding the distribution, density, and volume of hydrocarbons in an area that includes part of Mora County.   See Affidavit of Andrew Frelier ¶¶ 2-3, at 1-2, filed January 16, 2015 (Doc. 80-1)("Frelier Aff.").   Assuming that, after all of this testing and data collection, Shell Oil concluded that there is no oil or gas in Mora County, SWEPI, LP would still have suffered an injury in fact, because, as long as the information concerning the lack of oil and gas in Mora County is not make public, the leases still have value. As far as the outside world knows, there is still the possibility that oil and gas can be produced in Mora County.[24]   This possibility gives the leases value.   Once SWEPI, LP discovers that there is

---

[23]If there are indeed no oil-and-gas reserves in Mora County, the Ordinance would be pointless, because no hydrocarbon extraction activities would ever occur in Mora County.

[24]Because the information from seismic and geological studies may negatively affect SWEPI, LP and is highly valuable to any leaseholder or potential leaseholders, this information is

no oil or gas in Mora County, it may be willing to sell its leases at a discount.   Even if the leases could be sold at a discount, however, the fact that they could be sold at all shows that they have value.   The Ordinance's destruction of this value causes an injury in fact, which confers standing on SWEPI, LP.

It is not necessary for the Court to determine the exact value of the leases today.   All that matters is that they have value that the Ordinance destroyed.   The leases' exact value would be relevant to the amount of just compensation that Mora County owes, but is not relevant to whether SWEPI, LP has standing.   As long as SWEPI, LP has an interest in the leases -- i.e. a legally protectable, concrete interest -- then it has standing if the Ordinance infringes on this interest, which it does.   This taking and destruction of SWEPI, LP's property constitutes an injury in fact. Its leases provide it with a particularized, concrete interest in property that state law protects.   See Johnson v. Gray, 1966-NMSC-020, ¶ 5.   The reduction in the leases' value and the destruction of all economic use is an actual injury, rather than one that is conjectural or hypothetical.   See N.E. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. at 663 (noting that an injury in fact is "an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical" (citation

---

kept confidential and is fiercely protected.   SWEPI, LP asserts that the information about its seismic studies and data collection is not shared outside the company and that, if it were disclosed, it would potentially cause it to suffer economic injury.   See Frelier Aff. ¶¶ 3-4, at 2.   Like a poker player wishing to conceal his or her hand, a leaseholder or potential leaseholder wants to keep its information from seismic and geological studies secret to maintain the advantage that they bring. If the information reveals large potential oil reserves, the person may be able to lease surrounding property at a discount.   On the other hand, if the information reveals low or no oil reserves, the leaseholder can still sell its leases to a purchaser who does not have the same information.   Once the information is public, however, the leaseholder or potential leaseholder loses his or her advantage, because a lessor would not lease property at a discount, if he or she knows of the potential oil reserves, and a potential purchaser will not be willing to pay the same amount of money for a lease that he or she knows has a low likelihood of every producing oil or gas.

omitted)(internal quotation marks omitted).   Accordingly, SWEPI, LP has suffered a sufficient injury in fact to support its takings claim.

### 2.      SWEPI, LP's Substantive Due-Process Claims.

SWEPI, LP has standing to bring its substantive due-process claims for the same reason that it has standing to bring its takings claim: the Ordinance has deprived it of all economic value in its leases.   SWEPI, LP's substantive due-process claims centers around the deprivation of its property -- its leases -- for an arbitrary reason -- because it is a corporation.   See Complaint ¶¶ 81-102, at 17-20; Motion at 15-18.   Its injury for its due-process claims is the same as its takings claim: the deprivation of its property.   Because the Ordinance deprives SWEPI, LP of its value and use in its property, it has suffered a concrete, particularized injury sufficient to establish standing on its substantive due-process claims.   See ConocoPhillips Co. v. Henry, 520 F. Supp. 2d 1282, 1298 (N.D. Okla. 2007)(Kern, J.)(finding that plaintiffs' deprivation of its right to exclude others from its property was a sufficient injury to confer it with standing on its takings claim and substantive due-process claim), rev'd sub nom. on other grounds by Ramsey Winch Inc. v. Henry, 555 F.3d 1199 (10th Cir. 2009).

### 3.      SWEPI, LP's First Amendment Claim.

SWEPI, LP has suffered an injury in fact to establish standing on its First Amendment claim.   SWEPI, LP asserts that the Ordinance is overbroad in its absolute prohibition of First Amendment protections.   See Complaint ¶¶ 121-132, at 23-25; Motion at 10-12.   The Supreme Court has established a lax standing requirement for First Amendment overbreadth challenges. See Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. at 957-58.   The Supreme Court has held that "constitutional violations may arise from the deterrent, or chilling, effect of governmental efforts that fall short of a direct prohibition against the exercise of First Amendment rights."   Bd.

of Cnty. Comm'rs v. Umbehr, 518 U.S. 668, 674 (1996)(alterations omitted)(citation omitted)(internal quotation marks omitted).   Indeed, the Tenth Circuit has held that "a chilling effect on the exercise of a plaintiff's First Amendment rights may amount to a judicially cognizable injury in fact, as long as it 'arises from an objectively justified fear of real consequences.'"   Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1088 (10th Cir. 2006)(quoting D.L.S. v. Utah, 374 F.3d 971, 975 (10th Cir. 2004)(alteration omitted)).

Here, the Ordinance does more than deter or chill First Amendment rights; it prohibits them.   See Ordinance § 5.5, at 4.

Section 5.5 of the Ordinance states:

> Section 5.5:   Corporations in violation of the prohibitions enacted by this ordinance, or seeking to engage in activities prohibited by this ordinance, shall not have the rights of "persons" afforded by the United States and New Mexico Constitutions, nor shall those corporations be afforded rights under the 1st or 5th amendments to the United States Constitution or corresponding sections of the New Mexico Constitution, nor shall those corporations be afforded the protections of the commerce or contracts clauses within the United States Constitution or corresponding sections of the New Mexico Constitution.

Ordinance § 5.5, at 4.   According to the Ordinance, because SWEPI, LP has filed suit to engage in activities that the Ordinance prohibits, SWEPI, LP lacks First Amendment rights.   See Ordinance § 5.5, at 4 ("Corporations . . . seeking to engage in activities prohibited by this ordinance, shall not . . . be afforded rights under the 1st or 5th amendments to the United States Constitution . . . ."). This restriction is a prohibition of SWEPI, LP's First Amendment rights.

While Mora County has not yet sought to enforce the Ordinance against SWEPI, LP through a criminal prosecution, actual enforcement is not necessary for ripeness and the Defendants have refused to state that they will not enforce the Ordinance.   First, in Griffin v. Bryant, the Court concluded that a plaintiff could bring a First Amendment overbreadth challenge to a city rule, even though the plaintiff had never been punished for violating that rule.   See 2014

WL 3377705, at *28.   The Court concluded that, because the rule "most likely affected his speech," and because of the lax standing requirements for First Amendment overbreadth challenges, the plaintiff had standing to challenge the rule.   See Griffin v. Bryant, 2014 WL 3377705, at *28.   Second, the Defendants have refused to concede that they will not enforce the Ordinance's provisions that purport to strip corporation that violate, or that seek to violate, the Ordinance.   At the hearing, the Defendants stated that, as long as SWEPI, LP did not explore for or extract hydrocarbons in Mora County, they would likely not enforce the Ordinance against it. See Tr. at 79:5-20 (Haas, Court).   This restriction is essentially saying that, as long as SWEPI, LP does not violate the Ordinance, the Defendants will not prosecute it for the violation.   Moreover, if the Defendants did not intend to enforce this provision, it would not so vigorously defend it. The Defendants spend about a third of their Response arguing that their community rights permit them to strip corporations of their constitutional rights.   See Response at 20-29.   Based on the Defendants' actions, it appears that they are prepared to fully enforce every provision in the Ordinance, including the provision stripping corporations of their First Amendment rights.   There is thus a "credible threat" that the Defendants will prosecute violators of the Ordinance.   Initiative & Referendum Inst. v. Walker, 450 F.3d at 1088.

SWEPI, LP has gone ahead and filed suit in violation of the Ordinance.   While its willingness to violate the Ordinance and risk prosecution indicates that its First Amendment rights have not been chilled, the Tenth Circuit uses an objective test for a chilling effect and not a subjective one.   The Tenth Circuit holds that there must be an "objectively justified fear of real consequences" and not just "allegations of a subjective chill."   Initiative & Referendum Inst. v. Walker, 450 F.3d at 1088 (alterations omitted)(citations omitted)(internal quotation marks omitted).   The Ordinance states that a "violation of any provision of this Ordinance shall be

considered a criminal offense, punishable by maximum penalties and imprisonment as authorized by applicable New Mexico law."   Ordinance § 8.1, at 5.   An Ordinance that criminalizes the exercise of First Amendment rights, and then threatens "maximum penalties and imprisonment" for any violation, Ordinance § 8.1, at 5, creates an "objectively justified fear of real consequences" that would chill the exercise of First Amendment rights, Initiative & Referendum Inst. v. Walker, 450 F.3d at 1088 ("First Amendment rights may amount to a judicially cognizable injury in fact, as long as it arises from an objectively justified fear of real consequences."   (alteration omitted)(internal quotation marks omitted)(citation omitted)).   SWEPI, LP's standing should not be affected because it is willing to risk these maximum punishments and exercise its First Amendment right to challenge in federal court the Ordinance that threatens criminal prosecution for the exercise of those rights.

That the Defendants have not prosecuted SWEPI, LP for violating the Ordinance by filing this case also does not undermine its standing to bring a First Amendment claim.   It is understandable that the Defendants might not want to undermine their standing and ripeness arguments by bringing criminal charges against a corporation for filing a complaint in federal court, perhaps a violation of this Ordinance that most obviously violates SWEPI, LP's First Amendment rights.   The Defendants probably also want this Court's ruling on the issues presented and want to make their chances of prevailing on portions of the Ordinance that outlaws oil-and-gas exploration, which seems to be the Ordinance's primary purpose.

Accordingly, because SWEPI, LP is currently seeking to engage in activities that violate the Ordinance, because the Ordinance states that this conduct strips it of its First Amendment rights, and because the Ordinance creates a chilling effect on the exercise of First Amendment rights, SWEPI, LP has suffered an injury in fact.

### 4.      SWEPI, LP's Equal-Protection Claim.

SWEPI, LP has suffered an injury in fact to confer it standing on its equal-protection claim. SWEPI, LP's equal-protection claim is based on the assertions that the Ordinance discriminates against corporations by applying only to corporations and not to individuals.  See Complaint ¶¶ 59-71, at 14-16; Motion at 5-10.   SWEPI, LP's injury is thus that the Ordinance applies to it. The Ordinance prohibits SWEPI, LP for extracting hydrocarbons in Mora County and purports to strip SWEPI, LP of its constitutional rights.  See Ordinance § 5.1, at 4 ("It shall be unlawful for any corporation to engage in the extraction of oil, natural gas, or other hydrocarbons within Mora County."); id. § 5.5 ("Corporations in violation of the prohibitions enacted by this ordinance, or seeking to engage in activities prohibited by this ordinance, shall not have the rights of 'persons' afforded by the United States and New Mexico Constitutions . . .").   Its injuries are the same as for its takings claim and its First Amendment claim.  If the Ordinance did not apply to it, the economic value of its leases would not be destroyed.   Similarly, if the Ordinance did not apply to it, the Ordinance would not purport to strip it of its constitutional rights or chill its First Amendment rights.   Accordingly, these two injuries create an injury in fact that is sufficient to establish standing.

### 5.      SWEPI, LP's Supremacy Clause Claim.

SWEPI, LP's Supremacy Clause claim is based on the fact that § 5.5 of the Ordinance purports to strip corporations of their constitutional rights if they violate or seek to engage in activities that violate the Ordinance.  See Complaint ¶¶ 52-58, at 13.  Motion at 3-4.  SWEPI, LP's injury in fact for this claim is the same as its takings claim and its First Amendment claim. Section 5.5 states that corporations do not have constitutional rights.  See Ordinance § 5.5, at 4. According to the Ordinance, SWEPI, LP does not have Fifth or Fourteenth Amendment rights to

pursue its takings claims, or First Amendment rights to pursue its First Amendment claim. SWEPI, LP's Supremacy Clause claim is essentially that it does have these constitutional rights, because the Supremacy Clause nullifies § 5.5.   Thus, its injury in fact for this claim is that it suffered a sufficient injury to pursue its other claims.   The Court has already concluded that SWEPI, LP suffered a sufficient injury for its takings and First Amendment claims.   These injuries are sufficient to confer standing for SWEPI, LP's Supremacy Clause claim.   See Taubman Realty Grp. Ltd. P'ship v. Mineta, 320 F.3d 475, 481 n.3 (4th Cir. 2003)(noting that devaluation of property value was sufficient injury for Supremacy Clause claim).   Consequently, SWEPI, LP has also suffered a sufficient injury in fact for its Supremacy Clause claim.

### 6.   SWEPI, LP's State-Law Claims.

SWEPI, LP has suffered a sufficient injury in fact to bring its state-law claims.   SWEPI, LP's state-law claims rely on allegations that Mora County lacks the authority to regulate oil-and-gas activities.   See Complaint ¶¶ 103-120, at 20-23; Motion at 17-21.   Its injury for these claims is that it is prohibited from exercising its rights under its leases; that is, it is prohibited from engaging in oil-and-gas exploration and extraction.   Additionally, because the Ordinance strips SWEPI, LP's leases of value, its state-law claims are based on the same injury as its takings claim. In Energy Management Corp. v. City of Shreveport, the Fifth Circuit considered the harm to the plaintiff's mineral interests to consider whether the plaintiff had standing to bring a state law preemption claim.   See 397 F.3d at 301-02.   Deprivation in a property interest's value and the inability to exploit one's property interest is a sufficient injury in fact to bring a state law preemption claim.   See Energy Mgmt. Corp. v. City of Shreveport, 397 F.3d at 302.   Because Mora County enacted the Ordinance, SWEPI, LP's leases have been deprived of their value and

SWEPI, LP is unable to act on its property interests.   SWEPI, LP has thus suffered a sufficient injury to assert its state-law claims.

### B.     THERE IS A CAUSAL RELATIONSHIP BETWEEN SWEPI, LP'S INJURIES AND THE ORDINANCE, AND IT IS LIKELY THAT A FAVORABLE DECISION WILL REDRESS ITS INJURIES.

In addition to an injury in fact, to establish standing, SWEPI, LP must show that there is "a causal relationship between the injury and the challenged conduct," and that there is "a likelihood that the injury would be redressed by a favorable decision."   Protocols, LLC v. Leavitt, 549 F.3d at 1298.   The Defendants do not challenge these two conditions.   In any case, SWEPI, LP has satisfied them.

First, each of SWEPI, LP's injuries are a direct result of the Ordinance's prohibitions. SWEPI, LP's leases have been devalued, because the Ordinance prohibits hydrocarbon exploration and extraction.   Its First Amendment rights have been attacked and chilled because the Ordinance states that corporations that seek to violate the Ordinance lack constitutional rights. There is thus a causal relationship between SWEPI, LP's injuries and the challenged conduct -- i.e. the Ordinance.   Second, a favorable decision would redress its injuries.   If the Ordinance is invalidated, SWEPI, LP's leases would have their value reinstated.   Additionally, its First Amendment rights would no longer be chilled.   Finally, SWEPI, LP could receive just compensation to reimburse it for the time in which the Ordinance took its leases.   Accordingly, SWEPI, LP has shown a causal connection and redressibility, and has established that it has standing on each of its claims.

### III.    SWEPI, LP'S CLAIMS, EXCEPT FOR ITS TAKINGS CLAIM, ARE RIPE.

Each of SWEPI, LP's claims, except for its takings claim, are ripe for adjudication. Ripeness concerns the timing of a dispute.   See Blanchette v. Conn. Gen. Ins. Corp., 417 U.S.

102, 140 (1974).  "As a general rule, determinations of ripeness are guided by a two-factor test, requiring a court to evaluate both the fitness of the issue for judicial resolution and the hardship to the parties of withholding judicial consideration."   Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., 801 F. Supp. 2d at 1179 (citation omitted)(internal quotation marks omitted)(alterations omitted).   The fitness-of-the-issue concern focuses on "whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all."   New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499 (citation omitted)(internal quotation marks omitted).   The hardship-to-the-parties concern "'typically turns upon whether the challenged action creates a direct and immediate dilemma for the parties.'"   New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499 (quoting El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 495 (1st Cir. 1992))(internal quotation marks omitted).   Each of SWEPI, LP's claims, except for its takings claim, are ripe.

## A.   SWEPI, LP'S TAKINGS CLAIM IS NOT RIPE.

SWEPI, LP's takings claim is not ripe.   In determining ripeness for Takings Clause claims, courts apply a two-prong test.   See Alto Eldorado Partners v. Cnty. of Santa Fe, 634 F.3d 1170, 1174 (10th Cir. 2011).

> First, there must be a final decision about how a regulation will be applied to the property in question, including whether the implementing administrative body will grant any waiver or variance.   Second, a property owner may not challenge regulatory action under the Takings Clause until the owner has sought compensation, assuming adequate procedures exist for doing so.   Because contemporaneous compensation is not constitutionally required, if the state provides a mechanism for seeking compensation, the property owner must utilize the procedure and be denied just compensation before a takings claim is ripe.

Alto Eldorado Partners v. Cnty. of Santa Fe, 634 F.3d at 1174 (citations omitted).   SWEPI, LP has satisfied the first prong, but not the second.

For the first prong, there has been a final decision concerning how the Ordinance will be applied.   The Ordinance has been enacted into law.   It is not a pending law or a proposed law; in Mora County, it is law.   There has thus been a final decision about how the Ordinance will be applied.

Concerning the second prong, there are existing procedures for which SWEPI, LP can seek compensation, but it has not done so.   In Alto Eldorado Partners v. City of Santa Fe, the Court dismissed the plaintiffs' Takings Clause claim, because it was not ripe.   See 644 F. Supp. 2d at 1313.   There, the plaintiffs did not seek compensation for the alleged taking, but instead brought a facial challenge against a city ordinance and a county ordinance, seeking an injunction to invalidate the ordinances.   See 644 F. Supp. 2d at 1313.   The Court concluded that, because an injunction was inappropriate, the plaintiffs needed to first seek compensation before it could bring a Takings Clause claim.   See 644 F. Supp. 2d at 1333-34.   The Tenth Circuit affirmed the Court's decision.   See Alto Eldorado Partners v. Cnty. of Santa Fe, 634 F.3d at 1170.   In an opinion that the Honorable Michael R. Murphy, United States Circuit Judge for the Tenth Circuit, authored, and Judges Holloway and O'Brien joined, the Tenth Circuit held that, even for facial regulatory takings challenges, to bring a Takings Clause claim, a plaintiff must either demonstrate that "a procedure for seeking compensation is unavailable" or must first seek compensation.   634 F.3d at 1177.   Because the plaintiffs did not, before bringing suit under the Takings Clause, seek compensation through an inverse condemnation action under N.M. Stat. Ann. § 42A-1-29, the Tenth Circuit held that their claim was not ripe.   See 634 F.3d at 1174.

The Defendants have not argued that SWEPI, LP failed to first seek compensation through an inverse condemnation action.   Rather, the Defendants contend that the case is not ripe, because SWEPI, LP has not demonstrated that it is prepared to engage in hydrocarbon exploration and

extraction.   See Response at 11-13.   In the Complaint, SWEPI, LP alleges that it "has no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to its constitutional rights," specifically "the Ordinance provides no mechanism through which Plaintiff may obtain just compensation for the regulatory taking if its property." Complaint ¶ 140, at 26.   The Defendants denied the allegation in that paragraph of the Complaint. See Answer ¶ 140, at 14.   Accordingly, the Court may not rely on SWEPI, LP's assertion that it has no other remedy for its takings claim and that the Ordinance does not provide it with a compensation mechanism.   See Kellar v. U.S. Dep't of Veteran's Affairs, 2009 WL 1706719, at *1 (noting that a court may only consider the uncontroverted allegations in a motion for judgment on the pleadings).   Whether New Mexico law or the Ordinance provides a compensation mechanism, however, is a question of law.   While the Ordinance does not provide a mechanism through which SWEPI, LP could seek compensation, New Mexico law does.

New Mexico has an inverse condemnation statute, under which a person can seek compensation when an authorized person has taken or damaged property for public use without providing compensation.   See N.M. State Ann. § 42A-1-29.   It provides:

> A person authorized to exercise the right of eminent domain who has taken or damaged or who may take or damage any property for public use without making just compensation or without instituting and prosecuting to final judgment in a court of competent jurisdiction any proceeding for condemnation is liable to the condemnee, or any subsequent grantee thereof, for the value thereof or the damage thereto at the time the property is or was taken or damaged, with ten percent per year interest, to the date such just compensation is made, in an action to be brought under and governed by the Rules of Civil Procedure for the District Courts of this state.   Actions under this section shall be brought in the county where the land or any portion thereof is located.

N.M. Stat. Ann. § 42A-1-29.   In Alto Eldorado Partners v. City of Santa Fe, the Tenth Circuit noted that the plaintiffs did not seek compensation under this inverse condemnation statute.   See 634 F.3d at 1174.   If SWEPI, LP could seek compensation under § 42A-1-29, then its takings

claim is not ripe.   If, however, § 42A-1-29 does not apply, its takings claim is ripe.   The Court concludes that § 42A-1-29 applies to SWEPI, LP's takings claim and that federal law requires SWEPI, LP to first seek compensation through an inverse condemnation action before its takings claim is ripe.

Section 42A-1-29 states that a "person authorized to exercise the right of eminent domain" may be liable under the statute.   N.M. Stat. Ann. § 42A-1-29.   A "'person' includes a natural individual, partnership, corporation, association, or other legal or fiduciary entity and a governmental entity.'"   N.M. Stat. Ann. § 42A-1-2(H).   Section 42A-1-29 may be interpreted to mean that, if a person has general eminent domain powers, that person may be liable in an inverse condemnation action, as long as the taking was for public use.   On the other hand, § 42A-1-29 may be interpreted to mean that, if a person acted under his or her eminent domain authority, that person may be liable in an inverse condemnation action.   Under the first interpretation, if a person who has eminent domain authority, acted beyond that authority, but still took or damaged another's property, the person can be liable under § 42A-1-29.   Under the second interpretation, if a person who has eminent domain authority, acted beyond that authority, but still took or damaged another's property, the person cannot be liable under § 42A-1-29, because that person acted without eminent domain authority.   The Court concludes that the first interpretation is correct.

The Supreme Court of New Mexico has held that § 42A-1-29 does not apply in two situations: (i) when the taking was not for public use; and (ii) when the entity conducting the taking lacked eminent domain powers.   Neither situation applies here.

First, § 42A-1-29 does not apply if the taking was not for public use.   In <u>Brosseau v. New Mexico State Highway Department</u>, 1978-NMSC-098, 587 P.2d 1339, the Supreme Court of New Mexico held that the State of New Mexico does not have sovereign immunity against quiet title

actions.   See 1978-NMSC-098, ¶ 9.   The Supreme Court of New Mexico supported its holding

by noting that a plaintiff could not bring an inverse condemnation action under N.M. Stat. Ann.

1953 § 22-9-22[25] -- the prior version of § 42A-1-29 -- if the State did not acquire the property for

a public use, which would leave plaintiffs without a remedy in the absence of a quiet title action.

See 1978-NMSC-098, ¶ 12.   The court stated:

> A further justification for our decision is the fact that Brosseau and others in his
> position may have no adequate substitute to obtain an adjudication of their property
> rights as against the claimed interest of the State.   An inverse condemnation action
> under § 22-9-22, N.M.S.A. 1953 (Supp. 1975) would not lie if this property was not
> acquired for a public use. The doctrine of sovereign immunity may not be
> interposed to bar quiet title actions if its effect is to deny one a remedy for the
> taking of his property without compensation.

1978-NMSC-098, ¶ 12.

The Supreme Court of New Mexico again applied the rule from Brosseau v. New Mexico

State Highway Department in Kennedy v. Yates Petroleum Co., 1984-NMSC-033, 681 P.2d 53.

There, the plaintiffs brought a trespass and quiet title action against an oil company that laid a

---

[25] The Supreme Court of New Mexico in Brosseau v. New Mexico State Highway
Department applied the 1975 version of § 22-9-22.   See 1978-NMSC-098, ¶ 12.   That version of
the statute provides:

> Property taken or damaged without compensation or condemnation proceedings --
> Right of action by owner. -- Notwithstanding the provisions of the Relocation
> Assistance Act [22-9A-1 to 22-9A-16], the state of New Mexico or any agency or
> political subdivision thereof, including the state highway commission and any
> person, firm or corporation authorized by the Constitution or laws of this state to
> exercise the right of eminent domain who has heretofore taken or damaged or who
> may hereafter take or damage any private property for public use without making
> just compensation therefor or without instituting and prosecuting to final judgment
> in a court of competent jurisdiction any proceeding for condemnation thereof, shall
> be liable to the owner of such property, or any subsequent grantee thereof, for the
> value thereof or the damage thereto at the time such property is or was taken or
> damaged, with legal interest, to the date such just compensation shall be made, in
> an action to be brought under and governed by the Rules of Civil Procedure for the
> district courts of this state.   Actions under this section shall be brought in the
> county where the land or any portion thereof is located.

N.M. Stat. Ann. 1953 § 22-9-22 (1975 Supp.).

natural gas pipeline across the plaintiffs' property.   See 1984-NMSC-033, ¶ 1.   The oil company

argued that, among other things, it had eminent domain authority pursuant to N.M. Stat. Ann.

§ 70-3-5 to obtain a pipeline right-of-way across the plaintiffs' property.   See 1984-NMSC-033,

¶ 1.   Section 70-3-5 provides:

> Any person, firm, association or corporation may exercise the right of eminent
> domain to take and acquire the necessary right-of-way for the construction,
> maintenance and operation of pipelines, including microwave systems and
> structures and other necessary facilities for the purpose of conveyance of
> petroleum, natural gas, carbon dioxide gas and the products derived therefrom, but
> any such right-of-way shall in all cases be so located as to do the least damage to
> private or public property consistent with proper use and economical construction.
> Such land and right-of-way shall be acquired in the manner provided by the
> Eminent Domain Code. Pursuant to the requirements of Sections 42A-1-8 through
> 42A-1-12 NMSA 1978, . . . .

N.M. Stat. Ann. § 70-3-5(A).   The Supreme Court of New Mexico held that, if the oil company's

laying of the pipeline was done for public use, the plaintiffs' sole remedy was an inverse

condemnation action under § 42A-1-29.   See Kennedy v. Yates Petroleum Co., 1984-NMSC-033,

¶ 14.   On the other hand, if the pipeline was not laid for public use, "a suit in inverse

condemnation will not lie," and the plaintiffs could pursue their trespass action.   Kennedy v.

Yates Petroleum Co., 1984-NMSC-033, ¶ 14 (citing Brosseau v. N.M. State Highway Dep't,

1978-NMSC-098, ¶ 12).

     In North v. Public Service Company of New Mexico, 1980-NMCA-031, 608 P.2d 1128,

the defendant, Public Service Company of New Mexico, entered onto the plaintiff's property and

bulldozed two roads that were adjacent to the plaintiff's property and a third road on the plaintiff's

property, damaging the plaintiff's property.   See 1980-NMCA-031, ¶ 2.   The Court of Appeals

of New Mexico reversed the trial court's dismissal of the plaintiff's complaint for failing to state a

claim.   See 1980-NMCA-031, ¶ 9.   In specially concurring in the judgment, the Honorable Mary

Walters, New Mexico Court of Appeals Judge, wrote that, because the plaintiff alleged that the

defendant's trespass was not for public use, the district court should not have dismissed the plaintiff's trespass claim, because, if the trespass was not for public use, "a suit in inverse commendation [sic] will not lie."   1980-NMCA-031, ¶ 12 (citing Brosseau v. N.M. State Highway Dep't, 1978-NMSC-098, ¶ 12).

Neither the Supreme Court of New Mexico, in Brosseau v. New Mexico State Highway Department, nor Judge Walters, in her concurring opinion in North v. Public Service Company of New Mexico, explained their reasoning for why § 42A-1-29, or then-§ 22-9-22, does not apply if the taking was not for public use.   Section 42A-1-29's inapplicability can either be because the defendants in those cases lacked authority to exercise the power of eminent domain or because § 42A-1-29, by its terms, requires the taking to be for public use.   The state lacks authority to take property through eminent domain if the taking is not for public use.   See Kaiser Steel Corp. v. W.S. Ranch Co., 1970-NMSC-043, ¶ 24, 467 P.2d 986, 992 ("[T]he power of eminent domain cannot be exercised without a 'public use' being present . . . ."); N.M. Const. art. II, § 20 ("Private property shall not be taken or damaged for public use without just compensation.").   Brosseau v. New Mexico State Highway Department, Kennedy v. Yates Petroleum Co., and Judge Walters' concurrence in North v. Public Service Company of New Mexico may stand for the proposition that, if an entity acts outside its eminent domain authority, a plaintiff cannot sue the entity under § 42A-1-29.   If this interpretation is true, then SWEPI, LP was not required to bring a § 42A-1-29 action, because if Mora County did not have authority to enact the Ordinance -- as SWEPI, LP argues -- SWEPI, LP could not sue the Defendants under § 42A-1-29.   On the other hand, Brosseau v. New Mexico State Highway Department, Kennedy v. Yates Petroleum Co. and Judge Walters' concurrence in North v. Public Service Company of New Mexico may stand only for the

proposition that § 42A-1-29 does not apply if the taking was not for public use.   Section 42A-1-29's plain language suggests that the second interpretation is correct.

Section 42A-1-29 states: "A person authorized to exercise the right of eminent domain who has taken or damaged or who may take or damage any property for public use without making just compensation . . . is liable to the condemnee . . . ."   N.M. Stat. Ann. § 42A-1-29 (emphasis added). Section 42A-1-29's language states that the taking must be for public use for it to apply.   Section 42A-1-29 does not apply when the taking is not for public use, because it states that it applies only when the taking is for public use, and not because the condemnor lacks authority to perform the taking.   Accordingly, if a taking was for public use, a person is required to seek compensation under § 42A-1-29 before bringing a Takings Clause claim.

The second limitation on an inverse condemnation action under § 42A-1-29 is that the defendant must be "authorized to exercise the right of eminent domain."   N.M. Stat. § 42A-1-29. In Manning v. New Mexico Energy, Minerals and Natural Resources Department, 2006-NMSC-027, 144 P.3d 87, the Supreme Court of New Mexico noted that the plaintiffs' inverse condemnation claim under § 42A-1-29 was dismissed earlier in the case, "because the State agencies [t]here do not have a statutory grant of eminent domain power."   2006-NMSC-027, ¶ 19 n.4.   Thus, if an entity does not have eminent domain powers, a plaintiff cannot sue the entity under § 42A-1-29.

First, Mora County has eminent domain powers.   Section 4-52-11 of the New Mexico Statutes Annotated states that a "board of county commissioners has power to . . . acquire by purchase, gift, grant, bequest, devise or through condemnation proceedings, in the manner provided in the Eminent Domain Code, such property, rights-of-way or equipment as is necessary for exercise of any authorized function of the district . . . ."   N.M. Stat. Ann. § 4-52-11.

- 121 -

Additionally, New Mexico counties have broad authority to provide for its residents' safety, health, and prosperity.   See N.M. Stat. Ann. § 4-37-1.

> All counties are granted the same powers that are granted municipalities except for those powers that are inconsistent with statutory or constitutional limitations placed on counties.   Included in this grant of powers to the counties are those powers necessary and proper to provide for the safety, preserve the health, promote the prosperity and improve the morals, order, comfort and convenience of any county or its inhabitants.   The board of county commissioners may make and publish any ordinance to discharge these powers not inconsistent with statutory or constitutional limitations placed on counties.

N.M. Stat. Ann. § 4-37-1.   Mora County thus has eminent domain authority, and § 42A-1-29 applies as long as Mora County enacted the Ordinance for public use.

Second, the taking was done for public use.   The Supreme Court of New Mexico has defined the phrase "for public use" as a "public entity's deliberate taking or damaging of the property in order to accomplish the public purpose."   Electro-Jet Mfg. Co. v. City of Albuquerque, 1992 NMSC-060, ¶ 9, 845 P.2d 770, 773.   Where the beneficial use of water is involved, the Supreme Court of New Mexico has been more apt to find that a taking is for public use.   For instance, the Supreme Court of New Mexico held that a right of way for a private logging and mining road was not for public use while a right of way for the distribution of water was.   Compare Threlkeld v. 3d Judicial Dist. Ct., 1932-NMSC-041, 15 P.2d 671 (logging road), and Gallup Am. Coal Co. v. Gallup S.W. Coal Co., 1934-NMSC-049, 47 P.2d 414 (mining road), with Kaiser Steel Corp. v. W.S. Ranch Co., 1970-NMSC-043 (water right-of-way).   In Kaiser Steel Corp. v. W.S. Ranch Co., the Supreme Court of New Mexico, in holding that the exercise of eminent domain to transport water to be used by a private company was done for public use, stated that water had a "unique position" within the State's public policy.   1970-NMSC-043, ¶ 16.   In Threlkeld v. Third Judicial District Court, the Supreme Court of New Mexico noted:

> [W]e already had a policy, also time-honored, as to waters. We had nationalized them. Not as a source of public revenue, as minerals are retained for royalties; but as an elemental necessity, like air, which must not be allowed to fall under private control. Only by invoking the power of eminent domain can the state distribute its own waters as its public policy requires. A right of way taken for that purpose is in a large sense devoted to public use. This policy finds general and express recognition in the Constitution. It is impossible to suppose that any interpretation of "public use" was intended to upset it.

Threlkeld v. 3d Judicial Dist. Ct., 1932-NMSC-041, ¶ 21. If a taking is accomplished for the beneficial use of water, it is done for public use.

The Ordinance is focused on the protection and use of water. Its name states that it concerns water rights. See Ordinance § 1.1, at 1 ("This Ordinance shall be known and may be cited as the 'Mora County Community Water Rights and Local Self-Government Ordinance.'"). The Ordinance states that its purpose is to protect "the natural sources of water from damage related to the extraction of oil, natural gas, or other hydrocarbons." Ordinance, Introduction (capitalization removed). See id. § 1.2 (stating that the Ordinance's purpose is focused on water). The Ordinance is focused on the protection and beneficial use of water. Water in Mora County cannot be used for drinking or farming if toxins from fracking polluted the water.[26] By protecting the water in Mora County, the Defendants are securing the water to be used for beneficial purposes. Accordingly, the Ordinance's taking of SWEPI, LP's property was done for a public purpose.

Because Mora County has eminent domain authority, and because the Ordinance was enacted for a public purpose, SWEPI, LP could have brought an inverse condemnation action under § 42A-1-29 against the Defendants for the taking of its leases. SWEPI, LP's failure to

---

[26]The Court is not suggesting that fracking or hydrocarbon extraction necessarily pollutes ground water. Rather, the Court is noting that the purpose of the Ordinance is to attempt to protect water to be used for a beneficial purpose, which causes the taking of SWEPI, LP's leases to be done for a public purpose.

bring such an action before filing this suit causes its takings claim to not be ripe.   Consequently, SWEPI, LP's taking claim is not ripe.

**B.      SWEPI, LP'S DUE-PROCESS CLAIMS ARE RIPE.**

SWEPI, LP's due-process claims are ripe.   Because the Ordinance has been enacted, and because it destroys the value of SWEPI, LP's leases, its due-process claims do not involve "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all."   New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499.   Additionally, the Ordinance creates a direct hardship to SWEPI, LP.   Specifically, the value of its leases has diminished because of the Ordinance.   This diminution creates a "direct and immediate dilemma" for SWEPI, LP.   New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499.   For a substantive due-process claim, there is no ripeness requirement that a plaintiff first seek compensation, even if a substantive due-process claim is based on the same injury as a Takings Clause claim.   In Tri-Corp Management v. Praznik, 33 F. App'x 742 (6th Cir. 2002)(unpublished), the plaintiff brought substantive due-process and takings claims for a city's stop-work order for construction that had already been approved.   See 33 F. App'x at 743-44. The United States Court of Appeals for the Sixth Circuit, in an opinion that the Honorable Ransey G. Cole, Jr., United States Circuit Judge for the Sixth Circuit, authored, and Judges Jones and Daughtrey joined, held that the plaintiff's due-process claim was ripe, while its takings claim was not, because it had not sought compensation from the city through a writ of mandamus.   See Tri-Corp Mgmt. v. Praznik, 33 F. App'x at 748-49.   Accordingly, SWEPI, LP's substantive due-process claims are ripe, even if its takings claim is not.

### C.      SWEPI, LP'S FIRST AMENDMENT CLAIM IS RIPE.

SWEPI, LP's First Amendment claim is ripe.   Ripeness for First Amendment claims is subject to a more relaxed standard.   The Tenth Circuit has stated:

> The customary ripeness analysis outlined above is, however, relaxed somewhat in circumstances such as this where a facial challenge, implicating First Amendment values, is brought.   E.g., ACORN[ v. City of Tulsa], 835 F.2d [735, 739 (10th Cir. 1987)]; Martin Tractor Co. v. Federal Election Comm'n, 627 F.2d 375, 380 (D.C. Cir.), cert. denied, 449 U.S. 954, . . . (1980).   Thus, while it is true that "the mere existence of a statute is ordinarily not enough to sustain a judicial challenge, even by one who reasonably believes that the law applies to him and will be enforced against him according to its terms," National Student Ass'n v. Hershey, 412 F.2d 1103, 1110 (D.C. Cir. 1969), in the context of a First Amendment facial challenge, "[r]easonable predictability of enforcement or threats of enforcement, without more, have sometimes been enough to ripen a claim," Martin Tractor, 627 F.2d at 380.   See also Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298-99, . . . (1979).   The primary reasons for relaxing the ripeness analysis in this context is the chilling effect that potentially unconstitutional burdens on free speech may occasion:
>
> > First Amendment rights of free expression and association are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss. In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill.
>
> 13A Wright, Miller & Cooper, Federal Practice and Procedure § 3532.3 at 159, see also ACORN, 835 F.2d at 740.

New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499-500 (alterations omitted).

For a facial First Amendment challenge, ripeness requires consideration of three elements: (i) "hardship to the parties by withholding review"; (ii) "the chilling effect the challenged law may have on First Amendment liberties"; and (iii) "fitness of the controversy for judicial review." New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1500.   This inquiry should not "be applied mechanically but rather, with flexibility."   New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1500.

The first two elements -- hardship and chilling effect -- are related.   As noted earlier, part of SWEPI, LP's injury is the chilling effect on First Amendment rights that the Ordinance creates. By delaying review of SWEPI, LP's First Amendment claim, the Court would be requiring SWEPI, LP to further endure this injury without redress.   See U.S. W. Inc. v. Tristani, 182 F.3d 1202, 1209 (10th Cir. 1999)(considering the statute's chilling effect in determining the potential hardship if it delays consideration of the case).   Because the Ordinance chills protected First Amendment activities, SWEPI, LP will face hardship if the Court does not consider its claim. The first two elements are thus met.

The third element is also met.   The Defendants have already enacted the Ordinance.   It is currently in effect.   This case does not involve "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all."   New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499.   Accordingly, the case is fit for judicial review.   Because SWEPI, LP has satisfied all three elements for ripeness on its First Amendment claim, this claim is ripe for adjudication.

### D.        SWEPI, LP'S EQUAL-PROTECTION CLAIM IS RIPE.

SWEPI, LP's equal protection claim is ripe.   As previously stated, the case is fit for judicial review.   The Defendants have already enacted the Ordinance.   SWEPI, LP's claim is not based on a hypothetical, uncertain event.   See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499.   Additionally, SWEPI, LP would suffer hardship if the Court did not decide its claim.   Its injury for its equal protection claim is the same as its takings and First Amendment claims -- the taking of its property and the chilling of its First Amendment rights.   SWEPI, LP asserts that the Ordinance applies to it because of its corporate status.   See Motion at 7-10. According to SWEPI, LP, it is currently suffering an injury merely because of its corporate status

and in violation of the Equal Protection Clause.   See Motion at 7-10.   Its injury is "direct and immediate," and will continue to exist unless the Court considers its claims, including its equal protection claim.   New Mexicans for Bill Richardson v. Gonzales, 64 F.3d at 1499. Consequently, SWEPI, LP would suffer hardship if the Court did not consider its equal protection claim, and its equal protection claim is ripe for adjudication.

> E.   SWEPI, LP'S SUPREMACY CLAUSE CLAIM IS RIPE.

SWEPI, LP's Supremacy Clause claim is ripe.   First, the claim is fit for adjudication, because Mora County has already enacted the Ordinance.   Second, SWEPI, LP would suffer a hardship if the Court delayed resolving the case.   The Defendants are already violating SWEPI, LP's First and Fourteenth Amendment rights -- its property has been taken and its First Amendment rights have been chilled.   The case is not based on a potential future event or injury. SWEPI, LP has brought suit, asserting the very rights that the Ordinance says that it lacks.   It is thus currently facing a hardship that will continue if the Court does not resolve its claim. Accordingly, SWEPI, LP's Supremacy Clause claim is ripe.

> F.   SWEPI, LP'S STATE-LAW CLAIMS ARE RIPE.

SWEPI, LP's state-law claims are ripe for substantially the same reason that its Equal Protection and substantive due-process claims are ripe.   First, the case is fit for judicial determination, because the Ordinance has already been enacted.   Second, because SWEPI, LP's leases have been devalued, it is currently facing an imminent harm that it will continue to endure if the Court does not address its claims.   Accordingly, SWEPI, LP's state-law claims are ripe for adjudication.

## IV.   THE ORDINANCE VIOLATES THE SUPREMACY CLAUSE.

The Ordinance violates the Supremacy Clause.   The Supremacy Clause provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.   In simpler terms, the "Supremacy Clause of the Constitution provides that federal law trumps, or preempts, contrary state laws." Russo v. Ballard Med. Prods., 550 F.3d 1004, 1011 (10th Cir. 2008).   Certain provisions of the Ordinance blatantly contradict federal law.   Before considering whether the Court can invalidate these provisions, the Court must first determine whether SWEPI, LP may bring a claim under the Supremacy Clause.

## A.   SWEPI, LP MAY BRING A CLAIM UNDER THE SUPREMACY CLAUSE.

The Defendants argue that, because the Supremacy Clause does not create a private right of action, "some form of federal statute must exist to engage in Supremacy Clause analysis." Response at 19.   While the Defendants do not cite to it, they are likely referring to the Tenth Circuit's recent opinion in Planned Parenthood of Kansas and Mid-Missouri v. Moser, 747 F.3d 814 (10th Cir. 2014).   There, the Tenth Circuit held, in an opinion that the Honorable Harris L. Hartz, United States Circuit Judge for the Tenth Circuit, authored, and Judge O'Brien joined,[27] that the Supremacy Clause does not create a private cause of action to challenge a Kansas state appropriations bill, which stated that only public entities and nonpublic hospitals would receive priority status for benefits under Title X of the Public Health Service Act, Pub. L. No.

---

[27]The Honorable Carlos F. Lucero, United States Circuit Judge for the Tenth Circuit, dissented, arguing that, in holding that the Supremacy Clause does not provide a private right of action, Judge Hartz ignored binding Tenth Circuit precedent and "disregarded" the "bedrock principle of *stare decisis*" that one Tenth Circuit panel cannot overrule the decision of a prior panel. Planned Parenthood of Kan. & Mid-Missouri v. Moser, 747 F.3d at 843-44 (Lucero, dissenting).

91-572, 84 Stat. 1504.  See 747 F.3d at 814.[28]  Judge Hartz wrote that, because Title X does not

provide a private right of action, a private action cannot be brought under the Supremacy Clause to

challenge a state law that violates Title X.  See 747 F.3d at 822-23.[29]  While Judge Hartz'

opinion seems to give credence to the Defendants' argument, Judge Hartz severely narrowed the

application of his opinion.  See 747 F.3d at 817.

> Our holding is much narrower than what the dissent[, Judge Lucero,] suggests.
> We hold only that when actual or threatened state action is allegedly contrary to a
> federal statute, the Supremacy Clause does not necessarily (it is a matter of
> statutory interpretation that depends on the specifics of the federal statute)
> authorize an injunction against the state action when four conditions are all
> satisfied: (1) the statute does not specifically authorize injunctive relief, (2) the
> statute does not create an individual right (which may be enforceable under
> 42 U.S.C. § 1983), (3) the statute is enacted under the Constitution's Spending
> Clause, and (4) the state action is not an enforcement action in adversary legal
> proceedings to impose sanctions on conduct prohibited by law.

747 F.3d at 817.

In Planned Parenthood of Kansas and Mid-Missouri v. Moser, the plaintiff could not bring

a private action under § 1983 for a Title X violation.  See 747 F.3d at 824.  In contrast, SWEPI,

---

[28]Shortly after the Tenth Circuit issued its opinion, the Fifth Circuit, in an opinion that the Honorable Jerry E. Smith, United States Circuit Judge for the Fifth Circuit, authored, and Judges Jones and Owen joined, reached the opposite conclusion, holding that the Supremacy Clause creates a private right of action.  See Detgen ex rel. Detgen v. Janek, 752 F.3d 627 (5th Cir. 2014).

[29]This holding appears to contradict two prior Tenth Circuit cases.  In Qwest Corp. v. City of Santa Fe, the Tenth Circuit, in an opinion that Judge Murphy authored, and that Judges Porfilio and Hartz joined, held that a "party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action." 380 F.3d at 1266.  Again in Chamber of Commerce of United States v. Edmondson, 594 F.3d 742 (10th Cir. 2010), the Tenth Circuit, in an opinion that Judge Lucero wrote, repeated its holding from Qwest Corp. v. City of Santa Fe, that a party can bring a claim under the Supremacy Clause even if the federal law at issue does not create a private right of action.  594 F.3d at 756 n.13 ("We have held that 'a party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action.'"  (alteration omitted)(quoting Qwest Corp. v. City of Santa Fe, 380 F.3d at 1266)).  Despite the language in these two cases, Judge Hartz dismissed them, because the plaintiffs' ability to bring a private right of action under the Supremacy Clause was not contested in either case.  See Planned Parenthood of Kan. & Mid-Missouri v. Moser, 747 F.3d at 833-35.

LP can bring First, Fifth, and Fourteenth Amendment actions under § 1983 to challenge the Ordinance.   Indeed, SWEPI, LP has brought those claims.   See Complaint ¶¶ 121-141, at 23-26.   Moreover, the Ordinance does not merely conflict with federal law, it attempts to contradict it by stating that corporations do not have constitutional rights and by stating that federal preemptive law cannot be used to overturn the Ordinance.   See Ordinance § 5.5, at 4; id. § 5.6, at 4.   Because SWEPI, LP can bring its claims under the First, Fifth, and Fourteenth Amendments through § 1983, Planned Parenthood of Kansas and Mid-Missouri v. Moser not only does not prevent SWEPI, LP from bringing a claim under the Supremacy Clause for those violations, it suggests that SWEPI, LP can bring such a claim.   Judge Hartz focused on the legislative intent and canons of statutory construction to determine that Title X does not create a private right of action, and thus does not create a right under the Supremacy Clause.   See Planned Parenthood of Kan. & Mid-Missouri v. Moser, 747 F.3d at 823-28.   It has been long recognized that a private citizen can bring an action under either the First, Fifth, or Fourteenth Amendments.   See Zwickler v. Koota, 389 U.S. 241 (1967)(considering private action for First Amendment violation); Hannah v. Larche, 363 U.S. 420 (1960)(considering private action for Fifth Amendment violation); Hague v. Comm. for Indus. Org., 307 U.S. 496 (1939)(considering private action for Fourteenth Amendment violation).   Accordingly, SWEPI, LP may bring a claim under the Supremacy Clause in this case, arguing that those Amendments preempt and trump the Ordinance.

**B.   THE ORDINANCE VIOLATES THE SUPREMACY CLAUSE.**

The Ordinance -- specifically §§ 5.5, 5.6, 5.7, and 5.9 -- violates the Supremacy Clause. These provisions state:

> Section 5.5:   Corporations in violation of the prohibitions enacted by this ordinance, or seeking to engage in activities prohibited by this ordinance, shall not have the rights of "persons" afforded by the United States and New Mexico Constitutions, nor shall those corporations be afforded rights under the 1st or 5th

amendments to the United States Constitution or corresponding sections of the New Mexico Constitution, nor shall those corporations be afforded the protections of the commerce or contracts clauses within the United States Constitution or corresponding sections of the New Mexico Constitution.

Section 5.6:   Individuals or corporations in violation of the prohibitions enacted by this ordinance, or seeking to engage in activities prohibited by this ordinance, shall not possess the authority or power to enforce State or federal preemptive law against the people of Mora County, or to challenge or overturn County ordinances adopted by the Mora County Commission, when that enforcement or challenge interferes with the rights asserted by this ordinance or interferes with the authority of the county to protect the health, safety, and welfare of its residents.

. . . .

Section 5.8:   The New Mexico Constitution's Bill of Rights, and the United States Constitution's Bill of Rights and amendments thereto, shall be recognized as preemptive law within the County of Mora only to the extent that their interpretation and application are not inconsistent with the provisions of this Ordinance regarding the powers and "rights" of corporations, and to the extent that they do not otherwise elevate property interests over rights secured by this Ordinance.

Section 5.9:   Laws adopted by the legislature of New Mexico and rules adopted by any State agency, and laws adopted by the United States Congress and rules adopted by any federal agency, shall be recognized as preemptive law within the County of Mora only if those laws and rules both expressly preempt County ordinances and charters, and provide greater protections for the health, safety, and welfare of the people of Mora County than County ordinances and charters.

Ordinance §§ 5.5, 5.6. 5.8 & 5.9, at 4-5.   Each of these provisions contradicts federal constitutional law.

Section 5.5 states that corporations that violate, or seek to violate, the Ordinance do not have First or Fifth Amendment rights, nor rights under the Commerce Clause or the Contract Clause.   See Ordinance § 5.5, at 4.   The Supreme Court has established that corporations are "persons" within the meaning of the Equal Protection Clause and are entitled to its protections. Metro Life Ins. Co. v. Ward, 470 U.S. 869, 881 n.9 (1985)("It is well established that a corporation is a 'person' within the meanings of the Fourteenth Amendment.").   The Supreme Court has also

established that corporations have First Amendment rights, see Citizens United v. Fed. Election Comm'n, 558 U.S. at 342 ("The Court has recognized that First Amendment protection extends to corporations."), and Fifth Amendment rights, see United States v. Martin Linen Supply Co., 430 U.S. at 564 (applying Double Jeopardy Clause of the Fifth Amendment to corporations).   The Ordinance, in contradiction to the Constitution and Supreme Court precedent, states that corporations that violate, or that seek to violate, the Ordinance have no First or Fifth Amendment rights.   See Ordinance § 5.5, at 4.   Mora County lacks the authority to nullify constitutional rights.   See Haywood v. Drown, 556 U.S. at 745 ("[The States] lack authority to nullify a federal right or cause of action they believe is inconsistent with their local policies.").   Section 5.5, accordingly, violates the Supremacy Clause and must be declared invalid.

Section 5.6 states that no one can use federal preemptive law to challenge the Ordinance. See Ordinance § 5.6, at 4.   A county cannot decide when federal preemptive law applies and when it does not.   While the Tenth Circuit has reigned in a private litigants' ability to apply federal preemptive law, especially under a Supremacy Clause challenge, see Planned Parenthood of Kan. & Mid-Missouri v. Moser, 747 F.3d at 824, as the Court has previously concluded, a private litigant can still bring a Supremacy Clause challenge and argue that federal law preempts state law. The Tenth Circuit has held: "The Supremacy Clause of the Constitution provides that federal law trumps, or preempts, contrary state laws."   Russo v. Ballard Med. Prods., 550 F.3d at 1011. Section 5.6's proclamation that no one can use federal preemption law to overturn the contradicts federal law.   Indeed, federal law preempts the provision which states that federal preemptive law does not apply.   Because § 5.6 is contrary to federal law, it is invalidated under the Supremacy Clause.

The Court has previously discussed additional concerns regarding Section 5.6.   See SWEPI, LP v. Mora Cnty., 2014 WL 6983288, at *48-49.

> The Ordinance, thus, appears to state that no one can challenge it, or any other Mora County ordinance, as long as the ordinance concerns the health, safety, or welfare of its residents.   See Ordinance § 5.6.   The Intervenor-Applicants' argument is that SWEPI, LP, cannot challenge the Ordinance's constitutionality, because the Ordinance deprives SWEPI, LP, of its constitutional rights.   If this argument has validity, it would signal the end of all civil rights that the Constitution protects.   A county could pass an unconstitutional ordinance, but then say that anyone who challenged the ordinance lacks constitutional rights to support the challenge.   The county could enforce its unconstitutional ordinance free of constitutional restrictions, because no one could challenge the validity of the ordinance.   The consequences of such an outcome could be devastating to the Union as the Nation has known it since the Civil War.   Some counties could prohibit speech on certain viewpoints.   Others could deny basic rights to members of certain racial ethnicities.   Still others could prohibit religious practices; others could require participation in religious services.   The Constitution would be applied in a cookie-cutter fashion across the United States with such inconsistency from place-to-place that it would cease to be a Constitution of the United States at all.

SWEPI, LP v. Mora Cnty., 2014 WL 6983288, at *48.   The Court continues to have these concerns.

Sections 5.8 and 5.9 are invalid for the same reasons.   Section 5.8 states that the Bill of Rights preempts of Mora County ordinances only if their "interpretation and application" is not inconsistent with the Ordinance's provisions concerning corporate rights.   Ordinance § 5.8, at 5. Section 5.9 states that federal law is preemptive only if it "both expressly preempt[s] County ordinances and charters, and provide[s] greater protections for the health, safety, and welfare of the people of Mora County than County ordinances and charters."   Ordinance § 5.9, at 5.   Both of these provisions provide for the circumstances in which federal law may preempt Mora County law.   If a county could declare under what conditions federal law preempted its laws, federal law would not be preemptive at all.   The Supremacy Clause provides that federal law preempts contrary state and local law, see Russo v. Ballard Medical   Prods., 550 F.3d at 1011, and not that

- 133 -

federal law preempts contrary state and local laws when the state and local laws say that federal law can preempt them.   This result is especially true for § 5.8, which states that the Constitution preempts only if it is interpreted in a manner that is consistent with the Ordinance's interpretation of corporate rights.   See Ordinance § 5.8, at 5.   The Ordinance essentially provides that corporations have no constitutional rights.   See Ordinance § 5.5, at 4.

To find support for the long history of corporate constitutional rights, the Court needs to look no further than the Defendants' Response.   The Defendants list numerous cases in which the Supreme Court recognized corporate constitutional rights.   See Response at 23-25.   They urge the Court to ignore Supreme Court precedent, arguing that the rights of property should not supersede the rights of people.   See Response at 26.   It is well established, however, that corporations have constitutional rights, even if they are property.   See, e.g., Metro Life Ins. Co. v. Ward, 470 U.S. at 881 n.9 ("It is well established that a corporation is a 'person' within the meanings of the Fourteenth Amendment.").[30]   Supreme Court precedent well establishes these

_____

[30]There have certainly been dissenters to the concept of corporate constitutional rights.   See Response at 23 n.12 (listing a number of dissenting and concurring opinions of Supreme Court Justices challenging corporations' constitutional rights).   The most persuasive argument comes from the concurring opinion of the Honorable John Marshall Harlan, Associate Justice to the Supreme Court, in Hale v. Henkel.   Justice Harlan wrote:

> In my opinion, a corporation -- 'an artificial being, invisible, intangible, and existing only in contemplation of law' -- cannot claim the immunity given by the 4th Amendment; for it is not a part of the 'people,' within the meaning of that Amendment.   Nor is it embraced by the word 'persons' in the Amendment.   If a contrary view obtains, the power of the government, by its representatives, to look into the books, records, and papers of a corporation of its own creation, to ascertain whether that corporation has obeyed or is defying the law, will be greatly curtailed, if not destroyed.   If a corporation, when its affairs are under examination by a grand jury proceeding in its work under the orders of the court, can plead the immunity given by the 4th Amendment against unreasonable searches and seizures, may it not equally rely upon that Amendment to protect it even against a statute authorizing or directing the examination by the agents of the government creating it, of its papers, documents, and records, unless they specify the particular papers, documents, and records to be examined?

_____

Hale v. Henkel, 201 U.S. at 78-79 (Harlan, J., concurring).  Some may find it odd that certain types of property are afforded constitutional rights while unborn humans are not, compare Minneapolis & St. Louis Ry. Co. v. Beckwith, 129 U.S. at 1889 (recognizing that corporations have constitutional rights), with Roe v. Wade, 410 U.S. 113, 158 (1973)(holding that the unborn do not have Fourteenth Amendment rights), but Supreme Court has well established these principles, and the Court is bound to follow them.  Justice Scalia, in addressing a dissenting opinion written by the Honorable John Paul Stevens, Associate Justice to the Supreme Court, however, provides historical support for granting corporations First Amendment rights.  See Citizens United v. Fed. Election Comm'n, 558 U.S. at 385 (Scalia, J., concurring).

The lack of a textual exception for speech by corporations cannot be explained on the ground that such organizations did not exist or did not speak.  To the contrary, colleges, towns and cities, religious institutions, and guilds had long been organized as corporations at common law and under the King's charter, see 1 W. Blackstone, Commentaries on the Laws of England 455-473 (1765); 1 S. Kyd, A Treatise on the Law of Corporations 1-32, 63 (1793)(reprinted 2006), and as I have discussed, the practice of incorporation only expanded in the United States. Both corporations and voluntary associations actively petitioned the Government and expressed their views in newspapers and pamphlets.  For example: An antislavery Quaker corporation petitioned the First Congress, distributed pamphlets, and communicated through the press in 1790.  W. diGiacomantonio, "For the Gratification of a Volunteering Society": Antislavery and Pressure Group Politics in the First Federal Congress, 15 J. Early Republic 169 (1995).  The New York Sons of Liberty sent a circular to colonies farther south in 1766. P. Maier, From Resistance to Revolution 79-80 (1972).  And the Society for the Relief and Instruction of Poor Germans circulated a biweekly paper from 1755 to 1757. Adams, The Colonial German-language Press and the American Revolution, in The Press & the American Revolution 151, 161-162 (B. Bailyn & J. Hench eds. 1980). The dissent offers no evidence -- none whatever -- that the First Amendment's unqualified text was originally understood to exclude such associational speech from its protection.

Historical evidence relating to the textually similar clause "the freedom of the press" also provides no support for the proposition that the First Amendment excludes conduct of artificial legal entities from the scope of its protection.  The freedom of "the press" was widely understood to protect the publishing activities of individual editors and printers.  See McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, . . . (1995)(THOMAS, J., concurring in judgment); see also McConnell, 540 U.S., at 252-253, . . . (opinion of SCALIA, J.).  But these individuals often acted through newspapers, which (much like corporations) had their own names, outlived the individuals who had founded them, could be bought and sold, were sometimes owned by more than one person, and were operated for profit.  See generally F. Mott, American Journalism: A History of Newspapers in the United States Through 250 Years 3-164 (1941); J. Smith, Freedom's Fetters (1956). Their activities were not stripped of First Amendment protection simply because

they were carried out under the banner of an artificial legal entity.   And the notion which follows from the dissent's view, that modern newspapers, since they are incorporated, have free-speech rights only at the sufferance of Congress, boggles the mind.

In passing, the dissent also claims that the Court's conception of corruption is unhistorical.   The Framers "would have been appalled," it says, by the evidence of corruption in the congressional findings supporting the Bipartisan Campaign Reform Act of 2002.   For this proposition, the dissent cites a law review article arguing that "corruption" was originally understood to include "moral decay" and even actions taken by citizens in pursuit of private rather than public ends. Teachout, The Anti-Corruption Principle, 94 Cornell L. Rev. 341, 373, 378 (2009). It is hard to see how this has anything to do with what sort of corruption can be combated by restrictions on political speech.   Moreover, if speech can be prohibited because, in the view of the Government, it leads to "moral decay" or does not serve "public ends," then there is no limit to the Government's censorship power.

The dissent says that when the Framers "constitutionalized the right to free speech in the First Amendment, it was the free speech of individual Americans that they had in mind."   That is no doubt true.   All the provisions of the Bill of Rights set forth the rights of individual men and women -- not, for example, of trees or polar bears.   But the individual person's right to speak includes the right to speak *in association with other individual persons*.   [S]urely the dissent does not believe that speech by the Republican Party or the Democratic Party can be censored because it is not the speech of "an individual American."   It is the speech of many individual Americans, who have associated in a common cause, giving the leadership of the party the right to speak on their behalf.   The association of individuals in a business corporation is no different -- or at least it cannot be denied the right to speak on the simplistic ground that it is not "an individual American."

But to return to, and summarize, my principal point, which is the conformity of today's opinion with the original meaning of the First Amendment. The Amendment is written in terms of "speech," not speakers.   Its text offers no foothold for excluding any category of speaker, from single individuals to partnerships of individuals, to unincorporated associations of individuals, to incorporated associations of individuals -- and the dissent offers no evidence about the original meaning of the text to support any such exclusion.   We are therefore simply left with the question whether the speech at issue in this case is "speech" covered by the First Amendment.   No one says otherwise.   A documentary film critical of a potential Presidential candidate is core political speech, and its nature as such does not change simply because it was funded by a corporation.   Nor does the character of that funding produce any reduction whatever in the "inherent worth of the speech" and "its capacity for informing the public," First Nat. Bank of Boston v. Bellotti, 435 U.S. 765, 777, . . . (1978).   Indeed, to exclude or impede corporate speech is to muzzle the principal agents of the modern free economy.

principles, and, as a United States District Court, the Court is bound to follow them.  The Defendants' argument that corporations should not be granted constitutional rights, or that corporate rights should be subservient to people's rights, are arguments that are best made before the Supreme Court -- the only court that can overrule Supreme Court precedent -- rather than a district court.  Hicks v. Miranda, 422 U.S. 332, 344-45 (1975)(noting that "lower courts are bound by summary decisions by this Court until such time as the Court informs them that they are not."  (internal quotation marks omitted)(alterations omitted)); DeBoer v. Snyder, 772 F.3d 388, 400 (6th Cir. 2014)("Only the Supreme Court may overrule its own precedents, and we remain bound even by its summary decisions until such time as the Court informs us that we are not." (citation omitted)(internal quotation marks omitted)(alterations omitted)); Sojourner v. Roemer, 772 F. Supp. 930, 932 (E.D. La. 1991)(Duplantier, J.)("No judge in the United States enjoys the luxury of applying his or her own interpretation of the U.S. Constitution with respect to an issue which the United States Supreme Court has previously decided.   No judge in the United States can overrule [a Supreme Court decision]; only the Supreme Court can do so.").   This local law is contrary to over one-hundred years of Supreme Court precedent.  See, e.g., Minneapolis & St. Louis Ry. Co. v. Beckwith, 129 U.S. at 1889 (holding that "corporations can invoke the benefits of provisions of the constitution and laws which guaranty to persons the enjoyment of property").   In essence, Section 5.8 states that the Constitution cannot preempt the Ordinance unless the Constitution is applied in a manner that is contradictory to the way the Supreme Court has interpreted it.   This local law cannot stand.

---

We should celebrate rather than condemn the addition of this speech to the public debate.

Citizens United v. Fed. Election Comm'n, 558 U.S. at 388-93 (Scalia, J., concurring)(alterations omitted)(footnotes omitted)(citations omitted).

The Defendants argue that Mora County residents' right to self-government provides them with the right to pass the Ordinance, including the provisions stripping corporations of their constitutional rights.  See Response at 20-23.   They argue that the Declaration of Independence and the Treaty of Guadalupe Hidalgo provide, or at least recognize, these rights.  See Response at 20-23; Tr. at 102:22-103:9 (Haas, Court).   The Defendants are, however, mistaken.  "The Declaration of Independence is a statement of ideals, not law."  Schifanelli v. U.S. Gov't, No. 88-2172. 865 F.2d 1259, at *1 (4th Cir. Dec. 22, 1988)(per curiam)(unpublished).  See Rhode Island v. Massachusetts, 37 U.S. 657, 680 ("[U]nder the constitution [the court] is bound by events subsequent to the declaration of independence . . . ."); Borzych v. Frank, No. CIV 06-0475 C, 2006 WL 3254497, at *8 (W.D. Wis. Nov. 9, 2006)(Crabb, J.)("However, the Declaration of Independence is not binding law . . . .").   Moreover, to whatever extent the Treaty of Guadalupe Hidalgo provides Mora County residents with self-governing rights, those rights cannot trump the Constitution.   As the Supreme Court has held, "Article VI of the Constitution makes the Constitution the 'supreme Law of the Land.'"   Cooper v. Aaron, 358 U.S. 1, 18 (1958)(quoting U.S. Const. art. VI, cl. 2).   Someone must, in an orderly constitutional system, determine who decides certain issues, and the Supreme Court has concluded that it -- not local communities -- determines who decides federal constitutional issues.   The Supreme Court went on to hold that "the federal judiciary is supreme in the exposition of the law of the Constitution."   Cooper v. Aaron, 358 U.S. at 18.   Because the Supreme Court has held that the Constitution is superior to all other law, and because the Supreme Court's interpretation is superior to any other interpretation, the Supreme Court's numerous holdings that the Constitution confers corporations with certain rights is superior to any other contradictory law.   Accordingly, corporations have constitutional rights that inferior law cannot infringe, regardless of the Defendants' interpretation of the

Declaration of Independence and the Treaty of Guadalupe Hidalgo.   Because Sections 5.8 and 5.9 are contrary to federal law, they must be invalidated.   Accordingly, sections 5.5, 5.6, 5.8, and 5.9 are invalid.

## V.    THE ORDINANCE DOES NOT VIOLATE THE DUE PROCESS CLAUSE.

The Ordinance does not violate the Due Process Clause.   SWEPI, LP brings two claims under the Due Process Clause: (i) that the Ordinance arbitrarily deprives it of its property; and (ii) that Mora County lacked either a compelling or legitimate county interest in enacting the Ordinance.   See Complaint ¶¶ 81-102, at 17-20.   These two claims are one and the same.   At the hearing, SWEPI, LP argued that the Court should apply the shocks-the-conscience test in analyzing its due-process claims   See Tr. at 135:1-5 (Anderson, Court).   The shocks-the-conscience standard, however, is not the correct standard for SWEPI, LP's due-process claims.   The Tenth Circuit has held that, in analyzing arbitrary government action under the Due Process Clause, if the action is executive, the shocks the conscience standard applies, but, if the action is legislative, a rational basis test applies.   See Dias v. City & Cnty. of Denver, 567 F.3d 1169, 1182 (10th Cir. 2009).   The Tenth Circuit has stated:

> However, the "shocks the conscience" standard is not applicable to cases in which plaintiffs advance a substantive due process challenge to a *legislative* enactment. Instead, it is an inquiry reserved for cases challenging *executive* action. Legislative action is tested under a two-part substantive due process framework as we have described.   Again, we ask whether a fundamental right is implicated.   If it is, we apply strict scrutiny to test the fit between the enactment's means and ends. Otherwise, we use a rational basis test.

Dias v. City & Cnty. of Denver, 567 F.3d at 1182 (citations omitted)(emphasis in original). Because the Mora County Commissioners is a legislative body, and because the Ordinance is a legislative enactment, under the Due Process Clause, the arbitrariness of Mora County's

enactment of the Ordinance will be judged under a rational basis or strict scrutiny standard, depending on the nature of the interests involved.

### A.    SWEPI, LP'S SUBSTANTIVE DUE-PROCESS CLAIMS DO NOT IMPLICATE A FUNDAMENTAL RIGHT.

SWEPI, LP's substantive due-process claims do not implicate a fundamental right and are, thus, subject to a rational basis analysis.   In the Complaint, SWEPI, LP argues that Mora County lacked either a compelling county interest or a legitimate county interest in enacting the Ordinance.   See Complaint ¶¶ 89-102, at 18-20.   "If a legislative enactment burdens a fundamental right, the infringement must be narrowly tailored to serve a compelling government interest."   Dias v. City & Cnty. of Denver, 567 F.3d at 1181.   "But if an enactment burdens some lesser right, the infringement is merely required to bear a rational relation to a legitimate government interest."   Dias v. City & Cnty. of Denver, 567 F.3d at 1181.   By arguing that Mora County lacks both a compelling county interest and a legitimate county interest, SWEPI, LP appears to be arguing in the alternative: if a fundamental right is involved, there is no compelling interest; alternatively, if there is no fundamental right involved, there is no legitimate interest.   To apply the appropriate standard, the Court must first determine the nature of SWEPI, LP's rights.

SWEPI, LP argues that its oil-and-gas leases are "property interests [that] are fundamental rights protected by the Fourteenth Amendment."   Complaint ¶ 91, at 18.   It further argues that the Ordinance deprived it of its "fundamental property interests."   Complaint ¶ 92, at 18.   At the hearing, however, SWEPI, LP argued that Mora County lacked only a legitimate state interest, but did not argue that it lacked a compelling state interest.   See Tr. at 134:13-24 (Anderson).   In the Motion, SWEPI, LP argues that the Court must determine "whether the deprivation of SWEPI's property interest bears a rational relationship to a legitimate governmental interest."   Motion at 16.   Thus, in the Complaint, SWEPI, LP appears to argue that its property interests are

fundamental rights, requiring a strict scrutiny analysis; at the hearing, and in the Motion, however, SWEPI, LP appears to argue that its property rights are not fundamental rights and that its substantive due-process claims should be resolved under a rational basis analysis.   In any case, because its property rights are not fundamental rights, a rational basis analysis is the correct standard.

Courts have routinely held that property interests and rights do not rise to the level of fundamental rights requiring a strict scrutiny analysis.   See, e.g., Weems v. Little Rock Police Dep't, 453 F.3d 1010, 1015-16 (8th Cir. 2006)(holding that a case involving a resident's right to "acquire, enjoy, own and dispose of property" did not implicate a fundamental right); Hager v. City of West Peoria, 84 F.3d 865, 872 (7th Cir. 1996)("Access to real property does not rise to the level of a fundamental right such that its denial merits heightened scrutiny."); Clajon Prod. Corp. v. Petera, 70 F.3d 1566, 1580 (10th Cir. 1995)(rejecting plaintiffs' argument that their fundamental right to private property required a strict scrutiny analysis by holding that "[e]conomic regulations -- i.e., those burdening one's property rights -- have traditionally been afforded only rational relation scrutiny"); Nat'l W. Life Ins. Co. v. Commodore Cove Improvement Dist., 678 F.2d 24, 26 (5th Cir. 1982)("The right freely to alienate real property is not a 'fundamental right' that calls for application of strict scrutiny."); Dodge v. Johnson, 92 F. App'x 404, 406 (9th Cir. 2004)(unpublished)(holding that "interest in purchasing a particular piece of property is not a fundamental right"); Vestavia Plaza, LLC v. City of Vestavia Hills, No. CIV 2:11-4152 TMP, 2013 WL 4804196, at *11 n.8 (N.D. Ala. Sept. 9, 2013)(Putnam, M.J.)("Being a creature of state law, rights in real property are not 'fundamental' rights protected by the concept of substantive due process."); John E. Long, Inc. v. Borough of Ringwood, 61 F. Supp. 2d 273, 285 (D.N.J. 1998)(Chesler, M.J)(noting that "a person does not have a

fundamental right to use . . . property or have it zoned in any way he or she wishes"); <u>Clajon Prod.</u> <u>Corp. v. Petera</u>, 854 F. Supp. 843, 855 n.18 (D. Wyo. 1994)(Brimmer, J.)("This analysis is not meant to degrade property rights . . . .   The point is, however, that property rights are not fundamental rights for purposes of deciding the appropriate level of constitutional scrutiny that must be given to state laws that may affect those rights."); <u>Polselli v. Nationwide Mut. Fire Ins.</u> <u>Co.</u>, No. CIV A 91-1364, 1993 WL 137476, at *8 (E.D. Pa. Apr. 30, 1993)(Yohn, J.)("However, a property right is not considered one of the fundamental rights entitled to strict scrutiny analysis."). The Honorable Clarence A. Brimmer, United States District Judge for the District of Wyoming, concluded:

> There is, moreover, at least one other valid reason for rejecting [the argument that government action affecting property interests require strict scrutiny analysis]. The right not to have one's property taken without just compensation, the property right at issue here, is very different from the type of personal right that has been recognized as "fundamental" for equal protection purposes.   <u>See, e.g.</u>, [Mass. Bd. of Retirement v.] Murgia, 427 U.S. [427 U.S. 307, 312 n.3 (1976)] . . . (citing cases which involve fundamental rights such as the right to vote, the right to procreate, and the right to interstate travel).   All of those fundamental personal rights are rights that the individual can affirmatively exercise.   It is clear that any "rights" conferred by the takings clause are different from these fundamental rights in that they are not affirmative rights that can be exercised.   For all of these reasons, the Court finds that the plaintiffs have failed to rebut the presumption that rational basis review applies to social legislation and heightened scrutiny of this regulation is therefore unwarranted.

<u>Clajon Prod. Corp. v. Petera</u>, 854 F. Supp. at 855.   Consequently, SWEPI, LP's property interests are not fundamental rights that require a strict scrutiny analysis.

Moreover, strict scrutiny analysis would be contrary to the Supreme Court's Takings Clause jurisprudence.   The Supreme Court has held that "the exercise of eminent domain power" must be "rationally related to a conceivable public purpose."   <u>Haqaii Hou. Auth. v. Midkiff</u>, 467 U.S. 229, 241 (1984).   If a person's interest in property created a fundamental right, then a state would require a compelling state interest to exercise its eminent domain power over the

property.   The Supreme Court does not require such a heightened interest.   By merely requiring a

"conceivable public purpose" and requiring that the exercise of eminent domain power be

"rationally related" to this purpose, the Supreme Court has indicated that person's property interest

is not a fundamental right.   Accordingly, SWEPI, LP's substantive due-process rights have been

violated only if the Defendants lacked a legitimate county interest in enacting the Ordinance.

## B.      THE DEFENDANTS HAVE A LEGITIMATE COUNTY INTEREST.

The Defendants have a legitimate county interest in enacting the Ordinance.   It is rational

that the Defendants would ban corporations, but not individuals, from engaging in hydrocarbon

exploration and extraction.   Such a distinction is not arbitrary.   The Defendants argue that only

corporations have the resources to engage in fracking, and have the immunities to avoid liability

from spills and leaks by declaring bankruptcy.   See Response at 19.   According to the

Defendants, corporations are the only entities engaged in fracking.   See Response at 19.   It is

rational that, if corporations and not individuals engage in fracking, Mora County would ban

corporations but not individuals from engaging in hydrocarbon exploration and extraction.

In Dias v. City and County of Denver, the Tenth Circuit held that the plaintiffs sufficiently

alleged that a city and county ordinance banning the possession of pit bull terriers lacked a

legitimate state interest.   See 567 F.3d at 1172-73.   There, the district court dismissed the

plaintiffs' substantive due-process claim under rule 12(b)(6) for failing to state a claim.   See Dias

v. City & Cnty. of Denver, 567 F.3d at 1172-73.   In an opinion that Judge Lucero wrote, and

Judges Tacha and Ebel joined, the Tenth Circuit held that, while the city and county had a

legitimate interest in animal control, and in protecting the public's health and safety, the plaintiffs

had sufficiently alleged that the means in which they chose to pursue these interests -- banning all

pit bulls -- was irrational.   See 567 F.3d at 1183.   Specifically, the Tenth Circuit noted that the

plaintiffs alleged that there was "a lack of evidence that pit bulls as a breed pose a threat to public safety or constitute a public nuisance, and thus, that it is irrational for Denver to enact a breed-specific prohibition."   567 F.3d at 1183.   In distinguishing prior cases that dismissed substantive due-process challenges to pit bull bans, the Tenth Circuit noted that the state of science may have changed since those cases were decided and that the majority of those previous cases had "a developed evidentiary record."   567 F.3d at 1183 & n.12.   The Tenth Circuit held that, because the plaintiffs' claims were dismissed under rule 12(b)(6), there was no developed record to review and the court was required to assume that the plaintiffs' allegations were true.   See 567 F.3d at 1184 & n.12.   Taking the plaintiffs' allegations as true, the Tenth Circuit concluded that they reasonably stated a claim that the city and county lacked a legitimate state interest in banning pit bulls but no other dog breeds.   See 567 F.3d at 1184.

Here, there is no developed record.   Additionally, as the non-moving party, the Court must grant all inferences in the Defendants' favor.   See Smith v. United States, 561 F.3d at 1098. With these inferences, the Court cannot say that it is unreasonable for Mora County to apply the Ordinance's prohibitions to corporations but not to individuals.   It is likely that only incorporated entities -- corporations, limited liability companies, limited partnerships, et cetera -- engage in hydrocarbon exploration and extraction.   The very purpose of a corporation is to provide a mechanism in which individuals can pool large amounts of money to undertake an expensive endeavor without risking the rest of their wealth.   Drilling oil-and-gas wells is expensive.   A person who has enough capital to drill an oil-and-gas well will likely not do so without the limited liability of an incorporated entity.   Engaging in any expensive business venture, without limited liability protections, would subject a person's entire wealth to liability if something went wrong.   Using an incorporated entity, however, allows a person to risk only a

definite amount of money -- that which he or she invested into the entity -- without risking the rest of his or her wealth.    It is thus reasonable to assume that only incorporated entities, and not individuals, engage in hydrocarbon exploration and extraction.

While it is reasonable to assume that only incorporated entities drill oil-and-gas wells and engage in fracking, this assumption may not be accurate.   A more developed record is needed. See Dias v. City and Cnty. of Denver, 567 F.3d at 1184 (noting that without a developed record and drawing inferences in non-moving party's favor, the court could not say that there was a legitimate state interest).   SWEPI, LP may be able to show that Mora County lacks a legitimate county interest by producing evidence that individuals engage in fracking as often as corporations. If SWEPI, LP can show that individuals engage in fracking at the same frequency as corporations, it may not be reasonable that Mora County would ban only corporations from engaging in hydrocarbon extraction but not individuals.   Such a distinction may have been done for an arbitrary purpose.   This evidence, however, is not currently before the Court, and the Court must draw all reasonable inferences in the Defendants' favor.

The Defendants also argue that corporations are able to avoid liability for spills and leaks by declaring bankruptcy.   Even though this rationale may not be the soundest reasoning, it is still rational.   SWEPI, LP argues that, if a corporation attempts to take advantage of the corporate form to avoid liability, a court can pierce the corporate veil.   See Tr. 119:15-23 (Anderson). While undercapitalization is a factor to consider in piercing the corporate veil, it is not determinative.   See Certain Underwriters at Lloyd's, London Subscribing to Policy Number 501/NB03ACMD v. Nance, 506 F. Supp. 2d 700, 713 (D.N.M. 2007)(Browning, J.)(noting that undercapitalization is one fact, among others, to be considered in piercing the corporate veil); Harlow v. Fibron Corp., 1983-NMCA-117, ¶ 21, 671 P.2d 40, 44 (holding that undercapitalization

is "only one factor to be considered" in piercing the corporate veil). A corporation or an individual may avoid personal liability by establishing a corporation and then capitalizing it with just enough assets to conform with the law but not enough assets to pay out all likely liabilities. See John C. Heenan, Graceful Maneuvering: Corporate Avoidance of Liability through Bankruptcy and Corporate Law, 65 Mont. L. Rev. 99, 120-21 (2004)(noting that corporations can avoid liabilities by maintaining subsidiaries with just enough assets to comply with the law to avoid piercing but still not enough assets to satisfy creditors). By banning only corporations from engaging in hydrocarbon extraction, Mora County may be attempting to ensure that, if there are any oil leaks or spills, the perpetrator will not be able to avoid liability by using a partially undercapitalized subsidiary. The Ordinance's distinction between corporations and individuals is thus rational.[31]

Again, SWEPI, LP may be able to present evidence showing that this purported reasoning is not rational. At the judgment-on-the-pleadings stage, however, the Court must make all reasonable inferences in the Defendants' favor. The Court must, thus, infer that Mora County is more likely to recover any judgments for spills and leaks against individuals than corporations.

---

[31] Even with the potential of undercapitalization, most plaintiffs would rather sue a corporation than a private individual. Corporations more often have the sufficient funds to pay judgments. Plaintiffs often forego cognizable claims against individuals while pursuing claims against insurance companies or corporations for the same conduct or incident. Corporations and insurance companies can pay the judgments, while individuals often cannot. The same rationale likely applies to seeking damages for oil leaks and spills. A corporation is more likely than an individual to have the assets to repair any damage that a leak or spill causes. It is odd that Mora County would ban corporations from engaging in hydrocarbon extraction while permitting individuals, when corporations are more likely to have the necessary assets to clean up after a leak or spill. The Ordinance may fall into the class of laws to which the Honorable John Paul Stevens, Associate Justice of the Supreme Court, referred in his concurring opinion in New York State Board of Elections v. Lopez Torres, 552 U.S. 196 (2008). Quoting his former colleague, the Honorable Thurgood Marshall, Associate Justice of the Supreme Court, Justice Stevens wrote "The Constitution does not prohibit legislatures from enacting stupid law." N.Y. State Bd. of Elections v. Lopez Torres, 552 U.S. at 209 (Stevens, concurring)(internal quotation marks omitted). The Defendants' liability rationale is not the most sound, but remains rational, and, as such, it does not violate SWEPI, LP's substantive due-process rights.

The Court believes that SWEPI, LP will likely not be able to present contrary evidence, because individuals, without some limited liability protection, do not engage in hydrocarbon exploration and extraction.   There is likely no evidence showing the likelihood of recovering damages against an individual for leaks or spills that result for drilling oil-and-gas wells.   In any case, at this juncture, the Court cannot consider evidence and must draw all reasonable inferences in the Defendants' favor.   Under that standard, Mora County has a legitimate government interest that is rationally related to the Ordinance, and thus SWEPI, LP's due-process claims fail.

## VI.   THE ORDINANCE DOES NOT VIOLATE SWEPI, LP'S EQUAL-PROTECTION RIGHTS.

The Ordinance does not violate SWEPI, LP's equal-protection rights.   SWEPI, LP asserts two separate equal-protection arguments.   Its first argument is closely related to its substantive due-process claims: the Ordinance's distinction between corporations and individuals is arbitrary and does not bear a rational relationship with a legitimate state interest.   See Motion at 7-8. SWEPI, LP's second argument is that the Ordinance's distinction is based on an invidious and unlawful animus.   See Motion at 8-10.   Both of these arguments fail.

### A.   THE ORDINANCE IS RATIONALLY RELATED TO A LEGITIMATE STATE INTEREST.

The Ordinance is rationally related to a legitimate state interest.   SWEPI, LP argues that disparate treatment between corporations and individuals bears no rational relationship to a legitimate governmental purpose.   See Motion at 7.   SWEPI, LP relies heavily on the 1929 Supreme Court case, Frost v. Corporation Commission of Oklahoma.   See Motion at 7-8.   That case stands, however, for the proposition that arbitrary disparate treatment between corporations and individuals bears no rational relationship to a legitimate governmental purpose, and not that all disparate treatment bears no such rational relationship.   See Frost v. Corp. Comm'n of Okla., 278

U.S. at 522.   There, the City of Durant, Oklahoma, passed a law requiring a permit for the operation of cotton gins.   See Frost v. Corp. Comm'n of Okla., 278 U.S. at 517.   To obtain a permit, a person needed to show a "public necessity."   278 U.S. at 517.   When the city granted a corporation a permit without requiring it to show a public necessity, the plaintiff filed suit, alleging an Equal Protection Clause violation by arguing that there was a disparate treatment between individuals and corporations.   See 278 U.S. at 518-19.   The Supreme Court held that the Equal Protection Clause's purpose "is to rest the rights of all persons upon the same rule under similar circumstances."   278 U.S. at 522.   It stated:

> This Court has several times decided that a corporation is as much entitled to the equal protection of the laws as an individual.   The converse, of course, is equally true.   A classification which is bad because it arbitrarily favors the individual as against the corporation certainly cannot be good when it favors the corporation as against the individual.   In either case, the classification, in order to be valid, must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.

278 U.S. at 522 (citations omitted)(internal quotation marks omitted).   The Supreme Court, thus, held that it was the arbitrary distinction between corporations and individuals that invalidated the permit application process.   See 278 U.S. at 522.

That it was the arbitrariness of the distinction, and not the distinction itself, is highlighted by the Supreme Court's comparison between the two categories of Oklahoma corporations.   In 1917, Oklahoma passed a statute providing that "co-operative agricultural or horticultural associations not having capital stock or being conducted for profit, may be formed for the purpose of mutual help by persons engaged in agriculture or horticulture."   Frost v. Corp. Comm'n of Okla., 278 U.S. at 517-18.   In 1919, Oklahoma passed a statute providing that for-profit corporations could be "formed for the purpose of conducting, among others, an agricultural or horticultural business upon a co-operative plan."   278 U.S. at 518.   The 1919 statute provided the

number of owners that a for-profit corporation must have, the price of its stock, the number of its shares, and the manner for distributing its profits.  See 278 U.S. at 518.  The Supreme Court opined that, if a distinction was made between corporations formed under the 1917 act and individuals in the permit application process, that distinction would likely be upheld.  See 278 U.S. at 523-24 ("As applied to corporations organized under the 1917 act, we have no reason to doubt that the classification created by the proviso might properly be upheld.").  The Supreme Court noted, however, that, because anyone could own a corporation established under the 1919 act, and because those corporations were created for the purpose of making money, the differences between an individual and a corporation under the 1919 act were "without substance"  278 U.S. at 524.

> Stripped of immaterial distinctions and reduced to its ultimate effect, the proviso, as here construed and applied, baldly creates one rule for a natural person and a different and contrary rule for an artificial person, notwithstanding the fact that both are doing the same business with the general public and to the same end, namely, that of reaping profits.  That is to say, it produces a classification which subjects one to the burden of showing a public necessity for his business, from which it relieves the other, and is essentially arbitrary, because based upon no real or substantial differences, having reasonable relation to the subject dealt with by the legislation.

Frost v. Corp. Comm'n of Okla., 278 U.S. at 524-25.

As noted earlier, the differences between corporations and individuals in the hydrocarbon extraction arena are not arbitrary.  Corporations engage in more hydrocarbon extraction activities than individuals.  Additionally, corporations may be able to take steps to prevent total liability in ways that individuals cannot.  Merely because Mora County decided to eliminate some hydrocarbon extraction activities, but not, all does not make the Ordinance's distinctions arbitrary. The Supreme Court's decision in Railway Express Agency v. People of the State of New York, 336 U.S. 106 (1949), is instructive.  There, the City of New York passed an ordinance prohibiting

vehicles with advertising signs.   See Ry. Express Agency v. People of N.Y., 336 U.S. at 107.

The ordinance, however, did not apply to business delivery vehicles that were engage in the usual

business of the owner, and were not used merely or mainly for advertising.   See 336 U.S. at 107.

The plaintiffs argued that the distinction between delivery vehicles and advertising vehicles

violated the Equal Protection clause, because, while the ordinance was passed under the rationale

that vehicle advertising distracts drivers and pedestrians, affecting "the safety of the public in the

use of the streets," advertisements on delivery cars could just as easily distract drivers and

pedestrians as advertisements on other vehicles.   336 U.S. at 109-10.   The Supreme Court held

that the city "may well have concluded that those who advertised their own wares on their trucks

do not present the same traffic problem in view of the nature or extent of the advertising which

they use."   336 U.S. at 110.   It held that, "[i]f that judgment is correct, the advertising displays

that are exempt have less incidence on traffic than those of appellants.   We cannot say that that

judgment is not an allowable one."   336 U.S. at 110.   The Supreme Court noted that the city

could draw distinctions in banning vehicular advertisements.   See 336 U.S. at 110.

> And the fact that New York City sees fit to eliminate from traffic this kind of
> distraction but does not touch what may be even greater ones in a different
> category, such as the vivid displays on Times Square, is immaterial.   It is no
> requirement of equal protection that all evils of the same genus be eradicated or
> none at all.

336 U.S. at 110.   See S.W. Media Mobile LLC v. City of Rio Ranch, No. CIV 13-0248 JB/KBM,

2013 WL 6920856, at * 31 (D.N.M. Dec. 31, 2013)(Browning, J.)(concluding that city had

rational basis for banning private mobile advertisements but not advertisements on city buses).

In the same way, the Defendants could have concluded that corporations were more likely

to drill for oil and gas and to engage in fracking than individuals.   That the Defendants did not ban

all hydrocarbon extraction -- by both corporations and individuals -- does not violate the Equal

Protection Clause.   See Ry. Express Agency v. People of N.Y., 336 U.S. at 110.   The Defendants

may have decided to apply the Ordinance only to the most likely culprits of hydrocarbon extraction

and fracking.   The distinction between corporations and individuals is not arbitrary.   Cf. Frost v.

Corp. Comm'n of Okla., 278 U.S. at 522.   Accordingly, the Ordinance's disparate treatment of

corporations bears a rational relationship with a legitimate state interest.

### B.   THE ORDINANCE WAS NOT ENACTED WITH AN UNLAWFUL ANIMUS.

SWEPI, LP argues that the Ordinance constitutes an unlawful animus against corporations.

See Motion at 8-10.   Normally, courts do not consider legislators' subjective intent in determining

the constitutionality of a law.   See Palmer v. Thompson, 403 U.S. 217, 224 (1971)(discussing the

"hazards of declaring a law unconstitutional because of the motivations of its sponsors").   In a

line of cases, starting with United States Department of Agriculture v. Moreno, the Supreme Court

has created an exception to this general rule through a doctrine that has become known as the

animus -- or more aptly titled "anti-animus" -- doctrine.   Dale Carpenter, Windsor Products:

Equal Protection From Animus, 2013 Sup. Ct. Rev. 183, 204-215 (2013).   Under a rational basis

review, the party challenging a classification under the Equal Protection Clause normally has the

burden "to negative 'any reasonably conceivable state of facts that could provide a rational basis

for the classification.'"   Bd. of Trustees v. Garrett, 531 U.S. 356, 367 (2001)(quoting Heller v.

Doe, 509 U.S. 312, 320 (1993)).   In the animus line of cases, however, the Supreme Court

purported to use a rational basis review, but then invalidated the challenged laws under a

seemingly higher standard of review.   The standard from these cases has been called "heightened

rational-basis review," "rational basis with bite," "rational basis with teeth," and "rational basis

plus."   Bishop v. Smith, 760 F.3d 1070, 1099 (10th Cir. 2014)(Holmes, J., concurring)(citations

omitted)(internal quotation marks omitted).

1.      **The Animus Cases.**

The first case to apply the animus doctrine was <u>United States Department of Agriculture v.</u> <u>Moreno</u>.   <u>See</u> 413 U.S. at 528.   There, Congress passed a law providing that the distribution of food stamps should be determined on a household basis, and Congress defined household to include only groups of related individuals.   <u>See</u> 413 U.S. at 529-30.   The Supreme Court found that the term "household" was limited to related individuals "to prevent socalled 'hippies' and 'hippie communes' from participating in the food stamp program."   413 U.S. at 535.   In invalidating the household classification, the Supreme Court held that,

> if the constitutional conception of equal protection of the laws means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.   As a result, a purpose to discriminate against hippies cannot, in and of itself and without reference to some independent considerations in the public interest, justify the [classification].

413 U.S. at 534-35.

The Supreme Court again addressed the animus doctrine in <u>City of Cleburne v. Cleburne</u> <u>Living Center</u>.   <u>See</u> 473 U.S. at 432.   There, the city of Cleburne, Texas, refused to issue to a group home for mentally disabled individuals a special use permit, which was required to operate such a home.   <u>See</u> 473 U.S. at 435.   The Supreme Court held that the mentally disabled are not a suspect or a quasi-suspect class that would require heightened standard of review.   <u>See</u> 473 U.S. at 442-47.   Despite applying a rational basis review, the Supreme Court invalidated the zoning ordinance that required homes for the mentally disabled to obtain a special use permit, holding that the permit requirement appeared "to rest on an irrational prejudice against the mentally retarded." 473 U.S. at 450.

In <u>Romer v. Evans</u>, the Supreme Court invalidated a Colorado law that repealed any ordinance or law prohibiting discrimination against homosexuals.   <u>See</u> 517 U.S. at 620.   The

Supreme Court held that, in "the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous," and that, "[b]y requiring that the classification bear a rational relationship to an independent and legitimate legislative end, [courts] ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law."   517 U.S. at 632-33.   In quoting <u>Department of Agriculture v. Moreno</u>, the Supreme Court held "that a bare desire to harm a politically unpopular group cannot constitute a legitimate governmental interest" and that the Colorado law lacked a legitimate governmental purpose. 517 U.S. at 634-35 (quoting <u>Dep't of Agric. v. Moreno</u>, 413 U.S. at 534)(internal quotation marks omitted)(alterations omitted).

In <u>United States v. Windsor</u>, 133 S. Ct. 2675 (2013), the Supreme Court invalidated Section 3 of the Defense of Marriage Act, 110 Stat. 2419 ("DOMA").   133 S. Ct. at 2682. Section 3 defined marriage as a legal union between one man and one woman.   <u>See</u> 133 S. Ct. at 2683.   The Supreme Court noted that, "[i]n determining whether a law is motived by an improper animus or purpose, discriminations of an unusual character especially require careful consideration."   133 S. Ct. at 2693 (citations omitted)(internal quotation marks omitted).   The Supreme Court noted that DOMA's purpose was to "identify a subset of state-sanctioned marriages and make them unequal," in effect, treating lawful same-sex marriages as "second-class marriages."   133 S. Ct. at 2693-94.[32]

---

[32]While some have interpreted <u>United States v. Windsor</u> as an animus case, <u>see</u> <u>Bishop v. Smith</u>, 760 F.3d at 1102 (Holmes, J., concurring), others have interpreted it as either a federalism case, a substantive liberty case, or as creating a heightened scrutiny for classifications based on sexual orientation.   <u>See</u> Carpenter, <u>supra</u> at 197-203 (discussing various interpretations of <u>United States v. Windsor</u> but concluding that it is an animus case).   In his dissenting opinion, the Honorable John G. Roberts, Chief Justice of the United States, wrote that the majority opinion in <u>United States v. Windsor</u> should be interpreted as being based in federalism concerns.   <u>See</u> <u>United States v. Windsor</u>, 133 S. Ct. at 2696-97.   The Honorable Dale A. Kimball, United States District

2.    **Judge Holmes' Interpretation of the Animus Doctrine.**

In his concurring opinion in <u>Bishop v. Smith</u>, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, elucidated his interpretation of the animus doctrine. <u>See</u> 760 F.3d at 1096 (Holmes, J., concurring).   There, the Tenth Circuit, in an opinion that Judge Lucero wrote, invalidated an Oklahoma law that prohibited issuing marriage licenses to same-sex couples.   <u>See</u> 760 F.3d at 1074.   Judge Lucero concluded that the Oklahoma law denied "a fundamental right to all same-sex couples who seek to marry or to have their marriages recognized."   760 F.3d at 1081.   Neither the district court nor Judge Lucero decided the case on animus grounds.   <u>See</u> 760 F.3d at 1096-96 (Holmes, J., concurring).   Judge Lucero did not address the animus doctrine.   <u>See</u> 760 F.3d at 1074-96.   Judge Holmes wrote separately, but stated that he fully agreed with Judge Lucero's conclusion and reasoning, including the decision to not apply the animus doctrine.   <u>See</u> 760 F.3d at 1096-97.   Judge Holmes' concurring opinion focused on the contours of the animus doctrine and explained why it did not apply in that case. <u>See</u> 760 F.3d at 1097 (Holmes, J., concurring).

Judge Holmes noted that the "hallmark of animus jurisprudence is its focus on actual legislative *motive*."   <u>Bishop v. Smith</u>, 760 F.3d at 1099 (Holmes, J., concurring)(emphasis in original).   He asserted that an unlawful motive "could be viewed as falling somewhere on a continuum of hostility toward a particular group."   760 F.3d at 1099 (Holmes, J., concurring). "On the weaker end of the continuum, a legislative motive may be to simply exclude a particular group from one's community for no reason other than an 'irrational prejudice' harbored against

---

Judge for the District of Utah, concluded that <u>United States v. Windsor</u> recognized a substantive due-process right to marriage.   <u>See</u> <u>Evans v. Utah</u>, 21 F. Supp. 3d 1192, 1203 (D. Utah 2014)(Kimball, J.).   The United States Court of Appeals for the Ninth Circuit has held that <u>United States v. Windsor</u> "requires that heightened scrutiny be applied to equal protection claims involving sexual orientation."   <u>SmithKline Beecham Corp. v. Abbot Labs.</u>, 740 F.3d 471, 481 (2014).

- 154 -

that group."   760 F.3d at 1100 (Holmes, J., concurring)(quoting City of Cleburne v. Cleburne

Living Ctr., 473 U.S. at 450).   "On the more extreme end of the continuum, the legislative motive

that implicates the animus doctrine may manifest itself in a more aggressive form -- specifically, a

'desire to harm a politically unpopular group.'"   760 F.3d at 1100 (Holmes, J.,

concurring)(quoting United States Dep't of Agric. v. Moreno, 413 U.S. at 534)(emphasis omitted).

Judge Holmes stated that, in determining if a law was enacted based on an unlawful animus, a

court should "explore challenged laws for signs that they are, as a *structural* matter, aberrational in

a way that advantages some and disadvantages others."   760 F.3d at 1100 (Holmes, J.,

concurring)(emphasis in original).   From Romer v. Evans and United States v. Windsor, Judge

Holmes identified two structural aberrations for which courts should look.   See 760 F.3d

at 1100-03 (Holmes, J., concurring).   "Two types of structural aberration are especially germane

here: (1) laws that impose wide-ranging and novel deprivations upon the disfavored group; and

(2) laws that stray from the historical territory of the lawmaking sovereign just to eliminate

privileges that a group would otherwise receive."   760 F.3d at 1100 (Holmes, J., concurring).   He

concluded that, once animus is detected, a court must invalidate the law.   See 760 F.3d at 1103.

> When a litigant presents a colorable claim of animus, the judicial inquiry searches
> for the foregoing clues.   What happens when the clues are all gathered and animus
> is detected?   The answer is simple: the law falls.   Remember that under
> rational-basis review, the most forgiving of equal-protection standards, a law must
> still have a legitimate purpose.   A legislative motive qualifying as animus is never
> a legitimate purpose.   In other words, once animus is detected, the inquiry is over:
> the law is unconstitutional.

760 F.3d at 1103 (Holmes, J., concurring)(citations omitted).

### 3.     Mora County Did Not Enact the Ordinance Based Solely on an Unlawful Animus.

Mora County did not enact the Ordinance based solely on an unlawful animus.   While

Judge Holmes' animus test may call for the Ordinance's invalidation, the Court is hesitant to apply

- 155 -

the animus doctrine in a case such as this one.   SWEPI, LP has not cited, and the Court has been

unable to find, any cases invalidating a law because of an unlawful animus toward the corporate

form.   In fact, it appears that, outside <u>United States Department of Agriculture v. Moreno</u> and <u>City</u>

<u>of Cleburne v. Cleburne Living Center</u>, the animus doctrine has been applied only in homosexual

rights cases.   The Court is hesitant to be the first to apply the doctrine in these circumstances.

Moreover, the Tenth Circuit has previously indicated that the animus doctrine applies only after a

court has determined that there is no conceivable purpose for passing a law other than an unlawful

animus.   <u>See</u> <u>Powers v. Harris</u>, 379 F.3d 1208, 1224 (10th Cir. 2004).   Mora County had a

conceivable purpose for enacting the Ordinance -- protecting its water supplies.   Because the

Court will not apply the animus doctrine in a novel manner, and because Mora County had a

non-animus based reason for enacting the Ordinance, the Court will not apply the animus doctrine.

Under Judge Holmes' articulation of the animus doctrine, however, the Ordinance should

be invalidated.   Judge Holmes identified two structural aberrations for which a court should

search in detecting an unlawful animus: (i) the law imposes a "wide-ranging and novel

deprivations upon the disfavored group"; and (ii) the law strays "from the historical territory of the

lawmaking sovereign just to eliminate privileges that a group would otherwise receive."   <u>Bishop</u>

<u>v. Smith</u>, 760 F.3d at 1100 (Holmes, J., concurring).   Both structural aberrations are present here.

First, the Ordinance imposes "wide-ranging and novel deprivations upon [a] disfavored

group": corporations.   <u>Bishop v. Smith</u>, 760 F.3d at 1100 (Holmes, J., concurring).   The

Ordinance states that corporations may not engage in the extraction of hydrocarbons in Mora

County.   <u>See</u> Ordinance § 5.1, at 4.   It states that corporations may not extract water from Mora

County to be used for hydrocarbon extraction and that corporations may not import into Mora

County any substance to be used for hydrocarbon extraction.   <u>See</u> Ordinance § 5.2, at 4.   The

Ordinance provides that corporations, and those associated with corporations -- directors, officers, owners, and managers -- cannot store any byproducts from hydrocarbon extraction in Mora County, and that they cannot construct or maintain infrastructure in Mora County that is related to hydrocarbon extraction.  See Ordinance §§ 5.3, 5.4, at 4.  Finally, the Ordinance states that corporations in violation of, or seeking to violate, the Ordinance do not have rights under the First Amendment, the Fifth Amendment, the Commerce Clause, the Contract Clause, or similar rights under the New Mexico Constitution.  See Ordinance § 5.5, at 4.  The Ordinance thus deprives corporations of a wide range of rights.

Second, the Ordinance strays from the historical territory of county lawmaking just to deprive corporations of their rights.   Regulating oil-and-gas production is not within the purview of traditional county powers.   In New Mexico, oil-and-gas regulations have traditionally been left to the state and to the Oil and Gas Commission.   See N.M. Att'y Gen. Op. 86-2, 1986 WL 220334 (opining that counties cannot regulate oil-and-gas production).   Furthermore, the Ordinance states which federal laws apply and how federal laws are to apply.   See Ordinance §§ 5.5-5.9, at 4-5.   Historically, a county cannot enact or supersede federal law.   The Ordinance thus goes beyond Mora County's historical lawmaking just to deprive corporations of their rights.

Also, on a more basic level, the animus toward corporations is evident.  See Ordinance Introduction, at 1 ("We believe that industrial use of water supplies in this county placing the control of water in the hands of a corporate few, rather than the county would constitute abuse and usurpation; and that we are therefore duty bound to oppose such abuse and usurpation."  (bold omitted)); id. at 1 ("An Ordinance protecting the right of human communities, nature, and natural water, . . . by eliminating legal privileges and powers from corporations violating the Ordinance." (bold omitted)(capitalization omitted)); id. § 4.5, at 3 ("[C]orporate entities and their directors and

managers shall not enjoy special privileges or powers under the law which make community majorities subordinate to them."). Once animus is detected, at all, and here that animus seems overwhelming, the Court must stop and invalidate the law. Under Judge Holmes' analysis, because the Ordinance contains animus, it must be invalidated. See Bishop v. Smith, 760 F.3d at 1103 (Holmes, J., concurring). The Court should not continue to see if the Ordinance has some other lawful purpose. According to Judge Holmes, "once animus is detected, the inquiry is over: the law is unconstitutional." Bishop v. Smith, 760 F.3d at 1103. The Court will refrain, however, from invalidating the Ordinance under this animus theory. Judge Holmes was writing by himself in a concurring opinion. Judge Lucero wrote the opinion of the court. As a concurring opinion, it does not bind the Court. See Alto Eldorado Partners v. City of Santa Fe, 664 F. Supp. 2d 1213, 1218 (D.N.M. 2009)(noting that the Court is not bound by a concurring opinion). No court has applied the animus doctrine in circumstances such as this case's and there are a number of considerations counseling against such an application.

Before United States v. Windsor, The Tenth Circuit noted, that, in Romer v. Evans and City of Cleburne v. Cleburne Living Center, the Supreme Court may have found that, "after considering all other conceivable purposes," the only conceivable state interest was "a bare desire to harm a politically unpopular group." Powers v. Harris, 379 F.3d at 1224 (internal quotation marks omitted)(alterations omitted). If, however, a court can "conceive[] of a legitimate state interest other than a bare desire to harm" a politically unpopular group, the animus doctrine does not apply. Powers v. Harris, 379 F.3d at 1224 (internal quotation marks omitted). While the Tenth Circuit made these assertions before United States v. Windsor, United States v. Windsor should not change the rationale. Only Judge Holmes has interpreted United States v. Windsor as being based on an animus theory. The Tenth Circuit has interpreted United States v. Windsor in

only two cases: <u>Bishop v. Smith</u> and <u>Kitchen v. Herbert</u>, 755 F.3d 1193 (10th Cir. 2014).   In

<u>Kitchen v. Herbert</u>, the Tenth Circuit held, in an opinion that Judge Lucero wrote and Judge

Holmes joined, that <u>United States v. Windsor</u> indicates that there is a fundamental right to marry.

<u>See</u> 755 F.3d at 1213.   In his dissenting opinion in <u>Kitchen v. Herbert</u>, the Honorable Paul J.

Kelly, Jr., United States Circuit Judge for the Tenth Circuit, interpreted <u>United States v. Windsor</u>

as recognizing that the states, and not the federal government, have the authority to define

marriage.   <u>See</u> 755 F.3d at 1235-36 (Kelly, J., dissenting).   Accordingly, the three Tenth Circuit

judges to consider <u>United States v. Windsor</u> have each interpreted it differently.[33]   The Court

cannot, based on these conflicting interpretations, conclude that <u>United States v. Windsor</u>

fundamentally changed the Supreme Court's animus jurisprudence given that the Tenth Circuit

stated, in <u>Powers v. Harris</u>, that the animus doctrine applies only after a court concludes that there

are no other conceivable purposes for the law.[34]   <u>See</u> <u>Powers v. Harris</u>, 379 F.3d at 1224.

---

[33]Judges Lucero, Holmes, and Kelly sat on the panel for both <u>Kitchen v. Herbert</u> and <u>Bishop v. Smith</u>.

[34]Michael W. McConnell, former-United States Circuit Judge for the Tenth Circuit and current Stanford Law School Professor, has identified a number of problems that arise if the Supreme Court's holding in <u>United States v. Windsor</u> was grounded in the animus doctrine.

> There are three things wrong with this approach.   First, it is not factually true.   The Congress that passed DOMA in 1996 by a vote of 85-14 in the Senate and of 342-67 in the House of Representatives was not infested with hate-mongers.   Whether one agrees with DOMA or not, the law served the entirely rational purpose of ensuring that there would be uniform treatment of same-sex marriage for federal purposes, an outcome based on what was then the unanimous consensus of all fifty states.   Congress was merely preserving the status quo, and not "injuring" anyone.   President Obama himself claimed to oppose same-sex marriage until recent months.   He was not hateful then and benevolent now.   He simply changed his mind on a difficult social question.

> Second, the Court has repeatedly held that the constitutionality of statutes depends on their objective purpose and not on the subjective motivations of the legislators who vote for them.   Yet the Court did not trouble to engage with the rationales offered by the supporters of DOMA either in the legislative history, the

Because the Court has already concluded that the Defendants had a rational basis -- i.e. a conceivable purpose -- for enacting the Ordinance and applying its prohibitions only to corporations, the Court need not consider whether there may have been an anti-corporation animus involved in the Ordinance's enactment.

Additionally, the animus doctrine may only apply if the disadvantaged class "has a history of oppression and political powerlessness." Kitchen v. Herbert, 961 F. Supp. 2d 1181, 1208 (D. Utah 2013)(Shelby, J.). In City of Cleburne v. Cleburne Living Center, the Supreme Court noted that the mentally disabled had been subject to a "history of unfair and often grotesque mistreatment." 473 U.S. at 438 (internal quotation marks omitted). It may be argued that hippies, the mentally disabled, and homosexuals have been subject to a history of discrimination and oppression, but such a description cannot be said of corporations. For one, while corporations are persons for constitutional purposes, they still are not real human beings, deserving of respect and human dignity. Corporations are often the most powerful lobbyers in Washington, D.C., and in state capitals across the nation. Corporations are hardly politically powerless and have not suffered a history of oppression.

---

national debate, or the briefs. It simply dismissed contrary views as hateful. This is not constitutional analysis; it is adjudication by name-calling.

Third, judicial rhetoric of this sort does grave injury to the body politic. Fundamental to the equal respect necessary for a democratic republic is the ability to treat those with whom we disagree as acting in good faith. Disagreement is not the same thing as malice. Ordinarily we can count on the judiciary to model this respectful disagreement. In Windsor, however, the Court labeled at least half the population, including some of our most revered leaders and institutions, as motivated by a desire to injure and degrade some of their fellow citizens. This kind of talk will not help the nation come to peaceful resolution of this deep moral conflict.

Michael W. McConnell, 2013 Supreme Court Roundup: Telling a Tale of Two Courts, Firstthings.com (October 2013), http://www.firstthings.com/article/2013/10/2013-supreme-court-roundup.

In light of the uncertain contours of the animus doctrine, the Court declines to be the first to apply it in such a novel situation.   In Powers v. Harris, the Tenth Circuit declined to apply the animus doctrine, because the Supreme Court had not applied it in similar circumstances.   See 379 F.3d at 1224 ("Regardless, the [Supreme] Court itself has never applied Cleburne-style rational-basis review to economic issues.   Following the Court's lead, neither will we." (citations omitted)).   Following the Tenth Circuit's lead, the Court declines to extend the animus doctrine in a manner that the Supreme Court has not yet indicated it should be applied.[35]

---

[35]The animus doctrine has been heavily criticized.

> Scholars have tended to discount the doctrine.   Beyond uncertainty, there is strong criticism.   One critique is that the doctrine is analytically empty, a conclusion clothed in argument.   Another is that it calls for the kind of unprincipled judgment about subjective legislative motivation that has long been discredited in jurisprudence.   A third holds that slapping the animus label on a law is an attempt to hush debate about deeply contested moral and legal controversies.   On this view, it insults those who differ from the Court's majority, dismissing them as bigots -- a form of constitutional name-calling.   Perhaps animus doctrine is animus based.

Dale Carpenter, supra at 184-85.   The Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, has argued that that animus doctrine allows courts to invalidate laws without addressing the justifications for those laws.   See United States v. Windsor, 133 S. Ct. at 2707-08.

> However, even setting aside traditional moral disapproval of same-sex marriage (or indeed same-sex sex), there are many perfectly valid -- indeed, downright boring -- justifying rationales for this legislation.   Their existence ought to be the end of this case.   For they give the lie to the Court's conclusion that only those with hateful hearts could have voted "aye" on this Act.   And more importantly, they serve to make the contents of the legislators' hearts quite irrelevant: "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive."   United States v. O'Brien, 391 U.S. 367, 383, . . . (1968).   Or at least it was a familiar principle.   By holding to the contrary, the majority has declared open season on any law that (in the opinion of the law's opponents and any panel of like-minded federal judges) can be characterized as mean-spirited.

> The majority concludes that the only motive for this Act was the "bare desire to harm a politically unpopular group."   Bear in mind that the object of this condemnation is not the legislature of some once-Confederate Southern state

## VII.   THE ORDINANCE VIOLATES SWEPI, LP'S FIRST AMENDMENT RIGHTS.

The Ordinance violates SWEPI, LP's First Amendment Rights.   The Court has already invalidated § 5.5 under the Supremacy Clause.   Section 5.5 is doubly invalid, because it also violates the First Amendment.   Section 5.5 provides:

> Section 5.5:   Corporations in violation of the prohibitions enacted by this ordinance, or seeking to engage in activities prohibited by this ordinance, shall not have the rights of "persons" afforded by the United States and New Mexico Constitutions, nor shall those corporations be afforded rights under the 1st or 5th amendments to the United States Constitution or corresponding sections of the New Mexico Constitution, nor shall those corporations be afforded the protections of the commerce or contracts clauses within the United States Constitution or corresponding sections of the New Mexico Constitution.

Ordinance § 5.5, at 4.   Under the First Amendment overbreadth doctrine, a statute may be invalidated on its face if the overbreadth is substantial.   See Bd. of Airport Comm'rs v. Jews for Jesus, Inc., 482 U.S. at 574.   In Board of Airport Commissioners v. Jews for Jesus, Inc., the Supreme Court invalidated a resolution that banned all First Amendment activities in the central LAX terminal.   See 482 U.S. at 574.   The Supreme Court held that this ban was substantially

---

(familiar objects of the Court's scorn, see, e.g., Edwards v. Aguillard, 482 U.S. 578, . . . (1987)), but our respected coordinate branches, the Congress and Presidency of the United States.   Laying such a charge against them should require the most extraordinary evidence, and I would have thought that every attempt would be made to indulge a more anodyne explanation for the statute.   The majority does the opposite -- affirmatively concealing from the reader the arguments that exist in justification.   It makes only a passing mention of the "arguments put forward" by the Act's defenders, and does not even trouble to paraphrase or describe them.   I imagine that this is because it is harder to maintain the illusion of the Act's supporters as unhinged members of a wild-eyed lynch mob when one first describes their views as *they* see them.

United States v. Windsor, 133 S. Ct. at 2707-08 (citations omitted)(alterations omitted)(emphasis in original).   The Court shares these concerns about the unprincipled application of the animus doctrine and its departure from the Court's usual jurisprudence that it does not delve into the subjective intentions of a legislature -- if that is something a court can even judiciously do.   In any case, the Court is not inclined to extend this problematic doctrine without more explicit directive from a majority of the Tenth Circuit or from the Supreme Court itself.

overly broad, "because no conceivable governmental interest would justify such an absolute prohibition of speech." Bd. of Airport Comm'rs v. Jews for Jesus, Inc., 482 U.S. at 575.

Similarly, § 5.5 states that corporations that violate, or seek to violate, the Ordinance have no First Amendment Rights. See Ordinance § 5.5, at 4. "The [Supreme] Court has recognized that First Amendment protection extends to corporations." Citizens United v. Fed. Election Comm'n, 558 U.S. at 342. Section 5.5 purportedly strips them of these rights if they violate or seek to violate the Ordinance. "[N]o conceivable governmental interest would justify such an absolute prohibition of" First Amendment rights. Bd. of Airport Comm'rs v. Jews for Jesus, Inc., 482 U.S. at 575. Section 5.5 is substantially overly broad in its restriction on First Amendment rights. SWEPI, LP is currently exercising its First Amendment rights by filing suit to overturn the Ordinance -- i.e. seeking to violate the Ordinance. According to Section 5.5, because of SWEPI, LP's exercise of its First Amendment rights, it no longer has First Amendment rights. Such a law is illogical and cannot stand. Section 5.5 is overly broad in its restriction of First Amendment rights, and, as such, must be invalidated.

## VIII.   THE ORDINANCE VIOLATES STATE LAW AND MUST BE INVALIDATED.

The Ordinance violates state law and must be invalidated.[36]   SWEPI, LP brings two state-law claims.   First, SWEPI, LP argues that the Ordinance regulates activities on state owned

---

[36]Ordinarily, once the Court resolves all federal claims in a case, it will decline to exercise supplemental jurisdiction over any remaining state-law claims. See Salazar v. City of Albuquerque, No. CIV 10-0645, 2014 WL 6065603, at *50-51 (D.N.M. Oct. 27, 2014) (Browning, J.). Here, however, there are remaining federal claims. The Court has not resolved SWEPI, LP's substantive due-process claims, but has only decided that it cannot, without a more developed record, determine whether the Defendants had a rational basis in enacting the Ordinance. Additionally, SWEPI, LP did not move for judgment on the pleadings on its dormant commerce-clause claim. See Complaint ¶¶ 72-80, at 16-17. Moreover, the Court may have diversity jurisdiction, rather than supplemental, over SWEPI, LP's state-law claims.
    In Moor v. Alameda County, the Supreme Court held that, while a state and state agencies are not citizens of the state for diversity purposes, a county may be a citizen of a state for diversity purposes. See 411 U.S. at 718-20. There, the Supreme Court noted that California counties had

lands without statutory authority to do so.   See Complaint ¶¶ 103-107, at 20.   Second, it argues

that the Ordinance is preempted by state law.   See Complaint ¶¶ 108-120, at 21-23.   Both of

these arguments have merit.   The Defendants lack the authority to enforce zoning ordinances on

state lands.   Additionally, the Oil and Gas Act impliedly preempts the Defendants from

completely banning oil-and-gas production.

───────────────

sufficient independent status that they are not mere agents of the state of California.   See 411 U.S. at 718-20.   The Supreme Court noted that California counties are given corporate powers, can sue and be sued, are deemed local public entities, are liable for all judgments against them, are authorized to levy taxes, can sell and hold property, can contract for the construction and repair of structures, can provide public services, and are empowered to issue general obligation bonds.   See 411 U.S. at 718-20.   In the same way, New Mexico counties are granted "those powers necessary and proper to provide for the safety, preserve the health, promote the prosperity and improve the morals, order, comfort and convenience" of their residents.   N.M. Stat. Ann. § 4037-1.   In addition to a number of other powers, New Mexico counties can sue and be sued.   See N.M. Stat. Ann. § 4-46-1.   They can levy taxes.   See N.M. Stat. Ann. § 4-38-17.   Bernalillo County recently moved to increase its taxes.   See Dan McKay, County Commissioners Agree to Tax Increase, Albuquerque J. (Jan. 14, 2015, 2:28 p.m.), http://www.abqjournal.com/525733/news/bernalillo-county-moves-forward-with-tax-increases.html.   They can issue general revenue bonds.   See N.M. Stat. Ann. § 4-62-1.   If a county disapproves a person's monetary claim against the county, the person can appeal the decision to a New Mexico district court, rather than appealing to the State.   See N.M. Stat. Ann. § 4-45-5.   New Mexico counties can own property. See N.M. Stat. Ann. § 4-36-4.   Furthermore, New Mexico counties do not hold Eleventh Amendment immunity.   See Noland v. City of Albuquerque, No. CIV 08-0056 JB/LFG, 2009 WL 1292094, at *7 ("The County Defendants do not enjoy Eleventh Amendment immunity." (citing Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 401 (1979))). It thus appears that, under Moor v. Alameda County, New Mexico counties are not agents of the State.   See 411 U.S. at 718-20.   Consequently, New Mexico counties are citizens of New Mexico for diversity purposes.   See Moor v. Alameda Cnty., 411 U.S. at 721-22.   See also OneBeacon Am. Ins. v. San Juan Cnty., No. CIV 11-0991 JB/ACT, 2013 WL 5934351 (D.N.M. Oct. 4, 2013)(Browning, J.)(finding no diversity jurisdiction between New Mexico corporation and New Mexico county).   SWEPI, LP is a Delaware Limited Partnership with its principal place of business in Texas.   See Complaint ¶ 3, at 2.   Each of the Defendants is a citizen of New Mexico. See Complaint ¶¶ 8-12, at 3-4.   If SWEPI, LP were a corporation, the Court would have diversity jurisdiction over SWEPI, LP's claims.   See San Juan Basin Royalty Trust v. Burlington Res. Oil & Gas Co., 588 F. Supp. 2d 1274, 1275 (D.N.M. 2008)(Browning, J.)(noting that a corporation is citizen of the state of incorporation and the state in which it has its principle place of business). As a limited partnership, however, SWEPI, LP is a citizen of every state in which its partners are citizens.   See San Juan Basin Royalty Trust v. Burlington Res. Oil & Gas Co., 588 F. Supp. 2d at 1276.   Because the Court does not have sufficient information to determine the citizenship of each of SWEPI, LP's partners, the Court cannot say whether it has diversity jurisdiction over SWEPI, LP's state-law claims.   In any case, because federal claims remain, the Court will exercise supplemental jurisdiction over SWEPI, LP's state-law claims.

A.     THE DEFENDANTS CANNOT ENFORCE ZONING REGULATIONS ON
       STATE LANDS.

The Defendants cannot enforce zoning regulations on state lands.   That is not to say that

every county ordinance must contain an explicit exception stating that it does not apply on state

lands.   Rather, a county may not enforce its existing zoning ordinances to state lands.   Here, the

Ordinance does not state that it does not apply to state lands.   Such a statement is unnecessary.

The Defendants, however, have argued that it may be applied to state lands, because hydrocarbon

extraction on state lands may affect adjoining properties.   See Response at 18.   Such an assertion

is incorrect.

In City of Santa Fe v. Armijo, the Supreme Court of New Mexico held that the city of Santa

Fe could not enforce a local zoning ordinance on the premises of the State Land Office Building.

See 1981-NMSC-102, ¶ 1.   The Supreme Court of New Mexico held that municipalities have

only those powers which the State expressly confers on them and that the statute under which the

City of Santa Fe, New Mexico enacted the ordinance, did not give "express power to apply zoning

regulations to state land,' and, therefore, the city's ordinances "do not apply to state land."   City

of Santa Fe v. Armijo, 1981-NMSC-102, ¶¶ 3-4.   The Supreme Court of New Mexico went on to

hold that, if a State statute later authorized, validated, or extended a valid ordinance, the ordinance

may regulate state lands, if the ratifying statute provided that the ordinance could do so.   See

1981-NMSC-102, ¶¶ 6-8.   The State statute "must name or in some way identify the ordinance

which is intended to be validated or extended by ratification."   1981-NMSC-102, ¶ 8.   In that

case, however, no later statute validated the ordinance's application to state lands.

1981-NMSC-102, ¶ 8.

Two Court of Appeals of New Mexico Court cases have clarified that this doctrine from

City of Santa Fe v. Armijo does not apply only to activity by the State on state land, but also

applies to private conduct on state lands.   In City of Albuquerque v. Jackson Brothers, Inc., 1991-NMCA-140, 823 P.2d 949, the New Mexico State Highway and Transportation Department condemned a strip of land along Interstate-25 within the city limits of Albuquerque, New Mexico, to create a right of way.   See 1991-NMCA-140, ¶ 2.   In settling its condemnation lawsuit with the owner of the land, the Transportation Department agreed to allow the owner to maintain a sign on the right of way.   See 1991-NMCA-140, ¶ 2.   The owner's sign was partially within the Transportation Department's right of way, and the sign was fifty-five feet tall, despite a City of Albuquerque, New Mexico, ordinance limiting signs to twenty-six feet in that area.   See 1991-NMCA-140, ¶ 2.   The Court of Appeals held that the City of Albuquerque could not regulate the portion of the sign that was within the Transportation Department's right of way but could regulate the portion of the sign that was on the owner's private property.   See 1991-NMCA-140, ¶ 7.

In County of Santa Fe v. Milagro Wireless, LLC, a private company erected a cellular telephone tower on state land near Santa Fe.   See 2001-NMCA-070, ¶ 2.   The county of Santa Fe attempted to stop the construction of the tower, because it violated a county zoning ordinance. See 2001-NMCA-070, ¶ 2.   Santa Fe County filed suit, requesting a declaratory action to prevent the construction of the tower, by arguing that, even if a county cannot generally enforce zoning ordinances on state land, that prohibition applies to state action and not private action by a commercial entity on state land.   See 2001-NMCA-070, ¶¶ 2, 4.   The Court of Appeals of New Mexico, in an opinion that Judge Bustamante wrote, and Judges Alarid and Castillo joined, held that "county zoning ordinances cannot override the state's authority to regulate the use of its own land, whether the activity taking place on state land is pursued by the state or by a private entity with the state's approval."   2001-NMCA-070, ¶ 5.   The court concluded that the state statute

granting counties and municipalities the general authority to enact zoning ordinances did not

constitute an express delegation of authority for the county to enforce zoning ordinances on state

land.  See 2001-NMCA-070, ¶ 7 (citing N.M. Stat. Ann. § 3-21-1).

While the Court's task is to determine how the Supreme Court of New Mexico would

decide the issues, the Court concludes that these two Court of Appeals of New Mexico decisions

are good indications of how the Supreme Court would rule.[37]   They do not extend City of Santa Fe

v. Armijo much and are consistent with its language.

Here, the Defendants have not identified any state statute explicitly granting them the

authority to enforce zoning regulations on state land.   Instead, the Defendants argue that conduct

---

[37]Federal courts must determine what a state's Supreme Court would do if confronted with the same issue.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).   In Stoner v. New York Life Insurance Co., 311 U.S. 464 (1940), the Supreme Court explained that, "in cases where jurisdiction rests on diversity of citizenship, federal courts, under the doctrine of Erie Railroad Co. v. Tompkins . . . must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently."   311 U.S. at 467. "In particular, this is true where the intermediate state court has determined the precise question in issue in an earlier suit between the same parties, and the highest court of the state has refused review."   Stoner v. N.Y. Life Insurance Co., 311 U.S. at 467.   See Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins. Co., 891 F.2d 772, 774 (10th Cir. 1989)("With respect to issues which the Colorado Supreme Court has not addressed, we may consider all available resources, including Colorado appellate court decisions, other state and federal decisions, and the general trend of authority, to determine how the Colorado Supreme Court would construe the law in this case."). As the Tenth Circuit explained in Wade v. Emcasco Insurance Co., 483 F.3d 657 (10th Cir. 2007):

> In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law . . . . The federal court must follow the most recent decisions of the state's highest court . . . . Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do . . . .   In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state . . . . appellate decisions in other states with similar legal principles . . . . district court decisions interpreting the law of the state in question, . . . and the general weight and trend of authority in the relevant area of law. . . . Ultimately, however, the Court's task is to predict what the state supreme court would do.   Our review of the district court's interpretation of state law is de novo.

483 F.3d at 665-66 (citations omitted)(internal quotation marks omitted).

on state lands may affect adjoining county lands; specifically, hydrocarbon extraction on state lands may affect the water on the adjoining land.   See Tr. at 146:10-22 (Haas).   The effect that conduct on state lands may have on adjoining lands is not a factor that New Mexico courts have considered.   In City of Santa Fe v. Armijo, the Land Commissioner sought to place an oil field pumping rig on the premises of the State Land Office Building.   See 1981-NMSC-102, ¶ 1.   In addition to the City of Santa Fe, several private neighborhood associations also sought to prevent the Land Commissioner from placing the oil rig on the state land.   See 1981-NMSC-102, ¶ 1. The existence of an oil field pumping rig would certainly affect the aesthetics of the surrounding neighborhoods.   The Supreme Court of New Mexico did not, however, focus on the effect that the Land Commissioner's actions may have on the surrounding neighborhoods.   It focused solely on the City of Santa Fe's statutory authority to enforce the ordinance on state land.   See City of Santa Fe v. Armijo, 1981-NMSC-102, ¶ 5.   Similarly, in City of Albuquerque v. Jackson Brothers, Inc., the Court of Appeals of New Mexico did not consider the effect that the sign's height may have on surrounding properties or on vehicular traffic on I-25.   And in County of Santa Fe v. Milagro Wireless, LLC, Judge Bustamante did not consider the effect that the cellular telephone tower would have on surrounding properties.   All three courts focused exclusively on a city's or county's statutorily granted authority to enforce its ordinances on state lands.

The Defendants lack statutory authority to enforce the Ordinance on state lands.   While the Defendants have general zoning authority, see N.M. Stat. Ann. § 3-21-1, this general authority is not an express grant of authority to enforce zoning ordinances on state lands, see County of Santa Fe v. Milagro Wireless, LLC, 2001-NMCA-070, ¶ 7.   And despite the Ordinance going into effect on April 29, 2013, the New Mexico Legislature has not, by statute, validated or authorized

the Ordinance.   Without an express grant of authority, the Ordinance cannot be enforced on state lands.[38]

Because the Ordinance cannot be enforced on state lands, the question is whether the Ordinance should be invalidated merely because it lacks a provision stating that it does not apply to state lands or whether the Court should enjoin the Defendants from enforcing the Ordinance on state lands.   In City of Santa Fe v. Armijo, City of Albuquerque v. Jackson Brothers, Inc., and County of Santa Fe v. Milagro Wireless, LLC, the courts were considering challenges to conduct on state land, and not challenges to city or county ordinances.   Thus, they provide little guidance. In the Complaint, SWEPI, LP requests "a declaration that the Ordinance violates New Mexico law because it seeks, without an express delegation of authority, to regulate lands owned by the States, as well as a permanent injunction prohibiting Defendants from enforcing the statute as written." Complaint ¶ 107, at 20.   New Mexico law concerning the enforcement of county and municipal zoning ordinances on federal land is instructive.   "A county or municipality may zone federally-owned lands, but may not enforce the adopted zoning ordinances on federal land absent consent from the United States."   Bonito Land & Livestock, Inc. v. Valencia Cnty. Bd. of

---

[38]At least one author, in considering municipal and county fracking regulations in New Mexico, has reached the same conclusion in considering the ability of New Mexico counties and municipalities to regulate fracking.

> A local law regulating fracking would not necessarily apply to all land within the community's borders because community land use regulations in New Mexico apply differently to public and private landowners.   Privately owned land is subject to local land use laws.   However, such ordinances may be ineffective on publically owned land.   Land owned by the State of New Mexico is not subject to local land use ordinances.   Activity on state land, whether by a public or private entity, is not subject to local zoning regulations.

Jonas Armstrong, What the Frack Can We Do?  Suggestions for Local Regulation of Hydraulic Fracturing in New Mexico, 53 Nat. Resources J. 357, 369 (2013)(concluding that the oil-and-gas field is not completely preempted by state law, but noting that a complete ban on fracking may not be upheld).

Comm'rs, 1998-NMCA-127, ¶ 8, 964 P.2d 199, 200.   It is not the zoning of the state land that violates the state law, but the enforcement of the zoning ordinance that violates the state law. Similarly, it is not a violation of New Mexico law for the Ordinance to not provide an exception for state lands, but it would be a violation for the Defendants to enforce the Ordinance on state lands. Accordingly, invalidation of the Ordinance is not warranted; however, the Court will enjoin the Defendants from enforcing the Ordinance on state lands.[39]

**B      STATE LAW PREEMPTS THE ORDINANCE.**

New Mexico state law impliedly preempts the Ordinance, because it conflicts with state law.   State law may either expressly or impliedly preempt a county ordinance.   See San Pedro Mining Corp. v. Bd. of Cnty. Comm'rs, 1996-NMCA-002, ¶ 9, 909 P.2d 754, 758.   To expressly preempt local laws, the State "legislature must clearly state its intention to do so."   Rancho Lobo, LTD v. Devargas, 303 F.3d at 1201.   There are two doctrines under which state law may impliedly preempt a local law: (i) field preemption; and (ii) conflict preemption.   See San Pedro Mining Corp. v. Bd. of Cnty. Comm'rs, 1996-NMCA-002, ¶ 11.   Field preemption occurs when "it is evident from the language of the New Mexico law at issue that the legislature 'clearly intended to preempt a governmental area.'"   Rancho Lobo, LTD v. Devargas, 303 F.3d at 1204 (quoting Casuse v. City of Gallup, 1987-NMSC-112, ¶ 6, 746 P.2d 1103, 1105).   Conflict preemption examines "whether the ordinance permits an act the general law prohibits, or prohibits an act the general law permits."   Rancho Lobo, LTD v. Devargas, 303 F.3d at 1205 (citing Inc. Cnty. of Los Alamos v. Montoya, 1989-NMCA-004, ¶ 16 ("Rather, the tests are whether the stricter requirements of the ordinance conflict with state law, and whether the ordinance permits an act the general law prohibits, or prohibits an act the general law permits.")).   Merely requiring

---

[39]While the Court is willing to issue a permanent injunction, enjoining the Defendants from enforcing the Ordinance on state lands, because the Court will invalidate the Ordinance, in its entirety, such an injunction would be moot.

greater restrictions than state law, however, does not necessarily make the ordinance invalid.   See

Inc. Cnty. of Los Alamos v. Montoya, 1989-NMCA-004, ¶ 16.   SWEPI, LP argues that state law

impliedly preempts the Ordinance through either field or conflict preemption.   State law does not

entirely preempt the oil-and-gas field.   The Ordinance conflicts, however, with state law and is,

thus, invalid because of conflict preemption.

### 1.   New Mexico State Law Does Not Impliedly Preempt the Entire Oil-And-Gas Field.

New Mexico state law does not impliedly preempt the entire oil-and-gas field.   SWEPI,

LP directs the Court to a 1986 New Mexico Attorney General advisory letter in which the Attorney

General opined that the entire field of oil-and-gas regulation was occupied by the State -- i.e. the

State of New Mexico impliedly preempted the entire oil-and-gas field.   See Motion at 20 (citing

N.M. Att'y Gen. Op. 86-2, 1986 WL 220334).    However, "Attorney General opinions and

advisory letters do not have the force of law."   United States v. Reese, 2014-NMSC-013, ¶ 36,

326 P.3d 454, 462.   Moreover, the advisory letter is almost thirty years old, and there has been

intervening case law that indicates that field preemption does not apply.[40]

In the advisory letter, the Attorney General's Office, through Assistant Attorney General

Barbara G. Stephenson, considered whether the County of Santa Fe could regulate oil-and-gas

operations.   See N.M. Att'y Gen. Op. 86-2, 1986 WL 220334, at *1.   Ms. Stephenson opined that

---

[40]Several additional concerns caution against relying on the advisory letter.  First, the letter appears to be an informal "advisory letter" rather than a formal Attorney General Opinion. During his time in office, New Mexico Attorney General, Paul Bardacke, the Attorney General in 1986, issued very few formal Attorney General Opinions.   See Hal Stratton & Paul Farley, Office of the Attorney General State of New Mexico: History, Powers & Responsibilities 1846-1990 119 (1990)(showing that, in 1986, less than five Official Attorney General Opinions were issued while over seventy-five were issued in 1987, after Mr. Bardacke left office).   Second, and related to the first, Mr. Bardacke did not sign the 1986 advisory letter.   See N.M. Att'y Gen. Op. 86-2, 1986 WL 220334, at *1.   Assistant Attorney General Barbara G. Stephenson signed it.   See N.M. Att'y Gen. Op. 86-2, 1986 WL 220334, at *3.   The lack of the New Mexico Attorney General's signature on the letter cautions against giving too much weight to the letter.

it could not regulate oil-and-gas operations, because the county regulations conflicted with Oil Conservation Division regulations, and because "the county is preempted from adopting zoning regulations relating to oil and gas production." N.M. Att'y Gen. Op. 86-2, 1986 WL 220334, at *1. Specifically, Ms. Stephenson opined that "[t]he legislature has vested" the regulation of oil-and-gas production with the Oil Conservation Division "with the intention that the state agency occupy the entire field of regulation." N.M. Att'y Gen. Op. 86-2, 1986 WL 220334, at *1. Ms. Stephenson noted that the county has only those powers that the Legislature provides, and that the county's zoning authority is subject to statutory or constitutional limitations. See N.M. Att'y Gen. Op. 86-2, 1986 WL 220334, at *2. Ms. Stephenson opined that one such limitation comes from Section 70-2-36 of the New Mexico Statutes Annotated. See N.M. Att'y Gen. Op. 86-2, 1986 WL 220334, at *2.

> A.   The [Oil Conservation Division] shall have, and is hereby given, jurisdiction and authority over all matters relating to the conservation of oil and gas and the prevention of waste of potash as a result of oil and gas operations in this state. It shall have jurisdiction, authority and control of and over all persons, matters or things necessary or proper to enforce effectively the provisions of this act or any other law of this state relating to the conservation of oil and gas and the prevention of waste of potash as a result of oil and gas operations.

N.M. Att'y Gen. Op. 86-2, 1986 WL 220334, at *2 (quoting N.M. Stat. Ann. § 70-2-36)(emphasis in N.M. Att'y Gen. Op. 86-2 but not in source). Based on this statute, Ms. Stephenson concluded that the Oil Conservation Division, "therefore, occupies the entire area of oil and gas regulation and a county cannot, by ordinance, attempt to regulate this area." N.M. Att'y Gen. Op. 86-2, 1986 WL 220334, at *2. The Attorney General discussed cases from Washington, Missouri, and Alaska in which the courts found that the state law preempted the areas of prison construction, location of intercity electric transmission lines, subdivisions, and mobile home construction standards. See N.M. Att'y Gen. Op. 86-2, 1986 WL 220334, at *2 (citing Snohomish Cnty. v.

State of Washington, 648 P.2d 430 (Wash. 1982)(en banc)(prison location); Union Elec. Co. v. City of Crestwood, 562 S.W.2d 344 (Mo. 1978)(en banc)(location of intercity electric transmission lines); Kenai Peninsula Borough v. Kenai Peninsula Bd. of Realtors, Inc., 652 P.2d 471 (Alaska 1982)(subdivisions); Snohomish Cnty. v. Thompson, 577 P.2d 627 (Wash. Ct. App. 1978)). Additionally, Ms. Stephenson opined that the county ordinance was further invalid, because it "applies requirements to oil and gas production beyond those imposed by OCD and thus prohibits, that which OCD permits." N.M. Att'y Gen. Op. 86-2, 1986 WL 220334, at *3. Finally, Ms. Stephenson concluded that "[c]oncurrent jurisdiction does not appear possible." N.M. Att'y Gen. Op. 86-2, 1986 WL 220334, at *3.

Since the Attorney General's Office issued the advisory letter, New Mexico courts and the Tenth Circuit have reined in New Mexico's field-preemption doctrine. In San Pedro Mining Corp. v. Board of County Commissioners, the Court of Appeals of New Mexico considered whether the New Mexico Mining Act, N.M. Stat. Ann. §§ 69-36-1 through 69-36-20, preempts a county's ability to regulate mining activity within its jurisdiction. See 1996-NMCA-002, ¶ 4. The Court of Appeals of New Mexico first concluded that the Mining Act does not expressly preempt local mining ordinances. See 1996-NMCA-002, ¶ 10. Concerning implied field preemption, the Court of Appeals of New Mexico noted that the Mining Act's, and subsequent regulations', primary focus is on "the minimization of damage to the land being mined." 1996-NMCA-002, ¶ 12. The Court of Appeals of New Mexico noted, however, that

> neither the Act nor the regulations contain any mention of development issues with which local governments are traditionally concerned, such as traffic congestion, increased noise, possible nuisance created by blasting or fugitive dust, compatibility of mining use with the use made of surrounding land, appropriate distribution of land use and development, and the effect of the mining activity on surrounding property values.

1996-NMCA-002, ¶ 12.   The Court of Appeals of New Mexico concluded that, "[t]herefore, there is room for concurrent jurisdiction and regulation, with the County's ordinance regulating aspects of the mining activity that concern off-site safety, compatibility with surrounding property uses, and other matters left unaddressed by the Act and regulations."   1996-NMCA-002, ¶ 12. Because there was room for concurrent regulation between a county and the Mining Act, the Court of Appeals of New Mexico held that the Mining Act and subsequent regulations do not completely preempt the mining field.   See 1996-NMCA-002, ¶ 14.   The Court of Appeals of New Mexico noted that portions of Santa Fe County's ordinance may conflict with the Mining Act, and thus be preempted under conflict preemption, but, because the plaintiff argued only that the ordinance, as a whole, was preempted, the court did not consider which individual provisions might be preempted through conflict preemption.   See 1996-NMCA-002, ¶ 13.

In Rancho Lobo, LTD v. Devargas, the Tenth Circuit considered whether the New Mexico Forest Conservation Act, N.M. Stat. Ann. §§ 68-2-1 through 68-2-34, preempted a New Mexico county's "Timber Harvest Ordinance."   See 303 F.3d at 1197.   The Tenth Circuit, in an opinion that the Honorable Mary B. Briscoe, United States Circuit Judge for the Tenth Circuit, authored, and Judges Ebel and McKay joined, held that the Conservation Act did not preempt the ordinance. See 303 F.3d at 1207.   The Tenth Circuit noted that there was some support for the argument that the Conservation Act impliedly preempted the entire field; specifically, the Conservation Act created the Forestry Division and granted it with sweeping powers to make rules and regulations concerning timber harvests, and the Forestry Division's regulations were comprehensive.   See 303 F.3d at 1204.   The Tenth Circuit concluded, however, that the Conservation Act was "very similar" to the Mining Act in San Pedro Mining Corp. v. Board of County Commissioners.   303 F.3d at 1204.   Both acts, it noted, "did not really address the kinds of development issues 'with

which local governments are traditionally concerned.'" 303 F.3d at 1204 (quoting San Pedro

Mining Corp. v. Bd. of Cnty. Comm'rs, 1996-NMCA-002, ¶ 12). Specifically, the Tenth Circuit

stated that the "Conservation Act's primary focus is the minimization of damage to the permitted

land," while

> the main focus of the Timber Harvest Ordinance is on local issues, such as the
> amelioration of damage to the surrounding property as the result of timber
> harvesting, including issues such as the effect of the timber harvest on economic
> development and local employment, water quality and availability, soil protection,
> archeological, historic and cultural resources, abatement of noise, dust, smoke and
> traffic, hours of operation, compatibility with adjacent land uses, cumulative effect
> when combined with existing harvests.

Rancho Lobo, LTD v. Devargas, 303 F.3d at 1204-05. The Tenth Circuit concluded that, because

the Conservation Act "left room for concurrent jurisdiction over local forestry issues," the

Conservation Act does not impliedly preempt "the entire field of regulation relating to timber

harvesting in New Mexico." 303 F.3d at 1205. As for conflict preemption, the plaintiff argued,

and the district court concluded, that, because the Conservation Act permits clear cutting[41] but the

county ordinance prohibits it, the ordinance conflicts with state law. See 303 F.3d at 1205. The

Tenth Circuit, however, held that, because the Conservation Act did not create a right to clear

cutting or state that clear cutting is permitted, the ordinance's prohibition did not conflict with

Conservation Act. See 303 F.3d at 1205.

The Oil and Gas Act is focused primarily on the prevention of waste and the drilling and

maintenance of oil-and-gas wells. The Oil and Gas Act prohibits the production or handling of oil

and gas in a manner that constitutes or results in waste. See N.M. Stat. Ann. § 70-2-2. Waste is

interpreted with its ordinary meaning, and the Oil and Gas Act also provides a number of specific

examples that can be summed up as the inefficient, excessive, or improper use of oil and gas. See

---

[41]"Clearcutting, clearfelling, or clearcut logging is a forestry/logging practice in which
most or all trees in an area are uniformly cut down." Clearcutting, Wikipedia.org, http://
en.wikipedia.org/wiki/Clearcutting (last visited Jan. 14, 2014).

N.M. Stat. Ann. § 70-2-3.   The Oil and Gas Act provides the Oil Conservation Division with a number of powers concerning the regulation of drilling for, and producing, oil and gas.   See N.M. Stat. Ann. § 70-2-12.   The Oil and Gas Act, however, does not address "the kinds of . . . issues 'with which local governments are traditionally concerned.'"   Rancho Lobo, LTD v. Devargas, 303 F.3d at 1204 (quoting San Pedro Mining Corp. v. Bd. of Cnty. Comm'rs, 1996-NMCA-002, ¶ 12).   The Oil and Gas Act does not address issues such as traffic that oil-and-gas production creates; noise limitations for production near residential areas; potential nuisance issues from sound, dust, or chemical run-off; or the impact of oil-and gas production on neighboring properties.[42]   There is thus "room for concurrent regulation" by Mora County.   Rancho Lobo, LTD v. Devargas, 303 F.3d at 1200.   Because there is room for concurrent regulation, State law does not preempt the entire oil-and-gas field.   See Rancho Lobo, LTD v. Devargas, 303 F.3d at 1204-05; San Pedro Mining Corp. v. Bd. of Cnty. Comm'rs, 1996-NMCA-002, ¶ 12.

In the 1986 advisory letter, Assistant Attorney General Stephenson focused on the Oil Conservation Division's authority and jurisdiction in concluding that the Oil and Gas Act preempted the entire oil-and-gas field.   See N.M. Att'y Gen. Op. 86-2, 1986 WL 220334, at *2. That the Legislature has authorized the Oil Conservation Commission to pass regulations and has passed extensive regulations does not change the conclusion that there is no field preemption. Both the Mining Act and the Conservation Act created state agencies with the authority to enact extensive regulations.   See N.M. Stat. Ann. § 69-36-6 (creating the Mining Commission); N.M. Stat. Ann. § 69-36-7 (providing the Mining Commission with authority to enact regulations); N.M. Stat. Ann. § 68-2-16 (noting that the Forestry Division has the authority to enforce and enact rules

[42]The Surface Owners Protection Act, N.M. Stat. Ann. §§ 70-12-1 through 70-12-10, provides protections to surface owners, but the definition of "surface owner" is limited to the "person who holds legal or equitable title . . . to the surface of the real property on which the operator has the legal right to conduct oil and gas operations."   N.M. Stat. Ann. § 70-12-3(D). Consequently, it does not apply to neighboring properties.

and regulations).   The existence of a state agency with regulatory authority, however, did not lead

the Tenth Circuit or the Court of Appeals of New Mexico to conclude that the Mining Act or the

Conservation Act preempted their respective fields.   See Rancho Lobo, LTD v. Devargas, 303

F.3d at 1204-05; San Pedro Mining Corp. v. Bd. of Cnty. Comm'rs, 1996-NMCA-002, ¶ 12.

Similarly, the existence of the Oil Conservation Division, and its abilities to enact and enforce

regulations, does not cause the Oil and Gas Act to preempt the entire oil-and-gas field.   Instead,

the correct question to ask is whether the Oil and Gas Act left room for concurrent jurisdiction with

local governments.   See Rancho Lobo, LTD v. Devargas, 303 F.3d at 1205.   To answer this

question, the Court must examine whether the Oil and Gas Act addresses the issues with which

local governments are traditionally concerned.[43]   See Rancho Lobo, LTD v. Devargas, 303 F.3d

at 1204.   As the Court has already concluded, it does not address with which local governments

are traditionally concerned.   There is thus room for concurrent jurisdiction with local

---

[43]The statutory provision, on which the Ms. Stephenson relied, gives further evidence that there is no field preemption.   That provision states:

> The [Oil Conservation Division] shall have, and is hereby given, jurisdiction and authority over all matters relating to the conservation of oil and gas and the prevention of waste of potash as a result of oil or gas operations in this state.   It shall have jurisdiction, authority and control of and over all persons, matters or things necessary or proper to enforce effectively the provisions of this act or any other law of this state relating to the conservation of oil or gas and the prevention of waste of potash as a result of oil or gas operations.

N.M. Stat. Ann. § 70-2-6.   Ms. Stephenson focused on the language that says the Oil and Gas Division has "jurisdiction and authority over all matters," and over "all persons, matters or things necessary or proper to enforce effectively the provisions of this act."   N.M. Att'y Gen. Op. 86-2, 1986 WL 220334, at *2 (quoting N.M. Stat. Ann. § 70-2-6)(emphasis omitted).   The rest of the statutory provision, however, indicates that there is no field preemption.   The statute states that the Oil Conservation Division has jurisdiction and authority over "matters relating to the conservation of oil and gas and the prevention of potash as a result of oil and gas operations." N.M. Stat. Ann. § 70-2-6.   This provision, thus, bolsters the argument that the Oil and Gas Act is focused on the prevention of waste and conservation of oil and gas, and not on matters in which local governments are traditionally concerned.   See Rancho Lobo, LTD v. Devargas, 303 F.3d at 1204.

governments.  Because of this room for concurrent jurisdiction, the Oil and Gas Act does not completely preempt the field of oil-and-gas production despite Assistant Attorney General Stephenson's contrary conclusion in her advisory letter.  Professor Alex Ritchie of the University of New Mexico School of Law, who teaches oil-and-gas law at the Law School, has reached a similar conclusion concerning Ms. Stephenson's advisory letter: "Finally, the New Mexico Attorney General's office authored an opinion in 1986 concluding that county regulation was preempted by the Oil and Gas Act.  The opinion has little analysis and predates more current judicial precedent that trends towards concurrent jurisdiction."  Alex Ritchie, <u>On Local Fracking Bans: Policy and Preemption in New Mexico</u>, 54 Nat. Resources J. 255, 317 n.349 (2014). Accordingly, the Ordinance is not invalidated under the field preemption doctrine.

## 2.    The Ordinance Conflicts With State Law.

The Ordinance conflicts with New Mexico state law and must be invalidated.  The Supreme Court of New Mexico first articulated the conflict preemption test in <u>State ex rel. Coffin v. McCall</u>, 1954-NMSC-076, 273 P.2d 642, where it stated that "the test is whether the ordinance permits an act the general law prohibits, or vice versa."  1954-NMSC-076, ¶ 9.  "[G]eneral law" means "a law that applies generally throughout the state, or is of statewide concern as contrasted to local or municipal law."  <u>Apodaca v. Wilson</u>, 1974-NMSC-071, ¶ 16, 525 P.2d 876, 881.  The Supreme Court of New Mexico later clarified that "'an ordinance will conflict with state law when state law specifically allows certain activities or is of such a character that local prohibitions on those activities would be inconsistent with or antagonistic to that state law or policy.'"  <u>Stennis v. City of Santa Fe</u>, 2008-NMSC-008, ¶ 21, 326, 176 P.3d 309, 315 (quoting <u>New Mexicans for Free Enter. v. City of Santa Fe</u>, 2006-NMCA-007, ¶ 43, 126 P.3d 1149, 1166).  If a county or municipal law conflicts with state law, it must be invalidated.  See <u>Bd. of Comm'rs of Rio Arriba</u>

Cnty. v. Greacen, 2000-NMSC-016, ¶ 17 (invalidating provisions of county ordinance that conflicted with state law).   However, "an ordinance is not necessarily invalid because it provides for greater restrictions than state law."   Rancho Lobo, LTD v. Devargas, 303 F.3d at 1205.

By banning hydrocarbon exploration-and-extraction activities, the Ordinance is antagonistic to state law, because it prohibits activities that New Mexico state law permits.   New Mexico courts have generally applied the conflict preemption doctrine when local laws permit conduct that state law prohibits.   For example, in Board of Commissioners of Rio Arriba County v. Greacen, the Supreme Court of New Mexico held that a county ordinance, which imposed penalties for driving under the influence ("DUI") that were more severe than penalties that a state statute expressly limited, conflicted with state law.   2000-NMSC-016, ¶ 18.   Additionally, in Protection and Advocacy System v. City of Albuquerque, 2008-NMCA-149, 195 P.3d 1, the Court of Appeals of New Mexico held that a city ordinance, which permitted a court to order an individual to take medication, conflicted with a state law that prohibited forced medications.   See 2008-NMCA-149, ¶¶ 58-59.

The Court has been unable to find, and the parties have not cited, any case in which a New Mexico court found conflict preemption based on a local ordinance prohibiting conduct that state law permits.   The Court, however, has been unable to find a New Mexico case in which a court considered an ordinance as extreme as this one.[44]   If the Supreme Court of New Mexico's words that "an ordinance will conflict with state law when state law specifically allows certain activities or is of such a character that local prohibitions on those activities would be inconsistent with or

---

[44]Other states' courts that have considered local bans on oil-and-gas extraction activities have reached differing conclusions.   Compare Clouser v. City of Norman, 393 P.2d 827 (Okla. 1964)(holding that municipality could not ban all oil-and-gas drilling), and Voss v. Lundvall Bros., Inc., 830 P.2d 1061 (Colo. 1992)(en banc)(holding that Colorado state law preempted municipal ordinance banning oil-and-gas drilling), with Norse Energy Corp. USA v. Town of Dryden, 964 N.Y.S. 2d 714 (N.Y. App. Div. 2013)(holding that New York state law did not preempt municipal ordinance banning hydrocarbon extraction activities).

antagonistic to that state law or policy" have any meaning, Stennis v. City of Santa Fe, ¶ 21 (citation omitted)(internal quotation marks omitted), they must mean that a county cannot outright ban an activity that is highly regulated by that State and of which the State impliedly encourages. Most ordinances that New Mexico courts have upheld are merely more restrictive than state law without banning an entire area of conduct that is permitted by state law.   They concern regulating the drilling and location of water wells, see Stennis v. City of Santa Fe, 2008-NMSC-008, ¶ 22; stricter punishments and increased enforcement of DUI offenses, see Inc. Cnty. of Los Alamos v. Montoya, 1989-NMCA-004, ¶ 14-16; higher minimum wage requirements, see New Mexicans for Free Enter. v. City of Santa Fe, 2006-NMCA-007, ¶ 43; and stricter timber harvesting regulations, see Rancho Lobo, LTD v. Devargas, 303 F.3d at 1205.   No court has considered a ban on an activity that that State heavily regulates.   Rather, each case concerns an ordinance affecting an area on which state law is silent.   See New Mexicans for Free Enter. v. City of Santa Fe, 2006-NMCA-007, ¶ 41 ("For example, where state law is silent on smoking in public places, that silence likely would not be deemed permission by state law such that a municipality could never restrict smoking in public places.").   For instance, state law is silent on whether a person may engage in clear cutting, and, thus, a county may ban it, even if the state has other regulations concerning timber harvesting.   See Rancho Lobo, LTD v. Devargas, 303 F.3d at 1205. Additionally, while state law may require businesses to pay their employees a specific minimum wage, it does not explicitly permit businesses to pay employees that amount; state law only prohibits businesses from paying less than the minimum wage -- i.e. state law is silent on whether businesses can pay at or just above minimum wage.   See New Mexicans For Free Enter. v. City of Santa Fe, 2006-NMCA-007, ¶ 43.

State law is not silent on the exploration and extraction of hydrocarbons.   The State has created an extensive statutory and regulatory scheme to regulate oil-and-gas production.   See generally N.M. Stat. Ann. § 70-2-1.   By extensively regulating oil-and-gas production in a manner that is intended to prevent waste, see N.M. Stat. Ann. § 70-2-2, the State has indicated that oil-and-gas extraction is permitted.   This focus on preventing waste also highlights the Oil and Gas Act's focus on the efficient production of oil and gas.   Furthermore, if state law did not permit oil-and-gas production, the State would not so heavily regulate oil-and-gas production.   A complete ban on oil-and-gas extraction would be "antagonistic" to state law.   Stennis v. City of Santa Fe, 2008-NMSC-008, ¶ 21, 326.   As the Supreme Court of New Mexico has stated, state law may be "of such a character that local prohibitions on those activities would be inconsistent with or antagonistic to that state law or policy."   Stennis v. City of Santa Fe, 2008-NMSC-008, ¶ 21.   The Oil and Gas Act is such a state law so that prohibiting all oil-and-gas extraction "would be inconsistent or antagonistic to" state law.   Stennis v. City of Santa Fe, 2008-NMSC-008, ¶ 21. If a complete ban on all hydrocarbon extraction activities does not constitute a county ordinance that conflicts "with state law when state law . . . is of such a character that local prohibitions on those activities would be inconsistent with or antagonistic to that state law or policy," then no county ordinance will ever fall within this standard.   Stennis v. City of Santa Fe, ¶ 21 (citation omitted)(internal   quotation   marks   omitted).     Consequently,   the   Ordinance's hydrocarbon-extraction ban conflicts with state law.

At the hearing, in addressing SWEPI, LP's argument that state law preempts the entire oil-and-gas field and that a county cannot regulate oil-and-gas activities, the Defendants argued that the Ordinance does not regulate oil-and-gas extraction, because it bans all such activities. See Tr. at 145:9-19 (Haas, Court).   In the field preemption context, a ban rather than a regulation

would be a distinction without a difference, because a county could not legislate in that field regardless how the legislation is characterized.   For conflict preemption, however, the distinction makes a difference, and it is a difference that hurts the Defendants' position.   If the Defendants had merely regulated oil-and-gas production in Mora County, those regulations may not conflict with state law, even if they were stricter than state law.   See Rancho Lobo, LTD v. Devargas, 303 F.3d at 1205 (noting that an ordinance may provide for greater restrictions than state law).   As long as the regulations did not prohibit conduct that state law permits or permit conduct that state law prohibits, the regulations would likely be upheld.   The Defendants decided, however, to ban all hydrocarbon extraction activities rather than enacting specific regulations.   Because the Oil and Gas Act permits oil-and-gas production, such a ban conflicts with state law by prohibiting conduct that state law permits.[45]

Moreover, the Ordinance's ban conflicts with state law by creating waste and not recognizing correlative property rights, which the Oil and Gas Act prohibits.   As the University of New Mexico School of Law's oil-and-gas professor, Alex Ritchie, explains:

---

[45]The Defendants argue that the Oil and Gas Commission lacks the authority to assess civil penalties for violations of the Oil and Gas Act.   See Response at 16-18.   They also argue that the State is not enforcing the Oil and Gas Act by punishing individuals for oil-and-gas leaks and spills. See Tr. at 92:19-21 (Haas).   Even if these assertions are true, they would not affect whether the Ordinance conflicts with state law.   "'A county is but a political subdivision of the State, and it possesses only such powers as are expressly granted to it by the Legislature, together with those necessarily implied to implement those express powers.'"   Bd. of Comm'rs of Rio Arriba Cnty. v. Greacen, 2000-NMSC-016, ¶ 5 (quoting El Dorado at Santa Fe, Inc. v. Bd. of Cnty. Comm'rs, 1976-NMSC-029, ¶ 6, 551 P.2d 1360, 1364).   If a county lacks a certain authority to enact an ordinance, because the ordinance conflicts with state law, the ordinance is invalid. See Bd. of Comm'rs of Rio Arriba Cnty. v. Greacen, 2000-NMSC-016, ¶ 17.   New Mexico courts do not look to the county's justifications for enacting the unlawful ordinance; they just invalidate it. Without authority to enact an ordinance, it is invalid, regardless of a county's justifications for enacting it.   The Defendants' arguments concerning the enforcement of oil-and-gas leaks and the authority of the Oil and Gas Commission are best left for the New Mexico Legislature.   The Defendants are free to call on the Legislature to grant the Oil and Gas Commission greater enforcement authority, or to more vigorously enforce the Oil and Gas Act.   The Defendants may not, however, circumvent state law and enact an ordinance without the authority to do so.

First, an outright ban on oil and gas results in the waste of oil and gas in every pool where such a ban is in place.  Opponents might respond that the O&G Act only prohibits waste in connection with "the production or handling of crude petroleum oil or natural gas."  It follows that without production or handling (activities that are banned in Mora County), there can be no prohibited waste.  Such an argument, however, fails to recognize that pools do not conform to local boundaries.  Instead of drilling in an efficient pattern prescribed by reservoir characteristics, a ban requires an inefficient, irregular pattern of production from outside the local boundary in a manner that impedes the state's interest in the efficient production of the pool.

Second, the argument that New Mexico law only governs the manner of production, but not the ability to produce at all, ignores the relationship between waste and correlative rights.   A ban on production eviscerates the correlative rights of an owner by denying that owner the opportunity to produce her just and equitable share, or any share.  While all manner of federal and state laws that protect the environment may impair correlative rights, allowing a local government to ban oil and gas operations fails the basic preemption test.   It arguably goes even further by prohibiting not just something that the law allows, but something that an entire agency is bound by state law to protect.  A local ban also discriminates against the owners of a common pool with mineral interests inside the boundaries of the locality as owners outside the boundary would effectively have the right to drain the entire pool.  Further, because an owner has such an opportunity to produce under state law, it follows that a prohibition on fracking, a lawful method required for the extraction of oil and gas in shale and other tight formations, also wastes oil and gas that cannot be produced by other methods, thereby impairing correlative rights.

A ban allows for no permit, variance, or other procedure, but simply declares illegal an act that New Mexico law permits and comprehensively regulates, and that legislative history declares critically important to the state and its economy.

Ritchie, supra at 310-11 (footnotes omitted).  Accordingly, the Ordinance's ban conflicts with

state law.

Because certain provisions in the Ordinance conflict with state law, they must be

invalidated.   See Bd. of Comm'rs of Rio Arriba Cnty. v. Greacen, 2000-NMSC-016, ¶ 17

(invalidating provisions of county ordinance that conflicted with state law).    These provisions

include Sections 5.1, 5.2, 5.3, 5.4, and 8.5.   These provisions provide:

Section 5.1:   It shall be unlawful for any corporation to engage in the extraction of oil, natural gas, or other hydrocarbons within Mora County.

Section 5.2:   It shall be unlawful for any corporation to engage in the extraction of water from any surface or subsurface source within Mora County for use in the extraction of subsurface oil, natural gas, or other hydrocarbons, or for any director, officer, owner, or manager of a corporation to use a corporation to extract water from any surface or subsurface source, within Mora County, for use in the extraction of subsurface oil or natural gas or other hydrocarbons.   It shall be unlawful for a corporation to import water or any other substance, including but not limited to, propane, sand, and other substances used in the extraction of oil, natural gas, or other hydrocarbons, into Mora County for use in the extraction of subsurface oil, natural gas, or other hydrocarbons; or for any director, officer, owner, or manager of a corporation to do so.

Section 5.3:   It shall be unlawful for any corporation, or any director, officer, owner, or manager of a corporation to use a corporation to deposit, store, transport or process waste water, "produced" water, "frack" water, brine or other materials, chemicals or by-products used in the extraction of oil, natural gas, or other hydrocarbons, into the land, air or waters within Mora County.

Section 5.4:   It shall be unlawful for any corporation, or any director, officer, owner, or manager of a corporation to use a corporation to construct or maintain infrastructure related to the extraction of oil, natural gas, or other hydrocarbons within Mora County.   "Infrastructure" shall include, but not be limited to, pipelines or other vehicles of conveyance of oil, natural gas, or other hydrocarbons, and any ponds or other containments used for wastewater, "frack" water, or other materials used during the process of oil, gas, or other hydrocarbon extraction.

. . . .

Section 8.5. Reinstatement of Moratorium on Oil and Gas Extraction.   In the event that this ordinance is overturned or nullified, for any reason, a moratorium on the extraction of oil and gas within the County of Mora shall become effective on the date that this ordinance becomes inactive.   That temporary moratorium shall have a duration of no more than six months, during which the Board of County Commissioners shall adopt another ordinance which permanently bans hydrocarbon extraction within the County of Mora.

Ordinance §§ 5.1-5.4, at 4; id. § 8.5, at 6.

Section 5.1 bans corporations from engaging in hydrocarbon extraction.   As the Court has previously noted, and as the Defendants argued, see Response at 19, corporations are likely the only entities engaged in hydrocarbon extraction.   Individuals do not engage in oil-and-gas

production without some form of limited liability protection.   By banning all corporations from engaging in hydrocarbon extraction, and by defining the term corporation broadly, see Ordinance § 3.1, at 2, the Ordinance effectively bans all oil-and-gas production.   This conflicts with state law, and § 5.1 must be invalidated.

Sections 5.2, 5.3, and 5.4 are all invalid for the same reasons: they effectively ban all oil-and-gas production in Mora County.   While they do not explicitly ban hydrocarbon extraction activities -- like § 5.1 does -- they have the same effect of prohibiting all oil-and-gas production in Mora County.   Section 5.2 prohibits corporations and individuals associated with corporations from possessing materials used in hydrocarbon extraction.   See Ordinance § 5.2, at 4.   Section 5.3 prohibits corporations from possessing any chemicals used in hydrocarbon extraction.   See Ordinance § 5.3, at 4.   And section 5.4 prohibits corporations from constructing the necessary infrastructures for hydrocarbon extraction.   See Ordinance § 5.3, at 4.   Each section is an effective ban on all oil-and-gas production.   No one can produce oil and gas without the necessary materials, chemicals, or infrastructure.   By prohibiting these things, the Ordinance effectively prohibits all oil-and-gas production.   Sections 5.2, 5.3, and 5.4 are each, effectively, a ban on all hydrocarbon extraction activities.   Because a complete ban on oil-and-gas production conflicts with state law, §§ 5.2, 5.3, and 5.4 must be invalidated.

Section 8.5 is invalid, because it threatens to ban all hydrocarbon extraction activities. See Ordinance § 8.5, at 6.   Section 8.5 states that, if the Ordinance is overturned or nullified, then there will be a moratorium on oil-and-gas extraction in Mora County, and that, during the moratorium, the County Commissioners will adopt another ordinance permanently banning hydrocarbon extraction.   See Ordinance § 8.5, at 6.   In this Memorandum Opinion and Order, the Court is invalidating the Ordinance.   According to § 8.5, once the Court invalidates the

Ordinance, hydrocarbon extraction will be banned in Mora County.   See Ordinance § 8.5, at 6.

Because a ban on all oil-and-gas production conflicts with state law, § 8.5's moratorium, which

will take effect once the Court issues this Memorandum Opinion and Order, conflicts with state

law.   Accordingly, § 8.5 is invalidated as well.

In sum, §§ 5.1, 5.2, 5.3, 5.4, and 8.5 are invalid, because they conflict with state law.

## IX.    THE ORDINANCE IS NOT SEVERABLE AND MUST BE INVALIDATED IN ITS ENTIRETY.

The Ordinance is not severable and must be invalidated in its entirety.   The Court has

invalidated a number of the Ordinance's provisions.   The Court must now proceed to determine

whether those provisions of the Ordinance are severable from the remainder of the Ordinance,

such that these portions of the Ordinance that are not unlawful may remain in force.   "To

determine whether invalid portions of [an] ordinance[] are severable, the court must refer to state

law."   Bd. of Cnty. Comm'rs v. Qwest Corp., 169 F. Supp. 2d 1243, 1250 (D.N.M.

2001)(Conway, J.)(citing Leavitt v. Jane L. 518 U.S. 137, 139 (1996)).   New Mexico law

provides:

> A part of the law may be unconstitutional and the remainder of it valid, where the
> objectionable part may be properly separated from the other without impairing the
> force and effect of the portion which remains, and where the legislative purpose as
> expressed in such valid portion can be accomplished and given effect,
> independently of the void provisions, and where if the entire act is taken into
> consideration it cannot be said that the enacting power would not have passed the
> portion retained had it known that the void provisions must fall.

Chapman v. Luna, 1984-NMSC-029, ¶ 30 (quoting Schartz v. Town of Gallup, 1917-NMSC-021,

¶ 19, 165 P. 345 349).   The existence of a severability clause is "not an inexorable command" that

an ordinance is not severable, but it "does raise this presumption."   Barber's Super Mkts., Inc. v.

City of Grants, 1969-NMSC-115, ¶ 14, 458 P.2d 785, 788.   If the "valid portions are inextricably

intertwined with the invalid portions" so that they cannot be separated "without substantially

- 186 -

affecting the ordinance," then the entire ordinance must be invalidated.   City of Albuquerque v.

Cauwels & Davis, Mgmt. Co., 1981-NMSC-077, ¶ 10, 632 P.2d 729, 731.   Here, the Ordinance's

valid portions are so intertwined with the invalid portions that the purpose of the valid portions

cannot be accomplished, such that the Defendants would not have enacted the Ordinance without

the invalid portions.

The Ordinance contains a severability provision.   See Ordinance § 13, at 6.   Section 13

provides:

**Section 13.     Severability**

The provisions of this Ordinance are severable.   If any court of competent
jurisdiction decides that any section, clause, sentence, part, or provision of this
Ordinance is illegal, invalid, or unconstitutional, such decision shall not affect,
impair, or invalidate any of the remaining sections, clauses, sentences, parts, or
provisions of the Ordinance.   The Mora County Commission hereby declares that
in the event of such a decision, and the determination that the court's ruling is
legitimate, it would have enacted this Ordinance even without the section, clause,
sentence, part, or provision that the court decides is illegal, invalid, or
unconstitutional.

Ordinance § 13, at 6.   The Court has invalidated §§ 5.1, 5.2, 5.3, 5.4, 5.5, 5.6, 5.8, 5.9, and 8.5.

The remaining Ordinance, in its entirety, provides:

WHEREAS, We, the residents in Mora County, are a multi-cultural community
with indigenous roots of Many; and

WHEREAS, We recognize the Earth, water, and air as a source of life for all living
in Mora County; and

WHEREAS, We are convinced that the quality of life for residents in Mora County,
for both the present and the future, will be destroyed if we allow at-risk exploitation
and pollution of the Earth, water, and air; and

**WHEREAS, We the People of the County of Mora declare that we have the
duty to safeguard the water both on and beneath the Earth's surface, and in
the process, safeguard the rights of people within the county of Mora and the
rights of the ecosystems of which Mora County is a part; and**

**WHEREAS, We the People of Mora County declare that all of our water is held in the public trust as a common resource to be used for the benefit of Mora residents and of the natural ecosystems of which they are a part.   We believe that industrial use of water supplies in this county placing the control of water in the hands of a corporate few, rather than the county would constitute abuse and usurpation; and that we are therefore duty bound to oppose such abuse and usurpation.   That same duty requires us to recognize that two centuries' worth of governmental conferral of constitutional powers upon corporations has deprived people of the authority to govern their own communities, and requires us to take affirmative steps to remedy that usurpation of governing power; and**

WHEREAS, we are conscious of the urgency of taking decisive action to protect our collective rights and the rights of future generations, and of ensuring a balanced environment for the survival of all residents of Mora County; THEREFORE,

BE IT ORDAINED BY THE GOVERNING BODY OF MORA COUNTY, NEW MEXICO . . . AN ORDINANCE PROTECTING THE RIGHT OF HUMAN COMMUNITIES, NATURE, AND NATURAL WATER, BY ESTABLISHING A LOCAL BILL OF RIGHTS FOR MORA COUNTY THAT PROTECTS THE NATURAL SOURCES OF WATER FROM DAMAGE RELATED TO THE EXTRACTION OF OIL, NATURAL GAS, OR OTHER HYDROCARBONS, BY AFFIRMING THE RIGHT TO LOCAL AUTONOMY AND SELF-GOVERNANCE, AND BY ELIMINATING LEGAL PRIVILEGES AND POWERS FROM CORPORATIONS VIOLATING THE ORDINANCE.

## Section 1.   Name and Purpose

Section 1.1 *Name*:   This Ordinance shall be known and may be cited as the "Mora County Community Water Rights and Local Self-Government Ordinance."

Section 1.2 *Purpose*:   The People of the County of Mora are a cohesive community of diverse elements, united by common culture, social bonds and a common destiny, and are represented politically in various aspects by the Mora County Government, numerous Acequias, Land Grants and Mutual Domestic Water Consumers Associations.   The People of Mora County recognize that water is essential for the life, prosperity, sustainability, and health of their community and that damage to natural groundwater and surface water sources imposes great tangible loss, to the People, natural communities and ecosystems of Mora County, not just for today but for future generations.   The People of Mora County recognize that they may be forced, without their consent, to endure or attempt to repair harm inflicted on their environment and their vital water supply, which they have no equivalent governing authority to prevent under current state and federal law.   The governing body of Mora County adopts this Mora County Community Water Rights and Local Self-Government Ordinance to overcome that liability, to

provide for community health and safety, to promote a sustainable lifestyle, and to secure the comfort and convenience of the people.

## Section 2.   Authority

This Ordinance is enacted pursuant to the inherent right of the residents of Mora County to govern their own community.   That authority precedes government and is secured, without limitation, by:

> The Treaty of Guadalupe Hidalgo, Article VIII & Article IX, which guarantees the "free enjoyment of their liberty and property" of the inhabitants of what became Mora County, and which states that property of every kind "shall be inviolably respected."   According to a 2001 Government Accounting Office report (http://www.gao.gov/new.iemts/d01951.pdt), this guarantees traditional communal use rights under the Treaty, including, but not limited to, the following rights-hunting "caza," pasture "pastas," wood gathering "leña," and watering "abrevederos;"

> The Declaration of Independence, which states that governments are instituted to secure the rights of people, "deriving their just powers from the consent of the governed;"

> The New Mexico Constitution, Article 2, which declares that "all political power is vested in and derived from the people: all government of right originates with the people, is founded upon their will and is instituted solely for their good."   That section also declares that the people "have the sole and exclusive right to govern themselves as a free, sovereign, and independent state" and that "all persons are born equally free, and have certain natural, inherent and inalienable rights" and that "[t]he enumeration in this constitution of certain rights shall not be construed to deny, impair, or disparage others retained by the people;"

> The Mora County Comprehensive Land Use Plan, which states that "[t]he connection between our land, our water and our people has sustained our culture since the first settlements in Mora County, and our future depends on keeping these connections strong.   Water is a vital link, which, if severed from the land, will also fragment our people from their land.   The allocation of our limited water resources must recognize traditional subsistence agricultural and grazing activities as a priority over other types of more profitable land uses.   Water is not just a commodity to be bought and sold, or exploited for short-term gains.   Water is the lifeblood of Mora County's traditions, culture and land use.   A sustainable future for

Mora County requires protection of the most valuable resource for our communities -- the Water!"

## Section 3.   Definitions

Section 3.1:   "Corporation" shall mean any corporation, limited partnership, limited liability partnership, business trust, or limited liability company organized under the laws of any state of the United States or under the laws of any country, and any other business entity that possesses State-conferred limited liability attributes for its owners, directors, officers, and/or managers.

Section 3.2:   "Extraction" shall mean the digging or drilling of a well for the purposes of exploring for, developing or producing oil, natural gas, or other hydrocarbons.

Section 3.3:   "Horizontal drilling" shall mean intentional deviation of a wellbore from the vertical for the purpose of reaching subsurface areas laterally remote from the point where a well drilling bit or similar equipment enters the earth at the surface.

Section 3.4:   "Hydraulic fracturing" shall mean an activity in which water, propane, diesel, chemicals and a solid proppant or any other agent are pumped into a wellbore at a rate sufficient to increase the pressure downhole to a value in excess of the fracture gradient of the formation rock, causing the formation to crack, thus allowing the fracturing fluid to enter and extend the crack farther into the formation, forming passages through which natural gas, oil, or other hydrocarbons can flow.

Section 3.5:   "Hydrocarbons" shall mean any of numerous organic compounds, such as benzene and methane, that contain only carbon and hydrogen.

Section 3.6:   "La Querencia de la Tierra" shall mean the loving respect which Mora County residents have towards the land and Earth, which is rooted in our indigenous worldview -- the Earth is living and holy, is the habitat that sustains us, and is composed of all natural & living systems, flora and fauna -- interrelated, interdependent and complementary -- which share our common destiny: The right to live free from contamination.

Section 3.7:   "Natural Gas" shall mean any gaseous substance, either combustible or noncombustible, which is produced in a natural state from the earth and which maintains a gaseous or rarified state at standard temperature or pressure conditions, and/or gaseous components or vapors occurring in, or derived from, petroleum or natural gas.

Section 3.8:   "Oil" shall mean any thick, flammable, yellow-to-black mixture of gaseous, liquid, and solid hydrocarbons that occur naturally beneath the earth's surface.

## Section 4.   Statements of Law -- Rights of Mora County Residents and the Natural Environment

Section 4.1. *Right to Water*:   All residents, natural communities and ecosystems in Mora County possess a fundamental and inalienable right to sustainably access, use, consume, and preserve water drawn from natural water cycles that provide water necessary to sustain life within the County.

Section 4.2. *Right of Water for Agriculture*:   All Mora County residents possess the fundamental and inalienable right to unpolluted natural water to produce healthy food, to nourish our bodies, livestock and land and to continue "La Querencia de la Tierra," Love of the Land.

Section 4.3. *Rights of Natural* Communities:   Natural communities and ecosystems, including, but not limited to, wetlands, streams, rivers, aquifers, and other water systems, possess inalienable and fundamental rights to exist and flourish within Mora County against oil and gas extraction.  Residents of the County, along with the Mora County Commission, shall possess legal standing to enforce those rights on behalf of those natural communities and ecosystems. Natural communities and ecosystems protected by this ordinance shall be protected on all lands within Mora County, including those owned by the state and federal government

Section 4.4. *Right to a Sustainable Energy Future*:   All residents, natural communities, and ecosystems in Mora County possess a right to a sustainable energy future, which includes, but is not limited to, the development, production, and use of energy from renewable fuel sources, and the right to have an energy system based on fuel sources other than fossil fuel sources.  This right shall also include the right to energy practices that do not cause harm, and which do not threaten to cause harm, to people, communities, or the natural environment.

Section 4.5. *Right to Self-Government*:   All residents of Mora County possess the fundamental and inalienable right to a form of governance where they live which recognizes that all power is inherent in the people, that all free governments are founded on the people's authority and consent, and that corporate entities and their directors and managers shall not enjoy special privileges or powers under the law which make community majorities subordinate to them.

Section 4.6. *People are Sovereign*:   The Mora County Commission shall be the governing authority responsible to, and governed by, the residents of the County. Use of the "Mora County" municipal corporation by the sovereign people of the County to make law shall not be construed to limit or surrender the sovereign

authority or immunities of the people to a municipal corporation that is subordinate to them in all respects at all times.  The people at all times enjoy and retain an inalienable and indefeasible right to self-governance in the community where they reside.

Section 4.7. *Rights of La Querencia de la Tierra*:   The farm-based indigenous/mestizo (mixed blood) people who created the original Mora County culture considered the Earth to be living and holy; thus they referred to their homeland as "La Querencia de la Tierra," Love of the Land.  This sacredness connotes an intrinsic right of the land to exist without defilement.

Section 4.8. *Rights are Self-Executing*:   All rights delineated and secured by this ordinance shall be self-executing and these rights shall be enforceable against both public and private actors, and shall not require implementing legislation for their enforceability.

Section 4.9. *Exemption.*   Nothing in this ordinance shall be construed in such a manner as to impact the water rights of acequias, Mutual Domestic Water Consumers Associations or land grant, or to affect or color any negotiations regarding water rights, distribution or usage between these political subdivisions and the County of Mora.

## Section 5.   Statements of Law Prohibitions Necessary to Secure Bill of Rights' Protections

Section 5.7:   No permit, license, privilege or charter issued by any state or federal agency, Commission or Board to any person or any corporation operating under a State charter, or any director, officer, owner, or manager of a corporation operating under a State charter, which would violate the prohibitions of this Ordinance or deprive any County resident(s), natural community, or ecosystem of any rights, privileges, or immunities secured by this Ordinance, the Treaty of Guadalupe Hildalgo, the New Mexico Constitution, the United States Constitution, or other laws, shall be deemed valid within Mora County.

## Section 6.   Strict Liability

Section 6.1:   Persons using corporations to engage in the extraction of oil, natural gas or other hydrocarbons in a neighboring municipality shall be strictly liable for all harms caused to the health, safety, and welfare of the residents of Mora County from those activities, and for all harms caused to ecosystems and natural communities within Mora County.

**Section 7.   Future Lost Profits**

Section 7.1:   Within the County of Mora, corporate claims to "future lost profits" shall not be considered property interests under the law, and thus, shall not be recoverable by corporations seeking those damages.

**Section 8.   Enforcement**

Section 8.1.   Any violation of any provision of this Ordinance shall be considered a criminal offense, punishable by maximum penalties and imprisonment as authorized by applicable New Mexico law.  Each instance of a violation of the provisions of this Ordinance shall be treated as a separate offense subject to penalties authorized by applicable New Mexico law.

Section 8.2:   Mora County may enforce this Ordinance through an action brought in any court of competent jurisdiction.   In such an action, Mora County shall be entitled to recover all costs of litigation, including, without limitation, expert and attorney's fees, in addition to damages caused by the violation of this ordinance.

Section 8.3:   Any County resident shall have the authority to enforce this Ordinance through an action brought in a court of competent jurisdiction.   In such an action, the resident shall be entitled to recover all costs of litigation, including, without limitation, expert and attorney's fees.

Section 8.4:   Any person or municipality who brings an action to secure or protect the rights of natural communities or ecosystems against oil and gas extraction within Mora County shall bring that action in the name of the natural community or ecosystem in a court of competent jurisdiction.   Damages shall be measured by the cost of restoring the natural community or ecosystem to its pre-damaged state, and shall be paid to the County of Mora or other applicable governmental entity, to be used exclusively for the full and complete restoration of the natural community or ecosystem.

**Section 9   Effective Date and Existing State Permit Holders**

This Ordinance shall be effective five (5) days after the date of its enactment, at which point the Ordinance shall apply to any and all extractions of oil, natural gas, or other hydrocarbons in Mora County regardless of the date of any applicable governmental permits.

**Section 10. County Commission Action and Voter Referenda to Repeal Ordinance**

The foundation for the making and adoption of this law is the people's fundamental and inalienable right to govern themselves, and thereby secure their rights to life, liberty, and the pursuit of happiness.   Accordingly, this Ordinance automatically

suspends the operating rules of the Mora County Commission when the question of repealing this Ordinance is introduced.   Repeal of this ordinance shall require both a unanimous vote of the Mora County Commissioners voting in favor of the repeal of the ordinance, and a voter referenda following that vote which shall make the repeal effective only if two thirds of the Mora County electorate vote to repeal the ordinance.

## Section 11.   People's Right to Self-Government - Preemption

Any attempts to use other units and levels of government to preempt, amend, alter, or overturn this Ordinance, or parts of this Ordinance, shall require the County Commission to hold public meetings that explore the adoption of other measures that expand local control and the ability of residents to protect their fundamental and inalienable right to self-government.   Such consideration may include actions to separate the County from the other levels of government used to preempt, amend, alter, or overturn the provisions of this Ordinance or other levels of government used to intimidate the people of Mora County or their elected officials.

## Section 12.   New Mexico Constitutional Changes

Through the adoption of this local law, the people of Mora County call for amendment of the New Mexico Constitution to explicitly secure a community right to local self-government that cannot be preempted by the State if the community's laws enforce rights or standards more protective of the health, safety, and welfare of the people of Mora County and the natural environment, communities, and ecosystems.   The people of Mora County also call for a state constitutional amendment that explicitly elevates community rights above corporate property rights, and that recognize the rights of nature enforceable by the residents of a community.

## Section 13.     Severability

The provisions of this Ordinance are severable.   If any court of competent jurisdiction decides that any section, clause, sentence, part, or provision of this Ordinance is illegal, invalid, or unconstitutional, such decision shall not affect, impair, or invalidate any of the remaining sections, clauses, sentences, parts, or provisions of the Ordinance.   The Mora County Commission hereby declares that in the event of such a decision, and the determination that the court's ruling is legitimate, it would have enacted this Ordinance even without the section, clause, sentence, part, or provision that the court decides is illegal, invalid, or unconstitutional.

**Section 14.  Repealer**

All inconsistent provisions of prior Ordinances adopted by the Mora County Commission are hereby repealed, but only to the extent necessary to remedy the inconsistency.

Ordinance § 1.1-14, at 1-6 (invalid provisions omitted).

The Court has effectively invalidated all of Section 5.  Without these provisions, the remaining provisions have no meaningful force and effect.   Section 1 states the Ordinance's name and purpose.  See Ordinance §§ 1.1-1.2, at 1-2.   Section 2 states the authority for the Ordinance, and § 3 provides definitions.  See Ordinance §§ 2-3.8, at 2-3.   These sections have no force of law, but merely set up the rest of the Ordinance.   Section 4 states a number of rights; however, these rights do not provide any enforcement provision or any way in which they can be enforced. See Ordinance §§ 4.1-4.9, at 3-4.   Like the Declaration of Independence, Section 4 is more of a statement of ideals.  See Schifanelli v. U.S. Gov't, No. 88-2172. 865 F.2d 1259, at *1 ("The Declaration of Independence is a statement of ideals, not law.").  Section 5.7 states that any "license, privilege or charter issued by any state or federal agency" is not valid if it would violate the Ordinance or deprive Mora County residents, the natural community, or the ecosystem of their rights.  Ordinance § 5.7, at 5.  Because all remaining prohibitions have been invalidated, § 5.7 has little effect, because, if a license, privilege, or charter deprived Mora County residents of their rights, the source of those rights would protect the residents, making § 5.7 redundant.   Section 6 provides that people using corporations to engage in hydrocarbon extraction will be strictly liable for all harms caused by the extraction activities.[46]  See Ordinance § 6, at 5.  Section 7 provides

---

[46]While SWEPI, LP has not challenged this provision, it too appears to be in conflict with state law.  By stating that people "using corporations" will be strictly liable, the Ordinance appears to be eliminating corporations' limited liability protections, which would eliminate the purpose of incorporating and effectively eliminate the corporate form altogether.   As the Court of Appeals of New Mexico has stated:

that corporate claims for future lost profits will not be considered property interests that corporations can recover as damages.[47]   See Ordinance § 7, at 5.   Section 8 provides a number of enforcement mechanisms for punishing violations of the Ordinance.   See Ordinance §§ 8.1-8.4, at 5.   All of § 5's prohibitions have been invalidated or are meaningless.   Section 8, thus, has nothing to enforce.   Section 9 provides the date the Ordinance will go into effect, and § 10 provides the mechanism for repealing the Ordinance.   See Ordinance §§ 9-10, at 6.   Section 11 provides the measures that the County Commissioners will take if the Ordinance is challenged, including contemplating seceding from either the State of New Mexico or the United States.   See Ordinance § 11, at 6 (noting that, if another "unit" or "level[]" of government is used to attempt to overturn the Ordinance, the County Commissioners must meet to consider ways to protect Mora County residents' right to self-government, including considering "to separate the County from the other levels of government used to preempt . . . this Ordinance").   Section 11, thus, has no real legal affect and is concerned with what the County Commissioners should do in light of a challenge to the Ordinance.   Section 12 acts as a call to amend the New Mexico Constitution to state that community rights are elevated above "corporate property rights."   Ordinance § 12, at 6.

---

It would frustrate the purposes of the corporate law to expose directors, officers, and shareholders to personal liability for the obligations of a corporation when they, in their individual capacities, contribute funds to, or on behalf of, a corporation for the purpose of assisting the corporation to meet its financial obligations, and not for the purposes of perpetrating a fraud or promoting their personal affairs.

Harlow v. Fibron Corp., 1983-NMCA-117, ¶ 19, 671 P.2d 40, 44 (quoting Hill v. Dearmin, 609 P.2d 127, 128 (Colo. App. 1980).   Because SWEPI, LP has not challenged this provision, the Court will not separately invalidate it, but will invalidate it along with the entire Ordinance, because the invalid portions are not severable from the valid ones.

[47]It is questionable whether a county may declare that a formerly recognized property interest, which is recoverable in the form of damages, is no longer valid.   Because SWEPI, LP has not challenged this provision, the Court will not separately invalidate it, but will invalidate it along with the entire Ordinance, because the invalid portions are not severable from the valid ones.

It has no effect of law, but, instead, is a mere proposition to amend a different law.   Finally, § 13 is the severability provision.   See Ordinance § 13, at 6.

Without § 5's prohibitions, which the Court invalidated, the remaining Ordinance is an empty shell.   There is no enforcement power.   The remaining provisions provide support for § 5's prohibitions, state lofty ideals that have no force of law, or provide for the manner in which Mora County's government should act when certain issues arise regarding the Ordinance.   The only remaining provisions that have a semblance of legal enforcement are §§ 6 and 7 -- the strict liability and future lost profits provisions.   As the Court has noted, however, the validity of these two provisions is suspect.   The Court cannot say that the Defendants would have enacted the Ordinance without § 5's prohibitions.   The entire Ordinance revolves around § 5.   The Ordinance repeatedly discusses the importance of water and the need to protect it.   See Ordinance Introduction, at 1 ("[W]e have the duty to safeguard the water both on and beneath the Earth's surface . . . ."   (bold omitted)); id. § 1.2, at 2 ("The People of Mora County recognize that water is essential for the life, prosperity, sustainability, and health of their community and that damage to natural groundwater and surface water sources imposes great tangible loss . . . ."); id. § 2, at 2 ("Water is the lifeblood of Mora County's traditions, culture and land use.   A sustainable future for Mora County requires protection of the most valuable resource for our communities -- the Water!"   (internal quotation marks omitted)); id. § 4.1, at 3 ("All residents, natural communities and ecosystems in Mora County possess a fundamental and inalienable right to sustainably access, use, consume, and preserve water . . . ."); id. § 4.4, at 3 ("All residents . . . possess a right to a sustainable energy future, . . . and the right to have an energy system based on fuel sources other than fossil fuel sources.").   The Ordinance also focuses on subverting corporate rights.   See Ordinance Introduction, at 1 ("We believe that industrial use of water supplies in this county

placing the control of water in the hands of a corporate few, rather than the county would constitute abuse and usurpation; and that we are therefore duty bound to oppose such abuse and usurpation." (bold omitted)); id. Introduction at 1 ("An Ordinance protecting the right of human communities, nature, and natural water, . . . by eliminating legal privileges and powers from corporations violating the Ordinance."   (bold omitted)(capitalization omitted)); id. § 4.5, at 3 ("[C]orporate entities and their directors and managers shall not enjoy special privileges or powers under the law which make community majorities subordinate to them.").   The provisions that furthered each of these purposes have been invalidated.   The hydrocarbon extraction bans protected water, and the stripping corporations of their rights corrected the perceived wrongs that corporate rights create. These provisions, however, have been invalidated.   The Ordinances' purpose can no longer be given force and effect.

After the invalid provisions have been removed, the remaining portions no longer have "force and effect"; their legislative purpose cannot "be accomplished and given effect, independently of the void provisions"; and the Defendants would not have enacted the remaining portions if they had "known that the void provisions must fall."   Chapman v. Luna, 1984-NMSC-029, ¶ 30.   While § 13 provides a severability clause, creating a presumption of severability, see City of Albuquerque v. Cauwels & Davis, Mgmt. Co., 1981-NMSC-077, ¶ 10, this presumption is overcome.   Section 5 is at the Ordinance's center, such that the remaining provisions "are inextricably intertwined" with § 5.   See City of Albuquerque v. Cauwels & Davis, Mgmt. Co., 1981-NMSC-077, ¶ 10.   The invalid provisions are, thus, not severable from the remaining provisions.   Therefore, the entire ordinance must be invalidated.

**IT IS ORDERED** that SWEPI's Motion for Partial Judgment on the Pleadings, filed May 31, 2014 (Doc. 21), is granted in part and denied in part.  The Mora County, N.M., Ordinance 2013-10 (2013) is invalidated in its entirety.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Bradford C. Berge
Larry J. Montaño
John C. Anderson
Michael H. Feldewert
Holland & Hart, LLP
Santa Fe, New Mexico

    *Attorneys for the Plaintiff*

Nancy Ruth Long
Justin W. Miller
Long Komer & Associates, P.A.
Santa Fe, New Mexico

    --and--

Jeff H. Haas
Law Offices of Nanasi & Haas
Santa Fe, New Mexico

    *Attorneys for the Defendants*

Jeff H. Haas
Law Offices of Nanasi & Haas
Santa Fe, New Mexico

    *Attorneys for Defendant-Intervenors*